**LEASE AMENDMENT AGREEMENT NO. 2**

dated as of __28__ December 2021 by and among

**BOC AVIATION LIMITED**,
as Lessor

**AIRBRIDGECARGO AIRLINES LLC**,
as Lessee

and

**VOLGA-DNEPR LOGISTICS B.V.**,
as Consenting Party

————————————————————

Relating to One (1) Boeing Model 747-8F Airframe
with Four (4) General Electric Model GEnx 2B67/P Engines
bearing Manufacturer's Serial Number 60118
and Related Lease

————————————————————

THIS AMENDMENT AGREEMENT (this "<u>Agreement</u>") is entered into as of <u>28</u> December 2021, by and among BOC AVIATION LIMITED, a company organized under the laws of Singapore ("<u>Lessor</u>"), AIRBRIDGECARGO AIRLINES LLC, a company organized under the laws of the Russian Federation ("<u>Lessee</u>") and VOLGA-DNEPR LOGISTICS B.V., a company organized under the laws of the Netherlands ("<u>Consenting Party</u>").

PRELIMINARY STATEMENTS:

A.      Lessor and Lessee are parties to that certain Amended and Restated Aircraft Lease Agreement (60118) dated as of November 13, 2015 and assigned, assumed and amended and restated on March 30, 2017  (together with all amendments thereof and supplements thereto , the "<u>Lease</u>"), pursuant to which Lessor has leased to Lessee one (1) Boeing model 747-8F aircraft bearing Manufacturer's serial number 60118 and Bermuda Registration Mark VQ-BFE (the "<u>Airframe</u>") equipped with four (4) General Electric model GEnx 2B67/P engines bearing manufacturer's serial numbers 959449, 959448, 959447, and 959452 (collectively, the "<u>Aircraft</u>").

B.      Lessor, Lessee and Consenting Party have agreed to enter into this Agreement in order to amend the means by which Lessee and Consenting Party will provide financial and accounting documents to Lessor as required by clause 8.02 of the Lease.

NOW, THEREFORE, it is mutually agreed as follows:

SECTION 1.   <u>Defined Terms</u>. Any and all initially capitalized terms used herein and not otherwise defined herein shall have the meanings assigned thereto in the Lease.

SECTION 2.   <u>Amendment to Lease and Lease Supplement</u>. The parties hereto hereby agree that, as of the date hereof, the Lease and Lease Supplement shall be amended as set forth in <u>Annex A</u> hereto.

SECTION 3.   <u>Successors and Assigns</u>.  This Agreement will be binding upon and inure to the benefit of each party hereto and its respective successors and assigns as permitted under the Lease.

SECTION 4.   <u>No Further Amendments; Sole and Entire Lease Agreement</u>. Except as expressly modified by this Agreement, all of the terms of the Lease shall remain unchanged and in full force and effect.

SECTION 5.   <u>Modifications</u>. This Agreement may not be amended or modified except by a written agreement signed by the parties hereto.

SECTION 6.   <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which will be an original, but all of which will constitute but one and the same instrument.  Delivery of an executed counterpart of this Agreement by fax or e-mail will be deemed as effective as delivery of an originally executed counterpart. Any party delivering an executed counterpart of this Agreement by fax or e-mail will also deliver an originally executed

counterpart, but the failure of any party to deliver an originally executed counterpart of this Agreement will not affect the validity or effectiveness of this Agreement.

SECTION 7.   <u>Governing Law and Jurisdiction</u>.

(a)   THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, BUT WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(b)   Each of the parties hereto hereby irrevocably and unconditionally submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the City and County of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement and each such party hereby irrevocably and unconditionally agrees that all claims in respect of such action or proceeding may be heard and determined in such court in New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may effectively do so, any objection to venue of any such action or proceeding in any such court and any defense or objection that they may now or hereafter have of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

(c)   Each of Lessee and Consenting Party hereby appoints Corporation Service Company as its process agent for service of process in New York.  Lessee hereby irrevocably and unconditionally agrees that the provisions of Section 24.20 (Process Agent) of the Lease shall apply, <u>mutatis mutandis</u>, as if set forth in full in this Agreement and Consenting Party hereby irrevocably and unconditionally agrees for the benefit of Lessor that the provisions of Section 8 (Process Agent) of the replacement guaranty to be given by the Consenting Party in favor of Lessor pursuant to this Agreement shall apply, <u>mutatis mutandis</u>, as if set forth in full in this Agreement.

(d)   EACH OF THE PARTIES HERETO HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING TO WHICH IT IS A PARTY INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER.

SECTION 8.   <u>Further Assurances</u>. Each party hereto agrees that it shall, at any time and from time to time, promptly and duly execute and deliver any and all such further instruments and documents and take such further action as may be reasonably required in order to obtain the full benefits of this Agreement and to implement the rights and powers herein granted or contemplated hereby.

[*Remainder of Page Intentionally Left Blank*]

Lease amendment agreement No. 2 Msn 60118

IN WITNESS WHEREOF, the parties hereto or their duly authorized representatives have executed this Agreement as of the day and year first herein written.

**BOC AVIATION LIMITED**,
as Lessor

By: _____

Name:  David Walton

Title:    Deputy Managing Director and Chief Operating Officer

**AIRBRIDGECARGO AIRLINES LLC,**
as Lessee

By: _____
Name:
Title:

**VOLGA-DNEPR LOGISTICS B.V.**
as Consenting Party

By: _____
Name:
Title:

3

IN WITNESS WHEREOF, the parties hereto or their duly authorized representatives have executed this Agreement as of the day and year first herein written.


**BOC AVIATION LIMITED**,
as Lessor

By: _____
Name:
Title:


**AIRBRIDGECARGO AIRLINES LLC,**
as Lessee

By: _____
Name:     Denis Fisenko
Title:     General Director

**VOLGA-DNEPR LOGISTICS B.V.**
as Consenting Party

By: _____
Name:
Title:
          Director A

K. VELSHIN

Lease amendment agreement No. 2 Msn 60118

## ANNEX A

## AMENDMENTS TO LEASE

1.      The expressions "the Lease" and "this Lease" wherever they appear shall mean the Lease as amended by the Agreement.

2.      All references to the Aircraft Lease Agreement (60118) in any documents delivered thereunder or pursuant thereto shall, where appropriate, be construed as references to the Lease as amended by this Agreement (as the same may be amended from time to time).

3.      Clause 8.2(a), (b) and (c) of the Lease Amendment shall be deleted in their entirety and replaced with the following:

"(a) as soon as available, but not later than one hundred eighty (180) days after the close of each fiscal year of Guarantor, audited consolidated balance sheets, statements of income and changes in financial position, stockholders' equity and cash flows of Guarantor, plus supporting notes, prepared in accordance with IFRS, as of the close of such fiscal year, certified by Guarantor's independent public accountants;

(b) as soon as available, but not later than forty-five (45) days after the close of each of the first three fiscal quarters and as soon as possible but no later than one hundred and twenty (120) days after the close of each fiscal year of Lessee, a balance sheet, statements of income and changes in financial position of Lessee prepared in accordance with Russian accounting principles as of the close of such fiscal quarter or fiscal year where applicable;

(c) together with each set of financial statements and reports referred to in clause (a) above, upon Lessor's request only, a certificate of Guarantor, signed by the authorized representative of Guarantor certifying that to the best of its knowledge no Default or Event of Default  exists on a relevant date or, if such condition or event existed or exists, specifying the nature and period of existence thereof and what action Lessee has taken or is taking or proposes to take with respect thereto;"

Execution Version

# LEASE AMENDMENT AGREEMENT

dated as of 4 August 2021 by and among

**BOC AVIATION LIMITED**,
as Lessor

**AIRBRIDGECARGO AIRLINES LLC**,
as Lessee

and

**VOLGA-DNEPR LOGISTICS B.V.**,
as Consenting Party

———————————————————

Relating to One (1) Boeing Model 747-8F Airframe
with Four (4) General Electric Model GEnx 2B67/P Engines
bearing Manufacturer's Serial Number 60118
and Related Lease

———————————————————

THIS AMENDMENT AGREEMENT (this "Agreement") is entered into as of 4 August, 2021, by and among BOC AVIATION LIMITED, a company organized under the laws of Singapore ("Lessor"), AIRBRIDGECARGO AIRLINES LLC, a company organized under the laws of the Russian Federation ("New Lessee") and VOLGA-DNEPR LOGISTICS B.V., a company organized under the laws of the Netherlands ("Consenting Party").

PRELIMINARY STATEMENTS:

A.      Lessor and Lessee are parties to that certain Amended and Restated Aircraft Lease Agreement (60119) dated as of November 13, 2015 and assigned, assumed and amended and restated on March 30, 2017  (together with all amendments thereof and supplements thereto, as more particularly described on Schedule 1 hereto, the "Lease"), pursuant to which Lessor has leased to Lessee one (1) Boeing model 747-8F aircraft bearing Manufacturer's serial number 60118 and Bermuda Registration Mark VQ-BFE (the "Airframe") equipped with four (4) General Electric model GEnx 2B67/P engines bearing manufacturer's serial numbers 959449, 959448, 959447, and 959452 (collectively, the "Aircraft").

B.      Lessor, Lessee and Consenting Party have agreed to enter into this Agreement in order to, among other things, (i) amend the method of calculating the Maintenance Rent Rate for Engine LLPs and (ii) amend certain return conditions under the Lease.

NOW, THEREFORE, it is mutually agreed as follows:

SECTION 1.   Defined Terms. Any and all initially capitalized terms used herein and not otherwise defined herein shall have the meanings assigned thereto in the Lease.

SECTION 2.   Amendment to Lease and Lease Supplement. The parties hereto hereby agree that, as of the date hereof, the Lease and Lease Supplement shall be amended as set forth in Annex B hereto.  Except as expressly amended by this Agreement, all of the terms of the Lease and Lease Supplement shall remain unchanged and in full force and effect.

SECTION 3.   Successors and Assigns.  This Agreement will be binding upon and inure to the benefit of each party hereto and its respective successors and assigns as permitted under the Lease.

SECTION 4.   No Further Amendments; Sole and Entire Lease Agreement. Except as expressly modified by this Agreement, all of the terms of the Lease shall remain unchanged and in full force and effect. The documents set forth in Annex A, together with the Lease as amended hereby, constitute the entire agreement of Lessor and New Lessee currently in effect with respect to the leasing of the Aircraft.

SECTION 5.   Modifications. This Agreement may not be amended or modified except by a written agreement signed by the parties hereto.

SECTION 6.  Counterparts. This Agreement may be executed in two or more counterparts, each of which will be an original, but all of which will constitute but one and the same instrument.  Delivery of an executed counterpart of this Agreement by fax will be deemed as effective as delivery of an originally executed counterpart. Any party delivering an executed counterpart of this Agreement by fax will also deliver an originally executed counterpart, but the failure of any party to deliver an originally executed counterpart of this Agreement will not affect the validity or effectiveness of this Agreement.

SECTION 7.  Governing Law and Jurisdiction.

(a)     THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, BUT WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(b)     Each of the parties hereto hereby irrevocably and unconditionally submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the City and County of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement and each such party hereby irrevocably and unconditionally agrees that all claims in respect of such action or proceeding may be heard and determined in such court in New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may effectively do so, any objection to venue of any such action or proceeding in any such court and any defense or objection that they may now or hereafter have of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

(c)     Each of New Lessee and Consenting Party hereby appoints Law Debenture as its process agent for service of process in New York.  New Lessee hereby irrevocably and unconditionally agrees that the provisions of Section 24.20 (Process Agent) of the Lease shall apply, mutatis mutandis, as if set forth in full in this Agreement and Consenting Party hereby irrevocably and unconditionally agrees for the benefit of Lessor that the provisions of Section 8 (Process Agent) of the replacement guaranty to be given by the Consenting Party in favor of Lessor pursuant to this Agreement shall apply, mutatis mutandis, as if set forth in full in this Agreement.

(d)     EACH OF THE PARTIES HERETO HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING TO WHICH IT IS A PARTY INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER.

SECTION 8.  Further Assurances. Each party hereto agrees that it shall, at any time and from time to time, promptly and duly execute and deliver any and all such further instruments and documents and take such further action as may be reasonably required in order to obtain the full

benefits of this Agreement and to implement the rights and powers herein granted or contemplated hereby.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, the parties hereto or their duly authorized representatives have executed this Agreement as of the day and year first herein written.

**BOC AVIATION LIMITED**,
as Lessor

By: _____
Name: **David Walton**
Title: **Chief Operating Officer**

**AIRBRIDGECARGO AIRLINES LLC**,
as Lessee

By: _____
Name:
Title:

**VOLGA-DNEPR LOGISTICS B.V.**
as Consenting Party

By: _____
Name:
Title:

4

IN WITNESS WHEREOF, the parties hereto or their duly authorized representatives have executed this Agreement as of the day and year first herein written.


**BOC AVIATION LIMITED**,
as Lessor

By: _____
Name:
Title:


**AIRBRIDGECARGO AIRLINES LLC,**
as Lessee

By: _____
Name:
Title:

**VOLGA-DNEPR LOGISTICS B.V.**
as Consenting Party

By: _____
Name:
Title:

**SCHEDULE 1**

**DESCRIPTION OF THE LEASE**

1.      Aircraft Lease Agreement (60118) dated as of November 13, 2015 between BOC Aviation Limited (as assignee of Aircraft 60118, Inc.), as lessor, and AirBridgeCargo Airlines LLC., as lessee, as amended and restated and as assigned, assumed and amended pursuant to the Assignment, Assumption and Amendment Agreement dated as of March 30, 2017 and as further amended pursuant to the letter agreement in respect of payment deferrals dated as of May 1, 2020.

2.      Lease Supplement No. 1, dated as of November 13, 2015, between Aircraft 60118, Inc., lessor, and AirBridgeCargo Airlines LLC  as lessee.

3.      Technical Acceptance Certificate signed by AirBridgeCargo Airlines LLC, dated November 13, 2015.

**ANNEX B**

**AMENDMENTS TO LEASE**

1.      The expressions "the Lease" and "this Lease" wherever they appear shall mean the Lease as amended by the Agreement.

2.      All references to the Aircraft Lease Agreement (60118) in any documents delivered thereunder or pursuant thereto shall, where appropriate, be construed as references to the Lease as amended by this Agreement (as the same may be amended from time to time).

3.      Paragraph 2 of Schedule 2 of the Lease shall be deleted in its entirety and replaced with the following:

"2. Replaced Engines: In the event any Engine fails to meet its return condition, the Lessor will at Lessee's request consider accepting Redelivery of the Aircraft with a replacement engine in lieu of such Engine.  Such replacement engine shall be satisfactory to Lessor, in its reasonable discretion, be free and clear of Liens other than the Lessor Liens, be suitable for use on the Airframe and shall have a value and utility, in Lessor's reasonable discretion, at least equal to, and be in as good operating condition, including the incorporation of all Airworthiness Directives and alert service bulletins which Lessee is required to effect under this Lease, and with no greater number of accumulated Flight Hours or Cycles since the last heavy shop visit on such replacement engine, as the Engine that should have been returned, assuming such Engine which should have been returned was in the condition and repair as required by the terms hereof immediately prior to such required return; and Lessee shall, at its own expense and concurrently with such delivery, furnish Lessor with a bill of sale, in form and substance reasonably satisfactory to Lessor, of each such replacement engine and with evidence of Lessee's title to such replacement engine (including, if requested, an opinion of Lessee's counsel) and take such other action as Lessor may reasonably request in order that title to such replacement engine shall be duly and properly vested in Lessor, including without limitation appropriate filings with the International Registry to evidence the "sale" of such replacement engine to Lessor.  Upon full compliance with Article 17 of the Lease and passage of title to such replacement engine to Lessor, such engine shall be an "Engine" for all purposes of this Lease and Lessor shall Transfer to Lessee all Lessor's right, title and interest in any Engine so replaced and shall consent, at Lessee's expense, to any necessary or advisable registrations on the International Registry evidencing such Transfer."

4.      Paragraph 7(g)(iii) of Schedule 2 of the Lease shall be amended by deleting the words "performance restoration" in the first sentence of such paragraph and replacing them with "Refurbishment".

5.      The section entitled "Maintenance Rent Rates" in Schedule 1 of the Lease Supplement shall be amended by replacing the language "Engine LLP Maintenance: $632.31/EFC (per Engine)" with "Engine LLP Maintenance: rates shall be calculated at an amount in United States dollars per Cycle for each Engine LLP in each Engine equal to 100% of the cost of such Part (based on the Engine Manufacturer's current catalogue price from time to time) divided by 90% of the ultimate life (in Cycles) of such Part."

EXECUTION VERSION

**ASSIGNMENT, ASSUMPTION AND AMENDMENT AGREEMENT**

dated as of   March 3o, 2017

by and among

**AIRCRAFT 60118, INC.,**
as Assignor

**BOC AVIATION LIMITED,**
as Assignee

**AIRBRIDGECARGO AIRLINES LLC,**
as Lessee

**VOLGA-DNEPR LOGISTICS B.V.**
as Consenting Party

———————————————————

Relating to One (1) Boeing Model 747-8F Airframe with
Four (4) General Electric Model GEnx 2B67/P Engines
Bearing Bermuda Registration Mark VQ-BFE
and Manufacturer's Serial Number 60118
and Related Lease

THIS ASSIGNMENT, ASSUMPTION AND AMENDMENT AGREEMENT (this "Agreement") is entered into as of March 3o , 2017, by and among AIRCRAFT 60118, INC., a corporation incorporated under the laws of The State of Delaware ("Assignor"), BOC Aviation Limited , a company organized under the laws of Singapore ("Assignee"), AIRBRIDGECARGO AIRLINES LLC, a company organized under the laws of the Russian Federation ("Lessee") and VOLGA-DNEPR LOGISTICS B.V., a company organized under the laws of the Netherlands ("Consenting Party").

## PRELIMINARY STATEMENTS:

A.      Assignor and Lessee are parties to that certain Aircraft Lease Agreement (60118) dated as of November 13, 2015 (together with all amendments thereof and supplements thereto, as more particularly described on Schedule 1 hereto, the "Lease"), pursuant to which Assignor has leased to Lessee one (1) Boeing model 747-8F aircraft bearing Manufacturer's serial number 60118 and Bermuda Registration Mark VQ-BFE (the "Airframe") equipped with four (4) General Electric model GEnx 2B67/P engines bearing manufacturer's serial numbers 959449, 959448, 959447, and 959452 (collectively, the "Aircraft").

B.      Assignor, as owner of the Aircraft, has entered into an Aircraft Sale and Purchase Agreement dated as of March 3o, 2017 (the "Purchase Agreement"), pursuant to which Assignor has agreed, among other things, to sell the Aircraft to Assignee and Assignee has agreed to purchase the Aircraft from Assignor subject to the Lease.

C.      Assignor and Cougar Ltd. previously entered into that certain Head- Head Lease Agreement, dated as of November 13, 2015, and that certain Head Lease, dated as of November 13, 2015, each between Aircraft 60118, Inc., as head-head lessor and head lessee and Cougar Ltd., as head-head lessee and head lessor, in respect of the Aircraft, which will be terminated prior to or concurrently with the sale of the Aircraft to Assignee.

D.      Boeing Capital Corporation, as lessor guarantor ("Lessor Guarantor") previously provided that certain Guaranty (60118), dated as of November 13, 2015, in favor of Lessee, which will be terminated prior to or concurrently with the assignment of the Lease to Assignee.

E.      Concurrently with the sale of the Aircraft to Assignee, Assignor will assign all of its rights, obligations and interest in, to and under the Lease and all other agreements, documents and instruments, as set forth in Annex A hereto, delivered in connection with, or relating to, the lease of the Aircraft (collectively, the "Lease Documents") to Assignee, subject to the rights and interests of Lessee under the Lease.

F.      Assignor, Assignee and Lessee and the other parties hereto have agreed to enter into this Agreement in order to, among other things, (i) effect the Assignment (as defined herein), (ii) evidence Lessee's acknowledgment of and consent to the Assignment, and (iii)

1

amend certain provisions of the Lease.

NOW, THEREFORE, it is mutually agreed as follows:

SECTION 1.  <u>Defined Terms</u>.  Any and all initially capitalized terms used herein and not otherwise defined herein shall have the meanings assigned thereto in the Lease Documents.

SECTION 2.  <u>Effectiveness</u>.  Subject to satisfaction of or waiver by the parties hereto of the conditions precedent set forth in Section 15 hereto, the Assignment and the amendment to the Lease described in <u>Annex B</u> hereto will take effect as of the time of the transfer of title to the Aircraft by Assignor to Assignee (the "<u>Effective Time</u>"), as evidenced by a Confirmation of Effective Time substantially in the form of Annex C hereto to be delivered to Lessee by Assignor and Assignee at or promptly after the Effective Time (a "<u>Confirmation</u>").  Lessee agrees to countersign and deliver to Assignor and Assignee a copy of such Confirmation promptly upon receipt thereof.

SECTION 3.  <u>Assignment</u>.  Effective as of the Effective Time, Assignor hereby sells, assigns, conveys, transfers and sets over to Assignee all of Assignor's rights, title and interest in, to and under the Lease Documents (other than the rights of Assignor with respect to liabilities or obligations of Lessee to Assignor, as lessor under the Lease, arising from or relating to any acts, events or other circumstances which occur or are alleged to have occurred prior to the Effective Time), subject to the rights of Lessee under the Lease Documents (the "<u>Assignment</u>").  Assignee hereby accepts the Assignment.

SECTION 4.  <u>Assignee Assumption</u>.   Effective as of the Effective Time, Assignee hereby assumes all obligations and liabilities of the "Lessor" under the Lease Documents other than the Retained Obligations (as defined in Section 6), and will punctually perform and observe all such obligations and discharge all such liabilities and be bound by all the terms of the Lease Documents (the "<u>Assumption</u>").

SECTION 5.  <u>Letters of Credit: Security Deposit and Maintenance Rent</u>.  Assignor and Lessee hereby acknowledge that Lessor Guarantor received from Lessee a letter of credit in lieu of a cash security deposit (the "<u>Security Deposit Letter of Credit</u>") in the amount of Three Million Six Hundred Thousand Dollars (US$3,600,000) the full amount of which is still available to be returned to Lessee in accordance with and subject to the conditions therefore set forth in the Lease.  Assignor and Lessee hereby further acknowledge that Lessor Guarantor received from Lessee two letters of credit in lieu of Assignor holding cash maintenance reserves (the "<u>Maintenance Rent Letters of Credit</u>") in the amount of Six Million Nine Hundred Twenty Six Thousand Two Hundred Forty Eight Dollars and Eighty Seven cents (US$6,926,248.87) and the amount of Two Million Four Hundred Sixty Three thousand Six Hundred Thirty Six Dollars and Twenty One cents (US$2,463,636.21) (each of the Security Deposit Letter of Credit and the Maintenance Rent Letters of Credit, are jointly referred to as "<u>Letter(s) of Credit</u>").  Assignor and Lessee also acknowledge that no cash maintenance reserves have been paid by the Lessee to

2

the Assignor in respect of the Aircraft. Lessee shall, on or prior to the Effective Time, transfer each Letter of Credit to name Assignee as the sole beneficiary thereunder.   In accordance with terms of the Lease, 30 Business Days prior to the expiry of the existing Letters of Credit term, Lessee shall provide Assignee replacement Letters of Credit which shall be (i) issued or confirmed by a first class United States or European bank with a minimum senior, unsecured long-term debt rating of A3 (Moody's) or A- (Standard and Poor's), (ii) be advised to Lessor by a bank in Singapore and be presentable for payment in Singapore, and (iii) otherwise in form and substance satisfactory to Lessor. Lessor shall act reasonably in agreeing the form of the replacement letters of credit and Lessor's requirement shall comply and be in line with UCP-600 or ISP98 (whichever is applicable).

Assignor agrees to reimburse Lessee for any actual out-of-pocket issuance fees charged by the issuing and confirming letter of credit banks for the transfer of each Letter of Credit to Assignee as provided hereunder.

Assignor agrees for the benefit of Lessee and Assignee that, to the extent it receives any Basic Rent attributable to the period falling after the Effective Time, it shall remit such Basic Rent to Assignee by way of offset from the purchase price of the Aircraft payable by Assignee at the Effective Time.

The Assignee and Lessee agree to update the actual and estimated amount for the Maintenance Rent after the Effective Time in accordance with the terms of section 21.08 of the Lease.

SECTION 6.  Assignee and Assignor Obligations.  (a) Notwithstanding anything to the contrary herein, Assignee shall not have any responsibility or liability in respect of, and shall not be obligated to perform or observe, any obligations of the "Lessor" under the Lease Documents to the extent such obligations exist or have arisen or accrued under or in respect of the Lease Documents prior to the Effective Time or arise from or relate to any acts, events or other circumstances which occur or are alleged to have occurred prior to the Effective Time (the "Retained Obligations"), it being agreed among Assignor, Assignee and Lessee that Assignor shall be solely liable for all such Retained Obligations.  Nothing in this Agreement shall relieve Lessee of its liabilities or obligations to Assignor, as lessor under the Lease, arising from or relating to any acts, events or other circumstances which occur or are alleged to have occurred prior to the Effective Time, including, without limitation, any liabilities or obligations of Lessee to Assignor or other Persons under Articles 9, 13, 14 and 18 of the Lease.  For the avoidance of doubt, nothing in this Agreement shall relieve Assignor of its liabilities or obligations to Lessee, under the Lease, arising from or relating to any acts, events or other circumstances which occur or are alleged to have occurred prior to the Effective Time.

(b) Notwithstanding anything to the contrary herein, Assignor shall not have any responsibility or liability in respect of, and shall not be obligated to perform or observe, any obligations of the "Lessor" under the Lease Documents to the extent such obligations arise under or in respect of the Lease Documents after the Effective Time, it being agreed among Assignor,

3

Assignee and Lessee that Assignee shall be solely liable for all such obligations and liabilities of Lessor or Assignee arising from and after the Effective Time, in each case other than the Retained Obligations.  Nothing in this Agreement shall relieve Lessee of its liabilities or obligations to Assignee, as lessor under the Lease, arising under or in respect of the Lease Documents after the Effective Time or arising from or relating to any acts, events or other circumstances which occur or are alleged to have occurred after the Effective Time, including, without limitation, any liabilities or obligations of Lessee to Assignee or other Persons under Articles 9, 13, 14 and 18 of the Lease. In addition, Lessee's liabilities and obligations to Assignor under section 24.09(c) shall continue in accordance with the terms of such section 24.09.

SECTION 7.  <u>Acknowledgment, Consent and Agreement of Lessee</u>.  Lessee hereby acknowledges and consents to the Assignment and Assumption as stated in Sections 3 and 4 respectively.  Lessee and Assignee agree that on and after the Effective Time, Lessee and Assignee shall have the rights, interests and obligations (subject to Section 6, above) of the "Lessee" and the "Lessor", respectively, which they would have had if the Lease Documents had originally been entered into between Lessee and Assignee as "Lessee" and "Lessor" (or, as applicable, Assignor), respectively and Lessee shall indemnify Assignee for any claims relating of the operation of the Aircraft, in the same manner as if Assignee was a Indemnified Party under the Lease for all periods (including prior to the Effective Time).  Lessee acknowledges, and Assignee agrees, that the Agreement will not materially increase the duties, obligations, costs, burden or risk imposed on the Lessee (except that the insurance and indemnity obligations shall be extended to Assignee and each of its affiliates, subsidiaries, successors, assigns and subcontractors and their respective directors, officers, shareholders, agents and employees) or reduce the rights of Lessee under the Lease, and Lessee waives any provision of applicable law that would or might grant Lessee the right to demand assurances or compensation of any kind from Assignee or to require Assignee to take any action on account of the Assignment and Assumption, other than as expressly required herein.  Further, Lessee agrees for the benefit of Assignor that (subject to the provisions of Section 6 hereof) Assignee not Assignor, will be obligated to fulfill all of the obligations and liabilities of Lessor under the Lease Documents which arise on or after the Effective Time.

SECTION 8.  <u>Payments to Assignee/Confirmations</u>.  (a)     Lessee agrees that, on and after the Effective Time, all rental and other payments due from Lessee under the Lease Documents will be made by wire transfer to the bank account of Assignee set forth in section 5.05 of the Lease as amended and set forth in <u>Annex B</u> hereto.

(b)     Lessee and Assignor confirm that:

(i)      the monthly rental payable pursuant to Section 5.01 of the Lease during the Lease Term is One Million Two Hundred Thousand U.S. Dollars ($1,200,000) per month;

(ii)     the Rent Payment Date is 16th day of every month (Business Day convention as

4

set out in section 5.01 of the Lease shall apply);

(iii)    the Maintenance Rent is provided by Lessee as a Letter of Credit in accordance with section 21.08 of the Lease and as stated in Section 5 of this Agreement; and

(iv)    the Scheduled Return Date for the Aircraft is 15 February 2030.

SECTION 9.  <u>Insurance</u>.  From and after the Effective Time, Lessee shall cause Assignee to be named as Contract Party under the hull and spares all-risk and hull war risk insurances (including reinsurances) maintained by Lessee under the Lease and will cause Assignee and each of the Additional Insureds (as defined in section 13.01 of the Lease as amended and set forth in <u>Annex B</u> hereto to be named as additional insureds under Lessee's aviation and airline general third party liability insurance maintained by Lessee under the Lease. Additionally, from and after the Effective Time and until the earlier of (a) the second anniversary of the Effective Time and (b) the next Heavy Check, Lessee will cause Assignor and each of their respective directors, officers, employees, agents and successors to be named as additional insureds under Lessee's aviation and airline general third party liability insurance maintained by Lessee under the Lease.

SECTION 10.  <u>Identification Plates</u>.  After the Effective Time, Lessee will as soon as is reasonably practicable and in any event no later than 45 days remove the existing identification plates and install new identification plates on the Airframe and the Engines as set forth in <u>Annex B</u> hereto, and notify Assignee of such replacement as soon as is reasonably practicable after the Effective Time.

SECTION 11.  <u>Quiet Enjoyment</u>.  Assignee covenants that if, and as long as no Event of Default has occurred and is continuing under the Lease, Lessee shall quietly enjoy the Aircraft without hindrance or disturbance by Assignee or by any other person lawfully claiming the Aircraft through Assignee.

SECTION 12.  <u>Amendments to Lease</u>.  The parties hereto hereby agree that, effective on the Effective Time, the Lease shall be amended and restated as set forth in <u>Annex B</u> hereto.  The original de-registration powers of attorney and the original IDERA issued by Lessee to Assignor will be deemed voided and cancelled upon the Effective Time.

SECTION 13.  <u>Cooperation</u>.  The parties will cooperate with one another in order to close the sale of the Aircraft at a mutually convenient time on the date that the Effective Time occurs when the Aircraft is in a jurisdiction which is acceptable to Assignee on one of Lessee's regular routes or on a ferry flight at a convenient time for Lessee.  Lessee will provide sufficient prior notice to Assignor of the scheduled route of the Aircraft on each date the Effective Time is proposed to occur.  All costs associated with any ferry flight or unscheduled flight for the purpose of locating the Aircraft in a favorable location at the Effective Time shall be borne by Assignor.

SECTION 14.  <u>Representations and Warranties</u>.

5

A.    Lessee Representations.  Lessee hereby represents and warrants that the representations and warranties contained in Section 6.05 of the Lease are true and accurate on and as of the date hereof and on the Effective Time as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date and provided that each reference to the "Lease" therein shall be construed to refer to the Lease as assigned and amended hereby).  Additionally, Lessee represents and warrants as of the date hereof and as of the Effective Time to Assignor and Assignee the following:

1.    Lessee is a company duly organized, validly existing under the Laws of the Russian Federation.  It has the corporate power and authority to carry on its business as presently conducted and to perform its obligations hereunder.  This Agreement, the Lease and the Lease Documents (as defined in Annex A to Schedule 1) to which it is a party constitute the legal, valid and binding agreements of Lessee enforceable in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, fraudulent conveyance or transfer, reorganization, moratorium and other laws of general applicability relating to or affecting creditor's rights and general principles of equity.  The transactions contemplated hereby and the execution, delivery and performance of this Agreement by Lessee (i) have been duly authorized by all necessary corporate action of Lessee and (ii) do not and will not violate the charter, certificate of incorporation or by-laws of Lessee, any applicable law, rule or regulation or any provision in any existing agreement binding on Lessee.

2.    No authorization, approval, consent, license or order of, or registration with, or the giving of notice to the Aviation Authority or any other Government Entity is required for the valid authorization, execution, delivery and performance by Lessee under this Agreement.

3.    No consent of any affiliate or holder of any indebtedness of Lessee or of a party to any agreement binding on Lessee is or will be required as a condition to the validity of this Agreement; or, if required, all such consents have been or will be duly obtained by the Effective Time.

4.    Lessee has made no prepayment of Rent prior to the date on which such Rent payment is due under the Lease.

5.    Lessee has no knowledge of any Lien on the Aircraft other than its own rights under the Lease.

6.    No partial loss or Event of Loss has occurred in respect of the Aircraft or Engines and the standard certificate of airworthiness for the Aircraft remains in full force and effect, and the Aircraft is in good repair, condition and appearance in accordance with the terms and conditions of the Lease.

7.    As of the date of this Agreement, no Default or Event of Default has occurred and is continuing under the Lease or the other Lease Documents.

8.    Lessee has no existing claim against, and there are no existing actions by

6

Lessee against, Assignor or Lessor Guarantor with respect to the Aircraft or the other Lease Documents.

9.  The Aircraft is not being subleased and Lessee has not assigned or transferred any of its rights under the Lease Documents.

10.  The Lease, together with the other Lease Documents, constitute all of the agreements between Lessee and Assignor with respect to the leasing of the Aircraft currently in effect.

11.  The Lease Documents are in full force and effect, and their terms have not been modified, waived or amended by any agreement, written or oral, which is currently in effect except pursuant to any agreement set forth in Schedule 1 hereto.

13.  The Aircraft was delivered on the Delivery Date in accordance with the terms of the Lease Documents with no unresolved discrepancies.

14.  The Certificate of Airworthiness of the Aircraft remains in full force and effect.

15.  Lessee is not subject to any bankruptcy, insolvency or similar proceeding nor has it publicly announced that it will become subject to any such proceeding, nor has any other circumstance that would constitute an insolvency or bankruptcy-related Event of Default occurred and is continuing.

16.  There is no lien on the Aircraft in favour of or threatened by Eurocontrol or member state thereof.

B.   Assignor Representations.  Assignor hereby represents and warrants to Lessee and Assignee as of the date hereof and as of the Effective Time the following:

1.  Assignor is a corporation, validly existing and in good standing under the laws of the State of Delaware and is duly qualified to do business wherever necessary to carry on its present business operations and to perform its obligations hereunder.

2.  This Agreement constitutes a legal, valid, binding and enforceable agreement of Assignor.  The transactions contemplated hereby and the execution, delivery and performance of this Agreement by Assignor (i) have been duly authorized by all necessary corporate action of Assignor and (ii) do not and will not violate the articles of incorporation or by-laws of Assignor, any applicable law, rule or regulation or any provision in any existing agreement binding on Assignor.

3.  All authorizations, consents, registrations and notifications required in connection with the entry into, performance, validity and enforceability of, this Agreement and the transactions contemplated by this Agreement, have been (or will have been, on or before the

Effective Time) obtained or effected (as appropriate) and are (or will be on their being obtained or effected) in full force and effect.

       4.    The Lease Documents are in full force and effect and Assignor has not extended the time for any payments by Lessee under the Lease Documents.

       5.    Assignor has received no prepayment of Rent other than the Rent payment for the rent payment period in which the Effective Time will occur.

       6.    The Lease, together with the Lease Documents, constitute all the agreements between Lessee and Assignor with respect to the leasing of the Aircraft currently in effect.

       C.    <u>Assignee Representations</u>.   Assignee represents and warrants as of the date hereof to Assignor and Lessee as of the date hereof and as of the Effective Time the following:

       1.    Assignee is a company, duly formed and validly existing under the laws of Singapore.

       2.    This Agreement constitutes a legal, valid, binding and enforceable agreement of Assignee.  The transactions contemplated hereby and the execution, delivery and performance of this Agreement by Assignee (i) have been duly authorized by Assignee and (ii) do not and will not violate the charter, bylaws or organizational documents of Assignee, any applicable law, rule or regulation or any provision in any existing agreement binding on Assignee.

       3.    All authorizations, consents, registrations and notifications required in connection with the entry into, performance, validity and enforceability of, this Agreement and the transactions contemplated by this Agreement, have been obtained or effected (as appropriate) and are (or will be on their being obtained or effected) in full force and effect.

       4.    The net worth of Assignee is at least $30,000,000.

       SECTION 15.  <u>Conditions Precedent</u>.  On or before the Effective Time, the following conditions shall have been fulfilled, waived or deferred:

       A.    Assignee will have received the following, at no expense to Lessee, all of which shall be translated into the English language (where applicable) and be reasonably satisfactory in form and substance to Assignee:

       1.    a legal representative certificate or equivalent corporate authority, as the case may be, of Lessee (i) approving the terms of and the transactions contemplated by this Agreement and (ii) authorizing a specific person to execute this Agreement together with a certified copy of an incumbency certificate of Lessee naming the person or persons authorized to execute this Agreement and the documents delivered in connection herewith;

8

2.   a copy of Lessee's constitutional documents (including Lessee's charter, certificate of state registration, certificate of registration as taxpayer and evidence of appointment of the sole executive body) and air transport licenses;

3.   a certified copy of a resolution of the board of directors or participants, as applicable, or equivalent corporate authority, of Assignor approving the terms of and the transactions contemplated by this Agreement and authorizing a specific person to execute this Agreement together with a certified copy of an incumbency certificate of Assignor naming the person or persons authorized to execute this Agreement and the documents delivered in connection herewith.

4.   a legal representative certificate or power of authority or equivalent corporate authority, as the case may be, of Assignor naming the person or persons authorized to execute this Agreement and the documents delivered in connection herewith;

5.   certificate of insurance and certificate of reinsurance in compliance with the provisions of the Lease and hereof or, if not in compliance with such provisions, acceptable to Assignee, provided that if original certificates are not available on or before the Effective Time, Lessee may deliver copies or faxes thereof to Assignee and forward the original certificates and broker's letter of undertaking as soon as is reasonably practicable (and in no event more than 10 days) after the Effective Time;

6.   each transferred Letter of Credit reflecting the Assignee as sole beneficiary thereunder and in form and substance acceptable to Assignee;

7.   a copy of the current Air Operator's Certificate of the Lessee issued by the Aviation Authority of the Russian Federation;

8.   a copy of the current Certificate of Registration of the Aircraft issued by the Aviation Authority of the State of Registry and the current airworthiness certificate in the public transport category issued by the Aviation Authority of the State of Registry in respect of the Aircraft;

9.   each replacement deregistration power of attorney and DERA issued by Lessee in favor of Assignor with the DERA filed with the BDCA;

10.   replacement airframe and engine warranty agreements entered into between the Assignor, Assignee, Lessee and the airframe and engine manufacturer (as relevant) in form and substance satisfactory to Assignee;

11.   a Eurocontrol Letter duly executed by Lessee;

12.   a letter from Lessee's and Consenting Party's process agent in New York agreeing to act as process agent in respect of the Lease, the guarantee by Consenting Party and

9

this Agreement by each of Lessee and Consenting Party;

13.   satisfactory legal opinions issued to Assignee by its Russian counsel, New York counsel and Dutch counsel in respect of the transactions stated herein and the guarantee by the Consenting Party;

14.   this Agreement, duly executed by each of the parties hereto;

15.   an undated Confirmation duly executed by each of the parties thereto;

16.   a new guaranty issued by the Consenting Party in favor of the  Assignee;

17.   evidence that all filings, registrations, recordings and other actions, if any, have been or will be taken which are necessary or advisable to ensure that validity, effectiveness and enforceability of this Agreement and other documents provided to Assignee pursuant to this Agreement;

18.   evidence that the registration of Aircraft in Bermuda shall be amended as a consequence of this Agreement immediately after the Effective Time;

19.   evidence that the Head-Head Lease or Head Lease shall be terminated immediately prior to the Effective Time;

20. Lessee has consented or shall consent immediately after the Effective Time to International Interest filings made by Lessor or its PUE;

21.   satisfaction of all conditions precedent set forth in the Purchase Agreement; and

22.   up-to-date copy of the customs declaration in respect of the Aircraft together with any amendments and schedules thereto and evidence of payment of all applicable customs duties and taxes in full;

23.   all representation and warranties of the Assignee and Lessee given in this Agreement or the Purchase Agreement (as applicable) are true and accurate as of the Effective Time.

B.      Assignor will have received the following, at no expense to Assignee, all of which shall be in the English language and be reasonably satisfactory in form and substance to Assignor:

1.    an incumbency certificate or power of attorney or equivalent corporate authority, as the case may be, of Lessee naming the person or persons authorized to execute this Agreement and the documents delivered in connection herewith;

10

Assignment and Assumption Agreement
(msn 60118)

    2. an incumbency certificate or power of attorney or equivalent corporate authority, as the case may be, of Assignee naming the person or persons authorized to execute this Agreement and the documents delivered in connection herewith;

    3. a release by Lessee of the Lessor Guarantor from its guaranty obligations;

    4. a certificate of insurance in compliance with the provisions of the Lease and hereof or, if not in compliance with such provisions, acceptable to Assignor, provided that if original certificates are not available on or before the Effective Time, Lessee may deliver copies or faxes thereof to Assignor and forward the original certificates and broker's letter of undertaking as soon as is reasonably practicable (and in no event more than 30 days) after the Effective Time; and

    5. satisfaction of all conditions precedent set forth in the Purchase Agreement.

  C. Lessee will have received the following, all of which shall be in the English language and be reasonably satisfactory in form and substance to Lessee:

    1. an incumbency certificate or power of attorney or equivalent corporate authority, as the case may be, of Assignee naming the person or persons authorized to execute this Agreement and the documents delivered in connection herewith; and

    2. an incumbency certificate or power of attorney or equivalent corporate authority, as the case may be, of Assignor naming the person or persons authorized to execute this Agreement and the documents delivered in connection herewith.

    3. a copy of Assignee's constitutional documents and certificate of incorporation;

    4. a copy of the Tax Resident Certificate issued by the tax authority of Singapore;

    5. reasonable evidence that the Assignee's net worth is $30,000,000;

    6. a copy of the bill of sale issued by Assignor in favour of Assignee;

    7. the representations and warranties of Assignor and Assignee in Section 14 of this Agreement shall be true and correct; and

    8. replacement airframe and engine warranty agreements entered into between the Assignor, Assignee, Lessee and the airframe and engine manufacturer (as relevant) in form and substance satisfactory to Assignee.

11

Assignment and Assumption Agreement
(msn 60118)

SECTION 16.  <u>Assignment</u>.  This Agreement will be binding upon and inure to the benefit of each party hereto and its respective successors and assigns as permitted under the Lease.

SECTION 17.  <u>Notices</u>.

A.   The address of Assignee for notices and payments in its capacity as "Lessor" under the Lease Documents is until further notice as set forth in <u>Annex B</u>.

B.   Any notice, request or information required or permissible under this Agreement will be in writing and in English.  Notices, requests, and information will be delivered in person or sent by fax, letter (mailed airmail, certified and return receipt requested), or by expedited delivery addressed to the parties as set forth in this Section.  In the case of a fax, notice will be deemed received upon actual receipt (in the case of a fax notice, the date of actual receipt will be deemed to be the date set forth on the confirmation of receipt produced by the sender's fax machine immediately after the fax is sent).  In the case of a mailed letter, notice will be deemed received on the tenth (10th) day after mailing.  In the case of a notice sent by expedited delivery, notice will be deemed received on the date of delivery set forth in the records of the Person which accomplished the delivery.  If any notice is sent by more than one of the above listed methods, notice will be deemed received on the earliest possible date in accordance with the above provisions.  Notices will be sent:

| | |
|---|---|
| If to Assignee**:** | BOC Aviation Limited |
| | 8 Shenton Way, #18-01 |
| | Singapore 068811 |
| | Attn.: General Counsel |
| | Fax:  +54 63236962 |
| | Telephone:  + 6563235559 |
| | |
| If to Assignor: | c/o Boeing Capital Corporation |
| | 500 Naches Ave. SW |
| | Renton WA 98057 |
| | Attn.:  Legal Department |
| | Fax: +1 425-965-4088 |
| | |
| If to Lessee: | AirBridgeCargo Airlines LLC |
| | 28B, Building 3 |
| | Mezhdunarodnoe Rd. |
| | Moscow 141411 |
| | Russian Federation |
| | Fax:  +7 495 755 65 81 |
| | Attention:  General Director |

SECTION 18.  No Further Amendments; Sole and Entire Lease Agreement.  Except as expressly assigned and modified by this Agreement, all of the terms of the Lease shall remain unchanged and in full force and effect.  The documents set forth in Annex A, together with the Lease as amended and set out in Annex B and this Agreement, constitute the entire agreement of Lessee and Assignor currently in effect with respect to the leasing of the Aircraft.

SECTION 19.  Modifications.  This Agreement may not be amended or modified except by a written agreement signed by the parties hereto.

SECTION 20.  Counterparts.  This Agreement may be executed in two or more counterparts, each of which will be an original, but all of which will constitute but one and the same instrument.  Delivery of an executed counterpart of this Agreement by fax will be deemed as effective as delivery of an originally executed counterpart.  Any party delivering an executed counterpart of this Agreement by fax will also deliver an originally executed counterpart, but the failure of any party to deliver an originally executed counterpart of this Agreement will not affect the validity or effectiveness of this Agreement.

SECTION 21.  Governing Law and Jurisdiction.

A.    THIS AGREEMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, BUT WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

B.    Each of the parties hereto hereby irrevocably and unconditionally submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the City and County of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement and each such party hereby irrevocably and unconditionally agrees that all claims in respect of such action or proceeding may be heard and determined in such court in New York State or, to the extent permitted by law, in such federal court.  Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may effectively do so, any objection to venue of any such action or proceeding in any such court and any defense or objection that they may now or hereafter have of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

C.    Lessee hereby irrevocably and unconditionally agrees that the provisions of Section 24.20, entitled Process Agent, of the Lease shall apply, mutatis mutandis, as if set forth in full in this Agreement. Consenting Party hereby irrevocably and unconditionally agrees for the benefit of Assignee that the provisions of Section 8, entitled Process Agent, of the Guaranty by the Consenting Party in favor of the Assignee issued pursuant to this Agreement shall apply,

13

mutatis mutandis, as if set forth in full in this Agreement.

D.   EACH OF THE PARTIES HERETO HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING TO WHICH IT IS A PARTY INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF, RELATED TO, OR CONNECTED WITH THIS GUARANTY OR THE RELATIONSHIP ESTABLISHED HEREUNDER.

SECTION 22.  Further Assurances.  Each party hereto agrees that it shall, at anytime and from time to time, promptly and duly execute and deliver any and all such further instruments and documents and take such further action as may be reasonably required in order to obtain the full benefits of this Agreement and to implement the rights and powers herein granted or contemplated hereby.

SECTION 23.  Transaction Costs.  Assignee and Assignor shall each bear their own out of pocket costs or expenses incurred in connection with the consummation of the transactions contemplated hereby and Assignor agrees to bear the out of pocket costs or expenses incurred by Lessee to consummate the transactions contemplated hereby.

[*Remainder of Page Intentionally Left Blank*]

14

IN WITNESS WHEREOF, the parties hereto or their duly authorized representatives have executed this Agreement as of the day and year first herein written.

AIRCRAFT 60118, INC.,
as Assignor

BOC AVIATION LIMITED,
as Assignee

By: _____

Name: Mher Papyan

Title: Authorized Signatory

By: _____

Name:

Title:

AIRBRIDGECARGO AIRLINES LLC,
as Lessee

VOLGA-DNEPR LOGISTICS B.V.,
as Consenting Party

By: _____

Name:

Title:

By: _____

Name:

Title:

Execution Page

Assignment and Assumption Agreement
(msn 60118)

IN WITNESS WHEREOF, the parties hereto or their duly authorized representatives have executed this Agreement as of the day and year first herein written.

AIRCRAFT 60118, INC.,
as Assignor

BOC AVIATION LIMITED,
as Assignee

By: _____

By: _____

Name:

Name: Jonathan Mahony
General Counsel

Title:

Title:

AIRBRIDGECARGO AIRLINES LLC,
as Lessee

VOLGA-DNEPR LOGISTICS B.V.,
as Consenting Party

By: _____

By: _____

Name:

Name:

Title:

Title:

Execution Page

Assignment and Assumption Agreement
(msn 60118)

IN WITNESS WHEREOF, the parties hereto or their duly authorized representatives have executed this Agreement as of the day and year first herein written.

AIRCRAFT 60118, INC.,
as Assignor

BOC AVIATION LIMITED,
as Assignee

By: _____

By: _____

Name:

Name:

Title:

Title:

AIRBRIDGECARGO AIRLINES LLC,
as Lessee

VOLGA-DNEPR LOGISTICS B.V.,
as Consenting Party

By: _____

By: _____

Name: *Sergey Lazarev*

Name: *Eremin A.*

Title: *General Director*

Title: *Director A*

Assignment and Assumption Agreement
(msn 60118)

**SCHEDULE 1**
**DESCRIPTION OF THE LEASE**

1.   Aircraft Lease Agreement (60118) dated as of November 13, 2015 originally between Aircraft 60118, Inc., as lessor, and AirBridgeCargo Airlines LLC, as lessee.

2.   Lease Supplement No. 1, dated as of November 13, 2015, between Aircraft 60118, Inc., lessor, and AirBridgeCargo Airlines LLC, as lessee.

3.   Technical Acceptance Certificate signed by AirBridgeCargo Airlines LLC, dated November 13, 2015.

4.   Amendment No. 1 to Aircraft Lease Agreement (60118) dated as of December 8, 2015, between Aircraft 60118, Inc., lessor, and AirBridgeCargo Airlines LLC, as lessee.

5.   Amendment No. 2 to Aircraft Lease Agreement (60118) dated as of December 22, 2016, between Aircraft 60118, Inc., lessor, and AirBridgeCargo Airlines LLC, as lessee

**ANNEX A**

**LEASE DOCUMENTS**

1.    AD Cost Sharing Side Letter dated as of November 13, 2015 between Aircraft 60118, Inc., as lessor and AirBridgeCargo Airlines LLC, as lessee.

2.    Legal Opinion Side Letter dated as of November 13, 2015 between Aircraft 60118, Inc., as lessor and AirBridgeCargo Airlines LLC, as lessee.

3.    Guaranty dated as of November 13, 2015 by Volga-Dnepr Logistics B.V.

4.    Warranty Assignments
       (a)   Airframe Warranty Assignment, dated November 13, 2015
       (b)   Engine Warranty Assignment, dated November 13, 2015

5.    RORA Accession Certificate dated 13 November 2015

6.    Certificate of Insurance, Certificate of Reinsurance

7.    Officer's Certificate of AirBridgeCargo Airlines LLC

8.    The following Letters of Credit (as defined in section 5 of this Agreement):

| LC | Amount | Expiry date |
|---|---|---|
| SDLC REF NO. 0075I1705406B | US$3,600,000.00 | 26 January 2018 |
| MRLC REF NO. 0076I1705406B | US$6,926,248.87 | 26 January 2018 |
| MRLC REF NO. 0683I1605406B | US$2,463,636.21 | 31 August 2017 |

ANNEX B

# AMENDED AND RESTATED LEASE

**EXECUTION**

AIRCRAFT LEASE AGREEMENT (60118)

Dated as of November 13, 2015
and amended and restated on March 3o , 2017

Between

BOC Aviation Limited,
as Lessor

and

AirBridgeCargo Airlines LLC,
as Lessee

Concerning
One Boeing Model 747-8F Airframe with
four (4) General Electric Model GEnx-2B67/P Engines and
bearing Bermuda Registration Mark VQ-BFE and
Manufacturer's Serial Number 60118

## TABLE OF CONTENTS

ARTICLE                                                                          PAGE

ARTICLE 1.      Interpretation ..................................................................................... 1
  1.01    Definitions ....................................................................................... 1
  1.02    Construction .................................................................................. 12
ARTICLE 2.      Delivery and Acceptance ................................................................ 13
  2.01    Delivery Date ................................................................................ 13
  2.02    Title ............................................................................................... 13
  2.03    Acceptance .................................................................................... 13
  2.04    Failure to Accept Delivery ............................................................ 14
  2.05    Delivery Condition ....................................................................... 14
  2.06    International Interests .................................................................... 14
  2.07    CTC Benefits ................................................................................ 14
ARTICLE 3.      Conditions Precedent and Conditions Subsequent ........................... 14
ARTICLE 4.      Term ............................................................................................... 20
ARTICLE 5.      Rent; Time and Place of Payments .................................................. 20
  5.01    Basic Rent..................................................................................... 20
  5.02    Supplemental Rent ........................................................................ 20
  5.03    Net Lease; Prohibition Against Setoff, Counterclaim, Etc. ............. 21
  5.04    Waiver of Certain Rights of Lessee ............................................... 21
  5.05    Place and Time of Payment ........................................................... 21
ARTICLE 6.      Disclaimers and Waivers; Lessee's Representations and Warranties ....... 22
  6.01    As Is, Where Is ............................................................................. 22
  6.02    Waiver .......................................................................................... 22
  6.03    Conclusive Proof ........................................................................... 22
  6.04    No Lessor Liability........................................................................ 23
  6.05    Lessee's Representations and Warranties ....................................... 23
  6.06    Lessor's Representations and Warranties........................................ 27
ARTICLE 7.      Possession, Operations and Maintenance ........................................ 28
  7.01    Possession..................................................................................... 28
  7.02    Assignment by Lessee ................................................................... 29
  7.03    Lawful Operations ........................................................................ 29
  7.04    Insured Operations ........................................................................ 29
  7.05    Maintenance .................................................................................. 29
  7.06    Insignia ......................................................................................... 30
  7.07    Records ......................................................................................... 31
ARTICLE 8.      Inspection; Reports ........................................................................ 31
  8.01    Inspection ..................................................................................... 31
  8.02    Reports .......................................................................................... 32
ARTICLE 9.      Lessee's Covenants ........................................................................ 33
  9.01    Maintenance of Corporate Existence .............................................. 33
  9.02    Notice of Litigation, Etc. ............................................................... 33

9.03      Payment of Taxes .................................................................. 33
9.04      Consolidation, Merger or Sale.............................................. 33
9.05      No Distributions .................................................................... 33
9.06      Aircraft Related Charges and Aircraft  Fees ........................ 33
9.07      Compliance with Patriot Act ................................................ 34
9.08      Compliance With All Laws ................................................... 34
9.09      [Intentionally left blank]…………………………………34
ARTICLE 10.      Replacement of Parts; Alterations, Modifications and Additions ................... 34
10.01     Replacement of Parts............................................................ 34
10.02     Title to Replaced Parts ......................................................... 34
10.03     Alterations, Modifications and Additions ............................ 35
10.04     Title to Parts ......................................................................... 35
ARTICLE 11      General Tax Indemnity ........................................................ 35
11.01     Indemnity.............................................................................. 35
11.02     After-Tax Nature of Indemnity ............................................ 38
11.03     Refund ................................................................................... 38
11.04     Tax Credit ............................................................................. 39
11.05     Tax Filing ............................................................................. 39
11.06     Application of Payments During Existence of a Default or Event of Default .......... 39
11.07     Contest................................................................................... 40
11.08.    Verification............................................................................ 41
11.09     Mitigation .............................................................................. 42
11.10     Survival of Indemnities ........................................................ 42
ARTICLE 12.      Damage, Destruction, Requisition or Condemnation ........................... 42
12.01     Event of Loss with Respect to an Airframe or an Airframe and the Engines Installed Thereon.................................................................................. 42
12.02     Event of Loss with Respect to an Engine .............................. 43
12.03     Application of Payments from Government Bodies for Requisition of Title .......... 44
12.04     Requisition of Airframe for Use by Government.................... 44
12.05     Requisition of an Engine for Use by Government ................. 45
12.06     Application of Payments During Existence of Default or Event of Default ............ 45
12.07     Damage Notification ............................................................. 45
ARTICLE 13.      Insurance .............................................................................. 45
13.01     Aviation Third Party Legal Liability Insurance .................... 45
13.02     Aircraft Hull Insurance......................................................... 46
13.03     Default ................................................................................... 48
13.04     Certificates............................................................................ 48
13.05      Premiums ............................................................................. 48
13.06     Claims.................................................................................... 49
13.07     Reinsurance ........................................................................... 49
13.08     Lloyd's Endorsements ........................................................... 50
13.09     Self-Insurance ....................................................................... 50
ARTICLE 14.      General Indemnification .................................................... 50
14.04     Exclusion .............................................................................. 51

ARTICLE 15.    Liens...........................................................................................................51
ARTICLE 16.    Further Assurances........................................................................................52
16.01    Further Assurances .................................................................................................52
16.02    CTC ........................................................................................................................52
16.03    Lessor Co-operation ...............................................................................................52
ARTICLE 17.    Return of Aircraft and Aircraft Documentation...........................................52
17.01    Aircraft Return and Return Conditions ..................................................................52
17.02    Pre-Return Report and Inspections.........................................................................53
17.03    Delayed Return of Aircraft .....................................................................................53
17.04    Deficiency Charges - Airframe Heavy Check, Landing Gear, APU and Parts.........53
17.05    Deficiency Charges – Engines and Engine LLP's ..................................................54
17.06    No Lessor Obligation ..............................................................................................56
17.07    Storage ....................................................................................................................56
17.08    Maintenance at Lessor's Request ...........................................................................56
17.09    Deregistration and Export .......................................................................................57
17.10    Aid in Disposition ..................................................................................................57
17.11    Assistance with Assignments .................................................................................57
17.12    Assistance with Discharge ......................................................................................57
ARTICLE 18.    Events of Default ..........................................................................................57
ARTICLE 19.    Remedies .......................................................................................................60
19.01    Event of Default .....................................................................................................60
19.02    Retake Possession...................................................................................................60
19.03    Termination or Enforcement ...................................................................................61
19.04    Application of Funds, Etc........................................................................................62
19.05    Damages ..................................................................................................................62
19.06    Sale or Re-lease of Aircraft ....................................................................................64
19.07    General ....................................................................................................................64
ARTICLE 20.    Security Deposit.............................................................................................64
20.01    Security Deposit .....................................................................................................64
ARTICLE 21.    Maintenance Rent and Payments ..................................................................66
21.01    Maintenance Rent ...................................................................................................66
21.02    Maintenance Payment and Notice Procedures........................................................66
21.03    Lessor Contributions for Maintenance ...................................................................67
21.04    Retention of Maintenance Rent ..............................................................................68
21.05    Responsibilities of Lessee, Lessor..........................................................................68
21.06    Adjustments to Maintenance Rent Payments ..........................................................68
21.07    Reserved ..................................................................................................................69
21.08    Letter of Credit for Maintenance Rent ...................................................................69
21.09    Maintenance Reserve Equivalency .........................................................................69
ARTICLE 22.    Reserved ........................................................................................................70
ARTICLE 23.    Characterization of Lease ..............................................................................70
23.01    True Lease ...............................................................................................................70
23.02    Reserved ..................................................................................................................70
23.03    Reserved ..................................................................................................................70

23.04     Reserved ................................................................................................. 70
23.05     Reserved ................................................................................................. 70
23.06     Lessee Reporting Requirements ............................................................ 70
23.07     Lessor Tax Residence Certificate .......................................................... 70
23.08     Contracting State Assumptions .............................................................. 71
ARTICLE 24.     Miscellaneous ................................................................. 71
24.01     Invalidity of Any Provision .................................................................. 71
24.02     Amendments in Writing ......................................................................... 71
24.03     Effectiveness .......................................................................................... 71
24.04     Notices .................................................................................................... 71
24.05     Lessor's Right to Perform for Lessee .................................................... 72
24.06     Counterparts ........................................................................................... 72
24.07     Quiet Enjoyment ..................................................................................... 72
24.08     Legal Fees and Other Expenses ............................................................. 72
24.09     Assignment by Lessor ............................................................................ 73
24.10     Survival ................................................................................................... 74
24.11     Successors and Assigns .......................................................................... 74
24.12     Currency .................................................................................................. 74
24.13     Commercial Acts ..................................................................................... 75
24.14     Reserved .................................................................................................. 75
24.15     CTC Insolvency Provisions Compliance .............................................. 75
24.16     GOVERNING LAW ............................................................................... 76
24.17     WAIVER OF JURY TRIAL ................................................................... 76
24.18     Dispute Resolution; Jurisdiction ........................................................... 76
24.19     Submission to Jurisdiction ..................................................................... 77
24.20     Process Agent .......................................................................................... 77
24.21     Warranty Rights ...................................................................................... 78
24.22     Entire Agreement .................................................................................... 79
24.23     Use of English Language ........................................................................ 79

EXHIBIT A – FORM OF LEASE SUPPLEMENT
EXHIBIT B – FORM OF DEREGISTRATION POWERS OF ATTORNEY
EXHIBIT C – FORM OF MONTHLY REPORT
EXHIBIT D – FORM OF EUROCONTROL LETTER
EXHIBIT E –FORM OF IRREVOCABLE DE-REGISTRATION AND EXPORT REQUEST
AUTHORIZATION
EXHIBIT F – FORM OF REDELIVERY CERTIFICATE
EXHIBIT G – FORM OF TECHNICAL REPORT
EXHIBIT H – FORM OF TECHNICAL ACCEPTANCE CERTIFICATE

SCHEDULE 1 – PART A-REQUIRED APPROVALS
SCHEDULE 1 – PART B-CTC REGISTRATIONS
SCHEDULE 2 – AIRCRAFT RETURN CONDITIONS
SCHEDULE 3 – DELIVERY CONDITIONS

<u>AIRCRAFT LEASE AGREEMENT (60118)</u>

THIS AIRCRAFT LEASE AGREEMENT (60118) (this "<u>Lease</u>") dated as of November 13, 2015, and amended and restated on March ____, 2017, is between BOC Aviation Limited, a company incorporated and existing under applicable law of Singapore having its registered office at 8 Shenton Way #18-01, Singapore 068811 ("<u>Lessor</u>"), and AirBridgeCargo Airlines LLC, a limited liability company organized under the laws of the Russian Federation and having its registered office at  Building 3, 28B Mezhdunarodnoe Rd, Moscow, 141411, Russia ("<u>Lessee</u>").

WHEREAS, Owner is the owner of the Aircraft (as defined below);

WHEREAS, Owner has transferred possession of the Aircraft to Lessor;

WHEREAS, Lessee desires to lease from Lessor and Lessor is willing to lease to Lessee the Aircraft subject to the terms and conditions of this Lease;

WHEREAS, in order to induce the Lessor to enter into the Lease, Guarantor has agreed to provide the Guaranty.

NOW, THEREFORE, in consideration of the mutual promises herein, Lessor and Lessee agree as follows:

ARTICLE 1.   <u>Interpretation</u>.

1.01   <u>Definitions</u>.  Unless the context otherwise requires, the following terms shall have the following meanings for all purposes of this Lease and shall be equally applicable to both the singular and the plural forms of the terms herein defined:

"<u>Acceptance Certificate</u>" means that certain Technical Acceptance Certificate dated November 13, 2015 executed by Lessee substantially in the form of Exhibit H hereto.

"<u>Accounting Principles</u>" means accounting principles and standards locally generally accepted in the Russian Federation or the Netherlands, as applicable, which result in the fair presentation of Lessee's or Guarantor's, as applicable, financial condition and results of operations at the times and for the periods indicated prepared in accordance with IFRS.

"<u>Additional Insured</u>" is defined in Section 13.01(A).

"<u>Administrator</u>" is defined in the International Registry Regulations.

"<u>Agreed Value</u>" means Stipulated Loss Value as set forth in the Lease Supplement.

"<u>Aircraft</u>" means the Airframe to be leased hereunder together with the Engines installed on the Airframe when leased hereunder or any Engine as defined herein, all as more particularly

1

described and identified in the Lease Supplement. Where the context may permit, "Aircraft" shall also include the Aircraft Documentation.

"Aircraft Documentation" means the documents listed in Annex 1 to the Lease Supplement and all other logs, manuals and data, and inspection, modification, service, maintenance, overhaul and other records required to be maintained under this Lease or applicable Aviation Authority and FAA rules and regulations, in each case, with respect to the Aircraft.

"Aircraft Fees" means any and all fees, charges, tolls, levies, penalties, fines or any other amounts payable of any nature whatsoever imposed by any Government Body in respect of all Lessee's Aircraft (other than Taxes covered under Article 11) including without limitation any European Union Emission Trading System allowances, landing fees, navigation charges, communication charges or terminal fees associated with any country from, to or over which Lessee operates.

"Aircraft Protocol" means the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment which was adopted on November 16, 2001 at a diplomatic conference held in Cape Town, South Africa (as amended, supplemented or modified from time to time) and from and after the effective date of the Convention in the relevant Contracting State shall mean when referring to the Aircraft Protocol with respect to such Contracting State, the Aircraft Protocol, as in effect in such Contracting State unless otherwise indicated.

"Airframe" means:  (a) the  Boeing Model 747-8F aircraft described in the Lease Supplement (except the Engines and engines from time to time installed on the Airframe), having the manufacturer's serial number and the BDCA registration mark as set forth in the Lease Supplement, and (b) any and all related Parts.

"Airframe Warranties Assignment Agreement" means the airframe warranties assignment entered into or to be entered into, as the case may be, between Previous Lessor, Lessor and Lessee, and acknowledged by the Manufacturer.

"Airworthiness Directive" means any requirement for the inspection, repair or modification of the Aircraft or any portion thereof as issued by any Aviation Authority or by the FAA under the provisions of the Federal Aviation Regulations.

"APU" means the auxiliary power unit installed in the Airframe on the Delivery Date (or such auxiliary power unit as may be substituted therefor after the Delivery Date in accordance with the requirements of this Lease).

"APU Hour" means the time, in hours, or part thereof from start to shutdown that such APU is operated, independent of aircraft flight hours.

"Associated Right" is defined in the CTC.

"Average Refurbishment Interval" means the total Flight Hours or Cycles (whichever is more limiting) in the Engine Manufacturer's then current same model (as the Engine) world wide fleet average interval for Refurbishment.

"Aviation Authority" means, where applicable, any or all of the United States Department of Transportation, the FAA and/or the Administrator of the FAA, the BDCA, the CAA, the EASA, or any applicable Person, Government Body, bureau, commission or agency succeeding to the functions of any of the foregoing, in each case only to the extent that such entity has at any time jurisdiction over the Aircraft or Lessee's operations.

"Balance Sheet" is defined in Section 6.05(h).

"Basic Rent" means the rent payable throughout the Term pursuant to Section 5.01 and any other provision of this Lease which treats any payment by Lessee as Basic Rent.

"Basic Rent Rate" means the amount of Basic Rent as set forth and described in the Lease Supplement.

"BDCA" means the Bermuda Department of Civil Aviation and any successor Government Body thereto.

"Business Day" means any day other than a Saturday, Sunday or day on which commercial banking institutions in Singapore, New York, New York or Moscow, Russia are authorized or required by law to be closed.

"CAA" means, where applicable, any or all of the Russian Federation Ministry of Transport, the Federal Service for Supervision in the Sphere of Transport, the Federal Traffic Control Service, the Federal Air Transport Agency or any other Russian Government Body having responsibility for the regulation of civil aviation in the Russian Federation and any Russian Government Body succeeding to the functions thereof.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Conditional Sale Agreement" means that certain conditional sale agreement between Owner, as seller, and Lessor, as purchaser, for the Aircraft.

"Confirmation" means the confirmation of effective time as defined in the Lease Assignment Agreement.

"Consolidated Text" means the Consolidated Text of the CTC which was adopted on November 16, 2001 at a diplomatic conference held in Cape Town, South Africa (as amended, supplemented or modified from time to time).

"Contracting State" means a country that has ratified, accepted, approved or acceded to the CTC in accordance with its terms and with respect to which no denunciation in accordance with the terms of the CTC has taken effect.

"Convention" means the Convention on International Interests in Mobile Equipment which was adopted on November 16, 2001 at a diplomatic conference held in Cape Town, South Africa (as amended, supplemented or modified from time to time) and shall mean when referring to the Convention with respect to the Contracting State, the Convention, as in effect in such Contracting State unless otherwise indicated.

"CTC" means the Convention and the Aircraft Protocol together and shall mean when referring to the CTC with respect to such Contracting State, the CTC, as in effect in such Contracting State unless otherwise indicated.

"CTC Insolvency Provisions" means "Alternative A" contained in Article 23 of the CTC.

"CTC Registrations" means the registrations set forth in Part B of Schedule 1.

"Cycle" means one take-off and landing of the Airframe or any airframe on which an Engine, APU, Landing Gear or any other Part is installed.

"Debt" of any Person means, on any date, all indebtedness of such Person as of such date, and shall include the following: (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (c) all obligations of such Person to pay the deferred purchase price of property or services; (d) all obligations of such Person under leases which are not true leases for United States federal income tax purposes; (e) all indebtedness secured by a Lien on any asset of such Person, whether or not such Person has assumed or is otherwise liable for such indebtedness; (f) all Debt of others guaranteed in any manner, directly or indirectly, by such Person (or in effect guaranteed indirectly by such Person through an agreement intended to have the effect of enabling an obligor other than such Person to satisfy Debt or to assure the holder of Debt of such obligor against loss, whether through an obligation of such Person to purchase property or services or to maintain such obligor's financial condition or otherwise) and (g) all reimbursement obligations of such Person in respect of letters of credit, foreign currency sale agreements and bankers' acceptances.

"Default" means any event or condition which with the lapse of time or the giving of notice, or both, would constitute an Event of Default.

"Delivery Date" means November 13, 2015.

"Delivery Location" means Everett, Washington, or such other location as agreed between the Parties.

"DERA" means an irrevocable de-registration and export request authorization, substantially in the form of Exhibit E hereto, issued by Lessee in favor of Lessor.

"Dollars", "$" and "US$" means United States Dollars, being the lawful currency of the United States of America.

"EASA" means the European Aviation Safety Agency established by Regulation (EC) No 1592/2002 of the European Parliament and of the Council of 15 July 2002, and any Person, Government Body, bureau, commission, agency or agencies succeeding to the functions thereof.

"Effective Time" means the time stated in the Confirmation.

"Engine" means:  (a) any of the engines listed by manufacturer's serial number in the Lease Supplement and installed on the Airframe covered by the Lease Supplement whether or not from time to time installed on the Airframe or installed on any other airframe or any other aircraft; (b) any engine which may from time to time be substituted, or be a replacement or addition pursuant to Section 12.02 or Schedule 2 hereof, for any such Engine; and (c) except as otherwise provided in Sections 10.02 and 10.04 hereof, any and all Parts installed or required to be installed in the Engines.

"Engine LLP's" means a part with a limitation on use in cumulative engine flight hours or cycles, established by the OEM or the applicable Aviation Authority.

"Engine Manufacturer" means General Electric.

"Engine Warranty Assignment Agreement" means the engine warranty assignment agreement entered into or to be entered into, as the case may be, between Boeing Capital Corporation, Lessor and Lessee, together with the consent and agreement by the Engine Manufacturer.

"Eurocontrol" means the European Organization for the safety of Air Navigation established by the Convention relating to the Co-operation for the Safety of Air Navigation (Eurocontrol) signed on 13 December 1960 as amended by the Protocol thereto signed on 12 February 1981.

"Eurocontrol Letter" means a letter addressed to Eurocontrol signed by Lessee substantially in the form of Exhibit D hereto.

"Event of Default" is defined in Article 18 hereof.

"Event of Loss" with respect to any Item of Equipment means any of the following events with respect to such Item:  (a) loss of such Item of Equipment or the use thereof due to disappearance for a period in excess of sixty (60) days (or such shorter period ending on the date on which an insurance settlement has been reached on the basis of a total loss); (b) theft, destruction, damage beyond repair or rendering of such Item permanently unfit for normal use for any reason whatsoever; (c) any damage to such Item which results in an insurance settlement with respect to such Item on the basis of an actual or constructive total loss; (d) the condemnation, confiscation or seizure of, or requisition of title to, or requisition of use (for a period in excess of sixty (60) days, but in any event no longer than the last day of the Term) of, such Item by any Government Body; or (e) as a result of any rule, regulation, order or other action by any Aviation Authority, or other Government Body having jurisdiction, the use of such

5

Item in the normal course of air transportation of persons or property shall have been prohibited for a period of more than six (6) months.  An Event of Loss with respect to the Aircraft shall be deemed to have occurred if an Event of Loss occurs with respect to the Airframe.

"FAA" means the United States Federal Aviation Administration and any Person, Government Body, bureau, commission or agency or agencies succeeding to the functions thereof.

"Federal Aviation Regulations" means the regulations contained in Title 14 of the United States Code of Federal Regulations.

"Financing Party" means the Security Agent and financial institutions and/or other provider(s) of finance or funds from whom finance or funds or other financial accommodation for the acquisition or refinancing of the acquisition of the Aircraft by Lessor or Owner is for the time being, obtained and/or granted and includes any owner or intermediary person by, to whom or from whom the Aircraft is or is to be transferred, sold, leased or sub-leased in connection with the provision of such finance or funds.

"Flight Hour" means: (a) with respect to the Airframe, each hour or part thereof which elapses from the time the wheels of the Airframe leave the ground on take-off and the time when the wheels of the Airframe touch the ground on landing, and (b) with respect to an Engine, Landing Gear, APU or other Part, each hour or part thereof which elapses from the time the wheels of the airframe, whether or not the Airframe leased hereunder, on which such Engine, Landing Gear, APU or other Part is installed, leave the ground on takeoff and the time when the wheels of such airframe touch the ground on landing.

"GAAP" means generally accepted accounting principles as set forth in the statements of financial accounting standards issued by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants, as such principles may at any time or from time to time be varied by any applicable financial accounting rules or regulations issued by the United States Securities and Exchange Commission.

"Government Body" means any international governmental or non-governmental organization, any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, or any securities exchange, in each case having jurisdiction over the Lessee or the Aircraft.

"Guarantor" means Volga-Dnepr Logistics B.V.

"Guaranty" means that certain guaranty executed by Guarantor in favor of Lessor.

"Heavy Check" means any of the scheduled system/powerplant, zonal, structural maintenance checks (e.g. D/SI, SC4, SC8, SC12 or similar check) that are required by the

Maintenance Program at the initial and second interval of 96 months and each 72 months thereafter, provided that such intervals may be modified pursuant to Section 7.05.

"Incentive Rate" means a per annum interest rate equal to the Prime Rate plus three percent (3%), or the maximum rate permitted by applicable law, whichever is less, calculated on the basis of a year of 360 days and actual days elapsed.

"Income Tax Convention" means the Agreement between the Government of the Republic of Singapore and the Government of the Russian Federation for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income or any other tax convention with the Russian Federation that, on the date of transfer to a transferee Lessor, provides for an exemption from or reduction in the imposition of Taxes imposed by the Russian Federation on rental income required to be paid pursuant to this Lease.

"Indemnified Parties" and "Indemnified Party" are defined in Section 14.01.

"Insolvency Proceedings" is defined in the CTC.

"Insolvency-Related Event" is defined in the CTC.

"International Interest" is defined in the Convention.

"International Registry" means the international registry established pursuant to the CTC by Aviareto in Dublin, Ireland.

"International Registry Regulations" means the regulations issued pursuant to Article 17(2) of the Convention and Article XVIII of the Protocol to the Convention on International Interests in Mobile Equipment on Matters specific to Aircraft Equipment.

"Item(s) of Equipment" or "Item(s)" means all or any of the Aircraft, the Airframe, the Engines, the APU, the Landing Gear and each Part.

"Landing Gear" means any of the Landing Gear installed on the Airframe on the Delivery Date (or any landing gear as may be substituted therefor after the Delivery Date in accordance with the requirements of this Lease).

"Landing Gear Exchange" any exchange Landing Gear at time of installation shall be free and clear of all Liens other than Lessor Liens, fresh from first overhaul since new  and have complete back to birth trace on any Life Limited Parts.

"Law(s)" means any and all (a) constitutions, laws, statutes, ordinances, decrees, regulations, principles of common law, or orders or directives of any Government Body, (b) multinational or international treaties, conventions or accords to which any Government Body is signatory or party (including, without limitation, the CTC and all International Registry Regulations), and (c) judicial or administrative interpretations or applications of any of the foregoing.

"Lease", "Lease Agreement", "this Lease Agreement", "this Lease", "this Agreement", "herein", "hereunder", "hereby" and other like words mean this Aircraft Lease Agreement, as it may be amended, modified or supplemented pursuant to the applicable provisions hereof, including, without limitation, supplementation hereof by the Lease Supplement entered into pursuant to the applicable provisions hereof.

"Lease Supplement" means the Lease Supplement dated November 13, 2015, substantially in the form of Exhibit A hereto, for the purpose of leasing the Items of Equipment under and pursuant to the terms of this Lease.

"Lease Termination Date" means the date which is the earlier of (a) the date on which the Lease is terminated and the Aircraft is returned to Lessor pursuant to an exercise of remedies under Article 19 of this Lease or (b) the date which is the later of (i) the day the Aircraft is returned to Lessor in the condition required pursuant to Article 17 of the Lease or (ii) the Scheduled Return Date.

"Lessee Liability" means Debt of Lessee.

"Lessee's Aircraft" means, collectively and individually, any and all aircraft owned, leased or operated by Lessee including the Aircraft.

"Lessor Liens" means Liens on or relating to or affecting any Item of Equipment arising as a result of claims (including, without limitation, claims for Taxes) against Lessor or Owner, not related to this Lease or the other Operative Documents and for which Lessee is not obligated to indemnify Lessor or Owner, hereunder.

"Lien" means any mortgage, pledge, hypothecation, lien, charge, encumbrance, lease, right of seizure or detention, exercise of rights, security interest or claim, including without limitation any International Interest or Associated Right.

"Life Limited Parts" or "LLP's" means Parts that have a specified maximum life or time limit after which such Parts must be scrapped or discarded and can no longer be refurbished and reinstalled on or in an Airframe, any Engine or any Part.

"Liquidated Damages Payment Date" is defined in Section 19.03.

"Maintenance Program" means Lessee's BDCA approved overhaul and maintenance program, including all corrosion control provisions, applicable to the Aircraft, which program shall be equivalent in all material respects to that of an EASA operator and which shall comply in all material respects with the then latest revision of the Manufacturer's maintenance planning document, and so as to be immediately eligible for a valid EASA standard Certificate of Airworthiness and immediate commercial operations in accordance with EASA regulations.

"Maintenance Rent" is defined in Article 21.

"<u>Manual(s)</u>" means those manuals and specifications, including any subsequent amendments or supplements thereto which may be issued from time to time, generated by any manufacturer of an Item of Equipment, including the Manufacturer and Engine Manufacturer, which prescribe maintenance and/or operational requirements for the Aircraft or the applicable Item.

"<u>Manufacturer</u>" means The Boeing Company, a Delaware corporation.

"<u>Market Disruption</u>" means any inability of Lessor to reasonably access the public markets to borrow funds in an amount equal to the total amount of (a) funds committed by Lessor to its customers and (b) debt maturities, in each case in the 12-month period, commencing on the date of notice from Lessor to Lessee that a Market Disruption has occurred.  For purposes of "Market Disruption", Lessor shall refer to both Boeing and Boeing Capital Corporation with respect to any transaction for which The Boeing Company or any of its affiliates is the Lender or Lessor.

"<u>OEM</u>" or "Original Equipment Manufacturer" means the original manufacturer of any Item of Equipment as originally installed or incorporated in the Aircraft.

"<u>OFAC</u>" is defined in Section 6.05(x).

"<u>Operative Documents</u>" means, collectively, the Conditional Sale Agreement, this Lease, the Lease Supplement, the Acceptance Certificate, the amendment no. 1 dated December 8, 2015 in respect of the Aircraft, the amendment no. 2 dated December 22, 2016 in respect of the Aircraft, the AD cost sharing letter dated November 13, 2015 in respect of the Aircraft, the Guaranty, the Powers of Attorney, the DERA, the Lease Assignment Agreement, the Confirmation, the Engine Warranty Assignment Agreement, the Airframe Warranties Agreement and the Eurocontrol Letter and any other document or agreement agreed from time to time by Lessor and Lessee to constitute an Operative Document.

"<u>Other Operating Lease(s)</u>" means the Aircraft Lease Agreement (60117) dated as of November 13, 2015 and amended and restated on March __, 2017 between Lessor and Lessee or any other aircraft lease agreement entered into or to be entered into between Lessor and Lessee.

"<u>Overhaul</u>" means the complete disassembly, inspection, cleaning, repair, Refurbishment, reassembly and testing of an Item in accordance with the applicable Manuals and the Maintenance Program.

"<u>Owner</u>" means BOCA Leasing (Bermuda) Limited, a company organized under the laws of Bermuda.

"<u>Parts</u>" means any and all appliances, parts, systems, components, assemblies, rotables, LLP's, instruments, appurtenances, accessories, furnishings, seats and other equipment of whatever nature (other than engines), which (a) are from time to time incorporated or installed in or attached to the Airframe or any Engine, or (b) are acquired by Lessee to be incorporated or installed in or attached to the Airframe or an Engine, or (c) having been so installed or attached, are later removed therefrom, so long as title thereto remains vested in Lessor in accordance with

9

Sections 10.02 and 10.04 hereof after such removal from the Airframe or such Engine.  "Part" means any one of the Parts.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 enacted by the United States Congress October 24, 2001.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, limited liability company, trust, unincorporated organization or Government Body or any other entity.

"PMA Parts" means any parts that have received Parts Manufacturer Approval designation by the FAA as described in FAA Order 8110.42, or any other parts that have not been manufactured by the OEM.

"Powers of Attorney" means the deregistration powers of attorney duly authorized and accompanied by the company seal of the Lessee, and executed by the Lessee substantially in the form of Exhibit B hereto; in the case of the Russian law governed deregistration power of attorney, which shall be in the Russian language (with an English translation) and duly notarized by the Lessee.

"Previous Lessor" means Aircraft 60118, Inc., a company organized under the laws of Delaware.

"Prime Rate" means the interest rate designated by J.P. Morgan Chase Bank, National Association, or any successor thereto, from time to time at its principal office in New York City as its prime or base lending rate; with each change in such rate to take effect immediately under this Lease (calculated on the basis of a year of 360 days and actual days elapsed).

"Process Agent" is defined in Section 24.16 hereof.

"Prohibited Person" shall mean any individual or entity (a) that is a citizen or resident of or organized under the laws of or domiciled in a Restricted Country; (b) that is designated on the Specially Designated Nationals and Blocked Persons List on the website of the U.S. Department of Treasury, Office of Foreign Assets Control; (c) that is listed on the Entity or Denied Persons List on the website of the U.S. Department of Commerce, Bureau of Industry and Security and subject to the general policy of denial for all goods controlled under the Export Administration Regulations.

"Prospective International Interest" is defined in the Convention.

"PUE" means "professional user entity" as defined in the International Registry Regulations.

"QEC" means quick engine change kit.

"Qualifying Maintenance Event" means any of an Airframe Heavy Check, an Engine complete Refurbishment, replacement of Engine LLP, an APU Overhaul, and a Landing Gear Overhaul, the maintenance, Refurbishment, Overhaul or replacement work, as applicable, in connection with which is determined by Lessor to comply with the requirements set forth in Section 21.03. In respect to Landing Gear, a Landing Gear Exchange is to be accepted as a Qualifying Maintenance Event.

"Refurbishment" of an Engine means the off-wing maintenance for such Engine performed by an FAA approved maintenance provider (or other such provider acceptable to Lessor) which requires the complete teardown/ disassembly, inspection, repair and refurbishment of the Engine where the Engine module workscope level meets or exceeds the module workscope level described in the then current Engine Manufacturer's Workscope Planning Guide for the sequential shop visit number (SV)  resulting in, in Lessor's determination acting reasonably, the full restoration of such Engine in accordance with the Engine Manufacturer's shop manual limits and the Engine Manufacturer's then current Workscope Planning Guide.

"Registry Authority" is defined in the CTC.

"Rent" means Basic Rent and Supplemental Rent, collectively.

"Rent Payment Date" is defined in the Lease Supplement.

"Required Approval" means all necessary authorizations, consents, approvals, waivers, exemptions, variances, franchises, permissions, permits and licenses of, and filings, registrations, recordings and declarations with, all Government Bodies with jurisdiction over the Lessee, Guarantor or Aircraft as to the provisions of this Lease and the other Operative Documents and the consummation of the transactions contemplated hereby and thereby by the Delivery Date including, without limitation, any requirements set forth in Schedule 1.

"Restricted Country" shall mean (a) any state, country or jurisdiction which is subject to United States sanctions which would have the effect of prohibiting the sale, lease, charter, or flight of the Aircraft to, from, or over such country or otherwise cause the Owner, Lessor or Lessee to be in contravention of any Law to which such party is subject.

"Scheduled Return Date" means the close of business on the day prior to one hundred seventy one (171) month anniversary of the Delivery Date plus three (3) days.

"Security Agent" means such person (if any) from time to time notified by Lessor to Lessee as the security agent or trustee for the Financing Parties (or any of them).

"Security Deposit" is defined in Section 20.01.

"State of Registry" means (i) Bermuda or such other country or state of registration for the Aircraft as Lessor may, subject to Lessee's prior communication and agreement, approve in advance in writing and (ii) for purposes of the CTC, in respect of an aircraft, the country on the

national register of which an aircraft is entered or the country of location of the common mark registering authority maintaining the aircraft register on which the Aircraft is registered.

"<u>Stipulated Loss Value</u>" means the amount equal to the Stipulated Loss Value as set forth in the Lease Supplement.

"<u>Supplemental Rent</u>" means all amounts, liabilities and obligations (other than Basic Rent) which Lessee assumes or agrees to pay under this Lease, the other Operative Documents or related documents to Lessor or others, including, without limitation, (a) all Maintenance Rent and Stipulated Loss Value payments; (b) all amounts required to be paid by Lessee under the agreements, covenants and indemnities contained in this Lease and the other Operative Documents; (c) interest at the Incentive Rate in accordance with Section 5.02; and (d) any and all liabilities, obligations, losses, damages, penalties, taxes, claims, actions, suits, costs, expenses or disbursements (including without limitation legal fees and expenses) of any kind and nature whatsoever which may be imposed upon or incurred by Lessor by reason of the failure of Lessee to duly perform its obligations under this Lease or the other Operative Documents.

"<u>Taxes</u>" is defined in Section 11.01(a) hereof.

"<u>Technical Report</u>" is defined in Section 8.02(d) hereof.

"<u>Term</u>" means the term for which the Aircraft is leased hereunder pursuant to Article 4 hereof.

"<u>Time Controlled Components</u>" means Parts described in the Maintenance Program that have specified intervals at which such Parts must be either bench-checked, Refurbished or replaced, as applicable.

"<u>Transaction Costs</u>" is defined in Section 24.06.

"<u>Transfer</u>" means the transfer of all Lessor's or Owner's right, title and interest to property, without representation, recourse or warranty of any kind whatsoever except as to the absence of Lessor Liens.

"<u>TUE</u>" means transacting user entity as defined in the International Registry Regulations.

"<u>83 bis Agreement</u>" means the agreement entered into between the State of Registry and Country of the Habitual Base of Lessee pursuant to Article 83 bis of the Convention on International Civil Aviation signed at Chicago on 7 December 1944.

1.02 <u>Construction</u>.

(a)    In this Lease, unless the contrary intention is stated, a reference to:

(i)    "Lessor" or "Lessee" or any other Person includes, without prejudice to the provisions of this Lease restricting transfer or assignment, any successor and any assignee;

(ii)    any document shall include the document as amended, novated, assigned or supplemented;

(iii)    a Section or a Schedule is a reference to a section in or a schedule to this Lease; and

(iv)    any reference to a Law, or to any specified provision of any Law, is a reference to such Law or provision as amended, substituted or re-enacted.

(b)    Headings are to be ignored in construing this Lease.

(c)    Unless otherwise indicated, references in this Lease to Articles, Chapters and the Preamble of the CTC are references to the English language version of the Consolidated Text and any reference herein to a provision of the Consolidated Text is a reference to the English language version of the provision of the Convention or the Aircraft Protocol from which it is derived, the Convention and the Aircraft Protocol being read and interpreted together as a single instrument as required by Article 6(1) of the Convention.

(d)    CTC related provisions of this Lease, to the extent applicable, will prevail in the case of a conflict with non-CTC related provisions herein.

ARTICLE 2.   <u>Delivery and Acceptance</u>.

2.01   <u>Delivery Date</u>.  Lessor hereby agrees (subject to satisfaction of the conditions set forth herein) to lease to Lessee hereunder, and Lessee hereby agrees to lease from Lessor hereunder, the Aircraft, as further evidenced by the execution by Previous Lessor and Lessee of the Lease Supplement leasing the Aircraft hereunder and the Acceptance Certificate.  The Aircraft, together with all of the Aircraft Documentation as provided by the Manufacturer, shall be delivered to Lessee at the Delivery Location on the Delivery Date, and Lessee shall accept delivery of the Aircraft hereunder upon tender of delivery of the Aircraft by Lessor to Lessee in accordance with Section 2.05 herein.

2.02   <u>Title</u>.  At all times during the Term, full legal title to the Aircraft shall remain vested in Owner to the exclusion of Lessee, notwithstanding the delivery of the Aircraft to, and the possession and use thereof by, Lessee.

2.03   <u>Acceptance</u>.  Lessee hereby agrees that acceptance of the Aircraft by Lessee's authorized representative or representatives, as evidenced by Lessee's execution of the Lease Supplement and Acceptance Certificate, shall, without further act, irrevocably constitute acceptance by Lessee of the Aircraft for all purposes of this Agreement, including possession. Lessee acknowledges that it has selected the Aircraft and all other Items of Equipment and the suppliers thereof.

2.04    Failure to Accept Delivery.  In the event Lessee fails to accept the Aircraft when tendered by Lessor, or fails to satisfy the conditions precedent herein above within 10 days after the date on which Lessor communicates its readiness to tender the Aircraft, Lessor's obligation to lease the Aircraft to Lessee shall cease and Lessor shall be entitled to retain the Security Deposit, if any, and to any and all other remedies to which Lessor is entitled hereunder.

2.05    Delivery Condition.  Lessee's obligation to accept the Aircraft is subject to the Aircraft being, on the Delivery Date, in the condition described in the Attached Schedule 3 and shall otherwise be in "as is, where is" condition and status, *provided that*, so long as Lessor has exercised reasonable efforts to deliver the Aircraft in the required condition by the anticipated delivery date, and so long as the Aircraft shall be in substantial compliance with such delivery conditions set forth on Schedule 3 and shall be accompanied by a valid standard FAA Export Certificate of Airworthiness acceptable to the Bermuda aviation authority, Lessee shall be required to accept delivery of the Aircraft when tendered by Lessor, and the re-delivery conditions set forth herein shall be deemed adjusted to reflect the discrepancies from the condition set forth on Schedule 3 to the extent such discrepancies are set forth in the Lease Supplement as agreed by the parties.

2.06    International Interests.   Lessee and Lessor intend that the lease of each of the Airframe and each Engine by Lessor to Lessee shall create an International Interest in favor of Lessor and Lessee hereby consents to the registrations in the International Registry required hereunder in respect of the Lease.

2.07    CTC Benefits.   Lessee and Lessor intend that Lessor shall be entitled to the maximum benefit of the rights and remedies contained within the CTC to the extent not prohibited by applicable Law.

ARTICLE 3.   Conditions Precedent and Conditions Subsequent.

3.01    Lessor's obligation to lease the Aircraft to Lessee hereunder shall be subject to satisfaction, or waiver in writing, on or before the Delivery Date of each and all of the following conditions precedent:

(a) Lessor shall have received the following:

(i)      this Lease, duly authorized and executed by Lessee;

(ii)     the Lease Supplement, duly authorized and executed by Lessee as of the Delivery Date;

(iii)    the initial installment of Basic Rent;

(iv)    the Security Deposit per Section 20.01;

(v)     the Guaranty, duly authorized and executed by Guarantor;

(vi)    resolutions of the Board of Directors of Lessee (or Guarantor, as applicable) or other written evidence of appropriate authorizing action in accordance with Lessee's organizational Articles, certified by the Secretary of Lessee (or Guarantor, as applicable), duly authorizing the lease of the Aircraft and the execution, delivery and performance of this Lease and the other Operative Documents to which Lessee or Guarantor is a party, together with an incumbency certificate as to the person or persons authorized to execute and deliver said documents on behalf of Lessee or Guarantor, as applicable;

(vii)   an independent insurance broker's report, in form and substance reasonably satisfactory to Lessor, describing all insurance and reinsurance then carried and maintained with respect to the Aircraft and the expiration date thereof, together with certificates of insurance and reinsurance in accordance with Article 13 hereof, including a written confirmation from such broker in a form reasonably satisfactory to Lessor that such insurance and reinsurance complies with the terms of Article 13 hereof;

(viii)  at Lessor's arrangement and Lessor's cost, a favorable opinion of New York counsel to Lessor, dated the Delivery Date, in form and substance satisfactory to Lessor covering such matters as Lessor may reasonably request in respect of the transactions contemplated hereby and by the other Operative Documents;

(ix)    at Lessor's arrangement but at Lessee's cost, a favorable opinion of Russian counsel to Lessor, dated the Delivery Date, in form and substance satisfactory to Lessor covering such matters as Lessor may reasonably request in respect of the transactions contemplated hereby and by the other Operative Documents (except for those Operative Documents that Lessee or Guarantor are not a party thereto), and addressing appropriate Aircraft, Engine and Contracting State searches and the due registration of the International Interests created and provided for by this Lease in the Aircraft and each of the Engines and covering such matters, as Lessor may reasonably require of CTC matters;

(x)     at Lessor's arrangement but at Lessee's cost, a favorable opinion of CTC counsel (which shall be provided by Russian counsel per Section 3.01(a)(ix) above) to Lessor, dated the Delivery Date, addressing appropriate Aircraft, Engine and Contracting State searches and the due registration of the International Interests created or provided for by this Lease in the Airframe and each of the Engines and covering such other matters as Lessor may reasonably require in respect of CTC matters;

(xi)    at Lessor's arrangement but at Lessee's cost, a favorable opinion of Bermuda counsel of Lessor, dated the Delivery Date, addressing the due filing for registration and recordation of this Lease and the Lease Supplement with the BDCA and that the Aircraft (including the Engines) is free and clear of any mortgage, lease, pledge, lien, charge or encumbrance of record except the Conditional Sale Agreement and this Lease and that the Aircraft is owned as a matter of record solely by Owner.

(xii)   satisfactory evidence that all Required Approvals set forth in Schedule 1 have been received or issued and shall be in full force and effect;

(xiii)  satisfactory evidence of Lessee's appointment of the Process Agent;

(xiv)   a true and complete copy of the Maintenance Program;

(xv)    the DERA, duly authorized and executed by Lessee and recorded by the relevant Registry Authority on or prior to the Delivery Date, or will be so effected immediately after delivery of the Aircraft to Lessee hereunder;

(xvi)   the Powers of Attorney, duly authorized and executed by Lessee;

(xvii)  the Eurocontrol Letter, duly authorized and executed by Lessee;

(xviii)  Reserved;

16

(xix)   a certificate of the Lessee representing and warranting as to there being no Liens on any Lessee Aircraft in favor of or threatened by Eurocontrol or a member state thereof;

(xx)   such additional letters, statement of accounts or certificates substantially equivalent to those referred to in the foregoing clauses 3.01 (xvi) through (xviii)  with respect to any Liens in favor of any other Government Body having jurisdiction over the Lessee or the Aircraft;

(xxi)   Reserved;

(xxii)   evidence reasonably acceptable to Lessor that the Aircraft has been registered with the State of Registry or such registration will be so effected immediately after delivery of the Aircraft to Lessee hereunder;

(xxiii)   evidence reasonably acceptable to Lessor CTC Registrations in respect of the Airframe and Engines have been properly effected on the International Registry or will be so effected immediately after delivery of the Aircraft to Lessee hereunder with all required consents and are valid and searchable International Interests;

(xxiv)   confirmation that Lessor is entitled to the benefits available to a creditor who leases aircraft objects under the CTC Insolvency Provisions in connection with its right to take possession of the Aircraft in the event of an Insolvency-Related Event (which evidence may be provided in the legal opinion issued to Lessor described in clause (x) above);

(xxv)   a copy of the Lessee's current air operating certificate ("AOC") issued by the CAA; and

(xxvi)   such other documents as Lessor may reasonably request, in form and substance satisfactory to Lessor.

(b)     On the Delivery Date, Lessee shall have paid all fees, Taxes (including stamp taxes) and other amounts being due and payable on or before the Delivery Date pursuant hereto, including, without limitation, the fees and expenses payable pursuant to Section 24.08 hereof.

(c)     On the Delivery Date the following statements shall be true and Lessor shall have received a certificate satisfactory to Lessor signed by a duly authorized officer of Lessee, dated the Delivery Date, stating that:

(i)     the representations and warranties contained in Section 6.05 hereof are true and accurate on and as of the Delivery Date as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date in which case such representation or warranty shall be true and correct as of such earlier date); and

(ii)    neither Lessee, nor Guarantor shall be in default of its obligations under any agreement with Lessor or any affiliate of Lessor in any material respect.

(d)     Since November 1, 2015:

(i)     In Lessor's reasonable opinion, no material adverse change shall have occurred in Lessee's or Guarantor's financial condition or in the commercial aviation industry; and

(ii)    There shall not have occurred any change in United States income and tax treaties, federal income tax law, regulations or administrative or judicial interpretations thereof, or any change in GAAP, or shall have been introduced into, or enacted by, the United States Congress any legislation, any of which would have an adverse impact on Owner's and Lessor's after-tax yield and/or after-tax cash flow.

(e)     [intentionally left blank].

(f)     The debt markets in the United States shall not have failed to open for any reason on any day that was a Business Day during the 14-day period immediately prior to the Delivery Date and, if the debt markets have closed on any Business Day during such period, the Delivery Date shall be delayed until the first Business Day occurring 14 days after the last day of such closure.

(g)     No Market Disruption shall have occurred prior to the Delivery Date.

(h)     There are no other registrations on the International Registry in relation to the Aircraft or the Engines other than those relating to ownership interest in the Airframe and each Engine, this Lease and the other Operative Documents and any other registration on the International Registry explicitly permitted or required by this Lease or any other Operative Document.

(i)     [Reserved].

(j)      No current de-registration and export request authorization in relation to the Aircraft has been recorded by the relevant registry authority other than the DERA.

(k)      No Event of Loss shall have occurred with respect to the Aircraft.

(l)      [intentionally left blank].

(m)      [intentionally left blank].

(n)      Engine PIP certification issued by the CAA shall have been received by Engine Manufacturer.

3.02    Concurrently with the delivery of the Aircraft hereunder, Lessor and Lessee will cause this Lease and the Lease Supplement to be duly filed and recorded with the BDCA at Lessee's expense.

3.03    Lessee shall provide, at its sole cost and expense, promptly after the Delivery Date and in any event within ten (10) Business Days after the Delivery Date:

(a) a copy of Lessee's specifications to the air operator's certificate incorporating the Aircraft issued by the Russian Aviation Authority;

(b) evidence that all required customs formalities relating to the import of the Aircraft into the habitual base (meaning Russia as state of incorporation or such other location or jurisdiction from time to time agreed to by Lessor) (the "Habitual Base") have been complied with, including, but not limited to, copies certified by a duly authorized officer of Lessee of the customs declaration and, if applicable, written confirmation that Lessee has paid any import and customs duty, Tax and all other amounts payable upon the importation of the Aircraft into the Habitual Base;

(c) (i) a copy of an export declaration in relation to the Aircraft or a letter stating that there is no requirement to provide such an export declaration and (ii) to the extent required, a customs pro-forma invoice in respect of the Aircraft.

3.04    Lessee's obligation to accept the Aircraft from Lessor hereunder shall be subject to satisfaction, or waiver in writing, on or before the Delivery Date of each and all of the following conditions precedent:

(a) Lessee shall have received the following:

(i)     this Lease, the Lease Supplement and the Technical Acceptance Certificate executed by Previous Lessor;

(ii)    [intentionally left blank];

(iii)   a certificate signed by a duly authorized officer of the Lessor, to the effect that all appropriate action has been taken to authorize or ratify the lease by Lessor of the Aircraft hereunder and the execution, delivery and performance by Lessor of the Operative Documents, together with an incumbency certificate as to the persons authorized to execute and deliver said certification and the Operative Documents on behalf of Lessor;

(iv)    satisfactory evidence of Lessor's appointment of the Process Agent; and

(v)     satisfactory evidence of Lessor's tax status in Singapore.

(b) On the Delivery Date the following statements shall be true and Lessee shall have received a certificate satisfactory to Lessee signed by a duly authorized officer of Lessor, dated the Delivery Date, stating that the representations and warranties contained in Section 6.06 hereof are true and accurate on and as of the Delivery Date as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date in which case such representation or warranty shall be true and correct as of such earlier date).

ARTICLE 4.   Term.  The term of the Lease (the "Term") shall commence on the Delivery Date and shall continue until the Lease Termination Date.

ARTICLE 5.   Rent; Time and Place of Payments.

5.01    Basic Rent.  Lessee covenants and agrees to pay Lessor, in Dollars, Basic Rent for the Aircraft throughout the Term in accordance with the terms of this Lease.  If any installment of Basic Rent is due on a day other than a Business Day, such installment shall be payable on the immediately preceding Business Day.

5.02    Supplemental Rent.  Lessee also agrees to pay to Lessor, or at Lessor's direction to whomsoever shall be entitled thereto, any and all Supplemental Rent promptly as the same shall become due and owing.  To the extent not specified in this Lease or any related notice or invoice, Supplemental Rent shall be due and owing net thirty (30) days upon notice or invoice upon demand therefor. Lessee will also pay to Lessor, as Supplemental Rent, interest at the Incentive Rate on any part of any installment of Basic Rent not paid on the due date thereof for

any period for which the same shall be overdue and on any payment of Supplemental Rent not paid when due hereunder for the period until the same shall be paid.

     5.03    Net Lease; Prohibition Against Setoff, Counterclaim, Etc. This Lease is a net lease, and Lessee agrees that it will pay or cause to be paid all costs, charges, fees and expenses associated with the registration, import, export, re-registration, use, operation, possession, control, maintenance and insurance of the Aircraft.  Lessee's obligation to pay all Rent payable hereunder shall be absolute and unconditional and shall not be affected by any circumstances, including, without limitation:  (a) any setoff, counterclaim, recoupment, defense or other right which Lessee may have against Lessor, the manufacturers of the Items or anyone else for any reason whatsoever; (b) any defect in the title, airworthiness, condition, design, operation or fitness for use of, or any damage to or loss or destruction of, any Item of Equipment or any interruption or cessation in the use or possession thereof by Lessee for any reason whatsoever; (c) any insolvency, bankruptcy, reorganization, moratorium or similar proceedings by or against Lessor or Lessee; (d) any breach by Lessor of any representation, warranty or covenant of Lessor made herein or in connection herewith; (e) any Required Approval not being obtained, lapsing or otherwise not being in full force and effect, or the failure to have in force any exchange approval to remit payments of Rent or (f) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.  If for any reason whatsoever this Lease shall be terminated in whole or in part by operation of law or otherwise except pursuant to specific provisions of this Lease, Lessee nonetheless agrees to pay or cause to be paid to Lessor an amount equal to each installment of Basic Rent at the time such payment would have become due and payable in accordance with the terms hereof had this Lease not been terminated in whole or in part.

     5.04    Waiver of Certain Rights of Lessee.  Except as expressly provided hereunder, Lessee hereby waives, to the extent permitted by applicable law, all rights now or hereafter conferred upon it by statute or otherwise to terminate or surrender this Lease or the Aircraft, any Engine or any Part or to any abatement, suspension, deferment, diminution or reduction of Rent. Each payment of Rent shall be absolutely final and net to Lessor, as specified herein, so that this Lease will yield to Lessor the full amount of the installments of such Rent throughout the Term without deduction. In the event the parties agree to early termination of this Lease due to the exercise by Lessee of a purchase of the Aircraft, the parties will agree to adjustment of Rent at the relevant purchase date.

     5.05    Place and Time of Payment.  All Rent and any other amounts payable to Lessor under this Lease shall be paid by wire transfer of immediately available funds, unless otherwise specified herein, consisting of lawful currency of the United States of America, in such manner that Lessor receives the full amount of such payments, without deduction for any bank transaction or wire transfer fees, no later than 11:00 a.m. (New York City time) on the due dates in the Account Number: 001828444 with: HSBC Bank USA, N.A., Bank Address: 452 Fifth Avenue, New York, NY 10018-2706, United States of America, Swift Code: MRMDUS33, ABA Number: 021001088 or such other account as Lessor may designate in writing to Lessee. Lessee agrees to instruct the remitting bank with respect to any such payments that all forms of payment instructions to any beneficiary bank, such as SWIFT or SWIFT MT100, shall prohibit the deduction of any bank transaction or wire transfer fee from any such payments.

ARTICLE 6.   Disclaimers and Waivers; Lessee's and Lessor's Representations and Warranties.

6.01   "As Is, Where Is".   LESSEE UNCONDITIONALLY ACKNOWLEDGES AND AGREES THAT IT IS LEASING THE ITEMS OF EQUIPMENT HEREUNDER "AS-IS", "WHERE-IS" AND THAT NEITHER LESSOR NOR ANY OF ITS AFFILIATES, SUBSIDIARIES, SUCCESSORS, ASSIGNS OR SUBCONTRACTORS OR THEIR RESPECTIVE DIRECTORS, OFFICERS, AGENTS, REPRESENTATIVES, SHAREHOLDERS OR EMPLOYEES HAVE MADE OR WILL BE DEEMED TO HAVE MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO (a) THE TITLE (WHETHER BY WAY OF INFRINGEMENT, INTERFERENCE OR OTHERWISE AND INCLUDING WITHOUT LIMITATION THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, TRADEMARK, COPYRIGHT OR OTHER INTELLECTUAL PROPERTY RIGHTS), (b) AIRWORTHINESS, CONDITION, VALUE, DESIGN, CAPACITY, AGE, QUALITY, DURABILITY, PERFORMANCE, OPERATION, MANUFACTURE, MERCHANTABILITY OR FITNESS FOR USE OR PARTICULAR PURPOSE OF ANY ITEM OF EQUIPMENT, OR AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF ANY ITEM OF EQUIPMENT OR AS TO THE CONFORMITY OF ANY ITEM OF EQUIPMENT TO THE DESCRIPTION CONTAINED HEREIN, IN THE LEASE SUPPLEMENT OR ELSEWHERE, (c) THE ADEQUACY OF THE AIRCRAFT DOCUMENTATION OR ANY OTHER DOCUMENTS AND ENGINE RECORDS DELIVERED TOGETHER WITH ANY ITEM OF EQUIPMENT, (d) ANY IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE OR (e) ANY OTHER REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY ITEM OF EQUIPMENT, ALL OF WHICH ARE HEREBY EXPRESSLY EXCLUDED AND EXTINGUISHED.

6.02   Waiver.   LESSEE HEREBY WAIVES AS BETWEEN ITSELF AND LESSOR AND AGREES NOT TO SEEK TO ESTABLISH OR ENFORCE ANY RIGHTS AND REMEDIES, EXPRESS OR IMPLIED (WHETHER STATUTORY OR OTHERWISE) AGAINST LESSOR OR THE AIRCRAFT RELATING TO ANY OF THE MATTERS SET FORTH IN SECTION 6.01.

6.03   Conclusive Proof.   DELIVERY OF THE DULY EXECUTED LEASE SUPPLEMENT BY LESSEE TO LESSOR SHALL BE CONCLUSIVE PROOF AS BETWEEN LESSOR AND LESSEE THAT LESSEE'S TECHNICAL EXPERTS HAVE EXAMINED AND INVESTIGATED THE AIRCRAFT, ENGINES AND EACH PART THEREOF AND THAT THE AIRCRAFT, ENGINES AND EACH PART THEREOF IS AIRWORTHY AND IN GOOD WORKING ORDER AND REPAIR, WITHOUT DEFECT (WHETHER OR NOT DISCOVERABLE AT THE DELIVERY DATE) AND IN EVERY WAY SATISFACTORY TO LESSEE.

6.04    No Lessor Liability.  IN NO EVENT SHALL LESSOR OR ANY OTHER INDEMNIFIED PARTY BEAR ANY LIABILITY, RESPONSIBILITY OR EXPENSE WHATSOEVER TO LESSEE OR ANY OTHER PERSON, WHETHER IN CONTRACT OR TORT (INCLUDING NEGLIGENCE) AND HOWEVER ARISING, FOR ANY COST, LOSS OR DAMAGE (CONSEQUENTIAL OR OTHERWISE), LOSS OF REVENUE, LOSS OR SUSPENSION OF CERTIFICATION OF THE AIRCRAFT, OR GROUNDING OF THE AIRCRAFT OR ANY OTHER CLAIMS WHATSOEVER ARISING FROM (A) THE CONDITION OF ANY ITEM OF EQUIPMENT; (B) ANY MAINTENANCE, REPAIR OR REPLACEMENT OF ANY ITEM OF EQUIPMENT; (C) ANY ALTERATION, MODIFICATION OR ADDITION TO ANY ITEM OF EQUIPMENT, INCLUDING ANY ALTERATION, MODIFICATION OR ADDITION PURSUANT TO ARTICLE 10 HEREOF; OR (D) ANY INSPECTION PERFORMED BY LESSOR, OR LACK OF INSPECTION BY LESSOR, IN ACCORDANCE WITH ANY INSPECTION RIGHTS GRANTED TO LESSOR UNDER THIS LEASE. LESSOR SHALL NOT HAVE ANY DUTY TO DETERMINE WHETHER ANY ITEM OF EQUIPMENT IS REQUIRED TO BE OVERHAULED, REFURBISHED OR MAINTAINED, OR TO OBSERVE OR INSPECT THE OVERHAUL, REFURBISHMENT OR MAINTENANCE OF ANY ITEM OF EQUIPMENT, AND LESSOR SHALL NOT INCUR ANY LIABILITY OR OBLIGATION BY REASON OF THE FAILURE OF ANY ITEM OF EQUIPMENT TO BE PROPERLY OVERHAULED OR MAINTAINED OR BY REASON OF LESSOR'S ELECTION TO OBSERVE OR INSPECT OR NOT TO OBSERVE OR INSPECT ANY OVERHAUL, REFURBISHMENT OR MAINTENANCE OF ANY ITEM OF EQUIPMENT.

6.05    Lessee's Representations and Warranties.  Lessee represents and warrants as at the date hereof as follows:

(a)    Organization, Etc.  Lessee (i) is a company duly organized, validly existing, in good standing under the laws of Russian Federation, and is a tax resident of the Russian Federation, (ii) has duly qualified and is authorized to do business and is in good standing as a foreign company in each jurisdiction where the character of its properties or the nature of its activities (including the leasing and operation of the Aircraft) make such qualification necessary, and (iii) has the corporate power and authority to carry on its business as presently conducted and to perform its obligations under this Lease and the other Operative Documents to which it is a Party;

(b)    Licenses.  Lessee is a certificated air carrier and holds all licenses, certificates, permits and franchises from the CAA and any other Aviation Authority or other Government Body having jurisdiction, necessary to authorize Lessee to engage in air transport and to carry on its business as presently conducted and to be conducted with the Aircraft;

(c)    Authorization; Non-Contravention.  The execution, delivery and performance of this Lease and the other Operative Documents to which it is a Party, have been duly authorized by all necessary action on the part of Lessee, do not require any shareholder approval or approval or consent of any trustee or holders of any Debt or obligations of Lessee (except for any approval or consent previously obtained) and do not and will not contravene any law, governmental rule,

23

regulation or order binding on Lessee or the formation documents  or bylaws of Lessee or contravene the provisions of, or constitute a default under, or result in the creation of any Lien (other than as permitted under this Lease) upon the property of Lessee under any indenture, mortgage, deed of trust, conditional sales contract, bank loan or credit agreement, contract or other agreement to which it may be a party or by which its property may be bound;

(d)     Consents.  Neither the execution and delivery by Lessee of this Lease or any of the other Operative Documents, nor the consummation of any of the transactions by Lessee contemplated hereby or thereby requires the consent or approval of, the giving of notice to, or the registration with, or the taking of any other action in respect of, the CAA or any other Aviation Authority or Government Body, or any Person, except for (i) the registration of the Aircraft and recordation of this Lease and the Lease Supplement with the BDCA; (ii) the procurement of the Required Approvals; and (iii) the CTC Registrations;

(e)     Enforceability.  This Lease constitutes and the Lease Supplement and any other Operative Documents when entered into and delivered by Lessee will constitute, valid and binding obligations of Lessee enforceable in accordance with their respective terms;

(f)     Litigation.  There are no suits or proceedings pending or, to the knowledge of Lessee, threatened against or affecting Lessee in any court or before any regulatory commission, board or other administrative governmental agency, which if determined adversely to Lessee would have a material adverse effect on the financial condition or business of Lessee or the ability of Lessee to perform its obligations under this Lease and the other Operative Documents;

(g)     Perfection.  Except for the filing for registration and recordation of this Lease and the Lease Supplement with the appropriate registry maintained by the BDCA, the registration of the International Interests provided for in this Lease and created in the Lease Supplement and the procurement of the Required Approvals, no further filing or recording of this Lease or the Lease Supplement or of any other document is necessary or advisable under the Laws of any jurisdiction to which Lessee is subject in order to fully protect, establish and perfect in all applicable jurisdictions Owner's or Lessor's title to, and leasehold interest in, the Aircraft as against Lessee and any third parties;

(h)     International Registration.  Lessee is a TUE and has appointed an Administrator that has authorized specific TUEs and /or PUEs to consent to the CTC Registrations (which require Lessee consent) at the International Registry required herein;

(i)     Financial Condition.  The audited balance sheet of Guarantor as of December 31, 2015 (the "Balance Sheet"), and the audited statements of profit and loss of Guarantor for the twelve months then ended, each certified on an unqualified basis by Guarantor's independent

accountants heretofore furnished to Lessor, are complete and correct in all material respects and have been prepared in accordance with Accounting Principles.  Lessee and Guarantor have no contingent obligations, liabilities for taxes or forward or long-term commitments which could have a material adverse effect on its financial condition, except as disclosed in the Balance Sheet or the notes thereto.  Since the date of the Balance Sheet, there has been no material adverse change in Guarantor's operations or financial condition from that reflected in such financial statement, and no material adverse change in Lessor's operations or financial condition;

(j)     Pari Passu Ranking.  The obligations of Lessee to pay Rent hereunder will be direct and unconditional general obligations of Lessee, and will rank in right of payment at least pari passu with all Lessee Liabilities, other than any relating to labor claims and tax obligations, whether now or hereafter outstanding. The pari passu ranking referred to in the preceding sentence refers to ranking in right of payment only, and does not address the issues of collateral security for any Debt or recourse in respect of any Debt against any direct or indirect guarantor thereof;

(k)     No Conflicting Agreements.  Lessee is not a party to any agreement or instrument or subject to any charter or other restriction which individually or in the aggregate could reasonably be expected to adversely affect its ability to perform its obligations under this Lease or the other Operative Documents;

(l)     No Default.  No Default has occurred and is continuing;

(m)    Taxes.  As of the date hereof all payments to Lessor under this Lease will not be subject to Taxes, and as of the date hereof no withholding of any Taxes will be required upon any such payment;

(n)     Tax Filings.  Lessee has filed or caused to be filed all tax returns required to be filed and has paid or caused to be paid all Taxes shown to be due and payable thereon or on any assessment received by Lessee, except for non-payments or failure to file which individually or in the aggregate could not reasonably be expected to have a material adverse effect on the financial condition or results of operations of Lessee;

(o)     Accurate Information.  Each document, certificate or statement, furnished to Lessor by or on behalf of Lessee in connection with the transactions contemplated hereby does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein and therein not misleading;

25

(p)     <u>Not a Governmental Agency</u>.  Lessee is not an agency of any government and neither Lessee nor any of its revenues, properties or assets enjoys any right of immunity from suit, set-off, attachment upon or prior to judgment or in aid of execution in respect of its obligations hereunder;

(q)     <u>Compliance with Laws</u>.  Lessee is in compliance with all Laws to which Lessee is subject except for noncompliance which, individually or in the aggregate, could not reasonably be expected to have a material adverse effect on the business or financial condition of Lessee;

(r)     <u>Choice of Law</u>.  The choice by Lessee of the law of the State of New York to govern this Lease is valid and binding under the Russian Federation Laws and the State of Registration or any state or country in which Lessee conducts business and a court in any such state or country would uphold such choice of law in a legal proceeding to enforce this Lease brought in such court;

(s)     <u>Submission to Jurisdiction</u>.  Lessee has validly submitted to the jurisdiction of the courts of the State of New York and the federal courts for the Southern District of New York;

(t)     <u>Qualification</u>.  Lessor is not required to qualify for admission to do business under the Laws of the Russian Federation or any subdivision thereof, nor is Lessor required to take any other action which would (either alone or in connection with any other action) subject Lessor to liability or jurisdiction of any courts or taxing authorities in or for the Russian Federation or any subdivision thereof by reason of the transactions contemplated by this Lease, including, without limitation, the enforcement of remedies thereunder;

(u)     <u>Payment in Dollars</u>.  Lessee has obtained all consents, authorizations or approvals for the availability and transfer of Dollars required to make all payments due hereunder to Lessor (or its assignee or designee); except for opening of a transaction passport ("*passport sdelki*") which will be duly obtained prior to the delivery of the Aircraft.

(v)     <u>Powers of Attorney</u>.  The DERA and Powers of Attorney are in full force and effect and are in sufficient form to authorize, upon submission to the CAA following the occurrence and during the continuance of an Event of Default, the deregistration by the Registry Authority of the Aircraft on behalf of Lessee and to provide the export and physical transfer by Lessor of the Aircraft from the Russian Federation;

(w)     <u>Own Account</u>.  Lessee is entering into this Lease and the other Operative Documents to which it is a party and the transactions contemplated hereby and thereby solely for its own account, risk and beneficial interest;

(x)      OFAC.  Lessee (i) is not a Person identified on, nor does it have any affiliation of any kind with any Person identified on, (A) any "watch list" established by the United States Office of Foreign Assets Control ("OFAC"), including, without limitation, OFAC's list of Specially Designated Nationals and Blocked Persons or (B) any "watch list" established by the United States Federal Bureau of Investigation; (ii) is not a foreign shell bank or offshore bank; and (iii) is not resident in, nor has funds that are transferred from or through, nor has operations in, any jurisdiction identified as non-cooperative by the Financial Action Task Force of the United States or sanctioned by OFAC;

(y)      International Interest.  This Lease creates or provides for an International Interest in the Airframe and each Engine in favor of Lessor;

(z)      Insolvency Protections.  Lessee is not aware of any reason why protections  of the CTC Insolvency Provisions in connection with its right to take possession of the Aircraft in the event of an Insolvency-Related Event should not be available to Lessor; and

(aa)      Strict Liability.  The laws of the State of Registry and the Laws of the Russian Federation do not subject the Lessor to liability merely by reason of Owner or Lessor's ownership of the Aircraft.

6.06      Lessor's Representations and Warranties.  Lessor represents and warrants as follows:

(a) Organization, Etc.  Lessor (i) is a corporation duly organized, validly existing, under the laws of Singapore, (ii) has duly qualified and is authorized to do business and is in good standing as a foreign corporation in each jurisdiction where the character of its properties or the nature of its activities (including the leasing and operation of Aircraft) make such qualification necessary, and (iii) has the corporate power and authority to carry on its business as presently conducted and to perform its obligations under this Lease and the other Operative Documents;

(b) Authorization; Non-Contravention.  The execution, delivery and performance of this Lease and the other Operative Documents have been duly authorized by all necessary corporate action on the part of Lessor, do not require any shareholder approval or approval or consent of any trustee or holders of any debt or obligations of such Person (except for any approval or consent previously obtained) and do not and will not contravene any law, governmental rule, regulation or order binding on such Person or the articles of incorporation or bylaws of such Person;

(c) Consents.  Neither the execution and delivery by Lessor of this Lease or any other Operative Documents, nor the consummation of any of the transactions by such Person contemplated hereby or thereby requires the consent or approval of, the giving

notice to, or the registration with, or the taking of any other action in respect of, any Government Body, or any Person;

(d) <u>Enforceability</u>.  This Lease constitutes and the Lease Supplement and any other Operative Documents when entered into and delivered by Lessor will constitute, valid and binding obligations of such Person enforceable in accordance with their respective terms; except as the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditor's rights generally and by the application of general principals of equity (regardless of whether enforceability is considered in a proceeding in equity or at law);

(e) <u>Not a Governmental Agency</u>.  Lessor is not an agency of any government and neither Lessor nor any of its revenues, properties or assets enjoys any right of immunity from suit, set, set-off, attachment upon or prior to judgment or in aid of execution in respect of its obligations hereunder;

(f) <u>Choice of Law</u>.  The choice by Lessor of the law of the State of New York to govern this Lease is valid and binding under the laws of the state or country of Lessor's incorporation; and

(g) <u>Right to Lease the Aircraft</u>.  With effect from the Effective Time, Owner will have title to the Aircraft, and Lessor will have all necessary rights to lease the Aircraft to Lessee pursuant to this Lease.

ARTICLE 7.   <u>Possession, Operations and Maintenance</u>.

7.01   <u>Possession</u>.  Lessee shall not, without the prior written consent of Lessor, sublease or otherwise in any manner deliver, relinquish or transfer possession of any Item of Equipment; <u>provided</u>, <u>however</u>, that, so long as no Default or Event of Default shall have occurred and be continuing and so long as Lessee shall comply with the provisions of Article 13 hereof, Lessee may (a) deliver possession of an Item of Equipment to an FAA or EASA-approved maintenance organization for service, repair, maintenance or overhaul work, or for alterations or modifications in or additions to an Item of Equipment to the extent required or permitted by the terms hereof, and (b) install an Engine on an airframe owned by or leased to Lessee or purchased by Lessee subject to a conditional sale or other security agreement, <u>provided</u> that such airframe is free and clear of all Liens except the rights of the parties to the lease or conditional sale or other security agreement covering such airframe; and <u>provided</u> <u>further</u>, that Lessor shall have received prior to such installation a certificate from the owner of such airframe or secured party with respect thereto to the effect that the lease or conditional sale or other security agreement covering such airframe by its terms provides that neither such lessor nor secured party nor its successors or assigns will acquire or may claim any right, title or interest in any Engine by reason of such Engine being installed on such airframe at any time while such Engine is subject to this Lease.  If Lessor shall consent to any sublease of the Aircraft, such sublease shall (i) be collaterally assigned to Lessor as security for Lessee's obligations hereunder, (ii) be expressly subject and

subordinate to Lessor's rights hereunder, and (iii) be in all respects reasonably satisfactory to Lessor.

7.02    Assignment by Lessee.  LESSEE SHALL NOT ASSIGN ANY OF ITS RIGHTS UNDER THIS LEASE WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR. LESSEE MAY SUBLEASE THE AIRCRAFT ONLY WITH THE PRIOR WRITTEN APPROVAL OF LESSOR IN ITS SOLE AND ABSOLUTE DISCRETION AND LESSOR SHALL BE NOTIFIED OF ANY INTENTION TO SUBLEASE NOT LESS THAN THIRTY DAYS PRIOR TO THE DESIRED COMMENCEMENT THEREOF. LESSOR SHALL HAVE ABSOLUTE DISCRETION TO APPROVE THE SUBLEASE, THE TERMS OF ANY SUCH SUBLEASE, AND ANY CHANGE OF REGISTRATION NECESSITATED BY ANY SUCH SUBLEASE. ANY PURPORTED ASSIGNMENT, SUBLEASE OR CONVEYANCE NOT IN ACCORDANCE WITH THE TERMS HEREIN SHALL BE VOID AB INITIO EXCEPT AS PERMITTED BY SECTION 7.01 HEREOF.

7.03    Lawful Operations.  Lessee agrees throughout the Term (a) to maintain operational control of the Aircraft at all times, except as otherwise permitted in this Article 7, and (b) to use the Aircraft in accordance with all Laws of any Government Body having jurisdiction over Lessee, Lessee's operations or the Aircraft.  Lessee will not employ, suffer or cause the Aircraft to be used in any business which is forbidden by applicable Law, including without limitation any United States export and re-export controls and trade and economic sanctions laws and regulations, or in any manner which may render the Aircraft liable or susceptible to condemnation, destruction, seizure, or confiscation by any Government Body. Lessee will not operate or permit the Aircraft to fly to any airport or country if so doing would cause Lessee or Lessor to be in violation of any applicable Law, including without limitation any United States export and re-export controls and trade and economic sanctions laws and regulations, applicable to either Lessor or Lessee or to the Aircraft. Without limiting the generality of the foregoing, the Aircraft shall not be subleased or wet leased to a Prohibited Person.  The Aircraft shall not be used in, or with respect to travel to and/or from any Restricted Country if so doing would cause Lessee, Owner or Lessor to be in violation of any applicable Law of the United States; provided, however, the foregoing shall not prohibit the use of the Aircraft for travel to any such countries if (x) such use would be permitted as a temporary sojourn under Part 740.15 of the Export Administration Regulations of the United States, (b) Lessee retains operational control of the Aircraft at all times, as that term is defined in Part 740.15 of the Export Administration Regulations and (c) such use is not the predominant route of the Aircraft.

7.04    Insured Operations.  Lessee agrees not to operate any Item, or suffer such Item to be operated; (a) unless such Item is covered by insurance consistent with the provisions of Article 13 hereof; or (b) contrary to the terms of the policies of insurance held in compliance with Article 13 hereof.

7.05    Maintenance.  Lessee, at its own cost and expense, shall:  (a) inspect, service, repair, maintain and overhaul, test or cause the same to be done to each Item of Equipment leased hereunder (i) so as to keep such Item in as good an operating condition and appearance as when delivered to Lessee hereunder, ordinary wear and tear excepted, (ii) so as to keep such Item

in compliance with all Manuals relating to the Aircraft, and all so-called "mandatory" and "alert" service bulletins and similar notices issued or supplied by or available through the manufacturer of such Item provided that Lessee shall not have to be in compliance with the "alert" service bulletins if such service bulletins were not incorporated on Lessee's leased fleet of similar type aircraft, (iii) so as to keep such Item in such operating condition as may be necessary to enable the airworthiness certification of such Item to be maintained in good standing at all times under the applicable rules and regulations of the Aviation Authority, (iv) so as to meet the standards observed by Lessee with respect to aircraft of similar type owned or leased by Lessee and operated on similar routes, and in a manner which does not adversely discriminate against the Aircraft compared to aircraft of similar type operated by Lessee, (v) so as to keep the Aircraft in such operating condition as would be necessary to enable Lessor at the time of the return of the Aircraft by Lessee to immediately obtain a standard Certificate of Airworthiness for the Aircraft from the FAA, and (vi) in strict compliance with the Maintenance Program, it being understood that Lessee will promptly advise Lessor of any material change to the Maintenance Program including any optimization of Lessee's Maintenance Program, including increased inspection intervals, as accepted by Manufacturer and the relevant Aviation Authorities ("Optimized Maintenance Program" or "OMP"); (b) carry out, on each Item, all applicable Airworthiness Directives which the FAA and the Aviation Authority may from time to time issue and which become due during or within eighteen (18) months after the scheduled end of the Term with respect to such Item; (c) to the extent Lessee uses third-party maintenance providers, such provider shall be an FAA or EASA-approved repair facility and all maintenance records, components, tags or other documentation received from such maintenance provider shall be made a part of the Aircraft Documentation to the extent required by the FAA or Aviation Authority; and (d) promptly furnish to Lessor upon Lessor's request such information as may be required to enable Lessor to file any reports required to be filed with any Government Body because of Lessor's interest in the Aircraft.  In the event that compliance with any of the foregoing would require alteration of any Item of Equipment, Lessee shall conform the Item thereto at its sole expense and shall maintain the Item of Equipment in proper condition for operation under the foregoing requirements.  Lessee shall pay for and provide all electric power, oil, fuel and lubricants consumed by and required for the operation of the Aircraft, and all repairs, parts and supplies necessary therefor.  Lessee further agrees to at all times during the Term operate the Engines at the thrust rating no higher than as set forth in the Lease Supplement.

7.06    Insignia.  Lessee, at Lessor's expense, shall cause to be permanently affixed, and then, at its own expense, maintain throughout the Term, the following identification plates, each of which shall be fireproof and made of stainless steel with the appropriate legend prominently etched thereon:

(a)  Airframe Identification Plate.

Location:     In the cockpit of the Airframe in a location reasonably adjacent to and not less prominent than the airworthiness certificate for the Aircraft.

Size:          No smaller than four inches by six inches, or other size acceptable to Lessor.

Legend:        THIS AIRCRAFT IS OWNED BY BOCA LEASING (BERMUDA) LIMITED AND LEASED FROM BOC AVIATION LIMITED.

(b) Engine Identification Plates.

Location:        In a prominent, visible location near the Engine Manufacturer's data plate.

Size:        No smaller than two inches by six inches, or other size acceptable to Lessor.

Legend:        THIS ENGINE IS OWNED BY BOCA LEASING (BERMUDA) LIMITED AND LEASED FROM BOC AVIATION LIMITED

Lessee will not allow the name of any other person, association or corporation to be placed on the Airframe or any Engine as a designation that might be interpreted as a claim of ownership or of any interest therein; provided, however, that Lessee may cause the Airframe to be lettered or otherwise marked in a customary manner for convenience of identification of the interest of Lessee therein, including but not limited to the customary logo of Lessee.

7.07    Records.  Throughout the Term, Lessee shall, at its own cost and expense, maintain in English and in a form consistent with Aviation Authority requirements, recommendations of suppliers of any Item of Equipment and with good commercial airline practice, all records, logs and other materials required by the Aviation Authority to be maintained in respect of each Item of Equipment, including accurate, complete and current written records of all maintenance carried out with respect to the Aircraft.  Lessee shall permit Lessor or any authorized representative of Lessor to examine and make copies of such records at any reasonable time, subject to five (5) days' prior written notice, at Lessor's cost.

ARTICLE 8.   Inspection; Reports.

8.01    Inspection.  During the Term, Lessee shall furnish to Lessor such additional information concerning the location, condition, configuration, use and operation of the Aircraft as Lessor may reasonably request, and Lessee shall permit any person designated by Lessor pursuant to prior reasonable written notice, at Lessor's expense (or, if an Event of Default shall have occurred and be continuing, at Lessee's expense), to visit and inspect the Aircraft, its condition, use and operation and the Aircraft Documentation maintained in connection therewith (and, in connection with any such inspection during a scheduled maintenance check, Lessee shall cooperate with Lessor in connection with any inspection during such check) and to make copies of such Aircraft Documentation at Lessor's expense (or, if an Event of Default shall have occurred and be continuing, at Lessee's expense), and to visit and inspect the properties of Lessee where the Aircraft is located, and to discuss the affairs, finances and accounts of Lessee

31

with the principal officers of Lessee, all at such reasonable times and as often as Lessor may reasonably request. No inspection of the Aircraft shall unduly interfere with the scheduled operation of the Aircraft unless an Event of Default shall be continuing.  Lessor shall have no duty to make any such inspection and shall not incur any liability or obligation by reason of (and Lessee's indemnity obligations under Article 14 will apply notwithstanding) not making any such inspection or making any such inspection of the Aircraft or Aircraft Documentation.

8.02   <u>Reports</u>.  Lessee also agrees to furnish, or to cause Guarantor to furnish, Lessor the following, in English, during the Term:

(a)   as soon as available, but not later than one hundred eighty (180) days after the close of each fiscal year of Guarantor, audited balance sheets, statements of income and changes in financial position, stockholders' equity and cash flows of Guarantor, plus supporting notes, prepared in accordance with IFRS, as of the close of such fiscal year, certified by Guarantor's independent public accountants, including their unqualified opinion thereon;

(b)   as soon as available, but not later than forty-five (45) days after the close of each fiscal quarter of Lessee, a balance sheet, statements of income and changes in financial position of Lessee prepared in accordance with Russian accounting principles as of the close of such fiscal quarter;

(c)   together with each set of financial statements and reports referred to in clause (a) above, a certificate of Lessee, signed by the President or Chief Financial Officer of Lessee, to the effect that the signer has made, or caused to be made under his supervision, a review of the financial condition of Lessee during the accounting period covering such financial statement, and that such review has not disclosed the existence nor, after due inquiry, does the signer have any knowledge of the existence as at the date of such certificate, of any condition or event which constitutes a Default or an Event of Default, or, if such condition or event existed or exists, specifying the nature and period of existence thereof and what action Lessee has taken or is taking or proposes to take with respect thereto;

(d)   semi-annually, within thirty (30) days after each semi-annual anniversary of the Delivery Date, or more frequently if Lessor should reasonably request from time to time, a completed technical report in respect of the Aircraft substantially in the form of Exhibit G hereto (a "<u>Technical Report</u>");

(e)   at least sixty (60) days prior written notice of any significant scheduled maintenance check of the Aircraft (indicating the type of check and the time and place thereof); provided that with respect to the Airframe, Lessee shall only be responsible for notice of Heavy Checks;

(f)   after each month of operations, by the tenth (10th) day of the following month, a utilization report containing, among other information, the Flight Hours and Cycles accumulated on each Item of Equipment during the previous month substantially in the form of Exhibit C hereto; and

(g)     from time to time, such other information as Lessor may reasonably request and which is reasonably necessary to protect and preserve the rights of Lessor hereunder and the interests of Lessor and Owner in the Aircraft.

ARTICLE 9.   Lessee's Covenants.  Lessee covenants and agrees that, during the Term hereof:

9.01    Maintenance of Corporate Existence.  Lessee will preserve and maintain (a) its corporate existence, (b) its tax residence as of the Delivery Date and (c) all of its rights, privileges and franchises in every jurisdiction in which the character of the property owned or operated or the nature of the business transacted by it makes licensing or qualification necessary.

9.02    Notice of Litigation, Etc.  Lessee will promptly give to Lessor a notice in writing of (a) any claim, cause of action, litigation or proceeding pending or threatened before any Government Body which might, if determined adversely to Lessee, materially adversely affect Lessee's financial condition, affairs or operations, and (b) any other matter which might materially adversely affect Lessee's financial condition, affairs or operations or Lessee's ability to perform under this Lease or any of the other Operative Documents.

9.03    Payment of Taxes.  Lessee will pay or cause to be paid all Taxes imposed upon it or upon its income and profits, or upon any property belonging to it, prior to the date on which penalties attach thereto and all lawful claims, which, if not paid, might become a lien or charge upon the property of Lessee.

9.04    Consolidation, Merger or Sale.  Lessee will not merge or consolidate with or into any other corporation or entity (except to the extent Lessee is the successor, survivor or parent and, in such event, only if the tangible net worth of the successor, survivor or parent is, in Lessor's reasonable judgment, equal to or greater than the tangible net worth of Lessee as of the Delivery Date), or sell, lease or otherwise dispose of all or substantially all of its assets or properties, without the prior written consent thereto by Lessor.  Lessee will not, without the prior written consent of Lessor, authorize or become a party to any transaction (or series of transactions) which would result in a change of control of Lessee. Nothing contained herein shall prevent Lessee from merging or consolidating with any other entity in the Volga-Dnepr group provided that, Lessee (or the surviving entity) remains under the direct or indirect control of Guarantor, and if Lessee is not the surviving entity in any such consolidation, the surviving entity shall enter into such transfer documentation as may be reasonably necessary in order for such surviving entity to be bound by the terms of this Lease and the other Operative Documents to which Lessee is a party.

9.05    No Distributions.  Lessee shall not declare or pay any dividends, or otherwise make any distributions to its shareholders, at any time when a Default or Event of Default shall be continuing.

9.06    Aircraft Related Charges and Aircraft Fees.  Lessee shall promptly pay and discharge promptly before they become overdue (i) all airport landing fees, navigation charges

and similar fees or charges imposed on Lessee's Aircraft or Lessee (including, without limitation, charges levied on behalf of member countries by Eurocontrol) and (ii) all Aircraft Fees with respect to Lessee's Aircraft.

Lessee shall promptly, upon request, provide Lessor with copies of all correspondence sent to and received from Government Bodies that relate to or threaten Liens affecting Lessee's Aircraft.  In addition, at any time during the Term, upon Lessor's request, Lessee shall provide Lessor with (i) the past, current and future countries and airports where Lessee's Aircraft  have been or will be based, flown over or the subject of multiple landings, (ii) evidence reasonably satisfactory to Lessor that any Aircraft Fees in respect of Lessee's Aircraft have been satisfied in accordance with applicable Law, and (iii) an irrevocable instrument, in form and substance reasonably acceptable to Lessor, duly executed and delivered and addressed to the Government Body referred to in Lessor's request authorizing such Government Body to release to Lessor from time to time a statement of accounts of any and all such Aircraft Fees in respect of Lessee's Aircraft whether accruing, pending or owing by Lessee.

9.07    Compliance with Patriot Act.  Lessee agrees to provide any information deemed necessary by the anti-money laundering compliance officer of Lessor, in his or her sole discretion, to enable Lessor to comply with the Patriot Act, Lessor's anti-money laundering program and related responsibilities from time to time.

9.08    Compliance With All Laws.  Lessee shall comply in all material respects with all Laws applicable to the Lessee or the Aircraft, including without limitation the restrictions on operations set forth in Section 7.03 hereof.

9.09    [intentionally left blank].

ARTICLE 10. Replacement of Parts; Alterations, Modifications and Additions.

10.01    Replacement of Parts.  Lessee, at its own cost and expense, will promptly replace all Parts which may from time to time become worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use for any reason whatsoever.  In addition, in the ordinary course of maintenance, inspection, service, repair, overhaul or testing, Lessee may remove any Parts, whether or not worn out, lost, stolen, destroyed, seized, confiscated, damaged beyond repair or permanently rendered unfit for use, provided that Lessee shall replace such Parts as promptly as practicable.  All replacement parts shall be free and clear of all Liens and shall be in as good an operating condition as, and shall have a value and utility at least equal to, the Parts replaced, assuming such replaced Parts were in the condition and repair required to be maintained by the terms hereof.  PMA Parts shall not be used as replacement parts or otherwise installed on the Aircraft at any time.

10.02    Title to Replaced Parts.  All Parts owned by Owner and leased by Lessor hereunder at any time removed from any Item of Equipment shall remain the property of Owner and subject to this Lease, no matter where located, until such time as such Parts shall be replaced by parts which have been incorporated or installed in or attached to such Item and which meet the requirements for replacement parts specified in Section 10.01 above.  Immediately upon any

replacement part becoming incorporated or installed in or attached to an Item as above provided, without further act, (a) title to the replaced Part shall thereupon vest in Lessee, free and clear of all rights of Owner and all Lessor Liens and shall no longer be deemed a Part hereunder; (b) title to such replacement part shall thereupon vest in Owner and be and become a "Part"; and (c) such replacement part shall become subject to this Lease and be deemed part of such Item for all purposes hereof to the same extent as the Parts originally incorporated or installed in or attached to such Item.

10.03   <u>Alterations, Modifications and Additions</u>.  Lessee, at its own expense, shall make alterations and modifications in and additions to an Item of Equipment as may be required from time to time under any law, rule, directive, bulletin, regulation or order of the Aviation Authority, or other Government Body having jurisdiction or issued by the manufacturer of such Item of Equipment.  In addition, Lessee, at its own expense, with the prior written approval of Lessor, may from time to time make such alterations and modifications in and additions to each Item as Lessee may deem desirable in the proper conduct of its business, <u>provided</u> that no such alteration, modification or addition diminishes the value, utility, condition or airworthiness of such Item below the value, utility, condition and airworthiness thereof immediately prior to such alteration, modification or addition, assuming such Item was then in the condition and airworthiness required to be maintained by the terms of this Lease.  Any alteration, addition or modification made pursuant to this Section 10.03 shall be effected in compliance with all applicable laws, rules and regulations of the Aviation Authority.

10.04   <u>Title to Parts</u>.  Subject to the provisions hereof, title to all parts incorporated or installed in or attached or added to any Item as the result of any alteration, modification or addition made as contemplated in Section 10.03 hereof shall, without further act, vest in Owner and become subject to the Conditional Sale Agreement and this Lease; <u>provided</u>, <u>however</u>, that so long as no Event of Default shall have occurred and be continuing, at any time during the Term, Lessee may remove any Part from an Item of Equipment, provided that (a) such Part is in addition to, and not in replacement of or in substitution for, any Part originally incorporated or installed in or attached to such Item at the time of delivery thereof hereunder or any Part in replacement of, or substitution for, any such original Part; (b) such Part is not required to be incorporated or installed in or attached or added to such Item pursuant to the terms of Section 7.05 hereof or the first sentence of Section 10.03; and (c) such Part can be removed from such Item without diminishing or impairing the value, utility or airworthiness which such Item would have had at such time had such alteration, modification or addition not occurred.  Upon the removal by Lessee of any such Part as above provided, title thereto shall, without further act, vest in Lessee and such Part shall no longer be deemed a Part hereunder.  Any Part not removed by Lessee as above provided prior to the return of the Item to Lessor hereunder shall remain the property of Owner.

ARTICLE 11   <u>General Tax Indemnity</u>

11.01   (a)   <u>Indemnity</u>.  Whether or not any of the transactions contemplated hereby are consummated, Lessee agrees to pay and, on written demand, to indemnify, defend, protect, save and hold Owner and Lessor and any of their successors, assigns and affiliates (each a "<u>Tax</u>

Indemnitee") harmless from all license, recording, documentation and registration fees, sales and use taxes, income, franchise, stamp, customs, duties, excise, business, consumption, rental, ad valorem, property taxes (personal and real), value added taxes or similar taxes and any and all other taxes, levies, imposts, duties, charges, assessments or withholdings of any nature whatsoever together with any and all penalties, additions to tax, fines or interest thereon (collectively, "Taxes") imposed against any Tax Indemnitee, Lessee or any Item of Equipment, by any United States federal, state or local government or taxing authority in the United States, or any territory or possession of the United States, or by any taxing authority or Government Body of a foreign country or international organization, upon or in connection with or with respect to any Item of Equipment, or upon the purchase, sale, ownership, delivery, leasing, subleasing, charter, possession, repossession, acceptance, rejection, transfer of title, return, location, importation, exportation, transport, rental, re-leasing, presence, condition, improvement, replacement, overhaul, control, imposition of any Lien (other than a Lessor Lien), abandonment, use, operation, financing, refinancing, registration, change in registration, reregistration, documentation, landing, departure, maintenance, repair, storage, modification, return or other disposition thereof, or upon the rentals, receipts or earnings (whether actual or deemed) arising therefrom, or upon or with respect to this Lease or any other Operative Documents and amendments and supplements hereto and thereto and the transactions contemplated hereby or thereby.

(b)      Withholding Taxes.  Lessee agrees that all payments by Lessee pursuant to this Lease and the other Operative Documents shall be made free and clear of, and without deduction or withholding for or on account of, any present or future Taxes of any nature whatsoever now or hereafter imposed, levied, collected, withheld or assessed by any Government Body or taxing authority, required to be withheld or deducted from any amounts payable by, or on behalf of, Lessee hereunder to Tax Indemnitee and Lessee shall indemnify, defend and hold harmless Tax Indemnitee, on an after-tax basis, with respect to any withholding taxes whenever imposed (all such Taxes being herein referred to as "Withholding Taxes").  If any Withholding Taxes are so required to be withheld or deducted from any payment made by Lessee hereunder, Lessee shall (i) pay to the appropriate Government Body the amount of such Withholding Taxes and make such reports and filings in connection therewith in the time and manner required by applicable Laws, (ii) at the time that the payment upon which the deduction or withholding applies is required to be made, pay to Tax Indemnitee any additional amount which is necessary in order for the net amounts received by Tax Indemnitee, after deduction or withholding of such Withholding Taxes, to equal the amounts payable to Tax Indemnitee had no such deduction or withholding been required and (iii) promptly forward to Tax Indemnitee an official receipt or other documentation reasonably satisfactory to Tax Indemnitee evidencing payment of such Withholding Taxes to such Government Body.  Tax Indemnitee agrees to deliver to Lessee, at Lessee's sole cost and expense, such official certificates or documents as may be reasonably requested in writing by Lessee and necessary to establish that payments by Lessee to Tax Indemnitee hereunder, or under this Lease are exempt from or are subject to a reduced rate of Withholding Tax imposed by any Government Body or taxing authority, so long as, Tax Indemnitee has determined that, it is entitled to claim such reduction or exemption without any cost or adverse consequence.  If requested by Tax Indemnitee in connection with any request for certificates or documents hereunder, Lessee shall provide Tax Indemnitee with blank forms and instructions for completion thereof.  If requested by Tax Indemnitee, Lessee agrees to deliver to

Tax Indemnitee, at Lessee's sole cost and expense, such official certificates or documents as may be reasonably requested in writing by Tax Indemnitee and necessary to establish that payments by Lessee to Tax Indemnitee hereunder, or under any other Operative Documents, are exempt from or are subject to a reduced rate of Withholding Tax imposed by any Government Body or taxing authority, so long as, Lessee has determined that, it is entitled to claim such reduction or exemption without any cost or adverse consequence.

(c)     Limitation on Indemnity.  Notwithstanding the provisions of paragraphs (a) or (b) of this Section 11.01, Lessee shall have no obligation thereunder as to:

(i)     Taxes based on or measured by the net income of any Tax Indemnitee imposed by Singapore; provided, however, Lessee shall be liable for such Taxes based on or measured by such Tax Indemnitee's net income if, but only if,
(A) Such taxes are in lieu of Taxes on any Item of Equipment (or any Part thereof) which Lessee would otherwise be required to pay hereunder, or
(B) Such taxes on net income would not have been imposed by the taxing jurisdiction but for or are increased as a result of any one or any combination of
(x) the operation, registration, location, presence or use of any Item of Equipment (or any Part thereof), in such jurisdiction,
(y) the place of incorporation, commercial domicile, or other presence in such jurisdiction of Lessee, any sublessee or any other user of or person in possession of any Item of Equipment (or any Part thereof) (other than the Lessor or any Person claiming through it, each a "Lessee Person"), or the status of any Lessee Person as a foreign entity or as an entity owned in whole or in part by foreign persons, or
(z) any payments or deemed payments made under the Lease and the other Operative Documents being made from such jurisdiction;
(ii)    Taxes to the extent imposed solely as a result of  Tax Indemnitee's activities unrelated to the transactions contemplated by the Operative Documents;
(iii)   Taxes to the extent caused by (A) the breach by a Tax Indemnitee of any representation, warranty or covenant set forth in the Operative Documents, or (B) the gross negligence or willful misconduct of a Tax Indemnitee;
(iv)    Taxes to the extent arising from any event or period after the later of the expiration or early termination of the Lease and, if required pursuant to the terms of the Lease, the return of the Aircraft (provided, that this clause (iv) shall not apply to Taxes imposed after such period arising as a result of payments by Lessee under the Operative Documents after such period or attributable to events occurring prior to or coincident with such expiration or earlier termination of the Lease); and
(v)     Taxes to the extent imposed on any Tax Indemnitee upon a transfer or other disposition (other than a transfer resulting from (1) the actions of the Lessee or any Lessee Person pursuant to the terms of this Lease, (2) the exercise of Lessor's remedies under the Lease upon an Event of Default, (3) an Event of Loss, (4) otherwise pursuant to a request or at the option of the Lessee or pursuant to the terms of the Lease), or (5) any transfer, exchange, substitution, or pooling of any Engine, or any interest in any other Item of Equipment (or Part thereof), or any interest arising under the Operative Documents or a transfer or disposition of any interest in a Tax Indemnitee.

(vi)     Any Tax to the extent the liability for such Tax is caused by or would not have been incurred but for (A) the inaccuracy or breach of any representation or covenant of any Tax Indemnitee or (B) a Lessor Lien;

(vii)    Any penalty, interest or addition to Tax imposed on any Tax Indemnitee to the extent such penalty, interest or addition to Tax is incurred or increased as a result of and would not have been payable but for the failure of any Tax Indemnitee to file any Tax return when due or pay any Tax when due, unless such failure is the result of a failure of Lessee to perform any of its obligations under this Article 11;

(viii)   Taxes to the extent such Taxes are the result of and would not have been incurred but for an amendment to the Lease or any other Operative Document without prior written consent of Lessee, unless such amendment is made at Lessee's written request or while an Event of Default is in existence;

(ix)     Taxes to the extent such Taxes are incurred or increased as a result or would not have been payable but for the financing (directly or indirectly) of any Tax Indemnitee's interest in all or part of the transactions contemplated by the Lease or any of the other Operative Documents, or in the Aircraft, any Engine, any Item of Equipment, or any Part;

(x)      Taxes attributable to the failure of any Tax Indemnitee to avail itself of any exemptions or to comply with any certification, documentation, reporting or similar requirement concerning nationality, residence or identity, but only if Lessee shall have timely notified such Tax Indemnitee of such requirement or exemption and such Tax Indemnitee shall have determined in good faith that the exemption or compliance will not result in any material adverse consequences for which it had not been indemnified by Lessee in a manner reasonably satisfactory to the Tax Indemnitee;

(xi)     Intentionally blank; and

(xii)    Intentionally blank.

11.02   <u>After-Tax Nature of Indemnity</u>.  Lessee further agrees that, with respect to any payment or indemnity hereunder, such payment or indemnity shall include any amount necessary to hold Tax Indemnitee harmless on an after-tax basis from all Taxes required to be paid (or which would have been required to be paid by Tax Indemnitee with respect to such payment or indemnity had Tax Indemnitee had sufficient gross income, actually to pay tax at the highest marginal rates) by Tax Indemnitee with respect to such payment or indemnity under the Laws of Singapore, or under the Laws of any taxing authority or Government Body of any other country or international organization.

11.03   <u>Refund</u>.  If any Tax Indemnitee shall obtain a refund (in cash or as an offset to any liability for a Tax) of all or any part of Taxes paid by Lessee, or on behalf of Lessee, such Tax Indemnitee shall pay Lessee the amount of such refund; <u>provided</u> that such amount shall not be payable before such time as Lessee shall have made all payments of indemnities to such Tax Indemnitee then due under this Article 11 and such payment shall be limited to the amount previously paid by Lessee hereunder with respect to indemnified Taxes.  If in addition to such refund such Tax Indemnitee shall receive or be credited with an amount representing interest on the amount of such refund, Lessee shall be paid that proportion of such interest which is fairly attributable to the Taxes paid by Lessee prior to the receipt of such refund. If any Tax Indemnitee shall have paid Lessee any refund of all or part of any Tax paid by Lessee and it is subsequently determined that such Tax Indemnitee was not entitled to such refund, such

determination shall be treated as the imposition of a Tax for which Lessee is obligated to indemnify such Tax Indemnitee pursuant to the provisions of this Article 11 without regard to the exclusions set forth in Section 11.01(c) (other than Section 11.01(c)(iii)).

11.04   Tax Credit.  To the extent that a Tax Indemnitee determines in good faith that it actually realizes and utilizes a tax  credit in reducing its tax liability for Taxes (a "Tax Credit"), as reasonably determined by the relevant Tax Indemnitee in its sole opinion, by reason of any Tax paid or indemnified by Lessee, and such reduction is not otherwise taken into account in computing such payment or indemnity, such Tax Indemnitee shall  pay the amount of such tax credit to Lessee, but only if Lessee shall have made all payments then due and owing to such Tax Indemnitee under this Article 11 and so long as no Default is then continuing, an amount equal to the amount of such Tax Credit when, as, and to the extent actually utilized in reducing its Taxes.

In the case of a Tax Indemnitee that is a US person, as defined under Code Section 7701(a)(30), the relevant Tax Credit is defined under Code Section 901 subject to the limitations of Code 904. Taxes for the purposes of the Tax Credit are such Taxes that are determined to be eligible foreign income taxes for purposes of Code Section 901.

The Tax Credit is due and payable by a Tax Indemnitee to Lessee within a reasonable period following the close of the tax year for which the indemnified Tax paid by Lessee corresponds to both tax return audit examination by the relevant taxing authority and Tax Indemnitee tax return amendment.  If by way of subsequent agreement between the parties, any Tax Indemnitee shall have paid Lessee a Tax Credit prior to such time as indicated in the previous sentence and it is determined, in its own reasonable discretion, that such Tax Indemnitee was not entitled to such Tax Credit or the relevant Tax Credit is subsequently disallowed or canceled, such determination, disallowance or cancellation shall be treated as a Tax indemnified under this Article 11 (other than Section 11.01(c)(iii)).  Each Tax Indemnitee shall in good faith use reasonable efforts in filing its tax returns in dealing with tax authorities to claim any such Tax Credit; *provided*, *however*, that each Tax Indemnitee shall have absolute discretion as to the order and manner in which it claims a Tax Credit or arranges its Tax affairs.

11.05   Tax Filing.  In case any report or return is required by applicable Law to be made with respect to any obligation of Lessee under this Article 11 or arising out of this Article 11 Lessee will promptly notify Tax Indemnitee of such requirement and will inform Tax Indemnitee whether Lessee (i) will file such report or return in such manner as will show the ownership in Lessor of each Item of Equipment and send a copy of such report or return to Tax Indemnitee or (ii) will make such report or return for filing by Tax Indemnitee in such manner as shall be satisfactory to Tax Indemnitee.

11.06   Application of Payments During Existence of a Default or Event of Default.  Any amount payable to Lessee pursuant to the terms of this Article 11 shall not be paid to or retained by Lessee if at the time of such payment or retention a Default or an Event of Default shall have occurred and be continuing under this Lease.  At such time as there shall not be continuing any such Default or Event of Default, such amount shall be paid to Lessee to the extent not previously applied against Lessee's obligations hereunder as and when due.

11.07  Contest.

(a)     If any Tax Indemnitee receives a written claim from any Governmental Authority or taxing authority for any indemnified Tax, or if any Tax Indemnitee shall determine any Tax for which Lessee may be obligated pursuant to Section may be payable  (a "Tax Claim"), such Tax Indemnitee shall notify Lessee promptly in writing, provided, however, that the failure to so notify the Lessee shall not affect any obligation of the Lessee under this Article 11, except to the extent such failure materially adversely affects the Lessee's right to contest such Tax Claim.

(b)     If requested by Lessee in a written notice delivered to such Tax Indemnitee within thirty  (30) days after the date on which such Tax Indemnitee gives the notice required by Section 11.07 (a) with respect to a Tax Claim (or within such shorter period as may be required by applicable Law), and if the conditions described in Section 11.07(c) are satisfied and continue to be satisfied at all times during the contest, such Tax Indemnitee shall contest such Tax Claim (or, at the option of such Tax Indemnitee, may permit Lessee to contest such Tax Claim in the name of Lessee or in the name of such Tax Indemnitee), in each case at Lessee's expense, in accordance with applicable Law, and in a manner determined and controlled by the party that is conducting such contest (for example, by contesting the validity, applicability or amount of the indemnified Taxes that are the subject of such Tax Claim by resisting payment of such indemnified Taxes, or by paying such indemnified Taxes under protest if protest is necessary and proper, or by paying such indemnified Taxes and using reasonable efforts to obtain a refund thereof), provided, that such Tax Indemnitee shall have the right to refuse to begin or continue (or to permit Lessee to begin or continue) the contest or elects to settle, compromise or otherwise terminate any such contest without the consent of Lessee, any or all of the indemnified Taxes that are the subject of such Tax Claim if such Tax Indemnitee (x) waives in writing its right under this Article 11 to be indemnified for the indemnified Taxes which such Tax Indemnitee declines to contest and (y) promptly repays to Lessee the amount (if any) which Lessee previously advanced to such Tax Indemnitee in accordance with Section 11.07(c)(iv) with respect to the indemnified Taxes that such Tax Indemnitee declines to contest. Any request by Lessee to contest a Tax Claim pursuant to this Section 11.07 shall constitute an acknowledgment and agreement by Lessee that Lessee shall pay on demand and on an after-tax-basis all reasonable out of pocket costs and expenses paid or incurred by such Tax Indemnitee in connection with the conduct of such contest (including without limitation, reasonable attorneys' and accountants' fees and disbursements).

(c)     A Tax Indemnitee shall have no obligation to begin or continue (or to permit Lessee to begin or continue) to contest any Tax Claim pursuant to this Section 11.07 unless all of the following conditions are satisfied at the time such contest is to be commenced and at all times during the contest:

(i)     no Event of Default shall have occurred and be continuing;

(ii)     contesting such Tax Claim would not, in the opinion of Lessor, result in any risk of criminal penalties or any reasonable possibility of any sale, forfeiture, confiscation, seizure or loss of, or the imposition of a Lien (other than a Permitted Lien) on any Item of Equipment or any interest therein (unless Lessee provides a bond or other security therefore reasonably acceptable to such Tax Indemnitee);

(iii)    the amount of the indemnity in respect of the indemnified Tax that is the subject of such Tax Claim exceeds Fifty Thousand Dollars ($50,000) (or its equivalent in any other currency) or, if the indemnified Tax that is the subject of such Tax Claim is a recurring Tax, the sum of (A) the indemnity in respect of the amount of the indemnified Tax that is the subject of such Tax Claim plus (B) the aggregate amount of the indemnity in respect of the indemnified Taxes that would be required to be paid in all subsequent years during the remainder of the Term if the Tax Claim is not contested exceeds Fifty Thousand Dollars ($50,000) (or its equivalent in any other currency);

(iv)    if such Tax Indemnitee decides to contest such Tax Claim by paying the indemnified Tax that is the subject of such Tax Claim and taking action to obtain a refund thereof, Lessee shall have made an interest-free advance to such Tax Indemnitee in an amount equal to the amount of the indemnified Tax and shall have delivered to such Tax Indemnitee a written undertaking to indemnify such Tax Indemnitee for any adverse Tax consequences to such Tax Indemnitee (taking into account all relevant Tax benefit and detriments) resulting from such interest-free advance;

(v)    Lessee shall be paying, on demand and on an after-tax basis, all reasonable out of pocket costs and expense paid or incurred by such Tax Indemnitee in connection with the conduct of such contest (including, without limitation, reasonable attorneys' and public accountants' fees and disbursements); and

(vi)    if requested by such Tax Indemnitee in writing, Lessee shall have delivered to such Tax Indemnitee, at Lessee's expense, a written opinion of independent tax counsel selected by the Tax Indemnitee and reasonably acceptable to Lessee to the effect that there is more likely than not basis to prevail (consistent with the type of standards used in ABA Opinion 85-352 or any equivalent thereof in a country other than the United States) for the contest of such tax Claim.

11.08.  <u>Verification</u>.  The relevant Tax Indemnitee will calculate the amount of any indemnity payable by Lessee to such Tax Indemnitee under this Article 11 and deliver to Lessee a written statement describing in reasonable detail the calculation of such amount.  If Lessee requests in writing within thirty (30) days of receiving such statement that the statement be reviewed by an internationally recognized independent public accounting firm, the statement shall be reviewed by an internationally recognized independent public accounting firm chosen and regularly employed by the Tax Indemnitee, at the cost and expense of Lessee, unless the public accounting firm determines that the Tax Indemnitee's calculations are in error in an amount in excess of 10% of the amount originally calculated by the Tax Indemnitee in favor of such Tax Indemnitee provided the amount of such error in the Tax Indemnitee's calculation exceeds Fifty Thousand Dollars ($50,000), in which case the Tax Indemnitee shall pay the fees and expenses of such accounting firm.  The accounting firm will be requested to complete its review of the Tax Indemnitee's statement within thirty (30) Business Days.  Each Tax Indemnitee and Lessee shall provide the accounting firm with such information as the accounting firm may reasonably request to enable it to complete the requested review, subject to the

execution by the public accounting firm of a confidentiality agreement reasonably acceptable to the Tax Indemnitee or Lessee, as the case may be.  The determination of such public accounting firm shall be final, binding and conclusive on the Tax Indemnitee and Lessee.  In no event shall Lessee have the right to examine confidential information supplied by Lessor or its affiliates to the public accounting firm or the Tax returns or books of a Tax Indemnitee in connection with the verifying procedures described herein.  Lessee and each Tax Indemnitee agrees that the public accountant's sole responsibility shall be to verify the mathematical calculation of the amount of any payment hereunder and that matters of interpretation of this Article 11 are not within the scope of the public accountant's responsibility.

11.09   <u>Mitigation</u>.  If Lessee incurs or may incur an indemnity obligation due to a change in the Singapore – Russian Federation Income Tax Convention or by a domestic law change under Article 11 of this Agreement, then Lessee and the Tax Indemnitee(s) shall consult in good faith with a view toward restructuring the transaction contemplated by the Lease and the other Operative Documents so that the indemnity obligation can be a avoided or minimized (but Lessor shall not be obligated to take any action that it determines in its good faith discretion would result in the risk of an adverse impact on its business or economic interest in any respect, unless such impact is indemnifiable and Lessee shall have provided an indemnity which is reasonably acceptable to such Tax Indemnitee), *provided*, *however*, that such Tax Indemnitee shall bear no responsibility as to whether such restructuring will reduce any indemnity obligation (other than in respect of its or an affiliate's gross negligence or willful misconduct).  All costs and expenses incurred with such restructuring shall be borne by Lessee.

11.10   <u>Survival of Indemnities</u>.  Notwithstanding any other provision of the Operative Documents, all of the obligations of Lessee under this Article 11 shall continue in full force and effect notwithstanding the expiration or earlier termination of this Lease and are expressly made for the benefit of, and shall be enforceable by, the Tax Indemnitees (in the case of obligations of Lessee) or Lessee (in the case of obligations of Tax Indemnitees).

ARTICLE 12. <u>Damage, Destruction, Requisition or Condemnation</u>.

12.01   <u>Event of Loss with Respect to the Airframe or the Airframe and the Engines Installed Thereon</u>.  Upon the occurrence of an Event of Loss, or an event which with the passage of time would constitute an Event of Loss, with respect to the Airframe or to the Airframe and the Engines then installed on the Airframe, Lessee shall forthwith (and in any event within three (3) Business Days after such occurrence) give Lessor written notice of such Event of Loss or such event.  Lessee shall pay or cause to be paid to Lessor, in immediately available funds on the earlier to occur of (a) three (3) Business Days after the date Lessee receives insurance proceeds from such Event of Loss, or an event which with the passage of time would constitute an Event of Loss or (b) the date that is seventy five (75) days after the occurrence of such Event of Loss (i) then due and unpaid Rent in respect of the Aircraft to and including such date, (ii) an amount equal to the Stipulated Loss Value in respect of the Aircraft and (iii) interest at the Incentive Rate on the unpaid balance of (i) and (ii) above from the due date until paid in full.  At such time as Lessor has received the sum of (i), (ii) and (iii) above, the obligation of Lessee to pay all Basic Rent and Maintenance Rent hereunder with respect to the Aircraft shall terminate, and Lessor

shall Transfer to Lessee all its respective right, title, and interest, in and to (1) the Airframe and Engines, (2) all claims for damage to such Items, if any, against third persons arising from the Event of Loss (unless any insurance carrier requires that such claims be assigned to it), and (3) all rights to any insurance claims under all insurance maintained by Lessee hereunder except liability insurance. The obligation to pay Maintenance Rent and Basic Rent shall terminate after receipt by Lessor of the sum of paragraph (i), (ii) and (iii) above.  The amount of Maintenance Rent received by Lessor, less the value of all Lessor contributions to performed maintenance events, shall be returned to Lessee after the amounts payable to Lessor pursuant to paragraph (i), (ii) and (iii) above have been received by Lessor. For purposes of this Section 12.01, the Stipulated Loss Value shall not decrease or be adjusted once an Event of Loss has occurred.

   12.02   Event of Loss with Respect to an Engine.  Upon the occurrence of an Event of Loss with respect to an Engine not then installed on the Airframe, or an Event of Loss with respect to an Engine installed on the Airframe not involving an Event of Loss with respect to the Airframe, Lessee shall give Lessor prompt written notice thereof and Lessee shall replace such Engine as soon as practicable after the occurrence of such Event of Loss by duly conveying to Lessor as a replacement for said Engine, title to another engine made by the Engine Manufacturer and of the same or an improved model and suitable for installation and use on the Airframe, which engine shall be free and clear of all Liens, and shall have a value and utility at least equal to, and be in as good an operating condition as, the Engine with respect to which such Event of Loss occurred, assuming such replaced Engine was of the value and utility and in the condition and repair as required by the terms hereof immediately prior to the occurrence of such Event of Loss.  Such replacement engine, after approval and acceptance by Lessor, shall be deemed an Engine as defined herein, for all purposes hereunder.  Lessee agrees to take such action as Lessor may reasonably request to ensure that any such replacement engine shall be duly and properly titled in the name of Lessor and leased hereunder to the same extent as any Engine replaced thereby.  Prior to or at the time of any such conveyance, Lessee, at its own expense, will promptly (a) furnish Lessor with an executed warranty bill of sale for the replacement engine in favor of Lessor in form and substance satisfactory to Lessor, and take such action as Lessor may reasonably request to procure the registration of such warranty bill of sale on the International Registry, (b) cause a supplement hereto, in form and substance satisfactory to Lessor, subjecting such replacement engine to this Lease, to be duly executed by Lessee, and registered on the International Registry, (c) furnish Lessor with reasonable evidence of (i) title to such replacement engine and of compliance with the insurance provisions of Article 13 hereof with respect to such replacement Engine (ii) the sale of such replacement engine to Lessor being registered on the International Registry, (iii) the lease from Lessor to Lessee of such replacement engine being registered on the International Registry as an International Interest and (iv) compliance with the insurance provisions of Article 13 hereof with respect to such replacement engine as Lessor may reasonably request and (d) furnish Lessor with the report of a duly qualified appraiser or engineer reasonably satisfactory to Lessor as to such replacement engine's value, utility, condition and repair, and compliance with the related conditions specified above. Upon full compliance with this Section 12.02, such replacement engine shall be an "Engine" for all purposes of this Lease and Lessor shall (a) Transfer to Lessee all Lessor's right, title and interest in and to (i) the Engine with respect to which such Event of Loss occurred, (ii) all claims for damage to such Engine, if any, against third persons arising from the Event of Loss (unless any insurance carrier requires that such claims be assigned to it), and (iii) all rights to any

43

insurance claims under all insurance maintained by Lessee hereunder except liability insurance, in each case free and clear of all Lessor Liens and (b) promptly consent to the discharge of any registration of such Engine made on the International Registry in favor of Lessor with respect to the Lease and any registrations made by Lessee to evidence such Transfer of title to Lessee in such Engine on the International Register.  All costs of releasing Lessor's interests in an Engine in accordance with the terms hereof shall be borne by Lessor. No Event of Loss with respect to such Engine under the circumstances contemplated by the terms of this Section 12.02 shall result in any reduction in Rent or in Lessee's obligation to pay Basic Rent hereunder.  Lessee agrees that it shall at all times during the Term maintain the Engines or other engines of the same or improved model and suitable for installation and use on the Airframe as the Engines on the Aircraft leased hereunder.

12.03    Application of Payments from Government Bodies for Requisition of Title.  Any payments (other than insurance proceeds the application of which is provided for in Article 13 hereof) received at any time by Lessor or Lessee from any Government Body or other entity with respect to an Event of Loss resulting from the condemnation, confiscation or seizure of, or requisition of title to or use of the Aircraft, Airframe or Engines, will be applied as follows:

(a)    If such payments are received with respect to an Event of Loss relating to the Airframe and installed Engines, only so much of such payments as shall not exceed the amounts due under Section 12.01(i), (ii) and (iii) shall be applied in reduction of Lessee's obligation to pay such amounts, if not already paid by Lessee, or if already paid by Lessee, shall be applied to reimburse Lessee for its payment of such amounts, and the balance, if any, of such payments remaining thereafter will be paid over to or retained by Lessee; and

(b)    If such payments are received with respect to an Engine under the circumstances described in Section 12.02, all such payments shall be paid over to Lessee, at such time as Lessor shall have accepted an engine as replacement for such Engine in accordance with the provisions of Section 12.02.

12.04    Requisition of Airframe for Use by Government.  In the event of the requisition for use by a Government Body of the State of Registry or the Russian Federation ("Government") of the Airframe and the Engines or engines installed thereon during the Term, Lessee shall promptly notify Lessor of such requisition and all of Lessee's obligations under this Lease with respect to such Items of Equipment shall continue to the same extent as if such requisition had not occurred (except that such obligations shall be suspended if and to the extent that the performance thereof by Lessee shall be made impossible as the result of such requisition); provided, that if such Items of Equipment are not returned by the Government prior to the end of the Term, Lessee shall be obligated to (a) pay to Lessor, on the dates that Rent would have been payable hereunder if the Term had continued in effect for the duration of the requisition, an amount equal to the Basic Rent amount that would have been payable under Section 5.01 hereof if the Term had continued after deducting any amount paid by the Government to Lessor in respect of the use of the Aircraft during such period of requisition and (b) return such Items of Equipment to Lessor pursuant to, and in all other respects in compliance with the provisions of, Article 17 promptly upon their return by the Government, and, upon compliance therewith by Lessee satisfactory to Lessor, Lessor shall (to the extent that it is

44

lawfully able to do so) assign to Lessee all of Lessor's rights against the Government with respect to the condition and fitness of such Items of Equipment, including all repair obligations of the Government upon return by it of the Items of Equipment at the expiration of the period of requisition for use.  All payments in excess of Rent received by Lessor or Lessee from the Government for the use of such Items of Equipment during the Term therefor shall be paid over to, or retained by, Lessee; and all payments received by Lessor or Lessee from the Government for the use of such item of Equipment after the Term therefor shall be paid over to, or retained by, Lessor.  It is understood and agreed that, in the event the requisition for use extends beyond the Term, Lessee shall be responsible for completing any additional maintenance checks that become due during such period.

12.05   Requisition of an Engine for Use by Government.  In the event of the requisition for use by the Government of any Engine without the requisition for use of the Airframe, at Lessor's request Lessee will replace such Engine hereunder by complying with the terms of Section 12.02 to the same extent as if an Event of Loss had occurred with respect to such Engine, and any payments received by Lessor or Lessee from the Government with respect to such requisition shall be paid over to, or retained by, Lessee.

12.06   Application of Payments During Existence of Default or Event of Default.  Any amount referred to in Section 12.03 which is payable to Lessee shall not be paid to Lessee if, at the time of such payment, a Default or an Event of Default shall have occurred and be continuing.  In such event, all such amounts shall be paid to and held by Lessor as security for the performance by Lessee of its obligations hereunder or, at Lessor's option, applied by Lessor toward payment of any of such obligations of Lessee at the time due hereunder as Lessor may elect.  At such time as Lessee shall have cured all Defaults and Events of Default, all such amounts at the time held by Lessor in excess of the amounts, if any, which Lessor shall have elected to apply as above provided shall be paid to Lessee.

12.07   Damage Notification.  Lessee will notify Lessor promptly of any loss, theft, requisition or damage to any Item of Equipment for which the cost of repairs or replacement is estimated to exceed U.S. $200,000.


ARTICLE 13. Insurance.

13.01   Aviation Third Party Legal Liability Insurance.  On or before the Delivery Date, throughout the Term and for a period extending two years or until the completion of the next Heavy Check on the Aircraft (whichever shall first occur) following the later of (a) the end of the Term or (b) the date the Aircraft is returned to Lessor, Lessee will carry or cause to be carried at its own expense with insurers of internationally recognized standing reasonably acceptable to Lessor, aviation legal liability insurance in respect of the Aircraft in amounts denominated in United States Dollars and customary for similar aircraft in Lessee's fleet, but not less than U.S. $1,000,000,000 combined single limit for bodily injury and property damage each occurrence (and in the aggregate as respects aviation products and third party liability war and allied perils). Such insurance shall include third party legal liability including passenger liability, liability war and allied perils, property damage liability (including cargo, baggage (checked and unchecked) and mail liability) premises liability, products liability and contractual liability and shall be in

form and substance reasonably satisfactory to Lessor. Lessee covenants that any insurance policies carried in accordance with this Section 13.01 and any policies taken out in substitution or replacement for any of such policies shall: (A) be endorsed to name Owner, Lessor, Financing Parties and each of their affiliates, subsidiaries, successors, assigns, and subcontractors and their respective directors, officers, agents, shareholders and employees as additional insureds for their respective interests with respect to the Aircraft (hereinafter each an "Additional Insured" and collectively the "Additional Insureds"); (B) provide that in respect of the interests of any Additional Insured in such policies, the insurance shall not be invalidated by any act or omission (including misrepresentation and non-disclosure) of Lessee or any other Person including any sublessee and (other than, as to any Additional Insured, any misrepresentation or non-disclosure of such Additional Insured) which results in a breach of any term, condition or warranty of such policies; (C) provide that none of the Additional Insureds shall have responsibility for the payment of premiums or any other amounts payable under such policies; (D) provide that insurers waive all rights of subrogation against the Additional Insureds; (E) provide that, if such insurance is canceled or allowed to lapse for any reason whatsoever, or if any material change is made in such insurance that adversely affects the interest of any Additional Insured, such cancellation, lapse or change shall not be effective as to any Additional Insured for thirty (30) days (seven (7) days, or such other period as is then customarily obtainable in the industry, in the case of any war  and allied perils liability coverage) after the giving of written notice from such insurers or Lessee's appointed insurance broker to Lessor; (F) be primary without right of contribution from any other insurance maintained by any Additional Insured; (G) provide a severability of interests provision applicable to each insured and Additional Insured under the policy such that all of the provisions of the insurance required hereunder, except the limits of liability, shall operate in the same manner as if there were a separate policy covering each insured and Additional Insured; (H) waive any right of the insurers to any setoff, counterclaim or other deduction against the Additional Insureds; and (I) provide for worldwide coverage, subject to such limitations and exclusions as may be expressly set forth in the certificates of insurance delivered pursuant to Section 13.04 provided such limitations and exclusions are not applicable to the territories where the Aircraft is operated by Lessee, or as Lessor may otherwise agree in writing.

13.02   Aircraft Hull Insurance.  On or prior to the Delivery Date and throughout the Term, Lessee covenants to maintain or cause to be maintained in full force and effect, at its own expense and on terms substantially similar to and no less favorable than insurance carried by Lessee on similar aircraft in its fleet, all-risk ground and flight aircraft hull insurance covering the Aircraft including coverage of the Engines and Parts while temporarily removed from or not installed on the Aircraft and not replaced with similar components in amounts denominated in United States Dollars not less than, in respect of the Aircraft, the Stipulated Loss Value  and with respect to any Engines or Parts while removed from the Aircraft on a replacement value basis.

Lessee agrees to maintain or cause to be maintained in full force and effect hull war and allied perils insurance in respect of the Aircraft for not less than the amounts set forth in the preceding paragraph (subject to such aggregate limits and exclusions as Lessor may approve in writing, acting reasonably) covering any loss or damage arising from:

(a)     war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power;

(b)     strikes, riots, civil commotions or labor disturbances;

(c)     any act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional;

(d)     any malicious act or act of sabotage;

(e)     confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title or use by or under the order of any government (whether civil, military or de facto) or public or local authority; and

(f)     hijacking or any unlawful seizure or wrongful exercise of control of the Aircraft or any Engine or any airframe on which any Engine is installed or crew in flight (including any attempt at such seizure or control) made by any person or persons on board the Aircraft or such airframe acting without the consent of the insured.

The hull war and allied perils insurances shall be in accordance with Lloyd's Aviation Underwriters Association Standard Policy Form, LSW 555D (or as commonly available) (provided that any exclusion for confiscation by the government of the country in which the Aircraft is registered shall be deleted) unless otherwise approved by Lessor in writing.

Lessee covenants that all policies and subsequent policies taken out in accordance with this Section 13.02 shall: (A) be issued by insurance companies or underwriters of internationally recognized standing in the aviation industry and reasonably acceptable to Lessor; (B) be in form and substance reasonably acceptable to Lessor; (C) be endorsed to name Lessor as the sole loss payee in respect of hull claims that become payable on the basis of a total loss and shall provide that any other loss shall be settled (net of any relevant policy deductible) with such party(ies) as may be necessary to repair the Aircraft unless otherwise agreed in writing after consultation among the insurers and Lessor (it being agreed that where the loss is not expected to exceed U.S. $1,000,000 and, unless Lessor has notified the insurers to the contrary, such loss will be settled with and paid to Lessee); (D) be amended to name the Additional Insureds as additional insureds for their respective interest with respect to the Aircraft; (E) provide that, in respect of the interest of any Additional Insureds in such policies, the insurance shall not be invalidated by any act or omission (including misrepresentation and non-disclosure) of Lessee or any other Person (other than, as to any Additional Insured, any misrepresentation or non-disclosure of such Additional Insured) which results in a breach of any term, condition or warranty of such policies; (F)

provide that none of the Additional Insureds shall have responsibility for the payment of premiums or any other amount payable under such policies; (G) provide that insurers shall waive all rights of subrogation as against the Additional Insureds; (H) provide that, if such insurance is canceled or allowed to lapse for any reason whatsoever, or if any material change is made in such insurance which adversely affects the interest of an Additional Insured, such cancellation, lapse or change shall not be effective as to any Additional Insured for thirty (30) days (seven (7) days, or such other period as is then customarily obtainable in the industry, in the case of any hull war  and allied perils coverage) after the giving of written notice from such insurers or Lessee's appointed insurance broker to Lessor; (I) waive any right of the insurers to any setoff, counterclaim or other deduction against the Additional Insureds; (J) provide for worldwide coverage, subject to such limitations and exclusions as may be set forth in the certificates of insurance delivered pursuant to Section 13.04 provided such limitations and exclusions are not applicable to the territories where the Aircraft is operated by Lessee, or as Lessor may otherwise agree in writing; (K) contain a 50/50 claims funding clause in the form of Lloyd's standard provision AVS103 in the event of a dispute as to which policy in respect of the hull insurance set forth in this Section 13.02 shall pay in the event of a loss; and (L) have deductibles (not applicable in case of a total, constructive total and/or arranged total loss) standard in the industry which do not exceed, per occurrence, the amount of $750,000, provided however, any deductibles shall be assumed by and at the sole risk of Lessee and to the extent applicable shall be paid by Lessee.

13.03   <u>Default</u>.  If Lessee shall default in effecting, keeping or maintaining any insurance or if any insurance shall for any reason become void, Lessor may (but without any obligation to do so and without prejudice to Lessor's other rights and remedies hereunder) effect, keep up or maintain such insurance at the cost of Lessee and Lessee will forthwith upon demand repay to Lessor all premiums and other moneys from time to time paid or payable by Lessor in respect of such insurance.

13.04   <u>Certificates</u>.  Not less than three (3) Business Days before the Delivery Date, unless otherwise approved by Lessor in writing, and promptly upon each renewal thereafter and, with respect to the two-year period following the Lease Termination Date, not less than three (3) Business Days before the Lease Termination Date, Lessee will furnish to Lessor certificates of insurance written in English from an authorized representative of the insurers providing the insurance required hereunder and certificates of reinsurance from reinsurance brokers (together with a letter of undertaking from each of such representative and such reinsurance brokers and an opinion by an independent reinsurance broker stating that such insurance and reinsurance complies with the terms hereof) describing in detail the insurance and reinsurance carried and maintained on the Aircraft pursuant to this Lease.  Such certificates of insurance shall be in form and substance reasonably satisfactory to Lessor.  The policies providing such insurance may be inspected by Lessor upon reasonable request.  Failure of Lessee to furnish certificates of insurance or procure and maintain the insurance required herein or the failure of Lessor to request such certificates or other proof of coverage shall not constitute a waiver of Lessee's obligations hereunder.

13.05   <u>Premiums</u>.  Lessee agrees to pay (or to cause to be paid) the premiums (or installments thereof) as required by the terms of such policies and produce to Lessor upon

request receipts in respect of payment of such premiums (or installments thereof) or other evidence of such payments as Lessor may reasonably request.  In the case of renewals of such policies, Lessee shall cause to be produced to Lessor evidence of such renewal as soon as practicable and in any event within seven (7) days after the date of renewal and shall advise Lessor of such renewal not later than the Business Day immediately preceding such renewal date and Lessee shall pay or cause to be paid the renewal and other premiums (and installments thereof) as required by the terms of such policies.

13.06   Claims.  After an Event of Loss in relation to the Aircraft shall have occurred and so long as no Default or an Event of Default shall have occurred and be continuing, Lessee may pursue any and all claims against the insurers in respect of the insurance with respect to the Aircraft, subject to consultation with Lessor; provided that no settlement or compromise of any such claim may be made without the approval of Lessor (which approval shall not be unreasonably withheld or delayed).  Should a Default or an Event of Default have occurred and be continuing and any claim be made under any of the insurance policies, Lessor shall have full power to make, enforce, settle or compromise all claims with the insurers in respect of the insurance (other than the liability insurance) or for compensation and to sue for, recover, receive and give discharge for all moneys payable by virtue thereof, to be held and applied in accordance with Section 13.02.  Lessee shall irrevocably and unconditionally assign the insurance to Lessor if such an assignment is advisable for the purpose of the preceding sentence.  Lessee shall do or cause to be done all things necessary and provide or cause to be provided all documents, evidence and information to enable the assignee or loss payee referred to above to collect or recover any moneys due or to become due in respect of the insurance.

13.07   Reinsurance.  If the insurance required by Sections 13.01 and 13.02 is not provided by internationally recognized insurers in the U.S. and European markets, Lessee shall ensure that in respect of insurance required to be maintained by Lessee in accordance with the provisions in this Article 13 the insurers maintain reinsurance covering identical subject matter and risk for an amount (which shall not be less than one hundred percent (100%) (or, in the event of limitations imposed by applicable law, the maximum amount permitted to be reinsured under such law, but in no case less than 90%) of the coverage amount under this Article 13) and with reinsurers in the international aviation reinsurance market reasonably acceptable to Lessor.  Lessee shall grant or caused to be granted to Lessor assignments of insurance and reinsurance benefits and any such reinsurance shall:

(a)     be on the same terms as the original insurance; and

(b)     contain a "cut-through" clause satisfactory to Lessor providing that, in the event of any claim arising under the reinsurance, the reinsurers thereunder shall, in lieu of payment to the original insurer or its successors in interest and assigns, pay to Lessor (or its assigns) as loss payee that portion of any loss due for which the reinsurers thereunder would but for this cut-through clause be liable to pay the original insurer or its successors in interest and assigns, it being understood and agreed (and Lessee agreeing to obtain the agreement of its original insurers for the benefit of Lessor and the reinsurers) that any such payment by the reinsurers

49

thereunder shall fully discharge and release the original insurers from any and all further liability in connection therewith; and

(c)     provide for payment to be made directly to Lessor (or its assigns) as provided herein notwithstanding (i) any bankruptcy, insolvency, liquidation or dissolution of the original insurer(s), and/or (ii) that the original insurer(s) have made no payment under the primary insurance policies.

13.08   <u>Lloyd's Endorsements</u>.  Lessee may procure endorsements to the relevant insurance policies required to be maintained pursuant to this Article 13 so as to incorporate the terms of Lloyd's Form AVN 67B (or any updated version thereof if such updated endorsement shall then be the general aviation industry standard) into such insurance policies in which event, except for the obligation to maintain <u>Aviation Third Party Legal Liability Insurance</u> for a period extending two years following the later of (a) the end of the Term or (b) of the date the Aircraft is returned to Lessor in full compliance with Article 13.01, to the extent that any other provision of any such Form AVN 67B (or any updated version thereof, as the case may be) endorsement conflicts or is otherwise inconsistent with the requirements of any provision of this Lease relating to insurance, then so long as it shall remain general industry practice to insure aircraft financed or leased by financial institutions on the basis of such endorsement, such conflicting or inconsistent provision of this Lease shall be of no further force and effect and such endorsement shall be deemed to satisfy the requirements of each such conflicting or inconsistent provision of this Lease.  For the purposes of AVN67B, Lessor shall be named as the Designated Contract Party.

13.09   <u>Self-Insurance</u>.  Except for the deductibles permitted by Section 13.02 hereof or otherwise permitted in writing by Lessor, Lessee shall not be permitted to self-insure against any of the risks required to be covered by the insurance described in this Article 13.

ARTICLE 14. <u>General Indemnification</u>.

14.01   Lessee agrees to assume liability for, and does hereby indemnify, defend, protect, save and keep harmless Owner, Lessor, Financing Parties and each of their affiliates, subsidiaries, successors, assigns and subcontractors and their respective directors, officers, shareholders, agents and employees (collectively, the "Indemnified Parties" and each an "Indemnified Party") from and against any and all claims, damages, losses, liabilities (including, but not limited to, any claim or liability for strict liability in tort or otherwise imposed including, without limitation, liability arising under any applicable environment or noise or pollution control statute, rule or regulation), obligations, demands, suits, penalties, judgments or causes of action and all legal proceedings, whether civil or criminal, penalties, fines and other sanctions, and any costs and expenses in connection therewith including, without limitation, legal fees and expenses of whatever kind and nature (whether or not also indemnified against by any other Person under any other document), which may result from or grow or arise in any manner from or out of (i) the condition, ownership, manufacture, construction, design (including, without

limitation, latent and other defects whether or not discoverable by Lessee or Lessor and any claim for patent, trademark or copyright infringement), acceptance, non-acceptance, rejection, delivery, lease, possession, return, disposition, maintenance, inspection, storage, return, use or operation (in each and every case) of the Aircraft or any Item of Equipment either in the air or on the ground (except, with respect to an Indemnified Party, claims to the extent finally, non-appealably judicially determined to be caused by the gross negligence or willful misconduct of such Indemnified Party), (ii) the material of the Aircraft or any Item of Equipment or any article used therein; (iii) the design, testing or use thereof or from any maintenance, service, repair, overhaul or testing of the Aircraft or any Item of Equipment; or (v) this Lease or the transactions contemplated thereby, and with respect to all of the foregoing clauses, in each case, regardless of when such defect shall be discovered, whether or not such Aircraft or any Item of Equipment is at the time in the possession of Lessee, and wherever located.

14.02   Lessee hereby waives and releases any claim now or hereafter existing against each Indemnified Party on account of any and all claims, demands, suits, judgments or causes of action for or on account of or arising or in any way connected with injury to or death of personnel of Lessee or loss or damage to property of Lessee or the loss of use of any property which may result from or grow or arise in any manner from or out of (i) the condition, use or operation of the Aircraft or any Item of Equipment, either in the air or on the ground during the Term hereof, or which may be caused during the Term hereof by any defect (whether latent or patent) in the Aircraft or any Item of Equipment; (ii) the material of the Aircraft or any Item of Equipment or any article used therein; (iii) the design, testing or use of the Aircraft or any Item of Equipment; (iv) any maintenance, service, repair, overhaul or testing of the Aircraft or any Item of Equipment, and, with respect to all of the foregoing clauses, in each case, regardless of when such defect shall be discovered, whether or not such Aircraft or any Item of Equipment is at the time in the possession of Lessee, and wherever located.

14.03   Lessee further agrees that, with respect to any payment or indemnity to any Indemnified Party hereunder, such payment or indemnity shall include any amount necessary to hold the recipient of the indemnity harmless on an after-tax basis from all taxes required to be paid (or which would have been required to be paid by such Indemnified Party with respect to such payment or indemnity had such Indemnified Party had sufficient gross income within the meaning of Section 61 of the Code, and the applicable state and local law, actually to pay tax at the highest marginal rate) by such recipient with respect to such payment or indemnity under the Laws of Singapore, or under the Laws of any taxing authority or governmental subdivision of any other country.

14.04   Exclusion.  Notwithstanding the provisions of Section 14.01, Lessee shall have no obligation thereunder to the extent arising out of the legal liability of an Indemnified Party in its capacity as manufacturer, repairer, or servicing agent of the Aircraft.

ARTICLE 15. Liens.

Lessee shall not, directly or indirectly create, incur, assume or suffer to exist any Lien on or with respect to any Item of Equipment or title thereto or any interest therein or in this Lease,

except (i) the respective rights of Lessor, Owner and Lessee as herein provided; (ii) Lessor Liens; (iii) Liens for Taxes either not yet due or being contested in accordance with Article 11 hereof; and (iv) inchoate materialmen's, mechanics', workmen's, repairmen's, employees' or other like liens arising in the ordinary course of business and for amounts the payment of which is either not yet delinquent or is being contested in good faith (and for the payment of which adequate reserves have been provided) by appropriate proceedings so long as such proceedings do not involve any danger of sale, seizure, detention, forfeiture or loss of any Item of Equipment or any interest therein.  Lessee shall promptly, at its own expense, take such action as may be necessary to duly discharge any such Lien not excepted above if the same shall arise at any time with respect to an Item of Equipment leased hereunder or this Lease.

ARTICLE 16. Further Assurances.

16.01   Further Assurances.  Lessee shall, at its sole cost and expense and at all times during the Term, cause (a) the Aircraft registration to remain in effect with the BDCA and (b) this Lease, all attached Exhibits and Schedules (to the extent such attachments do not contain proprietary economic information), the Lease Supplement and any and all additional instruments which shall be executed pursuant to the terms hereof so far as permitted by applicable law or regulations, to be kept, filed and recorded and to be re-executed, refiled, and re-recorded or registered at all times with the Aviation Authority, and in such other places or with such other Persons as Lessor may reasonably request to perfect and preserve Lessor's rights hereunder, and Lessee shall, as may be reasonably requested by Lessor, at Lessor's expense,furnish to Lessor an opinion of counsel or other evidence satisfactory to Lessor of each such filing or refiling and recordation or re-recordation.

16.02   CTC.  Without limiting the foregoing, (i) Lessee shall do or cause to be done the CTC to perfect and preserve Lessor's interests in and to the Airframe, each Engine and this Lease, including without limitation, promptly and duly executing and delivering to Lessor such further documents and assurances and taking such further action as Lessor may from time to time reasonably request in order to more effectively carry out the intent and purpose of this Lease and the other Operative Documents and to establish and protect the rights and remedies created or intended to be created or provided for in favor of Lessor hereunder, including, without limitation, if requested by Lessor, at the expense of Lessee, the execution and delivery of supplements or amendments hereto, in recordable form, subjecting to this Lease any replacement or substituted engine and the recording or filing of counterparts hereof, or of financing statements with respect hereto, in accordance with the Laws of Singapore and the Russian Federation.

16.03   Lessor Co-operation.  Lessor will take all actions reasonably requested by Lessee in order to enable the Lessee to meet its obligations under this Article 16.

ARTICLE 17. Return of Aircraft and Aircraft Documentation

17.01   Aircraft Return and Return Conditions.  Lessee, at Lessee's expense, shall re-deliver the Aircraft to Lessor on the Scheduled Return Date at a location in the United States.

Upon return of the Aircraft to Lessor hereunder, the Aircraft shall meet the conditions set forth in Schedule 2.

17.02   <u>Pre-Return Report and Inspections</u>.  Twelve (12) months prior to the Scheduled Return Date, Lessee shall provide to Lessor a completed Technical Report current as of the date submitted.  Within one hundred eighty (180) days prior to the redelivery of the Aircraft, Lessee shall make the Aircraft and personnel available on a non-interference basis to Lessee for a detailed inspection of the Aircraft and records in order to verify that the condition of the Aircraft and records comply with all requirements of the Lease.  On the earlier of the date the Aircraft commences its return "C" check or thirty (30) days prior to the redelivery of the Aircraft, Lessee shall make the Aircraft and personnel available to Lessor for a final inspection which shall include ground functional checks, inspections, power assurance test (including assurance of EGT margins) and video borescope inspections of the Engines by a Lessor selected source (including any engine to be returned as provided for herein) and the APU and operational demonstration flight(s) of the Aircraft of not less than two (2) hours, conducted by Lessee using the Manufacturer's recommended demonstration flight procedures for Change of Operator.  Lessor shall be permitted to have four representatives conduct the final inspection and to be direct observers of the demonstration flight(s).  All discrepancies to the return condition requirements hereof discovered during such inspections shall be corrected by Lessee, at Lessee's expense, or if the Lessee fails to meet any minimum required return condition in Schedule 2, Lessor may accept, in Lessor's sole discretion, cash payment in lieu of the required condition.  The cost of the final inspection, including the operational demonstration flight(s), shall be paid by Lessee.  In the event that the operational demonstration flight(s) reveals any items or conditions that would prevent the Aircraft from meeting its return conditions, Lessor shall not be deemed to have taken re-delivery of the Aircraft until such time as all identified items or conditions have been rectified by the Lessee.

17.03   <u>Delayed Return of Aircraft</u>.  If the return of the Aircraft to Lessor in compliance with the terms of this Lease shall be delayed beyond the Scheduled Return Date, this Lease shall not terminate but shall continue in full force and effect until such return, provided that Lessee shall pay as Basic Rent for each day of such delay an amount equal to the daily Basic Rent then payable and in the meantime Lessee shall not operate the Aircraft (other than for maintenance, repair or return purposes).  During such period Lessee shall continue to maintain the aircraft, to provide storage for the Aircraft at Lessee's expense, and to insure the Aircraft in accordance with Article 13.  Notwithstanding the previous sentence, Lessee does not have the right to retain the Aircraft after the Scheduled Return Date.

17.04   <u>Deficiency Charges – Airframe Heavy Check, Landing Gear, APU and Parts</u>.  If any Airframe Heavy Check, Landing Gear, APU or Part Flight Hour/Cycle/calendar limit requirement set forth in Schedule 2 hereof is not met, and Lessor agrees that this deficient redelivery condition is acceptable to Lessor, which shall not be greater than ten percent (10%) of the Schedule 2 requirement, then Lessee shall pay to Lessor an amount as calculated within this Article for such deficient condition. With respect to any redelivery condition requirement set forth in Schedule 2 that is not met, Lessee shall pay to Lessor the Dollar amount equal to one hundred fifteen percent (115%) of the product of (a)  (i) the Flight Hours (or Cycles or calendar time) allowable under Schedule 2 minus (ii) the Flight Hours (or Cycles or calendar time)

accumulated on such Item as of the redelivery date and (b) (i) the then-current rates charged by an FAA-approved repair contractor chosen by Lessor and reasonably agreed to by Lessee for such Heavy Check, Overhaul or replacement divided by (ii) the total Flight Hours (or Cycles or calendar time) limit allowable between Heavy Checks, Overhauls, Refurbishments or replacements, as applicable, on such Item and (b); provided, however, that nothing contained in this Section 17.04 shall be deemed or construed as a waiver by Lessor of Lessee's obligation to perform the "C" check required in Schedule 2 hereof, at Lessee's expense, and provided, further, that if the Airframe, Landing Gear, APU or Part shall have less than the amount of Flight Hours, Cycles or calendar time set forth hereinabove remaining to next Heavy Check, Overhaul, Refurbishment or replacement, as the case may be, at the time of return, Lessee shall perform, at Lessee's sole expense, any and all maintenance or repairs necessary to bring such Airframe, Engine, Landing Gear, APU or Part into compliance with the requirements of this Article 17.

EXAMPLE:

Part = computer

| | |
|---|---|
| $x$ (Return condition requirement) | = 6,000 hours |
| $y$ (Actual hours remaining) | = 5,000 hours |
| $z$ (Part's full limit) | = 10,000 hours |
| $\$$ (Part's overhaul cost) | = $5000.00 |
| <u>Amount owed by Lessee</u> | = $575.00 |

$$= 1.15 \left[ (x-y) \, \frac{(\$)}{z} \right] = p$$

$$= 1.15 \left[ (6000-5000) \, \frac{(\$5000)}{10000} \right] = \$575$$

17.05   <u>Deficiency Charges – Engines and Engine LLP's</u>.  If any Engine or Engine LLP

Flight Hour or Cycle requirement set forth in Schedule 2 hereof is not met, and Lessor agrees that this deficient redelivery condition is acceptable to Lessor, which shall not be greater than 800 cycles over the Schedule 2 requirement, then Lessee shall pay to Lessor an amount as calculated within this Article for such deficient condition.  With respect to each such Engine's Refurbishment interval condition, Lessee shall pay the Dollar amount equal to one hundred fifteen percent (115%) of the product of (a) (i)  the Cycles accumulated on such Engine since its last complete Refurbishment minus (ii) the Cycles allowable under paragraph 7(g)(iii) of Schedule 2 and (b) (i) the then-current cost estimated by an FAA-approved repair contractor chosen by Lessor and reasonably agreed to by Lessee for such complete Refurbishment divided by (ii) the Average Refurbishment Interval for similarly operated engines (the Engine Manufacturer's data shall be provided to Lessee for review).  With respect to each Engine LLP, Lessee shall pay the Dollar amount equal to one hundred fifteen percent (115%) of the product of (a) (i) the Cycles accumulated on each installed LLP, minus (ii) the Cycles allowable under Schedule 2 and (b) (i) the then-current manufacturer's catalogue price for new LLP's divided by (ii) the total Cycles allowable by the Engine Manufacturer for each LLP; provided, however, that nothing contained in this Section 17.05 shall be deemed or construed as a waiver by Lessor of Lessee's obligation required in Schedule 2 hereof, at Lessee's expense, and provided, further, that if any Engine or Engine LLP shall have less than the amount of Flight Hours, Cycles time set forth hereinabove remaining to next Overhaul, Refurbishment or replacement, as the case may be, at the time of return, Lessee shall perform, at Lessee's sole expense, any and all maintenance or repairs necessary to bring such Airframe, Engine, Landing Gear, APU or Part into compliance with the requirements of this Article 17.

EXAMPLE:

| ENGINE PERFORMANCE RESTORATION DEFICIENCY SAMPLE | | | |
|---|---|---|---|
| 115% | PREMIUM | 115% | |
| CSLPR | accumulated cycles since last complete refurbishment: | 3,000 | cycles |
| CA | allowed cycles under para 7(g) of schedule 2 | 2,000 | cycles |
| $EPRSV | then current cost estimate for complete refurbishment | $5,000,000 | |
| APRI | average refurbishment interval | 5,000 | |

| FORMULA |
|---|
| 115%*((CSLPR-CA)*($EPRSV/APRI)) |
| 115%*((3000-2000)*($5,000,000/5000)) |
| 115%*((1000)*($1000)) |
| 115%*($1,000,000) |
| $1,150,000 |

| ENGINE LLP DEFICIENCY SAMPLE | |
|---|---|
| 115% | PREMIUM | 115% |

| | | | |
|---|---|---|---|
| LLPCC | LLP CYCLES CONSUMED (ACCUMULATED) | 18,000 | cycles |
| LLPCA | LLP CYCLES ALLOWED | 17,000 | cycles |
| LLP_CLP | LLP CATALOGUE PRICE (THEN CURRENT) | $250,000 | |
| LLPC5L | LLP CHAPTER 5 LIFE | 20,000 | cycles |

| FORMULA |
|---|
| 115%*((LLPCC-LLPCA)*(LLP_CLP/LLPC5L)) |
| 115%*((18,000-17,000)*($250,000/20,000)) |
| 115%*((1000)*($12.50)) |
| 115%*($25,000) |
| $14,375 |
| REPEAT FOR EACH LLP IN ENGINE THAT FAILS TO MEET THE ALLOWED CYCLE LIMIT |

17.06   <u>No Lessor Obligation</u>.  Lessee shall not be entitled to any adjustment or to be reimbursed or in any way compensated if any Item of Equipment is returned to Lessor in a better condition than as required under this Article 17.

17.07   <u>Storage</u>.  Upon any expiration or termination of this Lease, at the written request of Lessor, Lessee shall assist Lessor in obtaining secured ramp storage and storage maintenance for the Aircraft at an appropriate storage area for the Aircraft for a period not exceeding thirty (30) days, at Lessor's risk and expense (Lessor to reimburse Lessee for Lessee's incremental costs of such assistance).  For the avoidance of doubt Lessee shall have no obligation to perform any storage maintenance or cause any maintenance to be performed on the Aircraft during the storage period. Notwithstanding the previous sentence, if an Event of Default has occurred and is continuing, all storage, maintenance, insurance costs and risk of loss for the Aircraft shall be for the account of Lessee.

17.08   <u>Maintenance at Lessor's Request</u>.  Upon receipt of written notice from Lessor not less than one hundred eighty (180) days prior to the Scheduled Return Date, Lessee agrees to perform maintenance reasonably requested by Lessor and reasonably accepted by Lessee to the Airframe and/or the Engines.  Prior to commencement of the maintenance Lessor shall agree to an estimated price for accomplishment of the maintenance. Lessor shall be responsible for all resulting costs (unless such cost was Lessee's responsibility under this Lease) including providing any engineering, parts, certification, related non-routine findings and labor required to perform such maintenance and shall reimburse Lessee in an amount equal to Lessee's contract rates, if any, therefor, or if such maintenance is performed by someone other than Lessee, the actual amount paid therefor by Lessee. In any event no maintenance requested by Lessor hereunder shall cause any delay in return of the Aircraft. In the event the maintenance requested by Lessor under this provision is the sole cause for an extension of the Term of this Lease, Lessor agrees Lessee's obligation to pay Basic Rent shall cease during such extension period.

17.09   <u>Deregistration and Export</u>.  At such time as the Lessee is obligated to redeliver the Aircraft to the Lessor pursuant to this Lease, the Lessee shall upon the request of Lessor:

(a)  promptly take all such steps (not including procuring the discharge of any Lessor Liens) as may be necessary to cancel the existing registration of the Aircraft and obtain and deliver to the Lessor all certificates relating to the Aircraft required by applicable law or any transfer of or alteration to the registration thereof;

(b)  provide to the Lessor all assistance as the Lessor may reasonably request so as to enable the Lessor to obtain any required documents from or in the State of Registry or from any Aviation Authority or from or in such other country in which the Aircraft has been operated or is for the time being located; and

(c)  provide to the Lessor such assistance as the Lessor may reasonably require so as to enable the Aircraft to be registered and certified as to airworthiness under any applicable Laws of any country as Lessor may reasonably request.

17.10   <u>Aid in Disposition</u>.  Lessee agrees that during the last 180 days of the Term and during the storage period set forth in Section 17.07, if any, it will cooperate in all reasonable respects with the efforts of Lessor to lease or sell the Aircraft, including, without limitation, permitting potential lessees or purchasers to inspect the Aircraft and the records relating thereto, provided that, so long as no Event of Default has occurred and is continuing, Lessee shall not be required for such purpose to unreasonably interfere with the use of the Aircraft, or incur out-of-pocket expenses for which it is not reimbursed.

17.11   <u>Assistance with Assignments</u>.  In connection with the return of the Aircraft, Lessee shall, promptly and without undue delay, to the extent necessary, reassign or otherwise confirm to Lessor, at the expense of Lessee, the benefit of any indemnities or warranties available to Lessee from any manufacturer, supplier, overhaul or repair facility, or servicer of any Item of Equipment if such indemnities or warranties are assignable.

17.12   <u>Assistance with Discharge</u>.  In connection with the return of the Aircraft, Lessee shall promptly and without undue delay, to the extent requested by Lessor, at the expense of Lessee, take all actions necessary, including providing any required consents, to release any International Registry registration in relation to any Item of Equipment, this Lease, or the Lease Supplement.

ARTICLE 18. <u>Events of Default</u>.

The following events shall constitute Events of Default (whether such events shall be voluntary or involuntary or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree, order, rule or regulation of any Government Body):

(a)  Lessee fails to make any payment of Basic Rent within three (3) days of the due date, or Supplemental Rent when due; or

(b)  Lessee fails to procure and maintain in full force and effect any insurance required by Article 13 hereof; or

(c)  Lessee fails to perform or observe any of the covenants, conditions or agreements to be performed or observed by it under Sections 7.01, 7.02, 7.03, 7.04, 7.06 (first sentence), 9.01(a), 9.04 or 9.08 hereof; or

(d)  Lessee shall fail to timely comply with its obligation to accept delivery of the Aircraft when validly tendered by Lessor hereunder in accordance with Article 2, or Lessee fails in any material respect to satisfy the conditions precedent for delivery under Section 3.01 hereof in the time period provided for pursuant to Section 2.04 hereof; or

(e)  Lessee shall fail to comply with its obligation to redeliver the Aircraft to Lessor on the Scheduled Return Date; or

(f)  Lessee fails to perform or observe in any material respect any other of the covenants, conditions, or agreements to be performed or observed by it hereunder or under any other Operative Document and such failure continues for a period of sixty (60) days after written notice thereof from Lessor to Lessee; or

(g)  Any representation or warranty made by Lessee herein or in any document or certificate furnished to Lessor in connection herewith or pursuant hereto (including without limitation financial statements) proves to be incorrect in any material respect and Lessee fails to correct the same within sixty (60) days after receipt of notice from Lessor; or

(h)  Any license, consent, approval or authorization of, or any filing or registration with, any Government Body necessary for the performance by Lessee of its obligations under this Lease or any other Operative Document or in connection herewith (including, without limitation, the filing or registration of or in respect of the Aircraft, the Engines or this Lease) or therewith, shall be revoked, not applied for or not issued or shall cease to remain in full force (or, as applicable, is not duly renewed upon the terms consistent with the original approval or otherwise satisfactory to Lessor) or any of the foregoing shall be modified and any such revocation, non-application or issuance or modification would materially adversely affect (in the opinion of Lessor) the rights and remedies of Lessor under this Lease; or

(i)  Lessee (or any affiliate of Lessee, including Guarantor) shall (i) default in any payment or other obligation in any contract between it and Lessor (or any affiliate of Lessor, including Manufacturer) and such default shall continue beyond any applicable grace period; (ii) default in any payment or other obligation under any operating lease of aircraft or aircraft-related equipment and such default shall continue beyond any applicable grace period or extension thereof; or (iii) default in payment of any Lessee Liabilities in excess of $500,000 (with respect to either

principal or interest)when the same becomes due whether by acceleration or otherwise after expiration of any applicable grace period or extension thereof; or (iv) fail to perform or observe in any material respect any provision (unless such provision has been waived) in any agreement securing or relating to any Lessee Liability, and the effect of such failure is to cause such Lessee Liability to become due prior to its stated maturity; or

(j)      Lessee consents to the appointment of a receiver, trustee or liquidator of itself or of a substantial part of its property, or Lessee admits in writing its inability to pay its debts generally as they become due, or makes a general assignment for the benefit of creditors, or Lessee files a voluntary petition in bankruptcy or a voluntary petition or an answer seeking reorganization in a proceeding under any bankruptcy or reorganization laws (as now or hereafter in effect) or an answer admitting the material allegations of a petition filed against Lessee in any such proceeding, or Lessee by voluntary petition, answer or consent seeks relief under the provisions of any other now existing or future bankruptcy or other similar law providing for the reorganization or winding-up of corporations, or providing for an agreement, composition, extension or adjustment with its creditors or Insolvency Proceedings are commenced or an Insolvency Related-Event occurs ; or

(k)      An order, judgment or decree is entered in any proceedings by any court of competent jurisdiction appointing, with or without the consent of Lessee, a receiver, trustee or liquidator of Lessee or of any substantial part of its property, or any substantial part of the property of Lessee is sequestered, and any such order, judgment or decree of appointment or sequestration remains in force undismissed, unstayed or unvacated for a period of thirty (30) days after the date of entry thereof; or

(l)      A petition against Lessee in a proceeding under the bankruptcy laws or other insolvency laws (as now or hereafter in effect) is filed, and any decree or order adjudging Lessee as bankrupt or insolvent in such proceeding remains in force undismissed or unstayed for a period of sixty (60) days after such adjudication or, in case the approval of such petition by a court of competent jurisdiction is required, the petition as filed or amended shall be approved by such a court as properly filed and such approval shall not be withdrawn or the proceeding dismissed within sixty (60) days thereafter, or if, under the provisions of any law providing for reorganization or winding-up of corporations which may apply to Lessee, any court of competent jurisdiction shall assume jurisdiction, custody or control of Lessee or of any substantial part of its property and such jurisdiction, custody or control remains in force unrelinquished, unstayed or unterminated for a period of sixty (60) days or Insolvency Proceedings are commenced or an Insolvency Related-Event occurs; or

(m)      (i) Lessee voluntarily suspends all or substantially all of its commercial airline operations; (ii) the franchises, concessions, permits, rights or privileges required for the conduct of the business and operations of Lessee are revoked, canceled or otherwise terminated; or (iii) the free and continued use and exercise thereof is curtailed or prevented, and as a result of any of the foregoing the preponderant business activity of Lessee ceases to be that of a commercial airline; or

(n)     there shall be any change (or such change shall be enacted or made by notice or otherwise and shall be scheduled to become thereafter effective) in any Law (or in the interpretation thereof) of the jurisdiction of Lessee's incorporation or any jurisdiction in which Lessee conducts business which materially adversely affects (i) any of Lessor's material rights hereunder or under the Operative Documents; (ii) the validity, legality or perfection of any of the Operative Documents or Lessor's title to any Item; or (iii) materially adversely affects Lessee's ability to meet its obligations hereunder; or

(o)     any Government Body shall have condemned, seized or appropriated all or any substantial portion of the property of Lessee; or

(p)     judgment for the payment of money in excess of $2,000,000 is rendered against Lessee and the same shall remain undischarged for a period of sixty (60) days during which execution of such judgment shall not be effectively stayed, or an attachment or other Lien shall be issued against any of the property of Lessee for an amount in excess of $2,000,000 and shall remain undischarged or unbonded for sixty (60) days; or

(q)     an "Event of Default" under, and as such term is defined in, any Other Operating Lease shall have occurred and be continuing; or

(r)     [reserved]; or

(s)     [reserved].


ARTICLE 19. <u>Remedies</u>.

19.01   <u>Event of Default</u>.  Upon the occurrence of any Event of Default and so long as the same shall be continuing, Lessor shall have the right to, in each case exercisable in Lessor's sole discretion, (1) accept such Event of Default as a repudiation of this Lease and terminate the Term and/or terminate this Lease and each other Operative Document and (2) whether or not Lessor exercises its rights under clause (1), do all or any of the following, at its option and in its sole discretion whereupon all rights of Lessee under this Lease and the Operative Documents shall cease forthwith (but without prejudice to the continuing obligations of Lessee thereunder), in addition to such other rights and remedies which Lessor may have under Law:

19.02   <u>Retake Possession</u>.  Upon the written demand of Lessor with or without terminating this Lease and at Lessee's expense, cause Lessee to return promptly, and Lessee shall return promptly, the Aircraft and any part thereof (including the Aircraft Documentation) as Lessor may so demand to Lessor or its order in the manner and condition required by, and otherwise in accordance with all the provisions of, this Lease as if such were being returned at the expiration of the Term, or Lessor at its option and provided that Lessor has sent Lessee a notice of termination, may enter upon the premises where the Aircraft or any part thereof is located and take immediate possession of and remove the same (together with any engine which is not an Engine but which is installed on the Airframe, subject to all the rights of the owner, lessor, lienor or secured party of such engine, and such engine shall be held for the account of

any such owner, lessor, lienor or secured party or, if owned by Lessee, may, at the option of Lessor, be exchanged with Lessee for an Engine as if the original Engine had suffered an Event of Loss) by summary proceedings or otherwise, and Lessee waives any right it may have under Law to a hearing prior to repossession of the Aircraft or any part thereof (and/or, at Lessor's option, store the same at Lessee's premises until disposal thereof by Lessor), all without liability accruing to Lessor for or by reason of such entry or taking of possession or removing whether for the restoration of reasonably necessary damage to property caused by such action or otherwise, and Lessor is hereby irrevocably by way of security for Lessee's obligations under this Lease appointed attorney for Lessee in causing the redelivery and will have all the powers and authorizations necessary for taking that action.

19.03   <u>Termination or Enforcement</u>.  Terminate this Lease and any other Operative Document, terminate the leasing of the Aircraft hereunder by Lessee (whereupon all of Lessee's rights in relation to the Aircraft shall cease forthwith) and/or exercise any other right or remedy which may be available to it under Law or proceed by appropriate court action to enforce the terms hereof and/or exercise any other power, right or remedy which may be available to Lessor hereunder or under Law.  Without limiting the generality of the foregoing Lessor shall have the right:

(a) to require Lessee to move the Aircraft to a location designated by Lessor and/or cease operating the Aircraft except as expressly authorized or directed by Lessor (and, to the extent not inconsistent therewith, with Lessee to comply with all of its obligations hereunder and under each other Operative Document to which it is a party).

(b) to require Lessee, and Lessee will, at request of Lessor, take all steps necessary to effect (if applicable) deregistration of the Aircraft and its export from the country where the Aircraft is for the time being situated and the Lessee Jurisdiction and any other steps necessary to enable the Aircraft to be redelivered to Lessor in accordance with this Lease;

(c) to require Lessee and Lessee will, at request of Lessor and at Lessee's expense, take all steps necessary to ensure all rights under any warranty from any manufacturer, vendor, sub-contractor or supplier with respect to the Aircraft are assigned, including the obtaining of any such party's consent to such assignment, to Lessor to the extent such warranties have not expired otherwise than through the assignment itself; and

(d)       without need of any consent, authorization or action of Lessee, to cause the Aircraft to be deregistered by the Aviation Authority—Bermuda, and to be made ready for export and to be exported out of the country where the Aircraft is for the time being situated and the Lessee Jurisdiction, and to cause all rights of Lessee in respect of the Aircraft and this Lease and each other Operative Document under or in connection with or resulting from the registration of the Aircraft or the recordation of the Operative Documents with the Aviation Authority—Bermuda, the Aviation Authority—Russia or otherwise, to be terminated and extinguished.  In furtherance of the foregoing, Lessor shall be entitled and empowered to act in the name and in the place of Lessee as may be necessary or desirable, in Lessor's sole discretion, including with respect to the execution of documents and instruments, to effect such

deregistration, derecordation, exportation, termination and extinguishment.  Lessee hereby irrevocably and by way of security for its obligations under this Lease appoints Lessor as its attorney to execute and deliver any documentation and to do any act or thing required in connection with the foregoing; and

(d) refuse to comply with one or more or all of Lessor's obligations under any or all Operative Documents.

19.04   <u>Application of Funds, Etc</u>.

(a) Without limiting any other provision of this Lease or of any other Operative Document, Lessor shall have the right to continue to hold any amounts received or held, and to withhold or set off against all amounts otherwise payable to Lessee hereunder or under any other Operative Document to which the Lessee is a party, and to use and apply in whole or in part any or all of such amounts, withholdings and setoffs to and against Lessee's obligations under the Lease (in whatever order and according to whatever priority Lessor may choose), and any such use, application or setoff shall be absolute, final and irrevocable.

(b) If any sum paid or recovered in respect of the liabilities of Lessee under this Lease or any other Operative Document to which the Lessee is a party is less than the amount then due, Lessor may apply that sum to amounts due from Lessee under this Lease or any other Operative Document to which Lessee is a party in such proportions and order and generally in such manner as Lessor may determine.

(c) Lessor may set off any payments or draw on any letter of credit received under the Lease or any other Operative Document against any obligation owed by Lessee to Lessor, regardless of the place of payment or currency.  If the obligations are in different currencies, Lessor may convert either obligation at the market rate of exchange available in London or, at its option, New York, for the purpose of the set-off.  Amounts which would otherwise be due to Lessee from Lessor will fall due only if and when Lessee has paid all of Lessee's obligations under the Lease (or when the amount which would be due to Lessee would be sufficient to discharge the of Lessee's obligations under the Lease then due and owing), except only to the extent Lessor otherwise agrees or sets off such amounts against payments owing to it pursuant to the foregoing provisions of this clause (3).

19.05   <u>Damages</u>.  In addition to Lessor's rights under any other provision of this Lease, recover from Lessee, and Lessee shall on demand indemnify Lessor and/or any Indemnified Party for, all damages suffered, directly or indirectly, by Lessor, or any Indemnified Party in connection with such Event of Default or the exercise of Lessor's, or any Indemnified Party's remedies with respect to such Event of Default, including each of the following:

(a) All accrued and unpaid Rent payable hereunder in respect of any period prior to return of the Aircraft to Lessor in the condition and otherwise in the manner required under this Lease.

(b) All losses, expenses and costs incurred, directly or indirectly, by Lessor and/or any Indemnified Party in connection with such Event of Default or the exercise of Lessor's or any Indemnified Party's remedies with respect to such Event of Default, including (a) all reasonable costs and expenses incurred in connection with recovering possession, deregistration, exportation of the Airframe or any Engine and/or all reasonable costs and expenses in placing such Airframe or Engine in the configuration, condition and repair required by and all lost Rent payments during such recovery and reconditioning, and (b) all damages incurred by Lessor or any Indemnified Party in connection with such Event of Default, including all losses suffered by Lessor or such Indemnified Party because of its inability to place the Aircraft on lease with another lessee on terms as favorable to it as this Lease or because whatever use, if any, to which Lessor or such Indemnified Party is able to put the Aircraft upon its return to Lessor, or the amount received by Lessor or any Indemnified Party upon a sale or other disposal of the Aircraft, is not as profitable to Lessor or such Indemnified Party as leasing the Aircraft in accordance with the terms of this Lease would have been, including in each case, amounts corresponding to the payments of Rent which would have been due from the return of the Aircraft to Lessor until the Aircraft is placed on lease or otherwise disposed of by Lessor.

(c) Any amount of principal, interest, fees or other sums whatsoever paid or payable on account of funds borrowed in order to carry any unpaid amount.

Lessor will use reasonable endeavors to mitigate any such amounts for which Lessee is responsible under clause (2)(b) above, but Lessor shall not be obliged to consult with Lessee concerning any proposed course of action or to notify Lessee in advance of the taking of any particular action. Lessor shall provide a statement, with reasonable details, of any amount claimed under this Section.

For the avoidance of doubt and without limiting Lessor's other rights under this Lease, in connection with the occurrence of any Default, Lessor shall have the right to demand, and Lessee shall on demand pay to Lessor, damages to equal all losses, expenses or costs incurred, directly or indirectly, by Lessor in connection with such Default.

(d) Whether or not Lessor shall have exercised, or shall thereafter at any time exercise, any of its rights under this Section 19 with respect to all or any Item of Equipment, Lessor, by written notice to Lessee specifying a payment date which shall be not earlier than five (5) days from the date of such notice (the "Liquidated Damages Payment Date"), may demand that Lessee pay to Lessor, and Lessee shall pay to Lessor, on the Liquidated Damages Payment Date, as liquidated damages for loss of a bargain and not as a penalty, (in lieu of Rent due for periods commencing on or after the date specified for payment in such notice), any unpaid Rent due for periods prior to the payment date specified in such notice plus whichever of the following amounts Lessor, in its sole discretion, shall specify in such notice: (a) an amount equal to the excess, if any, of the present worth of the aggregate unpaid Rent due under this Lease discounted at the rate of three percent (3%) per annum to the date so specified in said notice over the aggregate fair market rental value (computed as hereafter in this Article provided)

of the Aircraft for the remainder of the Term after discounting such fair market rental value to present worth as of the payment date specified in such notice at the rate of three percent (3%) per annum; or (b) an amount equal to the excess, if any, of the Agreed Value computed as of the date specified for payment in such notice over the fair market sales value (computed as hereafter in this Article provided) as of the date specified in the notice.  The amount specified in said notice shall bear interest at the Incentive Rate from the payment date specified in said notice until receipt of payment by Lessor.

19.06   Sale or Re-lease of Aircraft.  If an Event of Default occurs, Lessor shall have the right to sell or re-lease or otherwise deal with the Aircraft Airframe, Engine or any Item of Equipment at such time and in such manner and on such terms as Lessor considers appropriate in its absolute discretion, free and clear of any interest of Lessee and without any duty to account to Lessee with respect to such action or inaction, as if this Lease had never been entered into.

19.07   General.  All types of relief and remedies under Article 20 of the CTC that are available to a lessor while final determination of Lessor's claims are pending shall be available to Lessor (including to the extent any applicable Contracting State may have opted-in or opted-out of certain relief and remedies of such Article 20).  Lessor and Lessee hereby agree to exclude the application of Article 20(4) of the CTC to this Lease.

Any amount referred to in any Operative Document which is payable to or retainable by Lessee thereunder shall not be paid to or retained by Lessee if an Event of Default shall have occurred and be continuing, but instead such amount shall be held by or paid over to Lessor, as security for Lessee's obligations under the Lease, to be held and applied against Lessee's obligations under the Lease as and when due.  At such time as there shall not be continuing any Event of Default or when return of the Aircraft to Lessor has occurred and there are no further amounts owed by the Lessee to the Lessor, such amount shall be paid to Lessee to the extent not so applied.

ARTICLE 20. Security Deposit.

20.01   Security Deposit.  (a)  Lessee shall provide Lessor with, and hereby pledges and grants a security interest in, a non-refundable security deposit, unless otherwise specified in the Lease, (the "Security Deposit") in the amount of three month's Basic Rent.  The Security Deposit will be paid to Lessor in accordance with the payment instructions in Section 5.05 hereof and shall be paid as follows:

(i)      on the Delivery Date, one-third of the Security Deposit shall be paid by Lessee to Lessor; and

(ii)     within ten (10) Business Days after the Delivery Date, two-thirds of the Security Deposit shall be paid by Lessee to Lessor.

(b) The Security Deposit may be utilized by Lessor to cover any rental deficiencies, deficiencies in maintenance of the Aircraft or any losses suffered by Lessor as a result of Lessee's failure to perform any of its obligations under this Lease.

(c) If an Event of Default shall exist, in addition to any other rights or remedies Lessor may have hereunder, Lessor shall be entitled, at its option, to apply all or any part of the Security Deposit toward payments due hereunder.  Lessee shall promptly (and in any event within ten (10) Business Days) repay any amount of the Security Deposit to the extent applied by Lessor.

(d) Provided that Lessee has fully performed its obligations hereunder, including without limitation the return of the Aircraft to Lessor pursuant to the terms and conditions of this Lease, and provided further that Lessee is not otherwise in default under any other obligation with Lessor, Lessor shall pay the value of the unused portion of the Security Deposit to Lessee.

(e) Lessor agrees, on or after the Delivery Date, so long as no Event of Default shall have occurred that is continuing, to permit Lessee to replace the amount of cash Security Deposit with an irrevocable standby letter of credit.  Upon receipt of an acceptable letter of credit, and so long as there exists no Event of Default, Lessor shall promptly refund to Lessee the amount of Security Deposit received by Lessor. Such letter of credit, and each replacement letter of credit, shall, in addition to any other terms and conditions provided for in this Lease, (i) be valid for a one year term from its date of issuance; (ii) be denominated in and payable in US Dollars in an amount equal to the Security Deposit; (iii) be a first demand, irrevocable and absolute payment undertaking of the issuing bank payable on written demand; (iv) be issued or confirmed by a first class United States or European bank with a minimum senior, long-term unsecured rating of at least "A3" from Moody's or "A-" from Standard & Poor's; (v) be advised to Lessor by a bank in Singapore and be presentable for payment in Singapore; (v) shall be in form and substance acceptable to Lessor; (vi) on each issuance date and each anniversary of the issuance date (by means of an amendment to the letter of credit), be in an amount equal to the full Security Deposit, and (vii) be replaced by a replacement letter of credit meeting the requirements of this paragraph not more than thirty (30) Business Days prior to the expiration thereof until such time as all obligations of Lessee under the Lease have been satisfied as provided herein. Upon receipt of an acceptable replacement letter of credit, the then existing letter of credit shall be returned to the advising bank or the issuing bank as Lessee shall direct within 10 Business Days. In the event Lessor draws on the letter of credit pursuant to Section 20.01(c), within ten (10) Business Days from such event, Lessee shall replace the amount drawn with an irrevocable standby letter of credit in accordance with the terms herein, or if requested by the Lessor, with US Dollars in the full amount of the Security Deposit (after receipt of which, Lessor shall return the letter of credit to the advising or the issuing bank as Lessee shall direct.

Upon receipt of all payments by Lessor and satisfaction of all other obligations of Lessee under the Lease, Lessor shall return the Security Deposit letter of credit to Lessee. To the extent Lessor has not been paid all amounts due from Lessee under the Lease at termination of the

Lease, Lessor shall be entitled to draw upon the Security Deposit letter of credit.

ARTICLE 21. <u>Maintenance Rent and Payments</u>.

21.01   <u>Maintenance Rent</u>.  In addition to the Basic Rent required to be paid for the Aircraft pursuant to Section 5.01, Lessee shall pay as Supplemental Rent the following monthly payments, at the rates set forth therefor in the Lease Supplement (as increased from time to time as appropriate pursuant to Section 21.06) (collectively, the "<u>Maintenance Rent</u>") for each calendar month, Flight Hour, Cycle, or APU Hour, as applicable, accumulated on the applicable Item of Equipment during the month immediately preceding each payment date:

(a) <u>Airframe Heavy Check</u>.  Maintenance Rent for the Airframe Heavy Check performed in accordance with the Maintenance Program.

(b) <u>Engine Maintenance</u>.  Maintenance Rent for each Engine for complete Refurbishment of each such Engine in accordance with the Maintenance Program.

(c) <u>APU Maintenance</u>.  Maintenance Rent with respect to the APU for the Overhaul of such APU in accordance with the Maintenance Program.

(d) <u>Landing Gear Maintenance</u>.  Maintenance Rent with respect to each landing gear for the Overhaul of each such landing gear in accordance with the Maintenance Program.

(e) <u>Engine LLP Maintenance</u>.  Maintenance Rent with respect to each Engine's LLP's for the replacement of each such Engine's LLP's in accordance with the Maintenance Program.

21.02   <u>Maintenance Payment and Notice Procedures</u>.  Maintenance Rent shall be due and payable by Lessee within fifteen (15) days following the end of each calendar month, commencing with the month immediately following the Delivery Date, through and including the month in which this Lease is terminated or expires and the Aircraft is returned to Lessor in accordance with the terms of this Lease.  The final Maintenance Rent payment due on the last day of the Term shall include payment for time flown by the Aircraft during the then current month.

On or before the 10th day of each month, Lessee shall provide to Lessor a completed Monthly Report in the form of Exhibit C hereto setting forth the number of Flight Hours and Cycles that have been accumulated on each Item of Equipment during the previous calendar month, additionally Lessee shall set forth in such Monthly Report the average derate of the Engines over the reporting period along with supporting flight data in Microsoft Excel format sufficient to calculate such monthly average derate and average flight time (for every flight city pair, flight time, and derate).  In the event Lessee does not communicate the average derate in its Monthly Report, Lessor shall assume a derate of ten percent (10%) in its calculations.  Based on such Monthly Report Lessor shall provide Lessee with relevant Maintenance Rent invoice. Any underpayment of Maintenance Rent shall accrue interest at the Incentive Rate from the 15th day

of the calendar month to the date on which the complete payment, as determined by the applicable Monthly Report received by Lessor, for such month is actually received by Lessor. Lessee shall provide Lessor with such supporting or other information and documentation as may from time to time be reasonably requested.

21.03   <u>Lessor Contributions for Maintenance</u>.  Lessee shall provide Lessor with all invoices and other information that Lessor may reasonably request in support of Lessee's request for Lessor contributions for any Qualifying Maintenance Event.  Lessor contributions shall only be available for work involving a Qualifying Maintenance Event determined by Lessor to comply with the requirements of this Section 21.03 and shall be paid to Lessee within thirty (30) Business Days after receipt of all such invoices and other information reasonably requested by Lessor.  Lessor contributions shall only be available for the performance of work involving a Qualifying Maintenance Event which complies with each of the following requirements:

(a) the work must consist of performance of work involving a Qualifying Maintenance Event.  For purposes of this Article 21, Lessor contributions for Refurbishment of Engine line replaceable components will be limited to (i) those components which are listed in the Aircraft or Engine Manufacturer's Manuals, as applicable and (ii) have been accepted by Lessor in the preliminary workscope.  For purposes of this Article 21, Lessor contributions for Overhaul of APU line replaceable components will be limited to (i) those components which are listed in the Aircraft Manufacturer's Manual or APU manufacturer's manual, as applicable and (ii) have been accepted by Lessor in the preliminary workscope.

(b) A preliminary workscope and estimated price quotation from a maintenance provider acceptable to Lessor for a Qualifying Maintenance Event has been provided to Lessor prior to the commencement of such work.

(c) Invoices must be reasonable, as determined by Lessor, for the work performed.

(d) Lessor shall have received satisfactory evidence that submitted invoices have theretofore been paid by Lessee and that no Lessor contributions had previously been made with respect to the maintenance related to such invoices.

(e) PAYMENT SHALL BE LIMITED TO THE AMOUNT OF MAINTENANCE RENT ACTUALLY PAID TO LESSOR FOR CALENDAR DRIVEN ITEMS ON THE DATE THE MAINTENANCE RELATING TO ANY SUCH CLAIM WAS COMPLETED IN RESPECT OF FLIGHT HOURS ACCUMULATED ON THE RELEVANT ITEM FOR WHICH PAYMENT IS BEING SOUGHT, less any Lessor contributions previously made for the respective type of maintenance for which Lessor contributions are sought.  By way of example, Lessor contributions for a Heavy Check will only be made to the extent of Maintenance Rent received by Lessor pursuant to Section 21.01(a) hereof by the conclusion of such Heavy Check net of any Lessor contributions for Heavy Checks previously made to Lessee.

(f) Invoices must be delivered to Lessor not more than 120 days after the completion of

the work to which such invoice respectively relates, shall not contain billing for more than one Item, and shall contain or be accompanied by the following substantiating data or reasonable equivalent (to the extent such data is applicable):

> (i)     work scope (routine, non-routine and materials);
> (ii)    vendor repair and overhaul instructions;
> (iii)   engine removal message and report (if applicable);
> (iv)    vendor invoice and billing summary;
> (v)     customer engine information (if applicable);
> (vi)    list of Airworthiness Directives and service bulletins accomplished during maintenance visit;
> (vii)   insurance claims submitted (if any);
> (viii)  date of removal;
> (ix)    reason for removal;
> (x)     Flight Hours and Cycles since last shop visit;
> (xi)    FAA Form 337 (or its equivalent);
> (xii)   vendor tear down report;
> (xiii)  current disk sheet or current list of LLP's installed; and
> (xiv)   total Flight Hours and Cycles since new.

(g) Lessor contributions will not be made for transportation costs, labor at overtime rates, Airworthiness Directives, service bulletins, any repair or overhaul caused by foreign object damage, mishandling, faulty maintenance, improper operation, negligence, abuse, proper or improper modification or alteration, shipping and handling, any claim which is subject to warranty rights or insurance or any claim which is found to be unreasonable as determined by Lessor in good faith.

21.04   Retention of Maintenance Rent.  Lessee acknowledges that the Maintenance Rent constitutes Supplemental Rent payable for the use of the Items of Equipment and that such Maintenance Rent, upon payment thereof by Lessee, shall be fully earned by Lessor upon receipt and shall become the unencumbered property of Lessor, free of any claims or rights thereto by Lessee.  Any amount referred to in this Article 21 which is payable to Lessee shall not be paid to Lessee if at the time of such payment an Event of Default shall have occurred and be continuing. At such time as Lessee shall have cured all Events of Default, Lessor contributions shall be paid to Lessee if then payable in accordance with the terms of this Article 21.  Lessee understands and agrees that Maintenance Rent is not reimbursable or refundable and remains at all times the property of Lessor.

21.05   Responsibilities of Lessee, Lessor.  Except as provided in this Article 21, nothing herein shall be deemed to impose on Lessor any other obligation to pay for or be responsible for the payment of maintenance Refurbishment or Overhaul of any Item of Equipment.  Lessee shall be responsible for any deficiency between the cost of any maintenance Refurbishment or Overhaul contemplated hereby and the amount of Lessor contributions available in accordance with the requirements set forth in Section 21.03.

21.06   Adjustments to Maintenance Rent Payments.  Maintenance Rent payment rates specified in the Lease Supplement may be adjusted by Lessor as of the first anniversary of the

Delivery Date and at any time thereafter to reflect (i) changes in the utilization of the Aircraft by Lessee (e.g. change in Flight Hours to Cycle ratio or other utilization changes that would impact the maintenance intervals for the Aircraft), (ii) any implementation by Lessee of an Optimized Maintenance Program, and (iii) in accordance with the Lease Supplement.  Finally, it is understood and agreed that the Maintenance Rent rates set forth in the Lease Supplement have been determined based on operation of the Engines at or below the thrust rating for such Engines specified in the Lease Supplement, and any operation of the Engines at a higher thrust rating may result in an increase to the Maintenance Rent rates to reflect the accelerated rate of deterioration of the Engines resulting from operation at the increased thrust rating.

      21.07  <u>Reserved</u>.

      21.08  <u>Letter of Credit for Maintenance Rent</u>. Lessor agrees, so long as no Event of Default shall have occurred that is continuing, to permit Lessee to provide an irrevocable standby letter of credit, in lieu of paying cash Maintenance Rent.  Such letter of credit, and each replacement letter of credit, shall, in addition to any other terms and conditions provided for in the Lease, (i) be valid for a one year term from its date of issuance; (ii) be a first demand, irrevocable and absolute payment undertaking of the issuing bank payable on written demand; (iii) be issued or confirmed by a first class United States or European bank with a minimum senior, long-term unsecured rating of at least "A3" from Moody's or "A-" from Standard & Poor's; (iv) be advised to Lessor by a bank in Singapore and be presentable for payment in Singapore; (vi) be in form and substance acceptable to Lessor; (vii) on each issuance date and each 6 month anniversary of the issuance date (by means of an amendment to the letter of credit), be in an amount equal to the actual and estimated amount of Maintenance Rent that accrued or would have accrued (if any) as of the date of issuance plus the estimated Maintenance Rent that would accrue (if payable in cash) during the six months following the date of issuance, less the amount paid by Lessee for any qualifying maintenance event satisfying the conditions of the Lease for Lessor Contributions, and (viii) be replaced by a replacement letter of credit meeting the requirements of this paragraph not more than 30 business days prior to the expiration thereof until such time as all Maintenance Rent has been paid as provided herein.  Upon receipt of an acceptable replacement letter of credit the then existing letter of credit shall be returned to the advising bank or the issuing bank as Lessee shall direct within ten (10) Business Days.

      Payment in cash of the total accrued Maintenance Rent less the amount of Lessor Contributions for each category of Maintenance Rent herein at the expiration of the Lease Term shall relieve Lessee of its obligation to maintain the Maintenance Rent letter of credit, and upon receipt of such payment by Lessor and satisfaction of all other obligations of Lessee under the Lease, Lessor shall return the Maintenance Rent letter of credit to Lessee. Failure to pay in cash the total accrued Maintenance Rent at termination of the Lease shall entitle Lessor to draw upon the Maintenance Rent letter of credit.

      21.09  <u>Maintenance Reserve Equivalency</u>.

     (a) It is acknowledged by Lessee and Lessor that the Maintenance Rent payable by Lessee during the Term in respect of each applicable component, Airframe, Landing Gear, APU, Engine and Engine Life Limited Parts, shall correspond to life consumed

for each applicable component since new or if applicable the last Qualifying Maintenance Event.  If, at the expiration of the Lease Term, the actual life consumed since new or last Qualifying Maintenance Event, as applicable, by each component is greater than expected based on the Maintenance Rent paid by Lessee during the Term for each applicable component, then Lessee shall compensate Lessor for each deficit.

(b)  In the event that a component covered by Maintenance Rent is exchanged during the Term of the Lease for any reason.  Lessor may require the Lessee to make additional contributions to the applicable component reserve fund if Lessor determines that the maintenance status, condition, useable life remaining of the replacement component is less than that of the original component.  The Lessee shall pay the amount which, based upon the then applicable reserve rate, the lessor would expect to have received in the reserve fund of the applicable component given the replacement component's maintenance status, condition, or useable life remaining at the time of exchange.

ARTICLE 22. <u>Reserved</u>.

ARTICLE 23. <u>Characterization of Lease</u>.

23.01  <u>True Lease</u>.  It is the intent of the parties that this Lease be a "true lease"  and that Lessor shall at all times be considered the owner of the Items of Equipment for all purposes, including without limitation for purposes of all Taxes, and that this Lease conveys no right, title or interest in the Items to Lessee, except as a lessee.

23.02   <u>Reserved</u>.

23.03   <u>Reserved</u> .

23.04   <u>Reserved</u>.

23.05   <u>Reserved</u>.

23.06   <u>Lessee Reporting Requirements</u>.  Lessee agrees promptly to provide Lessor with sufficient information as is reasonably requested by Lessor and may be reasonably necessary to allow Lessor properly to determine the extent to which any tax items (including, without limitation, items of income, gain, loss, deduction or credit) attributable to this Lease should be apportioned or allocated to sources without the United States within the meaning of Sections 861 through 863 of the Code or is otherwise reasonably necessary for Lessor properly to file any return or report required in connection with this Lease.

23.07   <u>Lessor Tax Residence Certificate</u>.  As soon as available following the Delivery Date and annually on or before March 15 in each year during the Term, Lessor will provide Lessee with an apostilled certificate issued by the Inland Revenue Authority of Singapore confirming Lessor's tax residence (for purposes of the Singapore – Russian Federation Income

Tax Convention) in Singapore or if one is not then available equivalent official evidence of the status of Lessor as a resident of the Singapore under the Tax Convention, or in the case of a transferee Lessor, official evidence of the status of such transferee Lessor as a resident under the applicable Tax Convention. However, Lessor will be relieved of the obligation imposed on it pursuant to this Section 23.07 in the event that a change in law, regulation or administrative practice occurring after the date Lessor became the Lessor hereunder prevents Lessor from delivering such certificate or other equivalent official evidence to Lessee; provided that a transferee Lessor shall also be relieved of such obligation to the extent that the transferor Lessor was so relieved at the time of the transfer.

23.08   Contracting State Assumptions. This Lease has been entered into on the assumption that all applicable Contracting State declarations and elections under the CTC shall continue in force as at the date hereof.

ARTICLE 24. Miscellaneous.

24.01   Invalidity of any Provision.  Any provision of this Lease which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

24.02.   Amendments in Writing.      No term or provision of this Lease may be changed, waived, discharged or terminated orally, but only by a written instrument signed by the party against which the enforcement of the change, waiver, discharge or termination is sought.

24.03.   Effectiveness.  This Lease shall be effective for all purposes as of the date first above written.

24.04   Notices.  Unless otherwise expressly specified or permitted herein or in the other Operative Documents, all notices, requests, demands, authorizations, directions, consents, waivers or documents provided or permitted by this Lease or the other Operative Documents to be made, given, furnished or filed shall be in writing, personally delivered or delivered by a commercial carrier, or by facsimile, and addressed as set forth below.  Any party hereto may change the address to which notices to such party will be sent by giving notice of such change to the other parties to this Lease and the other Operative Documents.  Any notice given as provided in this Section shall be deemed effective and given for the purposes of the Operative Documents on the date on which it is received (or delivery refused) by the addressee.

If to Lessee:          AirBridgeCargo Airlines LLC
                        Building 3, 28B Mezhdunarodnoe Rd,
                       Moscow 141411, Russia.

                       Attn: General Director
                       Phone: +7 495 7862613

Fax: +7 495 755 65 81

If to Lessor:                    BOC Aviation Limited
                                      8 Shenton Way #18-01
                                      Singapore 068811
                                      Attn:  General Counsel
                                      Phone: +65 6325 9555
                                      Fax: + 65 6323 6962/6932

or to any party at such other address as the party may designate by notice duly given in accordance with this Section.

24.05   <u>Lessor's Right to Perform for Lessee</u>.  If Lessee fails to make any payment of Rent required to be made by it hereunder or fails to perform or comply with any of its agreements contained herein or in related documents, Lessor may itself, but shall be under no obligation to, make such payment or perform or comply with such agreement, and the amount of such payment and the amount of the reasonable expenses of Lessor incurred in connection with such payment or the performance of or compliance with such agreement, as the case may be, together with interest thereon at the Incentive Rate, shall be deemed Supplemental Rent, payable by Lessee upon demand.

24.06   <u>Counterparts</u>.  This Lease may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

24.07   <u>Quiet Enjoyment</u>.  Lessor covenants that as long as no Default or Event of Default has occurred and is continuing, Lessee shall quietly enjoy the use and possession of the Aircraft without hindrance or disturbance by Lessor, Financing Parties or by any other person claiming by, through or under any of them.

24.08   <u>Legal Fees and Other Expenses</u>.  Whether or not the transactions contemplated hereby are consummated, Lessee shall promptly pay or reimburse Lessor, as appropriate (against invoices submitted by or on behalf of Lessor), for all costs, fees and expenses (including fees and disbursements of legal counsel and other experts employed or retained by Lessor) incurred by Lessor, and all payments made or payable in connection with, arising out of or in any way related to the preparation, negotiation, execution or delivery of this Lease and the other Operative Documents (collectively, "<u>Transaction Costs</u>").  All Transaction Costs shall (to the extent invoices have been submitted to Lessee at least three (3) Business Days prior to the Delivery Date) be paid on the Delivery Date.  In addition to any Transaction Costs, Lessee shall pay or reimburse Lessor for all costs, fees and expenses including but not limited to, legal expenses, collection costs and reasonable attorneys' fees and accounting fees, incurred by or on behalf of Lessor in connection with (a) any amendment, consent, approval, or waiver in connection with this Lease, (b) Articles 15 and 16 hereof, (c) the registration of the Aircraft and the recordation of this Lease and the Lease Supplement with the CAA or (d) the registration of this Lease and the Lease Supplement as an International Interest in respect of the Aircraft and each Engine on the International Registry and/ or (e) any Event of Default or the exercise of

72

Lessor's remedies with respect thereto, including all costs and expenses incurred in connection with the repossession or return of the Aircraft.

24.09   <u>Assignment by Lessor</u>.  (a) Lessee acknowledges and agrees that Lessor shall have the absolute right to transfer or assign to any Person any or all of Lessor's rights, obligations, benefits and interests under this Lease, including, without limitation, the right to receive Rent or any other payment due under this Lease, or the right to transfer or assign International Interests or Associated Rights now or hereafter obtained by Lessor, or title to any Item and the right to make all waivers and agreements, to give all notices, consents and releases, to take all action upon the occurrence of an Event of Default, or to do any and all other things which Lessor is or may become entitled to do under this Lease, including without limitation, the arranging of third party debt or lease-in/lease-out financing.  Lessor agrees that no such transfer or assignment will materially change the duty of or materially increase the burden or risk imposed on Lessee or reduce the rights and benefits of Lessee hereunder, and Lessee waives any provision of applicable law that would or might grant Lessee the right to demand assurances or compensation of any kind from the transferee or to require the transferee to take any action on account of such transfer or assignment, other than as expressly required herein.  Lessee acknowledges that, if Lessor should sell or transfer to a third party all of Lessor's interest under this Lease in accordance with the terms hereby, Lessor shall thereupon be relieved of all of its obligations hereunder (except in the case of a security assignment) and Lessor's transferee (and, if the transferee is a trust, the beneficial owner of such trust) shall succeed to all of Lessor's rights, interests and obligations under this Lease as though Lessor's transferee had been the initial lessor hereunder. Lessor may also arrange third party debt or lease-in/lease-out financing without restriction from Lessee.  Lessee shall cooperate with Lessor in complying with reasonable documentation and insurance/indemnity requirements, provided that any reasonable out of pocket expenses incurred by Lessee shall be for the account of Lessor and that Lessor shall procure that any such assignee or financing party or the beneficial owner of the assignee as applicable, shall provide a covenant of quiet enjoyment on the same terms as provided in this Lease.  Lessor shall provide at least thirty (30) days prior written notice of any such assignment to Lessee. Assignee will have a net worth of $30,000,000 or its obligations will be guaranteed by an entity with such a net worth; Assignee will not be a commercial or cargo airline or freight forwarder or a competitor of Lessee; if Assignee is not an experienced aircraft lessor, as determined by Lessee acting reasonably, Assignee will appoint a servicer reasonably acceptable to Lessee; Lessee will be given thirty (30) days prior written notice of any such transfer, and Lessee to be reasonably satisfied with the form of the document that effects the transfer; and the Assignee will be an entity, or will enter into a legal structure, such that the registration of the Aircraft in at BDCA (or such other then current registration) will not be disturbed.

(b)       Without limiting the generality of paragraph (a), Lessee acknowledges and agrees that the terms and conditions of this Lease have been agreed to by Lessor in anticipation of its being able to assign any and all of its rights under and interests in this Lease and the Aircraft and/or its being able to grant a security interest in all or any of its rights and interest under this Lease and in the Aircraft or any Item to one or more lenders, to an agent or trustee representing such lenders, or to any other party having an interest in any Item or participation in the transaction which is the subject of this Lease, any or all of which may rely on and shall be entitled to the benefit of the provisions of this Section

24.09(b).  Lessee will use reasonable efforts to cooperate with Lessor in connection with any such transfer or assignment and shall, among other things, upon the written request of Lessor:  (i) arrange for each Item of Equipment to be located, at the time of any such transfer or assignment, on the ground in, a jurisdiction selected by Lessor (and which is a jurisdiction in which Lessee routes aircraft); (ii) cause a broker's report and insurance certificate substantially in the form of the report and certificate required by this Lease (or otherwise reasonably acceptable to the transferee), to be dated, and be delivered on, the date of any such transfer or assignment, with the transferee included as an additional insured and, if appropriate, the loss payee thereunder and (iii) recognize any such assignment, (iv) accept the directions or demands of such assignee in place of those of Lessor, (v) surrender any leased property only to such assignee, (vi) pay all Rent payable hereunder and do any and all things required of Lessee hereunder, (vii) execute any documents (including an estoppel certificate) which Lessor may reasonably request in order to effectuate the foregoing, and (viii) consent to any necessary or advisable registrations on the International Registry giving notice of such transfer or assignment.

(c)      Notwithstanding any assignment by Lessor hereunder, BOC Aviation Limited and BOCA Leasing (Bermuda) Limited, as original Lessor and owner hereunder, shall remain an Indemnified Party, a Tax Indemnitee, and an additional insured under the liability insurance policies pursuant to this Lease to the same extent as if the assignment had not occurred.  In connection with any assignment contemplated by this Section 24.09, BOC Aviation Limited shall receive an insurance certificate and broker's report meeting the requirements of Article 13 confirming BOC Aviation Limited and BOCA Leasing (Bermuda) Limited as an additional insured under the liability insurance required by Article 13.01 hereof.

24.10   Survival.  The representations, warranties, and agreements of Lessee provided for in this Lease, and Lessee's obligations under any and all provisions thereof, shall survive the expiration or other termination of this Lease to the extent required for full performance and satisfaction hereof.  All of the obligations of Lessee under Articles 11 and 23 hereof shall continue in full force and effect notwithstanding the expiration or earlier termination of this Lease and are expressly made for the benefit of, and shall be enforceable by Lessor, and its successors and assigns. The indemnity obligations contained in Article 14 hereof shall continue in full force and effect notwithstanding the assignment, expiration or other termination of this Lease.

24.11   Successors and Assigns.  This Lease shall be binding on and shall inure to the benefit of Lessee, Lessee's permitted successors and assigns, Lessor and Lessor's successors and assigns.

24.12   Currency.  Lessee and Lessor hereby agree the payment obligations set forth in this Lease will be paid in U.S. Dollars and in immediately available funds strictly in accordance with the terms and provision of this Lease.  The payment obligations of Lessee (the "payor") payable under this Lease expressed to be payable thereunder in one currency (the "first currency") shall not be discharged by an amount paid in another currency (the "second currency"), whether pursuant to a judgment or otherwise, to the extent the amount so paid on

prompt conversion to the first currency under normal banking procedures does not yield the full amount of the first currency due thereunder, and the payor shall indemnify the recipient of such payment (the "payee") against any such shortfall; and in the event that any payment by the payor, whether pursuant to a judgment or otherwise, upon conversion and transfer does not result in payment of such amount of the first currency, the payee shall have a separate cause of action against the payor for the additional amount necessary to yield the amount due and owing to the payee.

24.13   Commercial Acts.  Lessee is subject to civil and commercial law with respect to its obligations under this Lease, and the execution, delivery and performance by Lessee of this Lease constitute and will constitute private and commercial acts rather than public or governmental acts.  Lessee is a corporate entity with the legal capacity to sue and be sued. Neither Lessee nor any of its property, whether or not held for its own account, has any immunity (sovereign or otherwise) from any suit or proceeding, from jurisdiction of any court or from set-off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise under the Laws country in which Lessee is incorporated or domiciled or any  country in which Lessee conducts business or any other jurisdiction in respect of its obligations under this Lease.  Lessee hereby waives every immunity (sovereign or otherwise) to which it or any of its properties would otherwise be entitled from any legal action, suit or proceeding, from jurisdiction of any court or from set-off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) under the Laws of the country in which  Lessee is incorporated or domiciled or any  country in which Lessee conducts business or any other jurisdiction in respect of its obligations under this Lease.  The waiver by Lessee described in the immediately preceding sentence is the legal, valid and binding obligation of Lessee.

24.14   Reserved.

24.15   CTC Insolvency Provisions Compliance.  Notwithstanding any provision herein or elsewhere contained to the contrary, it is understood and agreed among the parties hereto that:

(a) the transactions contemplated by this Lease and the other Operative Documents are expressly intended to be, shall be and should be construed so as to be, entitled to the full benefits of the CTC Insolvency Provisions, as amended from time to time, and any successor provisions thereto; and

(b) Lessee shall never take the position or assert that the protections of the CTC Insolvency Provisions should not be available to Lessor in respect of the Aircraft including, without limitation, in the event of an Insolvency-Related Event.

(c) the transactions contemplated by this Lease and the other Operative Documents are expressly intended to be subject to the CTC with the declarations in effect as of the Delivery Date.  If the CTC is found by Lessor, in its reasonable determination, not to be applicable to this Lease, whether or not such failure is caused by any act or omission of Lessee, and in the Lessor's reasonable determination, the transaction

contemplated by this Lease cannot promptly be restructured by the parties so as to bring the transaction within the coverage of the CTC, or if the declarations made by the Contracting State are amended in such a manner so as to adversely affect, in Lessor's opinion, Lessor's interests hereunder, Lessor, at its option, may terminate this Lease and Lessee shall:

(d) return the Aircraft to Lessor in accordance with the provisions of Article 17 and Schedule 2 if the Aircraft has been delivered to Lessee under this Lease; and

      (ii) pay to Lessor all amounts due and payable by Lessee to Lessor and/or any Indemnitee under the Operative Documents to which it is a party as of the Relevant Date, and

      (iii) pay to Lessor all amounts that would be due and payable pursuant to Section 19.03 of the Lease.

24.16   GOVERNING LAW.  THIS LEASE SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE , BUT WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

24.17   WAIVER OF JURY TRIAL.  EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES AS AGAINST THE OTHER PARTY HERETO ANY RIGHTS IT MAY HAVE TO A JURY TRIAL IN THE UNITED STATES OF AMERICA IN RESPECT OF ANY CIVIL ACTION ARISING UNDER THIS AGREEMENT.

24.18   Dispute Resolution; Jurisdiction.

(a) Any controversy or claim ("Dispute") arising out of or relating to this Agreement, or the breach thereof, shall be referred to arbitration under the Rules of Arbitration of the International Chamber of Commerce by three arbitrators appointed in accordance with such Rules, and judgment on the award(s) rendered by the arbitrators may be entered in any court having jurisdiction thereof.  The place of arbitration shall be New York.  The language of the arbitration shall be English.

(b) Notwithstanding the foregoing, either the Lessor or the Lessee may choose to submit any Dispute arising out of or relating to this Agreement before the U.S. federal courts situated in the Southern District of New York and each of the Lessor and the Lessee hereby submits to the jurisdiction of such courts.  The Lessor and Lessee shall at all times maintain an agent for service of process in the city of New York.

(c) Sections 24.18(a) and (b) shall not prevent any party from taking proceedings in any other court for enforcement of an arbitration award or a judgment of a court, or for interim or injunctive relief pending arbitration or court proceedings.

(d) The parties intend that any arbitration proceedings be confidential and the parties shall not disclose to any person, other than those necessary to the proceedings, the existence of the arbitration, any information submitted during the arbitration, any documents submitted in connection with it, any oral submissions or testimony, transcripts, or any award unless disclosure is required by law or is necessary for permissible court proceedings, such as proceedings to recognize or enforce an award.

(e) Notwithstanding any provision to the contrary in the ICC Rules, each party shall bear its own costs and expenses and an equal share of the arbitrators' and administrative fees and costs of the arbitration.

24.19    Submission to Jurisdiction.  To the fullest extent permitted by Law, each of Lessee and Lessor hereby irrevocably and unconditionally submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the City and County of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Lease and each of Lessee and Lessor hereby irrevocably and unconditionally agrees that all claims in respect of such action or proceeding may be heard and determined in such court in New York State or, to the extent permitted by law, in such federal court.  Each of Lessee and Lessor hereby irrevocably and unconditionally waives, to the fullest extent it may effectively do so, any objection to venue of any such action or proceeding in any such court and any defense or objection that they may now or hereafter have of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

24.20    Process Agent.  Lessee hereby irrevocably and unconditionally appoints Corporation Service Company (the "Process Agent"), with an office on the date hereof at 1180 Avenue of the Americas, Suite 210, New York, New York 10036; Telephone +1 212 299 5600; Facsimile +1 212 299 5656, as its agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which may be served in any such action or proceeding in any such New York state or federal court referred to in Section 24.15 above and agrees promptly to appoint a successor Process Agent in New York, New York (which successor Process Agent shall accept such appointment in a writing reasonably satisfactory to Lessor) prior to the termination for any reason of the appointment of the initial Process Agent.  In any such action or proceeding in such New York state or federal court sitting in the City and County of New York, such service may be made on Lessee by delivering a copy of such process to Lessee in care of the Process Agent at the Process Agent's above address and by depositing a copy of such process in the mails by certified or registered air mail, addressed to Lessee at its address referred to in Section 24.02 hereof (such service to be effective upon such receipt by the Process Agent and the depositing of such process in the mails as aforesaid). Lessee hereby irrevocably and unconditionally authorizes and directs the Process Agent to accept such service on its behalf.  As an alternate method of service, Lessee irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding in

such New York state or federal court sitting in the City and County of New York by mailing copies of such process to it by certified or registered air mail at its address referred to in Section 24.02.  Lessee agrees that, to the fullest extent permitted by applicable law, a final judgment in any such action or preceding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction.

Lessor hereby irrevocably and unconditionally appoints National Corporate Research Ltd. (the "Lessor's Process Agent"), with an office on the date hereof 10 East 40th Street, 10th Floor, New York, NY 10016; Telephone: 800-221-0102; Facsimile 800-944-6607,as its agent to receive on behalf of it and its property service of copies of the summons and complaint and any other process which may be served in any such action or proceeding in any such New York state or federal court referred to in Section 24.15 above and agrees promptly to appoint a successor Process Agent in New York, New York (which successor Process Agent shall accept such appointment in a writing reasonably satisfactory to Lessee) prior to the termination for any reason of the appointment of the initial Process Agent.  In any such action or proceeding in such New York state or federal court sitting in the City and County of New York, such service may be made on Lessor by delivering a copy of such process to Lessor in care of the Process Agent at the Process Agent's above address and by depositing a copy of such process in the mails by certified or registered air mail, addressed to Lessor at its address referred to in Section 24.02 hereof (such service to be effective upon such receipt by the Process Agent and the depositing of such process in the mails as aforesaid).  Lessor hereby irrevocably and unconditionally authorizes and directs the Process Agent to accept such service on its behalf.  As an alternate method of service, Lessor irrevocably and unconditionally consents to the service of any and all process in any such action or proceeding in such New York state or federal court sitting in the City and County of New York by mailing copies of such process to it by certified or registered air mail at its address referred to in Section 24.02.  Lessor agrees that, to the fullest extent permitted by applicable law, a final judgment in any such action or preceding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction.

24.21   Warranty Rights.  So long as no Default or Event of Default has occurred and is continuing, Lessor hereby authorizes Lessee to enforce in its own name such rights as Lessor may have with respect to any Item of Equipment under any warranty, service policy or product agreement of the manufacturer thereof, the maintenance and overhaul agencies of the Aircraft and the Engines, or any subcontractor or supplier or vendor thereof to the extent that the same may be assigned or otherwise made available to Lessee and, to the extent that the same may not be so assigned or otherwise made available to Lessee, Lessor agrees to exercise reasonable diligence, at Lessee's expense, to enforce such rights as Lessor may have with respect thereto for the benefit of Lessee; provided, however, that upon an Event of Default all such rights shall immediately revert to Lessor without any further action, including all claims thereunder whether

or not perfected, and conditioned upon the occurrence of an Event of Default, Lessee waives any provision of applicable law granting such rights to it.

24.22   <u>Entire Agreement</u>.  This Lease constitutes the entire agreement of the parties hereto with respect to the subject matter hereof, and all prior or contemporaneous understandings or agreements, whether written or oral, among any of the parties hereto with respect to such subject matter are hereby superseded in their entireties.

24.23   <u>Use of English Language</u>.  Each of the parties hereby acknowledges and confirms that the English language version of this Lease shall be the governing version upon which all the parties hereto shall rely.

*       *       *

[PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Lessor and Lessee have each caused this Aircraft Lease Agreement (60118) to be duly executed by their authorized officers as of the day and year first above written.

BOC AVIATION LIMITED
as Lessor

By: _____

Its: _____


AIRBRIDGECARGO AIRLINES LLC
as Lessee

By: _____

Its: _____


[*seal*]

81

EXHIBIT A

LEASE SUPPLEMENT (60118)


THIS LEASE SUPPLEMENT (60118), dated as of November 13, 2015, between AIRCRAFT 60118, INC. as previous lessor ("Lessor") and AIRBRIDGECARGO AIRLINES LLC ("Lessee");


W I T N E S S E T H

WHEREAS, Lessor and Lessee have heretofore entered into that certain Aircraft Lease Agreement (60118) dated as of November 13, 2015 (herein called the "Lease" and the terms defined therein being herein used with the same meaning), which Lease provides for the execution and delivery of a Lease Supplement substantially in the form hereof for the purpose of leasing the Aircraft under the Lease as and when delivered by Lessor to Lessee in accordance with the terms thereof;

NOW, THEREFORE, in consideration of the premises and other good and sufficient consideration, and pursuant to Article 2 of the Lease, Lessor and Lessee hereby agree as follows:

1. On the date first set forth hereinabove at 10:40AM at Everett, Washington Lessor hereby delivers and leases to Lessee, and Lessee hereby accepts, takes possession of, and leases from Lessor, under the Lease as herein supplemented, the following:

(i)     Airframe:  One new Boeing Model 747-8F (Generic Model 747) aircraft bearing manufacturer's serial number 60118 and Bermuda registration mark VQ-BFE that is type certified by the Aviation Authority to transport (a) at least eight (8) persons (including crew) or (b) goods in excess of 2750 Kilograms.

(ii)    Engines: Four (4) new General Electric Model GEnx-2B67/P engines (66,500 pounds thrust rating) bearing manufacturer's serial numbers 959449, 959448, 959447, 959452, each of which Engines is turbine-powered and has 550 or more rated takeoff horsepower or its equivalent.

(iii)   APU:  One (1) new model Pratt & Whitney PW901C APU bearing manufacturer's serial number PCE 900899.

(iv)    All Aircraft Documentation, as listed in Annex I attached hereto.

(v)     The loose equipment listed in Annex II hereto.


A-1

      (vi)     Such other further and additional equipment as may be specified in any other attachment hereto.

All the foregoing is hereinafter referred to as the "<u>Delivered Equipment</u>".  The Delivered Equipment has been accepted and delivered to Lessee on the date set forth above to Lessee's full satisfaction pursuant to the terms and provisions of the Lease.

      2.     The Delivery Date of the Delivered Equipment is the date of this Lease Supplement set forth in the opening paragraph hereof.

      3.     The Scheduled Return Date means the close of business on the day prior to the one hundred seventy one (171) month anniversary of the Delivery Date plus three (3) days.

      4.     Lessee hereby confirms its agreement to pay Lessor Basic Rent and Supplemental Rent for the Delivered Equipment throughout the Term therefor in accordance with the Lease. The Basic Rent for the Delivered Equipment shall be payable in one hundred seventy-one (171) consecutive (except for any permitted rent holiday pursuant to the terms of the Lease) monthly installments, payable in advance, the first installment of which is due and payable on the date hereof, and subsequent installments shall be payable on the corresponding day of each month throughout the Term (each a "<u>Rent Payment Date</u>").  Each installment of Basic Rent shall be in amounts set forth on Schedule 1 hereto. The three (3) days in addition to the one hundred seventy one (171) months of the Term shall be added on to the first month of the Lease. No additional Basic Rent will be due for the first three (3) days of the Lease. For the avoidance of doubt, no Basic Rent will be due for the fourteenth month of the Lease.

All amounts of Rent under the Lease shall be paid to Lessor by wire transfer of same day funds, without deduction for bank transaction or wire transfer fees, on or before the due dates therefor in accordance with the instructions set forth on Schedule 1 hereto.

      5.     The Airframe, Engines, APU, Landing Gear and Parts had the hours and cycles at Delivery set forth on Annex III hereto.

      6.      Lessee hereby confirms that the Stipulated Loss Value for the Aircraft is set forth on Schedule 1 hereto.

      7.     Lessee hereby confirms its agreement to pay Lessor, as Supplemental Rent, the following Maintenance Rent rates (payable in accordance with the provisions of Article 21 of the Lease) as set forth on Schedule 1 hereto.

      8.     Lessee confirms it has accepted the Delivered Equipment for all purposes hereof and of the Lease, including its being airworthy, in accordance with specifications, in good working order and repair and without defect in title, condition, design, operation or fitness for use, whether or not discoverable by Lessee on the date hereof, and free and clear of all Liens,

except for those contemplated by the Lease, provided, however, that nothing contained herein or in the Lease shall in any way diminish or otherwise affect any right Lessee or Lessor may have with respect to the Delivered Equipment against the manufacturer thereof, or any subcontractor or supplier of the manufacturer thereof.  Lessee confirms the Delivered Equipment is in the condition set forth in Annexes I, II and III attached hereto.

8.       This Lease Supplement, together with the Lease, constitutes the entire agreement of the parties with respect to the subject matter hereof, and all prior or contemporaneous understandings or agreements (other than the Lease), whether written or oral, with respect to such subject matter are hereby superseded in their entirety.

9.       THIS LEASE SUPPLEMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE , BUT WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

*       *       *

IN WITNESS WHEREOF, Lessor and Lessee have each caused this Lease Supplement (60118) to be duly executed by their authorized officers as of the day and year first above written.

AIRCRAFT 60118, INC.
as Previous Lessor

By: _____

Its: _____


AIRBRIDGECARGO AIRLINES LLC
as Lessee

By: _____

Its: _____

A-3

<u>SCHEDULE 1 TO LEASE SUPPLEMENT</u>

**<u>Basic Rent</u>**

The Basic Rent shall be fixed during the Term of the Lease. The Basic Rent Rate shall be fixed at $1,200,000 per month per instalment (except for any permitted Rent Holiday pursuant to the terms of the Lease).

|  |  |
|---|---|
| Payments 1-13: | $1,200,000 |
| Payment 14: | $0 |
| Payments 15-171: | $1,200,000 |

For the avoidance of doubt, no Basic Rent will be due for the fourteenth month of the Lease.

**<u>Maintenance Rent Rates</u>**

|  |  |
|---|---|
| Airframe Heavy Check: | $35,320.31 / month |
| Engine Maintenance: | See "Engine Maintenance Reserve Matrix" below (applies to each Engine) |
| APU Maintenance: | $53.43 / APU hour |
| Landing Gear Maintenance: | $8,014.50 / month |
| Engine LLP Maintenance: | $632.31/ EFC (per Engine) |

Engine Maintenance Reserve Matrix*:

* This Engine Maintenance Reserve Matrix was derived from data provided by the Engine Manufacturer for the following baseline conditions: (i) a Flight Hour to Cycle ratio ("Flight Leg") of 6:1, (ii) 70 degree Fahrenheit static temperature adjusted to sea level in a non-severe environment, (iii) 20% derate and (iv) annual utilization of 4,200 engine flight hours.  Linear interpolation will be used in cases where actual utilization parameters (derate and FH/Cycle ratio) fall between derate and Flight Leg values.

| Derate | Flight Leg (FH:FC) | Maintenance Rent (US Dollars per Engine per Flight Hour) |
|---|---|---|
| 5% | 10 | $153.70 |
| 5% | 9 | $158.39 |
| 5% | 8 | $163.08 |
| 5% | 7 | $170.20 |
| 5% | 6 | $177.32 |
| 5% | 5 | $189.04 |
| 5% | 4 | $200.75 |
| 10% | 10 | $147.33 |
| 10% | 9 | $151.36 |
| 10% | 8 | $155.39 |
| 10% | 7 | $161.39 |
| 10% | 6 | $167.39 |
| 10% | 5 | $177.42 |
| 10% | 4 | $187.44 |
| 15% | 10 | $142.08 |
| 15% | 9 | $145.55 |
| 15% | 8 | $149.02 |
| 15% | 7 | $154.17 |
| 15% | 6 | $159.70 |
| 15% | 5 | $167.88 |
| 15% | 4 | $176.95 |
| 20% | 10 | $137.69 |
| 20% | 9 | $140.77 |
| 20% | 8 | $143.85 |
| 20% | 7 | $148.99 |
| 20% | 6 | $154.13 |
| 20% | 5 | $161.32 |
| 20% | 4 | $169.54 |

The Engine Maintenance Reserve Matrix calculation rate will increase following completion of the first performance restoration to a rate of $317 per flight hour and will be based on the same operational conditions listed above and a new Engine Maintenance Reserve Matrix will be provided by Lessor. Lessor shall have the right to adjust the Engine Maintenance rates if the actual Flight Hours to Cycles ratio during the term deviates from the values published in the Engine Maintenance Reserve Matrix.

To the extent Lessee shall be a party to a GE On-Point maintenance program that is in form and substance acceptable to Lessor which would provide, in Lessor's determination, the equivalent

Schedule 1 - 2

protection to Lessor as the maintenance reserves set forth in this clause, and to the extent such program is assignable to Lessor on terms acceptable to Lessor and is so assigned pursuant to an assignment agreement in form and substance reasonably acceptable to Lessor, Lessee shall not be required to pay Maintenance Rent for Engine performance restoration thereafter.

The Maintenance Rent rates set forth herein are based on an assumed Flight Hours to Cycles ratio of 6:1 and Lessor shall have the right to adjust if the actual Flight Hours to Cycles ratio during the term differs. Engine LLPs shall be adjusted annually based upon the manufacturer's then current catalog list price. The Maintenance Rent amounts, excluding Engine LLPs, shall increase annually at the rate of 2.75% on each one year anniversary of the Delivery Date and a revised Engine Maintenance Reserve Matrix will be issued accordingly.

In the event the actual cost of the qualified maintenance performed exceeds the projected cost on which the Maintenance Rent rates were based, Lessor shall be entitled to adjust the Maintenance Rent for such event to reflect such actual cost.  Any such adjustment shall not be retroactive and shall be in addition to any regular annual adjustment occurring on the next anniversary of the Delivery Date (such adjustment to be mutually agreed by Lessor and Lessee).

For the first qualifying maintenance event relating to APU or Landing Gear Overhaul only, in the event that the actual, qualifying cost of such first APU or Landing Gear Overhaul is less than the amount of Maintenance Rent  received by Lessor for such first APU or Landing Gear Overhaul up to the time of the occurrence of the event, and provided no Event of Default has occurred that is continuing under the Lease, Lessor agrees that in the event that the amount of Maintenance Rent paid for such first APU or Landing Gear Overhaul exceeds the actual qualifying cost of such event, Lessor agrees that going forward the relevant Maintenance Rent rate shall be reduced to reflect such lower cost.

For the first qualifying maintenance event relating to Airframe Heavy Maintenance , APU or Landing Gear Overhaul only, in the event that the actual, qualifying cost of such first Airframe Heavy Maintenance, APU or Landing Gear Overhaul is less than the amount of Maintenance Rent  received by Lessor for such first Airframe Heavy Maintenance, APU or Landing Gear Overhaul up to the time of the occurrence of the event, and provided no Event of Default has occurred that is continuing under the Lease, Lessor agrees that in the event that the amount of Maintenance Rent paid for such first Airframe Heavy Maintenance, APU or Landing Gear Overhaul exceeds the actual qualifying cost of such event, Lessor agrees Lessee shall not be required to pay Maintenance Rent for such item until the utilization on the relevant item of Equipment times the applicable Maintenance Rent rate then in effect equals or exceeds the excess amount that had been received by Lessor.


**Wire Transfer Instructions**

        Name:           BOC Aviation Limited
        Acct #:          001828444

Bank Name:      HSBC Bank USA, N.A
Bank Address:   452 Fifth Avenue
                New York, NY 10018-2706
                United States of America
Bank ABA:       021001088
Bank SWIFT:     MRMDUS33
Contact:        Finance Department at +65 63235559
Reference:      Operating Lease Rent MSN 60118

The Stipulated Loss Value for the Aircraft shall be as follows:

| Rental Period (months) | Stipulated Loss Value ("SLV") |
|---|---|
| 1 through 12 | $190,000,000 |
| 13 through 24 | $182,400,000 |
| 25 through 36 | $175,104,000 |
| 37 through 48 | $168,099,840 |
| 49 through 60 | $161,375,846 |
| 61 through 72 | $154,920,813 |
| 73 through 84 | $148,723,980 |
| 85 through 96 | $142,775,021 |
| 97 through 108 | $137,064,020 |
| 109 through 120 | $131,581,459 |
| 121 through 132 | $126,318,201 |
| 133 through 144 | $121,265,473 |
| 145 through 156 | $116,414,854 |
| 157 through 168 | $111,758,260 |
| Thereafter | $107,287,930 |

Annex I to Lease Supplement

Aircraft Documentation

| Document Name | Quantity |
| --- | --- |
| Aircraft Readiness Log: By ATA | (1) provided |
| Aircraft Readiness Log: By Zone | (1) provided |
| Aircraft Readiness Log: CD Excel | (2) provided |
| Export  Certificate of Airworthiness | (1) Original not provided(1) Copy provided |
| FAA Certificate of Non-registration | (2) Copies telegraphic message provided |
| FAA Certificate of Eligibility | (2) Copies provided |
| Weight and Balance Manual – Chapter 2 | (3) Copies (2) CD provided |
| Fuel Measuring Stick Correction Data (kilograms) | (3) Copies (1) CD provided |
| Engine Brochure<br>(1) Engine Historical Record<br>(2) Engine Equipment List<br>(3) Engine Data Submittal<br>(4) Performance Sheet<br>(5) Thrust Reverser Data | (2) Copies |
| FAA Approved Aircraft Flight- Manual (for flight deck) | (2) Copies provided |
| Miscellaneous Delivery Record<br>Brochure<br><br><br>(1)    Airplane Flight Log Summary<br>(2)    Flight Reports with Disposition<br>        (a)  Flight Log - Page 1<br>        (b)  Airplane Flight Log<br>Experimental Flight Reports (if any)<br>(3)    Compass Swing Data 3<br>(4)    Final Airplane Fuel Systems Test | (4) Copies<br><br>Provided<br>Provided<br>Provided<br>Provided<br>Not provided<br>Provided<br>Provided |
| Rigging Record Brochure | (2) Copies provided |
| FAA Airworthiness Directive Compliance Record Status | (1) Original (3) Copies provided |
| Auxiliary Power Unit Log | (1) Original (1) Copy provided |
| Operations Manual & QRH | (3) Copies provided |
| Battery Warranty Log Books - (Main & APU) | (1) Original (1) Copy provided |
| Life Limited Landing Gear Parts Brochure | (2) Copies provided |
| Maintenance Manual Temporary Revisions | MBF |
| Significant Rework Log | (1) Printed (3) CD  - not provided |
| Electrical Load Analysis | (3) CD provided with remarks |

| | |
|---|---|
| Escape Slide List | (2) Copies not provided |
| Pressure Vessel List | (1) Copy not provided |
| Repetitive SB Summary Affecting A/C | (2) Copies not provided |
| Production Flight Test Procedures | (2) Copies provided |
| Type Certificate & Data Sheets - Airframe | (2) Copies not provided |
| Type Certificate & Data Sheets - Engine | (1) Copy not provided |
| Supplemental Type Certificate Attached to Export Certificate of Airworthiness | (2) Copies not provided |
| Noise Certification Data Sheet | (1) Copy N-registry provided |
| Performance Guarantee Compliance Report | (1) Copy provided |
| ELT Data | (1) Copy provided for fixed ELT |
| Provided by Customer Engineering:<br>  a.  Detail<br>      Specification<br>         2 Copies<br>          -<br>          -<br>          -<br><br>  b.  PRR Full list (1st delivery only)   2 Copies<br>          -<br>          -<br>          -<br><br>      PRR Differences list    MC/RR list<br>  c.  All LN 1502 applicable PRRs   MBF<br>          -<br>          -<br>          -<br>      in "PRR Sent List" folder.<br>  d.  LOPA and Emergency Equipment Arrangement | (2) Copies provided<br>(2) Copies provided<br><br>MBF provided<br><br>(2) Copies Delivery Arrangement Diagram – Volga-Dnepr airlines/AirBridgeCargo (VDA/ABM) FREIGHTER UPPER DECK LOPA 478-033 |

<u>Annex II to Lease Supplement</u>

Loose Equipment List

All Equipment is as set forth in the Aircraft Readiness Log in regards to detail part, serial number and quantity at delivery.

Annex III to Lease Supplement

Flight Hours and Cycles

One (1) new Model 747-8F Airframe bearing Manufacturer's Serial No. 60118

| Total Time (Flight Hours) | Total Cycles |
|---|---|
| 17.32 | 13 |

FUEL ON BOARD:   4,000 U.S. Gallons

TEST FLIGHT HOURS/CYCLES:   0 / 0 (Test flight time & Cycles are not included in the times and cycles referenced on this sheet)

**Engines**

General Electric Model GEnx-2B67/P
Position #1:   MSN 959449
Position #2:   MSN 959448
Position #3:   MSN 959447
Position #4:   MSN 959452

| Serial Number | Total Time Flight Hours | Total Engine Cycles | Cycles Remaining to Next Replacement Of Lowest L.L. Part | Time Since Last Shop Visit | Time Since Last Performance Restoration |
|---|---|---|---|---|---|
| 959449 | 17.32 | 13 | 8,687 | N/A | N/A |
| 959448 | 17.32 | 13 | 8,687 | N/A | N/A |
| 959447 | 17.32 | 13 | 8,687 | N/A | N/A |
| 959452 | 17.32 | 13 | 8,687 | N/A | N/A |

Engines are delivered oil service full.

**APU**

Pratt & Whitney Model PW901C

B-1

| Serial Number | Total Hours | Hours/Cycles since Last Overhaul | Cycles remaining to next replacement of lowest L.L. Part |
|---|---|---|---|
| 900899 | 59 Hours | 59 Hours / 202 Cycles | 29,798 |

**Landing Gears**

| | Serial Number | Hours / Cycles Since New | Hours / Cycles Since Last Overhaul | Days Since Last Overhaul | Days Remaining to Next Overhaul |
|---|---|---|---|---|---|
| Nose | MAL00081P1502 | 17.32 / 13 | N/A | N/A | 10 years |
| LH Wing Gear | MAL00161P1502 | 17.32 / 13 | N/A | N/A | 10 years |
| LH Body Gear | MAL00161P1502 | 17.32 / 13 | N/A | N/A | 10 years |
| RH Wing Gear | MAL00162P1502 | 17.32 / 13 | N/A | N/A | 10 years |
| RH Body Gear | MAL00162P1501 | 17.32 / 13 | N/A | N/A | 10 years |

**Maintenance Program**

| | A Check | C Check | D/SI Heavy Check | Accomplish Engine Performance Restoration Shop Visit | Accomplish APU Overhaul |
|---|---|---|---|---|---|
| Interval | 1,000 HRS | 10,000 HRS 2,400 FC or 24 MO* | 8 Years / 8 Years / 6 Years thereafter | On Condition | On Condition |

*Whichever comes first

B-2

EXHIBIT B

FORM OF DEREGISTRATION POWERS OF ATTORNEY

By this Power of Attorney dated [(] we, [Lessee], a [corporation] organized under the laws of _____ ("Lessee") do hereby irrevocably empower and appoint:

_____, (the "Lessor" and "Attorney") and whose principal office is at _____ to be our true and lawful attorney for and on our behalf and in our name, to do all or any of the following acts and things:

1.      To effect de-registration of the aircraft Model_____, Serial Number [(] Nationality and Registration Marks_____, _____ Certificate of Registration Number No. [(] with the Aviation Authority.

2.      To apply for an Export Certificate of Airworthiness of the aircraft Model _____, Serial Number [(] Nationality and Registration Marks _____, _____ Certificate of Registration Number [(] with the Aviation Authority including to present for inspection the said aircraft and necessary documentation and information required to be inspected by the competent officers as part of the process to issue the Export Certificate of Airworthiness to the Aviation Authority and to do fall necessary acts and things in order to obtain the said Export Certificate of Airworthiness from the Aviation Authority.

For the aforesaid purpose in our name to sign and lodge all documents, papers and writings which may be deemed necessary or desirable, to alter and amend documents and also to acknowledge and comply with orders of the competent officers, and in particular to appoint and remove a substitute or substitutes for performance of any and all of the aforesaid acts.

PROVIDED THAT the powers conferred on the Attorney by this power of attorney shall not become exercisable until such time as Lessor shall have advised the Aviation Authority that an Event of Default (as defined in the Aircraft Lease Agreement dated [(] between the Attorney and the Lessee) has occurred.

The rights, powers and authority of the Attorney granted by this Power of Attorney shall be irrevocable and shall commence and be in full force and effect on the [(] and remain in full force and effect thereafter.

This Power of Attorney shall be governed by the laws of the State of New York.

IN WITNESS WHEREOF we have hereunto signed and affixed our seals.

For and on behalf of

[Airline                              [seal]]

_____

_____

Witness

_____

_____

## <u>Irrevocable Power of Attorney – Russian Law Version</u>

*[to be issued on the letter-head of Lessee and notarised]*

## POWER OF ATTORNEY

City of _____

_____

(_____ the year two thousand and _____)

AirBridgeCargo Airlines LLC, a company organized and existing under the laws of Russia, registered in Russia under the principal state registration number [          ] and having its registered address at [          ] (the "**Company**"), represented by its General Director _____, acting on the basis of the Company's Charter, hereby authorizes BOC Aviation Limited, a company organized under the laws of Singapore (the "**Representative**"), acting through its authorized employees to take the following actions in the name and on behalf of the Company:

(1)   to require and receive from any government authorities (including customs and tax authorities) of the Russian Federation, legal entities or individuals any information or documents regarding aircraft Boeing Model 747-8F aircraft bearing manufacturer's serial number 60118 and Bermuda registration mark VQ-BFE (together with all installed, incorporated or attached accessories, parts and equipment) (the "**Aircraft**");

(2)   to take any actions and sign any documents in connection with the customs clearance of the Aircraft or any part thereof (including, without limitation, to change any customs regime and declare any new customs regime, to submit customs declarations and all related or requested documents and information to the customs authorities and/or any third parties (including customs brokers), to present the Aircraft to the customs and other state authorities for examination or otherwise, to determine and declare the customs value of the Aircraft, to pay the customs payments in relation to the Aircraft, to transport the Aircraft, to carry out inspections of the Aircraft and provide the Aircraft for inspections by any third parties and to provide any forms of guarantees to the customs authorities in relation to the Aircraft);

(3)   to take any actions and sign any documents required for obtaining any permits or other authorizations from Russian aviation authorities required for any domestic or international flights of the Aircraft;

(4)   to do all acts and things and execute all documents which the Company could itself do in relation to the Aircraft or any part thereof; and

(5)   to sign any other documents and carry out any other actions necessary in the opinion of the Representative for the realization of the abovementioned rights.

This Power of Attorney is given as security by the Company for the performance of its obligations under the Aircraft Lease Agreement (60118), dated November 13, 2015 (as amended, supplemented and restated from time to time).  This Power of Attorney is irrevocable. This Power of Attorney shall cease to be in effect upon expiration of fifteen (15) years from the date of its issuance.  The Representative has the right to sub-delegate the powers granted by this Power of Attorney (fully or in part) to third parties.

This Power of Attorney shall be governed by and construed in accordance with the laws of the Russian Federation.

By:   _____
Name:
Title:   General Director

[*Seal*]

B-6

### **Безотзывная доверенность – вариант в соответствии с российским законодательством**

*[выдается на фирменном бланке Лизингополучателя и подлежит нотариальному удостоверению]*

## ДОВЕРЕННОСТЬ

Город _____

_____ г.
(_____ , _____)

Общество с ограниченной ответственностью «Авиакомпания ЭйрБриджКарго», компания, учрежденная и действующая в соответствии с законодательством России, зарегистрированная в России под основным государственным регистрационным номером [                  ], юридический адрес: [                  ] (**«Компания»**), в лице Генерального директора _____, действующего на основании Устава Компании, настоящим наделяет полномочиями «БиОуСи Авиэйшен Лимитед» (BOC Aviation Limited), корпорацию, учрежденную в соответствии с законодательством Сингапура (**«Представитель»**), действующую через своих уполномоченных сотрудников, осуществлять следующие действия от имени и в интересах Компании:

(1)   запрашивать и получать от государственных органов (включая таможенные и налоговые органы) Российской Федерации, юридических или физических лиц любую информацию или документы касательно воздушного судна «Боинг» модели 747-8F с серийным номером изготовителя 60118 и регистрационным знаком Бермудских островов VQ-BFE (вместе со всеми установленными, вмонтированными или закрепленными аксессуарами, частями и оборудованием) (**«Воздушное судно»**);

(2)   осуществлять действия и подписывать документы в связи с таможенной очисткой Воздушного судна или любой его части (в том числе, изменять таможенный режим и заявлять о новом таможенном режиме, подавать таможенные декларации и все связанные или требующиеся документы и информацию в таможенные органы и/или третьим лицам (включая таможенных брокеров), представлять Воздушное судно на таможне и в других государственных органах для проверки или иных действий, определять и заявлять таможенную стоимость Воздушного судна, оплачивать таможенные платежи в отношении Воздушного судна, транспортировать Воздушное судно, проводить проверки Воздушного судна и представлять Воздушное судно для

проверки любыми третьими сторонами и предоставлять любые формы гарантий таможенным органам в отношении Воздушного судна);

(3)    предпринимать действия и подписывать любые документы, необходимые для получения официальных разрешений от российских органов гражданской авиации, необходимых для осуществления внутренних или международных рейсов Воздушного судна;

(4)    совершать все действия и формальности и оформлять все документы, которые могла бы осуществить сама Компания в отношении Воздушного судна или любой его части; и

(5)    подписывать любые иные документы и осуществлять любые иные действия, необходимые, по мнению Представителя, для реализации вышеупомянутых прав и полномочий.

Настоящая Доверенность выдана для обеспечения исполнения обязательств Компании в соответствии с Договором аренды Воздушного судна (60118) от 13 ноября 2015 года, заключенного между «БиОуСи Авиэйшен Лимитед» (BOC Aviation Limited) и Компанией (с учетом последующих изменений, дополнений и новации (изменения стороны)). Настоящая Доверенность является безотзывной. Настоящая Доверенность утрачивает силу по истечении 13 (тринадцати) лет после даты ее выдачи. Представитель имеет право передоверять третьим сторонам полномочия, предоставляемые настоящей Доверенностью (полностью или частично).

Настоящая Доверенность регулируется и толкуется в соответствии с законодательством Российской Федерации.


Подписано: _____
Ф.И.О.:
Должность:


      [*Печать*]


B-8

EXHIBIT C

Report to be directed to:
**BCC Seattle Aircraft Accounting**
**UDATE**
**Fax:  (425) 393-1493**
**E-mail:  _bccseattleaccounting@boeing.com**

Monthly Report

REPORT FOR CALENDAR MONTH ENDED: _____

CUSTOMER:  _____

AIRCRAFT TYPE:  _____

MANUFACTURER SERIAL NUMBER:  _____

REGISTRATION NUMBER:  _____

| **AIRFRAME** | During Period | | Total |
|---|---|---|---|
| | Within US | Outside US | |
| Airframe Flight Hours: | | | |
| Airframe cycles: | | | |
| Airframe Miles Flown: | | | |

| **APU**  (MSN:_____) | During Period | Total |
|---|---|---|
| APU hours | | |
| APU cycles | | |

| **LANDING GEAR** | Nose | LH Main | LH Body | RH Main | RH Body |
|---|---|---|---|---|---|
| MSN | | | | | |
| Cycles during period | | | | | |
| Total cycles | | | | | |

| **ENGINES** | Position #1 | Position #2 | Position #3 | Position #4 |
|---|---|---|---|---|
| MSN  of original engine: | | | | |
| Present location of original engine: | | | | |
| Total Flight hours: | | | | |
| Total Cycles: | | | | |
| Flight hours during period: | | | | |
| Cycles during period: | | | | |
| Derate during period: | | | | |
| Serial number of installed engine: | | | | |

<u>EXHIBIT D</u>

FORM OF EUROCONTROL LETTER

DATE: _____ 2017

**Authorisation Letter**

The Director of the Central Route Charges Office
European Organisation for the Safety of Air Navigation (EUROCONTROL)
Rue de la Fusée, 96
1130 BRUXELLES
BELGIUM

Dear Sir

**Aircraft model Boeing 747-8F: Registration VQ-BFE, msn 60118 (the "Aircraft")**

We have leased the above Aircraft from BOC Aviation Limited (the "**Lessor**"), in accordance with a lease agreement (dated November 13, 2015 and amended and restated on March __, 2017) between us and the Lessor.

We hereby authorise you to provide the Lessor (hereby represented by Boeing Capital Corporation) with a general statement of account in relation to air navigation charges incurred by us and due to EUROCONTROL. Access to the statement(s) of account will be provided in accordance with the procedures established by EUROCONTROL.

The authorisation contained in this letter may only be revoked or amended by a written instruction signed by us and the Lessor.

Yours faithfully


For and on behalf of
AirBridgeCargo Airlines, LLC


_____
Name:
Title:

E-1

<u>EXHIBIT E</u>

## FORM OF IRREVOCABLE DE-REGISTRATION
## AND EXPORT REQUEST AUTHORIZATION

*{Insert Date}*

To:      *{Insert Name of Registry Authority}*

Re:      Irrevocable De-Registration and Export Request Authorization

The undersigned is the registered *[operator] [owner]\** of the *[insert the airframe/helicopter manufacturer name and model number]* bearing manufacturer's serial number *[insert manufacturer's serial number]* and registration *[number] [mark] [insert registration number/mark]* (together with all installed, incorporated or attached accessories, parts and equipment, the "aircraft").

This instrument is an irrevocable de-registration and export request authorization issued by the undersigned in favor of *[insert name of creditor]* (the "authorized party") under the authority of Article 25 of the Convention.  In accordance with that Article, the undersigned hereby requests:

(i)      recognition that the authorized party or the person it certifies as its designee is the sole person entitled to:

(a)      procure the de-registration of the aircraft from the *[insert name of aircraft register]* maintained by the *[insert name of registry authority]* for the purposes of Chapter III of the Convention on International Civil Aviation, signed at Chicago, on 7 December 1944; and

(b)      procure the export and physical transfer of the aircraft from *[insert name of country]*; and

(ii)     confirmation that the authorized party or the person it certifies as its designee may take the action specified in clause (i) above on written demand without the consent of the undersigned and that, upon such demand, the authorities in *[insert name of country]* shall co-operate with the authorized party with a view to the speedy completion of such action.

---

E-2

The rights in favor of the authorized party established by this instrument may not be revoked by the undersigned without the written consent of the authorized party.

Please acknowledge your agreement to this request and its terms by appropriate notation in the space provided below and lodging this instrument in *[insert name of registry authority]*.


*[insert name of operator/owner]*


Agreed to and lodged this                                        By: *[insert name of signatory]*

[insert date]                                                              Its: *[insert title of signatory]*


[insert relevant notational details].

E-3

<u>EXHIBIT F</u>

Form of Re-Delivery Certificate

RE-DELIVERY CERTIFICATE

**Date:  _____**

1.      _____ ("Lessee") and _____ ("Lessor") have entered into an Aircraft Lease Agreement (60118) dated as of _____, 2015 (the "Lease").  Words used herein with capital letters and not otherwise defined will have the meanings set forth in the Lease.

2.      Lessor has this ___ day of _____, _____ (Time: _____) at _____ received from Lessee possession of:

(i)      Airframe:  One [new/used] _____ Model _____ (Generic Model _____)  aircraft bearing manufacturer's serial number _____ and _____ registration [number/mark] _____.

(ii)     Engines:  _____ (____) [new/used] _____ Model _____ (Generic Model _____) engines bearing manufacturer's serial numbers _____ and _____.

(iii)    APU:  One (1) [new/used] model _____ APU bearing manufacturer's serial number _____.

(iv)    All Aircraft Documentation, as listed in Annex I attached hereto.

(v)     The loose equipment listed in Annex II hereto.

(vi)    Such other further and additional equipment as may be specified in any other attachment hereto.

3.      The Re-Delivered Equipment had the following Flight Hours/Cycles at return:

Flight Hours and Cycles

One (1)  _____ Model _____ Airframe bearing Manufacturer's Serial No. _____

F-1

| Total Time (Flight Hours) | Total Cycles |
|---|---|
| _____ | _____ |

FUEL ON BOARD:   _____ (pounds/kilos)

TEST FLIGHT HOURS/CYCLES:  ___ / __(Test flight time & Cycles are not included in the times and cycles referenced on this sheet)

**Engines**

General Electric Model GEnx-2B67/P

Position #1:  MSN _____
Position #2:  MSN _____
Position #3:  MSN _____
Position #4:  MSN _____

| Serial Number | Total Time Flight Hours | Total Engine Cycles | Cycles Remaining to Next Replacement Of Lowest L.L. Part | Time Since Last Shop Visit | Time Since Last Performance Restoration | EGT Margin |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Engines are delivered oil service full.

**APU**

Pratt & Whiney Model PW901C

| Serial Number | Total Hours | Hours/Cycles since Last Overhaul | Cycles remaining to next replacement of lowest L.L. Part |
|---|---|---|---|
| | | | |

F-2

**Landing Gears**

|  | Serial <u>Number</u> | <u>Hours / Cycles Since New</u> | Hours / Cycles Since Last <u>Overhaul</u> | Days Since Last Overhaul | Days Remaining to Next Overhaul |
|---|---|---|---|---|---|
| Nose |  |  |  |  |  |
| LH Wing Gear |  |  |  |  |  |
| LH Body Gear |  |  |  |  |  |
| RH Wing Gear |  |  |  |  |  |
| LH Wing Gear |  |  |  |  |  |

4.     Lessee confirms that the other technical information regarding the Aircraft and its components are correctly set forth in the completed Technical Evaluation Report (in the form of Exhibit G to the Lease) attached hereto.

5.     The above specified aircraft, engines and documentation have been delivered by Lessee to and are hereby accepted by Lessor [in/at] _____ [location—use full street address if in U.S.] subject to (a) the provisions of the Lease and (b) correction by Lessee (or procurement by Lessee at Lessee's cost) as soon as reasonably possible of the discrepancies specified in Annex III hereto.

6.     Subject to the following paragraph, the leasing of the Aircraft by Lessor to Lessee pursuant to the Lease is hereby terminated without prejudice to Lessee's continuing obligations under the Lease including, without limitation, paragraph 5(b) above.

7.     Lessee confirms that during the Term all maintenance and repairs to the Airframe, Engines and other Items of Equipment were performed in accordance with the requirements contained in the Lease.  Lessee further confirms that all of its obligations under the Lease whether accruing prior to the date hereof or which survive the termination of the Lease by their terms and accrue after the date hereof, will remain in full force and effect until all such obligations have been satisfactorily completed.  Lessee represents and warrants that there have been no accidents or incidents involving any Item of Equipment which have not been entered in the logbooks or other records provided to Lessor.

8.     Lessee has delivered to Lessor current certificates of insurance evidencing the coverages required by Section 13.01 of the Lease are in effect through the end of the current policy period notwithstanding the termination of the Lease.

9.     This Re-Delivery Certificate shall be governed by and construed in accordance with the laws of the State of New York.

F-3

IN WITNESS WHEREOF, the parties hereto have caused this Re-Delivery Certificate to be executed in their respective corporate names by their duly authorized representatives as of the day and year first above written.

_____        _____
Lessor                                    Lessee


By: _____          By: _____

Its: _____         Its: _____

F-4

ANNEX I TO RE-DELIVERY CERTIFICATE

Aircraft Documentation
[to be updated as required]

A.      Documents delivered to Lessee on the Delivery Date


B.      Such of the following documents as were generated, or should have been generated pursuant to the provisions of the Lease, during the Term:

1.      Current Certificate of Airworthiness (C of A).
2.      Current registration Certificate.
3.      Current, or last Export Certificate of Airworthiness.
4.      Aircraft description and status summary.
5.      All historical records for Airframe and Engines.
6.      Airframe and Engines current inspection status and operating times APU historical records and details of overhaul or last shop visit.
7.      Current status of APU inspection and operating times.
8.      List and status of time and cycle controlled components – Airframe, Engines, APU, landing gear and accessories.
9.      List and status of time and cycle controlled LLP's – Airframe, Engines, APU, and landing gear.
10.     List of all installed components (LRU's) showing part number, serial number, manufacturer and accumulated time and cycles.
11.     Summary and status of FAA Airworthiness Directives – including Engines, APU and equipment, and the method of accomplishment (i.e., repetitive inspections, interim fix, or terminating action).
12.     List of manufacturer's Service Bulletins incorporated and the method of accomplishment (i.e., repetitive inspections, interim fix, or terminating action) for Airframe, Engines and equipment. Where only a portion of a service bulletin is accomplished, Lessee will so identify which portion was accomplished.
13.     List of Lessee-initiated modifications and/or alterations accomplished on the Aircraft, Engines, and equipment together with one copy of each modification, alteration, engineering order, FAA Form 8110-3 approval, and associated drawings, manuals, and/or data.
14.     List of incorporated FAA Supplemental Type Certificates (STC's) together with a copy of each certificate, list of drawings, manuals, and/or associated data.
15.     List of maintenance "watch items" (including any system or structural defects and special condition repetitive inspection requirements).
16.     List of special, non-SRM or non-MM repairs accomplished to the Airframe, Engines, APU and landing gear together with one copy of each such repair, engineering order, FAA Form 8110-3 approval, and associated drawings and/or data.
17.     List of non-United States manufactured parts, components and/or equipment installed on

the Aircraft after the date such Aircraft was delivered new by the Aircraft manufacturer to the initial owner which parts, components, or equipment have not been approved or certified by the FAA.

18. Inventory list of Aircraft loose equipment (to include all galley equipment, flight deck and passenger cabin emergency equipment, cargo compartment removable cargo stops and restraint nets).

19. Current freighter upper deck interior arrangement drawing (LOPA)

20. Current emergency equipment installation diagram.

21. FAA 8130-3 Forms or airline Part tags, and shop overhaul reports for all time and Cycle controlled components – Airframe, Engines, APU, landing gear and accessories – changed since original aircraft delivery from Aircraft Manufacturer.

22. FAA 8130-3 Forms or Airline Part tags for all time and cycle controlled Life Limited Parts – Airframe, Engines, APU, and landing gear – changed since original aircraft delivery from Aircraft Manufacturer.

23. Burn Certification Test Data and/or FAA 8130-3 forms for cabin interior materials replaced since original Aircraft delivery from Aircraft Manufacturer (to include materials used for all interior seating, curtains, partitions, sidewalls, and carpets).

24. Record of last compass swing.

25. List of oils and fluids used for Aircraft Engines, APU, and Airframe systems.

26. Aircraft flight log books.

27. Aircraft maintenance / readiness log books.

28. All FAA Form 337's, Major repair and alterations.

29. All repair records, Major and Class 1, 2, 3.

30. Aging Aircraft program summary, and compliance documents.

31. Last aircraft weight and balance report.

32. Last aircraft flight control surfaces weight and balance reports.

33. All records initiated by Lessee to comply with Aviation Authority requirements, and/or initiated by Lessee for Lessee's own benefit.

34. All Engines' trend monitoring program documents.

35. Last accomplished Digital Flight Data Recorder (DFDR) calibration and algorithms report.

36. Acceptance flight reports – last flight accomplished prior to re-delivery.

37. Scheduled maintenance check status.

38. Quality Control Department Statements:

    (a) Maintenance Program Certification or Approval.

    (b) Letter detailing any major incident and/or accidents involving the Aircraft (if none, the letter should so state).

    (c) Letter detailing and leased or loaned parts that are installed on the Aircraft (if none, the letter should so state).

    (d) Letter certifying time/Cycles on Airframe, Engines, LLP's, time controlled items, hard time items, landing gear, APU, etc.

43. List of supporting Repair Stations/Approved vendors (if available).

44. List of equipment to be removed prior to Lease return delivery.

45. In-service activities report.

46.     Significant Service Item summary.
47.     Service Letters Index and Service Letters / All Operators Letters (AOLs)
48.     Miscellaneous documents or manuals pertaining to Aircraft storage, Engine handling, aircraft recovery, and ground crew training (if available).
49.     Maintenance planning document (MPD).
50.     Operator's Operation Specification document / General Maintenance Manual document (will be used by Lessor only as reference material).
51.     Maintenance program task work cards (will be used by Lessor only as reference material).
52.     Operator's Maintenance Program tasks-to-Maintenance Review Board (MRB) tasks cross-reference list.
53.     Scheduled Maintenance Program requirements summary.
54.     Aircraft parts two-way cross-reference list: Airline/Manufacturer part numbers.
55.     Original Aircraft Readiness Log.
56.     FAA approved Airplane Flight Manual (AFM).
57.     Operations Manual / Quick Reference Handbook (QRH).
58.     Flight Crew Training Manuals / Flight Crew Operating Manuals (FCOMS).
59.     Dispatch Deviation Procedures Guide.
60.     Minimum Equipment List (MEL), Master Minimum Equipment List (MMEL), Configuration Destination List (CDL).
61.     MEL Procedures Manual.
62.     Fault Isolation Manuals.
63.     Fault Reporting Manual.
64.     Manufacturer's Maintenance Manuals – Seats, Galley, Emergency Equipment
65.     Manufacturer's Illustrated Parts Catalogs (IPC) – Airframe and Engines.
66.     Manufacturer's Structural Repair Manuals (SRM).
67.     Manufacturer's Component Maintenance Manuals (CMM) –  Emergency Equipment listed below as provided at delivery.

| DESIGNATION | PART NUMBER | QNT | CMM availability in myboeingfleet |
|---|---|---|---|
| PORTABLE EMERGENCY LOCATOR TRANSMITTER | 1153426-1M310 | 1 | CMM 25-60-13 available in mbf |
| LIFE RAFT | 68810-125 revB | 2 | CMM 25-62-42 available in mbf |
| FIXED ELT | 822-2547-101 | 1 | CMM 31-31-04 available in mbf |
| LIFE VEST | 66601-501 | 6 | CMM 25-64-05 available in mbf |
| EVAC SLIDE ASSY | 7A1412 | 1 | CMM 25-68-06 available in mbf |
| WATER FIRE EXTINGUISHER | 892480 | 1 | CMM 26-20-20 available in mbf |
| HALON FIRE EXTINGUISHER HALON 1211 Model PRO-9 HM2 | 466090 | 1 | CMM 26-21-39 available in mbf |

| HALON FIRE EXTINGUISHER HALON 2011 Model HL2.5 H2 | 898052 | 1 | CMM 26-21-39 available in mbf |
|---|---|---|---|
| HALON FIRE EXTINGUISHER HALON 1211 | 898052 | 1 | CMM 26-21-39 available in mbf |
| WATER FIRE EXTINGUISHER | 892480 | 1 | CMM 26-20-20 available in mbf |
| FLASH LIGHT | P2-07-0020-002 | 2 | CMM 25-62-13 available in mbf |
| FLASH LIGHT | P2-07-0020-002 | 1 | CMM 25-62-13 available in mbf |
| PORTABLE O2 BOTTLE CYLINDER ASSY DUAL PURPOSE | 9800-201A-BF23A | 1 | CMM 35-31-55 available in mbf |
| OXYGEN MASK Smoke Goggles | MLD20-626-1 | 1 | CMM 35-13-64  available in mbf |
| PORTABLE O2 BOTTLE | 35553AAAYAACXBD | 1 | CMM 35-35-53 available in mbf |
| OXYGEN MASK | 10800C1F | 1 | CMM 35-10-80 available mbf |

68. Powerplant Build-up Manuals.
69. Engine Ground Handling Document.
70. Non-Destructive Testing Manuals (NDTM).
71. Corrosion Prevention Manual (CPM).
72. Wiring Diagram Manual, including wiring diagram equipment lists.
73. System Schematic Manuals.
74. Aircraft Weight and Balance Manual Chapter 2
75. Service Bulletin Index and Service Bulletins.
76. Airplane Recovery Document.
77. Fuel Measuring Stick Calibration Document.
78. Non-proprietary Vendor Maintenance Manuals, and Component Maintenance Manuals for specialized equipment (i.e., galleys, lavatories, flight crew seating, passenger seating, video systems, passenger entertainment, etc.).
79. Special Tool and Ground Handling Equipment Index.
80. Illustrated Tool and Equipment Catalog.
81. Facilities Planning Document.
82. Lessee's statement of no accidents or incidents.
83. DFDR/QAR data frame list

<u>EXHIBIT G</u>

<u>FORM OF TECHNICAL REPORT</u>

# Aircraft Technical Status Report

DATE: [enter date inspection completed]

MSN: [serial number of aircraft]

MODEL: [model and variant of aircraft]

ENGINES: [engine type]

OPERATOR: [operator/lessee]

LOCATION: [location where inspection conducted]

EVENT: [DELIVERY/CHECK…/REDELIVERY]

TECHNICAL PROJECT MANAGER:

ON SITE REPRESENTATIVE:

G-1

## AIRCRAFT SUMMARY

| Aircraft Make: | Model: | | S/N: | |
|---|---|---|---|---|
| | | | | |
| MFG Date: | PROD No.: | | Effectivity  No.: | |
| | | | | |

| Current Registration: | Country | Registration Date | |
|---|---|---|---|
| | | | |
| Previous Registrations: | Country: | Registration Date | Deregistration date |
| | | | |
| | | | |

| Aircraft Accident/Incident Summary: | | | |
|---|---|---|---|
| Date: | Location: | Operator: | Description |
| | | | |
| | | | |

| ETOPS Operation | ETOPS Limit | RVSM Operations |
|---|---|---|
| | | |

| Annual Utilization | | | | |
|---|---|---|---|---|
| Period Start | Period End | Flight Hours | Flight Cycles | Hour/Cycle Ratio: |
| | | | | |

| Total Aircraft Time | | | |
|---|---|---|---|
| Date | Flight Hours | Flight Cycles | Hour/Cycle Ratio |
| | | | |
| | | | |
| | | | |

| Last Maintenance Check Information | Time Since(FH) | Cycle Since(FC) |
|---|---|---|
| Last Systems and Zonal "C" Check: | | |
| Last "SI" or equivalent Structural Check: | | |

| Engine Make: | Model: | Thrust Rating: |
|---|---|---|
| | | |

\*   **IMPORTANT NOTE:  THE ENGINE SERIAL NUMBERS SPECIFIED ON THIS REPORT REFLECT THE LESSOR OWNED ENGINE SERIAL NUMBERS.  IF THE ENGINE SERIAL NUMBERS ARE NOT IDENTIFIED ON THIS REPORT, THEN PLEASE PROVIDE DATA FOR THE ENGINES ORIGINALLY DELIVERED WITH THE AIRCRAFT (LESSOR OWNED ENGINES).**

## MAINTENANCE PROGRAM GENERAL

| Aircraft Maintenance Program: | Type | Program Approved | Approving Aviation Authority |
|---|---|---|---|
| [Operator/OEM/Other] | [msg2/msg3] | [yes/no] | [FAA/EASA/Other] |
| MRO/Repair Station | FAA/EASA Approved | | Repair Station No. |
| [name] | [yes/no] | | |
| Line Maintenance | FAA/EASA Approved | | Repair Station No. |
| [name] | [yes/no] | | |
| Reliability Controlled Maintenance Program | | Component Tags Available For Controlled Components | |
| [yes/no] | | [yes/no] | |

| Auto Land Qualification | CAT I | CAT II | CAT IIIa | CAT IIIb | CAT IIIc |
|---|---|---|---|---|---|
| At Aircraft Delivery | ☐ | ☐ | ☐ | ☐ | ☐ |
| Currently Approved by Local Authority | ☐ | ☐ | ☐ | ☐ | ☐ |
| Currently Operated/Maintained | ☐ | ☐ | ☐ | ☐ | ☐ |

## MAINTENANCE & INSPECTION PROGRAM DESCRIPTION

| Operator Nomenclature | | Intervals | | | |
|---|---|---|---|---|---|
| Check | Name | Calendar | Interval FH | Interval FC | Phases |
| Systems "C" | | | | | |
| Structural "SI" | | | | | |

## MAINTENANCE & INSPECTION PROGRAM STATUS

| | Phase or Equivalent | Date | Flight Hours | Flight Cycles |
|---|---|---|---|---|
| Next Planned "C" Phase or Equivalent: | | | | |
| Last "C" Phase or Equivalent: | | | | |
| Time Remaining to Next Phase: | | | (Hrs) | (Cyc) |
| Next "Heavy Check" Phase or Equivalent: | | | | |
| Last "Heavy Check" Phase or Equivalent: | | | | |
| Time Remaining to Next Heavy Check Phase: | | (Days) | (Hrs) | (Cyc) |
| Next SSIP Phase: | | | | |
| Last SSIP Phase: | | | | |
| Time Remaining to Next SSIP Phase: | | (Days) | (Hrs) | (Cyc) |

| SSIP Cards Worked During Last "C" Phase: | |
|---|---|
| | |

|  |  |
|---|---|
|  |  |

| Component Testing/Aircraft Weighing | Date |
|---|---|
| ATC Transponder #1 last test |  |
| ATC Transponder #2 last test |  |
| Flight Recorder last test |  |
| Aircraft weighing |  |

**LANDING GEAR**

| MLG Tires: (Size) |  | (MPH Rating) |  | (MFG) |  |
|---|---|---|---|---|---|
| NLG Tires: (Size) |  | (MPH Rating) |  | (MFG) |  |
| Brake Manufacturer: |  |  |  |  |  |

| TIRE & BRAKE LIFE [AS A PERCENT OF NEW] |  |  |  |  |  |
|---|---|---|---|---|---|
| TIRE/BRAKE | DATE | EVENT | NLG | LMLG | RMLG |
|  |  |  |  |  |  |

| LEFT MAIN: |  |  |
|---|---|---|
| P/N |  | S/N |  |
| Date of Last Overhaul | Agency Performing Overhaul Service: | Cert # |
|  |  |  |
| Utilization and Limits | Months | Flight Hours | Flight Cycles |
| Total Time on Gear |  |  |  |
| Allowable Limit to Next Overhaul: |  |  |  |
| Present Landing Gear Total Time: |  |  |  |
| Time Remaining to Next Overhaul: |  |  |  |

| RIGHT MAIN: |  |  |
|---|---|---|
| P/N |  | S/N |  |
| Date of Last Overhaul | Agency Performing Overhaul Service: | Cert # |
|  |  |  |
| Utilization and Limits | Months | Flight Hours | Flight Cycles |
| Total Time on Gear |  |  |  |
| Allowable Limit to Next Overhaul: |  |  |  |
| Present Landing Gear Total Time: |  |  |  |
| Time Remaining to Next Overhaul: |  |  |  |

| NOSE: | | | |
|---|---|---|---|
| P/N | S/N | | |
| Date of Last Overhaul | Agency Performing Overhaul Service: | | Cert # |
| | | | |
| Utilization and Limits | Months | Flight Hours | Flight Cycles |
| Total Time on Gear | | | |
| Allowable Limit to Next Overhaul: | | | |
| Present Landing Gear Total Time: | | | |
| Time Remaining to Next Overhaul: | | | |

**ENGINES**

ENGINE MAINTENANCE PROGRAM

| Engine Maintenance Program: | Condition Monitoring | Trend Analysis | Engine Oil Type: |
|---|---|---|---|
| [operator/oem | [yes/no] | [yes/no] | |
| Program Requirements/Limitations | Yes/NO | Note | |
| Engine Operations (Increased/Decreased Thrust) | | | |
| Modification required for designated thrust rating | | | |
| Power by the Hour/Total Care Agreement | Service Provider | | |
| | | | |

ENGINE SPECIFICATIONS

<u>ENGINE NUMBER 1</u>

| Engine Make: | Model: | | S/N: | Thrust Rating | Derate |
|---|---|---|---|---|---|
| | | | | | |
| Date of Mfg: | | Total Flight Hours | | Total Flight Cycles | |
| | | | | | |
| Last Performance Restoration Reason | Date | | Total Hours | | Total Cycles |
| | | | | | |
| Agency Performing Service: | Work Scope of Last Shop Visit: | | | Test Cell EGT Margin | |
| | | | | | |
| Last Shop Visit: | Total Hours | Total Cycles | | Reason | |
| [date] | | | | | |
| Agency | | | Agency FAA Approved?: | Cert. #: | |
| | | | [yes/no] | | |

| | 1st LIMITER* | UOM | 2nd LIMITER* | UOM |
|---|---|---|---|---|
| Part Name: | | | | |
| Allowable Life/Insp Limit: | | Cycles | | Cycles |
| Total Component Time: | | Cycles | | Cycles |
| Life Remaining: | | Cycles | | Cycles |

| Inspections & Deferrals | |
|---|---|
| Description | Interval/Limit |
| | |
| | |
| | |

*Provide a copy of a current Disk Sheet for all modules.

## ENGINE NUMBER 2

| Engine Make: | Model: | | S/N: | Thrust Rating | | Derate |
|---|---|---|---|---|---|---|
| | | | | | | |
| Date of Mfg: | | Total Flight Hours | | | Total Flight Cycles | |
| | | | | | | |

| Last Performance Restoration Reason | Date | Total Hours | Total Cycles |
|---|---|---|---|
| | | | |
| Agency Performing Service: | Work Scope of Last Shop Visit: | | Test Cell EGT Margin |
| | | | |

| Last Shop Visit: | Total Hours | Total Cycles | Reason | |
|---|---|---|---|---|
| [date] | | | | |
| Agency | | Agency FAA Approved?: | Cert. #: | |
| | | [yes/no] | | |

| | 1st LIMITER* | UOM | 2nd LIMITER* | UOM |
|---|---|---|---|---|
| Part Name: | | | | |
| Allowable Life/Insp Limit: | | Cycles | | Cycles |
| Total Component Time: | | Cycles | | Cycles |
| Time Remaining: | | Cycles | | Cycles |

| Inspections & Deferrals | |
|---|---|
| Description | Interval/Limit |
| | |
| | |
| | |

*Provide a copy of a current Disk Sheet for all modules.

## ENGINE NUMBER 3

| Engine Make: | Model: | | S/N: | Thrust Rating | | Derate |
|---|---|---|---|---|---|---|
| | | | | | | |
| Date of Mfg: | | Total Flight Hours | | | Total Flight Cycles | |
| | | | | | | |

| Last Performance Restoration Reason | Date | Total Hours | Total Cycles |
|---|---|---|---|
| | | | |
| Agency Performing Service: | Work Scope of Last Shop Visit: | | Test Cell EGT Margin |
| | | | |

| Last Shop Visit: | Total Hours | Total Cycles | Reason |
|---|---|---|---|

| [date] | | | | | |
|--------|--|--|--|--|--|
| Agency | | | Agency FAA Approved?: | Cert. #: | |
| | | | [yes/no] | | |
| | 1st LIMITER* | UOM | 2nd LIMITER* | UOM | |
| Part Name: | | | | | |
| Allowable Life/Insp Limit: | | Cycles | | Cycles | |
| Total Component Time: | | Cycles | | Cycles | |
| Time Remaining: | | Cycles | | Cycles | |

| Inspections & Deferrals | |
|-------------------------|--|
| Description | Interval/Limit |
| | |
| | |
| | |

*Provide a copy of a current Disk Sheet for all modules.

### ENGINE NUMBER 4

| Engine Make: | Model: | | S/N: | Thrust Rating | Derate |
|--------------|--------|--|------|---------------|--------|

| Date of Mfg: | Total Flight Hours | | Total Flight Cycles |
|--------------|--------------------|--|---------------------|

| Last Performance Restoration Reason | Date | Total Hours | Total Cycles |
|--------------------------------------|------|-------------|--------------|

| Agency Performing Service: | Work Scope of Last Shop Visit: | Test Cell EGT Margin |
|-----------------------------|--------------------------------|----------------------|

| Last Shop Visit: | Total Hours | Total Cycles | Reason |
|------------------|-------------|--------------|--------|
| [date] | | | |

| Agency | | | Agency FAA Approved?: | Cert. #: | |
|--------|--|--|-----------------------|----------|--|
| | | | [yes/no] | | |
| | 1st LIMITER* | UOM | 2nd LIMITER* | UOM | |
| Part Name: | | | | | |
| Allowable Life/Insp Limit: | | Cycles | | Cycles | |
| Total Component Time: | | Cycles | | Cycles | |
| Time Remaining: | | Cycles | | Cycles | |

| Inspections & Deferrals | |
|-------------------------|--|
| Description | Interval/Limit |
| | |

G-10

| | |
|---|---|
| | |

*Provide a copy of a current Disk Sheet for all modules.

## AUXILIARY POWER UNIT

| APU Make: | Model: | | S/N: | | Date of Mfg: |
|---|---|---|---|---|---|

| APU Hours Measured by | Total Hours | Total Cycles | Utilization Ratio |
|---|---|---|---|
| [apu clock/ airframe hours] | | | |

| Last HSI Reason | Date | Total Hours | Total Cycles |
|---|---|---|---|
| | | | |

| Agency Performing Service: | Work Scope of Last Shop Visit: | Test Cell EGT Margin |
|---|---|---|
| | | |

| Last Overhaul | Total Hours | Total Cycles | Reason |
|---|---|---|---|
| [date] | | | |

| Agency | | Agency FAA Approved?: | Cert. #: |
|---|---|---|---|
| | | [yes/no] | |

| 1st LIMITER* | Part Name: | | | | |
|---|---|---|---|---|---|
| | Allowable Life/Insp Limit: | | (Hrs) | | (Cyc) |
| | Total Component Time: | | (Hrs) | | (Cyc) |
| | Time Remaining: | | (Hrs) | | (Cyc) |
| 2nd LIMITER* | Part Name: | | | | |
| | Allowable Life/Insp Limit: | | (Hrs) | | (Cyc) |
| | Total Component Time: | | (Hrs) | | (Cyc) |
| | Time Remaining: | | (Hrs) | | (Cyc) |

| Inspections & Deferrals | |
|---|---|
| Description | Interval/Limit |
| | |
| | |
| | |

G-12

**PASSENGER CABIN CONFIGURATION**

SEATING CONFIGURATION

| Seating Total | First Class | Business Class | Economy |
|---|---|---|---|
|  |  |  |  |

| Handicap Seating | | Quantity | Air Stairs | |
|---|---|---|---|---|
| [yes/no] | |  | [describe provisioning] | |

FIRST CLASS

| Pax Qty: | Seat Mfg: | Model: | P/N: | Fireblocked? | | |
|---|---|---|---|---|---|---|
|  |  |  |  | [yes/no] |  |  |

BUSINESS CLASS

| Pax Qty: | Seat Mfg: | Model: | P/N: | Fireblocked? | | |
|---|---|---|---|---|---|---|
|  |  |  |  | [yes/no] |  |  |

COACH CLASS

| Pax Qty: | Seat Mfg: | Model: | P/N: | Fireblocked? | | |
|---|---|---|---|---|---|---|
|  |  |  |  | [yes/no] |  |  |

|  | Provisions for Life Vests Under Seats?: | Emergency Escape Path Lighting: |
|---|---|---|
|  | [yes/no] | [floor mounted/seat mounted] |
| Entertainment Controls(PCU) Installed: | Manufacturer: | Part Number: |
| [yes/no] |  |  |
| Configuration Drawing No. | Engineering Order/Installation Doc: | FAA Approved: | Approval Method |
|  |  |  |  |

G-13

GALLEY PROVISIONS

| Galley Standard | | | | | | |
|-----|----------|--------------|-----------|----------|--------|-------|
| [Atlas/KSSU/Other | | | | | | |
| | Location | Manufacturer | Model No. | Part No. | H$_2$0 | Power |
| 1. | | | | | [   ] | [   ] |
| 2. | | | | | [   ] | [   ] |
| 3. | | | | | [   ] | [   ] |
| 4. | | | | | [   ] | [   ] |
| 5. | | | | | [   ] | [   ] |
| 6. | | | | | [   ] | [   ] |
| 7. | | | | | [   ] | [   ] |
| 8. | | | | | [   ] | [   ] |
| 9. | | | | | [   ] | [   ] |
| 10. | | | | | [   ] | [   ] |

NOTE:  Galley Locations per Spec or LOPA drawing i.e., G1, G2 etc.   Galley Location numbers above correspond to the numbers below.

| | Ovens | Galley Inserts | Refer Units | Chillers | Coffee Makers | Water Boilers | Hot Jugs | Hot Cups | Bev Jugs |
|-----|-------|--------|-------|----------|--------|--------|------|------|---------|
| 1. | | | | | | | | | |
| 2. | | | | | | | | | |
| 3. | | | | | | | | | |
| 4. | | | | | | | | | |
| 5. | | | | | | | | | |
| 6. | | | | | | | | | |
| 7. | | | | | | | | | |
| 8. | | | | | | | | | |
| 9. | | | | | | | | | |
| 10. | | | | | | | | | |

LAVATORIES

| No. | Type | Locations: | Handicap Provisions |
|-----|------|-----------|---------------------|
| 1. | | | [yes/no] |
| 2. | | | |
| 3. | | | |
| 4. | | | |

**IN-FLIGHT AUDIO & ENTERTAINMENT SYSTEM**

| Boading Music | Warning & Auto Evac | Pre Recorded Announcements | Passenger Entertainment |
|---|---|---|---|
| [yes/no] | [yes/no] | [yes/no] | [audio/video/audio&video] |

**CARGO COMPARTMENT**

| Cargo Loading System | Smoke & Fire Detection System | Fire Suppression System |
|---|---|---|
| [yes/no] | [yes/no] | [yes/no] |

**INTERIOR COLORS**

| Interior Color Scheme: | Carpets: | Curtains: |
|---|---|---|
| | | |

**PLACARDS & LIGHTED SIGNS**

| English | Bi-Lingual | 1st Language | 2nd Language |
|---|---|---|---|
| [yes/no] | [yes/no] | | |

G-15

## HYDRAULIC SYSTEM

| Hydraulic Fuel Type | Manufacturer |
|---|---|
|  |  |

## FUEL SYSTEM

| Total Fuel Capacity | | | |
|---|---|---|---|
| U.S. Gallons | Pounds | Kilograms | Fuel Instrumentation (unit of measure) |
|  |  |  | [U.S. Pounds or Kilograms] |
| No. of Tanks: | Auxiliary Tanks Installed: | Capacity (Gallons) | Capacity (Pounds) | Capacity (Kilos) |
|  | [yes/no] |  |  |  |

## WEIGHT & BALANCE

| Current Lessee increased aircraft weights?: | | From (MTOW) | To (MTOW) |
|---|---|---|---|
| [yes/no] |  |  |  |
| AFM approved Aircraft Weights | Type | US Pounds | Kilograms |
| Maximum Takeoff Weight: | (MTOW) |  |  |
| Maximum Taxi Weight: | (MTW) |  |  |
| Maximum Landing Weight: | (MLW) |  |  |
| Manufacturer's Empty Weight: | (MEW) |  |  |
| Maximum Zero Fuel Weight: | (MZFW) |  |  |
| Operational Empty Weight: | (OEW) |  |  |

*For the above please refer to the AFM approved limits*

## AVIONICS SYSTEMS

### 22  AUTO FLIGHT

| QTY | COMPONENT | MANUFACTURER | MODEL or PART NUMBER |
|-----|-----------|--------------|----------------------|
| | Mode Control Panel(MCP): | | |
| | Flight Control Computer: | | |
| | Auto Throttle Computer: | | |
| | Yaw Damper Coupler: | | |

### 23  COMMUNICATIONS

| QTY | COMPONENT | MANUFACTURER | MODEL/PART No. |
|-----|-----------|--------------|----------------|
| | PA Amplifier: | | |
| | HF Transceiver: | | |
| | VHF COM Transceiver: | | |
| | SATCOM Data Unit (SD): | | |
| | SATCOM Radio Frequency Unit: | | |
| | Cockpit Voice Recorder: | | |
| | Tape Reproducer(Pre-Recorded PAX Address): | | |
| | Tape Reproducer (Audio) Entertainment: | | |
| | Tape Reproducer (Video) Entertainment | | |
| | SELCAL Decoder: | | |
| | ACARS Management Unit: | | |
| | Printer: | | |

### 31  INDICATING AND RECORDING

| QTY | COMPONENT | MANUFACTURER | MODEL/PART No. |
|-----|-----------|--------------|----------------|
| | Flight Data Recorder (DFDR): | | |
| | Digital Flight Data Acquisition Unit (DFDAU): | | |
| | Accelerometer: | | |

### 34  NAVIGATION

| QTY | COMPONENT | MANUFACTURER | MODEL/PART No. |
|-----|-----------|--------------|----------------|
| | Digital Air Data Computer: | | |
| | Ground Proximity Warning System (GPWS) Computer: | | |
| | Windshear System: | | |
| | Weather Radar Transceiver: | | |

| | | | |
|---|---|---|---|
| | Traffic Alert & Collision Avoidance System (TCAS) Computer: | | |
| | Air Traffic Control (ATC/Mode S) System Transponder: | | |
| | Inertial Reference Unit (IRU): | | |

| ELECTRONIC FLIGHT INSTRUMENT SYSTEM (EFIS) | | | |
|---|---|---|---|
| QTY | COMPONENT | MANUFACTURER | MODEL/PART No. |
| | Electronic Attitude Director indicator (EADI) | | |
| | Electronic Horizontal Situation Indicator (EHSI) | | |
| | EFIS Symbol Generators: | | |

| GLOBAL POSITION SYSTEM (GPS) | | | |
|---|---|---|---|
| QTY | COMPONENT | MANUFACTURER | MODEL/ PART No. |
| | Receiver Processor Unit (RPU): | | |
| | Control Display Unit (CDU): | | |

| RADIO NAVIGATION | | | |
|---|---|---|---|
| QTY | COMPONENT | MANUFACTURER | MODEL /PART No. |
| | Distance Measuring Equipment (DME) Interrogators: | | |
| | VHF VOR/ILS Receiver: | | |
| | Marker Beacon Receiver: | | |
| | Radio Altimeter Transceiver: | | |
| | Radio Digital Distance Magnetic Indicator (RDDMI): | | |
| | Microwave Landing Receiver: | | |
| | Automatic Direction Finder (ADF) Receiver: | | |

| FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) | | | |
|---|---|---|---|
| QTY | COMPONENT | MANUFACTURER | MODEL /PART No. |
| | Flight Management Computer: | | |
| | Control Display Unit (CDU): | | |

| 77 ENGINE INDICATION | | | |
|---|---|---|---|
| QTY | COMPONENT | MANUFACTURER | MODEL /PART No. |

G-18

|  | Panel, Primary Engine Display: |  |  |
|  | Panel, Secondary Engine Display: |  |  |

**INSPECTOR RECORD**

| INSPECTED BY | INSPECTION DATE | INSPECTION LOCATION | REGISTERED OWNER |
|---|---|---|---|
| | | | |

| | |
|---|---|
| Operator: | |
| Habitual Base: | |
| Address (1): | |
| Address (2): | |
| Address (3): | |
| City: | |
| State/Province: | |
| Postal Code: | |
| Country: | |
| Airport (With Code): | |

| | |
|---|---|
| Operator Contact: Name: | |
| Title: | |
| E-Mail Address: | |
| Office Telephone: | |
| Facsimile No.: | |
| Mobile Telephone: | |
| My Boeing Fleet ID: | [YES/NO] |

| Department Contact | Name | Phone | Fax | Email |
|---|---|---|---|---|
| Quality Control: | | | | |
| Power Plant Engineering | | | | |
| Maintenance Programs/Planning: | | | | |

## EXHIBIT H

## FORM OF TECHNICAL ACCEPTANCE CERTIFICATE (60118)

IN ACCORDANCE WITH that certain Aircraft Lease Agreement (60118) dated as of November 13, 2015 (the "Lease Agreement"), by and between Aircraft 60118, Inc.("Previous Lessor") and AirBridgeCargo Airlines LLC ("Lessee") the undersigned hereby accepts the technical condition of the Equipment (as defined below) and acknowledges and agrees that the Equipment is in the Delivery Condition on the date hereof:

(i)     Airframe:  One new Boeing Model 747-8F aircraft bearing manufacturer's serial number 60118 Bermuda registration mark VQ-BFE;

(ii)     Engines:  Four (4) new General Electric Model GEnx-2B67/P engines (67,400 pounds thrust rating on engine data plate) bearing manufacturer's serial numbers 959449; 959448; 959447; 959452, each of which Engines is turbine-powered and has 550 or more rated takeoff horsepower or its equivalent.

(iii)     APU:  One (1) new Pratt & Whitney PW901C bearing manufacturer's serial number PCE 900899;

(iv)     All Aircraft Documentation, as listed in Annex I attached hereto;

(v)     The loose equipment listed in Annex II hereto; and

(vi)     Discrepancies at delivery listed in Annex III hereto; and

(vii)    Such other further and additional equipment as may be specified in any other attachment hereto (collectively, the "Equipment").

1.  The Equipment had the following Flight Hours/Cycles as of the date hereof:

One (1) new Model 747-8F Airframe bearing Manufacturer's Serial No. 60118

| Total Time (Flight Hours) | Total Cycles |
|---|---|
| 17.32 FH | 13 FC |

FUEL ON BOARD:   4,000 U.S. Gallons

H – 1

TEST FLIGHT HOURS/CYCLES:   0 / 0 (Test flight time & Cycles are <u>not</u> included in the times and cycles referenced on this sheet)

### **Engines**

General Electric Model GEnx-2B67/P
Position #1:   MSN 959449
Position #2:   MSN 959448
Position #3:   MSN 959447
Position #4:   MSN 959452

| <u>Serial Number</u> | <u>Total Time Flight Hours</u> | <u>Total Engine Cycles</u> | <u>Cycles Remaining to Next Replacement Of Lowest L.L. Part</u> | <u>Time /Cycles Since Last Shop Visit</u> | <u>Time / Cycles Since Last Performance Restoration</u> |
|---|---|---|---|---|---|
| 959449 | 17.32FH | 13 | 8,687 | N/A | N/A |
| 959448 | 17.32FH | 13 | 8,687 | N/A | N/A |
| 959447 | 17.32FH | 13 | 8,687 | N/A | N/A |
| 959452 | 17.32FH | 13 | 8,687 | N/A | N/A |

Engines are delivered oil service full.

### **APU**

### **Pratt & Whitney Model PW901C**

| Serial Number | Total Hours | Hours/Cycles since Last Overhaul | Cycles remaining to next replacement of lowest L.L. Part |
|---|---|---|---|
| PCE 900899 | 89 Hours | 89 Hours/202 Cycles | 29,798 |

### **Landing Gears**

| | Serial <u>Number</u> | <u>Hours / Cycles Since New</u> | Hours / Cycles Since Last <u>Overhaul</u> | Days Since Last Overhaul | Days Remaining to Next Overhaul |
|---|---|---|---|---|---|
| Nose | MAL00081P1502 | 17.32 / 13 | N/A | N/A | 10 years |
| LH Wing Gear | MAL00161P1502 | 17.32 / 13 | N/A | N/A | 10 years |
| LH Body Gear | MAL00161P1502 | 17.32 / 13 | N/A | N/A | 10 years |

| | | | | | |
|---|---|---|---|---|---|
| RH Wing Gear | MAL00162P1502 | 17.32 / 13 | N/A | N/A | 10 years |
| RH Body Gear | MAL00162P1501 | 17.32 / 13 | N/A | N/A | 10 years |

**Maintenance Program**

| | A Check | C Check | D/SI Heavy Check | Accomplish Engine Performance Restoration Shop Visit | Accomplish APU Overhaul |
|---|---|---|---|---|---|
| Interval | 1,000 HRS | 10,000 HRS 2,400 FC or 24 MO* | 8 Years | On Condition | On Condition |

*Whichever comes first

      2.     The above specified aircraft and documentation have been inspected by Lessee and the technical condition thereof is hereby accepted by Lessee at Everett, Washington, U.S.A..

      3.     This Technical Acceptance Certificate shall be governed by and construed in accordance with the laws of the State of New York.

H – 3

EXECUTED by a duly authorized representative of Lessee at Everett, Washington, U.S.A., at Paine Field this 13day of November 2015 at 10:40 AM local time.


AirBridgeCargo Airlines LLC


By: _____
Name:_____
Title: _____


Acknowledged By:

Aircraft 60118, Inc.


By: _____
Name:_____
Title: _____

H – 4

Annex I

Aircraft Documentation

| Document Name | Quantity |
|---|---|
| Aircraft Readiness Log: By ATA | (1) provided |
| Aircraft Readiness Log: By Zone | (1) provided |
| Aircraft Readiness Log: CD Excel | (2) provided |
| Export  Certificate of Airworthiness | (1) Original (1) Copy provided |
| FAA Certificate of Non-registration | (2) Copies telegraphic message provided |
| FAA Certificate of Eligibility | (2) Copies provided |
| Weight and Balance Manual – Chapter 2 | (3) Copies (2) CD provided |
| Fuel Measuring Stick Correction Data (kilograms) | (3) Copies (1) CD provided |
| Engine Brochure<br>(1) Engine Historical Record<br>(2) Engine Equipment List<br>(3) Engine Data Submittal<br>(4) Performance Sheet<br>(5) Thrust Reverser Data | (2) Copies |
| FAA  Approved  Aircraft Flight- Manual (for flight deck) | (2) Copies provided |
| Miscellaneous Delivery Record Brochure<br><br><br>(1)     Airplane Flight Log Summary<br>(2)     Flight Reports with Disposition<br>       (a)  Flight Log - Page 1<br>       (b)  Airplane Flight Log<br>Experimental Flight Reports (if any)<br>(3)     Compass Swing Data 3<br>(4)     Final Airplane Fuel Systems Test | (4) Copies<br><br><br>Provided<br>Provided<br>Provided<br>Provided<br>Not provided<br>Provided<br>Provided |
| Rigging Record Brochure | (2) Copies provided |
| FAA Airworthiness Directive Compliance Record Status | (1) Original (3) Copies provided |
| Auxiliary Power Unit Log | (1) Original (1) Copy provided |
| Operations Manual & QRH | (3) Copies provided |
| Battery Warranty Log Books - (Main & APU) | (1) Original (1) Copy provided |
| Life Limited Landing Gear Parts Brochure | (2) Copies provided |
| Maintenance Manual Temporary Revisions | MBF |
| Significant Rework Log | (1) Printed (3) CD provided |
| Electrical Load Analysis | (3) provided |
| Escape Slide List | (2)  copies provided |
| Pressure Vessel List | (1) Copy provided |

| | |
|---|---|
| Repetitive SB Summary Affecting A/C | (2) Copies provided |
| Production Flight Test Procedures | (2) Copies provided |
| Type Certificate & Data Sheets - Airframe | (2) provided |
| Type Certificate & Data Sheets - Engine | (1)  provided |
| Supplemental Type Certificate Attached to Export Certificate of Airworthiness | (2) Copies provided |
| Noise Certification Data Sheet | (1) Copy provided |
| Performance Guarantee Compliance Report | (1) Copy provided |
| ELT Data | (1) Copy provided |
| Provided by Customer Engineering:<br>    a.   Detail<br>         Specification<br>            2 Copies<br>              -<br>              -<br>              -<br><br>    b.   PRR Full list (1st delivery only)     2 Copies<br>              -<br>              -<br>              -<br><br>       PRR Differences list     MC/RR list<br>    c.   All LN 1501 applicable PRRs     MBF<br>              -<br>              -<br>              -<br>       in "PRR Sent List" folder.<br>    d.   LOPA and Emergency Equipment Arrangement | (2) Copies provided<br>(2) Copies provided<br><br>MBF provided<br><br>(2) Copies Delivery Arrangement Diagram – Volga-Dnepr airlines/AirBridgeCargo (VDA/ABM) FREIGHTER UPPER DECK LOPA 478-033 |

<u>Annex II</u>

Loose Equipment List

All Equipment is as set forth in the Aircraft Readiness Log in regards to detail part, serial number and quantity at delivery.

<u>Annex III</u>

Discrepancy List

All discrepancies and resolutions are agreed as set forth in the Delivery Commitment Letter.

SCHEDULE 1

<u>PART A --</u> REQUIRED APPROVALS

NONE

PART B – CTC REGISTRATIONS

(i)     Prospective International Interest in respect of the Lease of the Airframe bearing manufacturer's serial number 60118 from Lessor to Lessee;

(ii)    Prospective International Interest in respect of the Lease of the Engine bearing manufacturer's serial number 959449;

(iii)   Prospective International Interest in respect of the Lease of the Engine bearing manufacturer's serial number 959448;

(iv)   Prospective International Interest in respect of the Lease of the Engine bearing manufacturer's serial number 959447; and

(v)    Prospective International Interest in respect of the Lease of the Engine bearing manufacturer's serial number 959452.

SCHEDULE 2

AIRCRAFT RETURN CONDITIONS

1.      Return.  Except as otherwise provided herein, at the expiration of the Term for the Aircraft or upon the sooner termination of this Lease, Lessee, at its own expense, shall return the Aircraft to Lessor by delivering the same to Lessor at a location in the United States as designated by Lessor.  The Aircraft, at the time of return to Lessor, shall be in the same configuration as on the Delivery Date, unless otherwise mutually agreed in writing between the parties hereto, fully equipped, subject to the terms hereof, the Engines installed thereon, with all Parts and with all other equipment as when delivered to Lessee. Lessee shall not be relieved of any of its duties, obligations, covenants or agreements under this Lease (including, without limitation, its obligation to pay Basic Rent) prior to the return of the Aircraft in the manner and condition required with respect to such return.  The Aircraft, upon redelivery pursuant hereto, (a) shall be free and clear of all Liens, other than Lessor Liens and the Lien of this Lease, (b) shall be in the same operating condition, ordinary wear and tear excepted, as when delivered to Lessee hereunder and (c) shall satisfy all the conditions set forth in Article 17 of the Lease.  At re-delivery there shall not be installed on the Aircraft any PMA Parts.

2.      Replaced Engines.  In the event any engine not owned by Lessor shall be returned with the Airframe in lieu of an Engine such engine shall be satisfactory to Lessor, in its reasonable discretion, free and clear of Liens other than the Lessor Liens, suitable for use on the Airframe and shall have a value and utility, in Lessor's reasonable discretion, at least equal to, and be in as good operating condition, including the incorporation of all Airworthiness Directives and alert service bulletins which Lessee is required to effect under this Lease, and with no greater number of accumulated Flight Hours or Cycles since the last heavy shop visit on such engine, as the Engine that should have been returned, assuming such Engine which should have been returned was in the condition and repair as required by the terms hereof immediately prior to such required return; and Lessee shall, at its own expense and concurrently with such delivery, furnish Lessor with a bill of sale, in form and substance reasonably satisfactory to Lessor, of each such engine and with evidence of Lessee's title to such engine (including, if requested, an opinion of Lessee's counsel) and take such other action as Lessor may reasonably request in order that title to such engine shall be duly and properly vested in Lessor, including without limitation appropriate filings with the International Registry to evidence the "sale" of such engine to Lessor.  Upon full compliance with Article 17 of the Lease and passage of title to such engine to Lessor, such engine shall be an "Engine" for all purposes of this Lease and Lessor shall Transfer to Lessee all Owner's right, title and interest in any Engine so replaced and shall consent, at Lessee's expense, to any necessary or advisable registrations on the International Registry evidencing such Transfer.

3.      Return of Aircraft Documentation.  Upon the return of the Aircraft, Lessee shall deliver to Lessor all updated logs, manuals, certificates and data, and inspection, modification and overhaul and repair records amended to their latest amendment revision pertaining to the Airframe, Engines or engines, components, assemblies and appliances, which are required to be maintained with respect thereto under applicable rules and regulations of the FAA, the Aviation

Authority and as described herein.  These shall include but not be limited to the items described in paragraph 7(f) of this Schedule 2.

4.   Special Markings.  Prior to the return of the Aircraft, Lessee shall, at Lessee's cost, remove from the interior and the exterior of the Aircraft all insignias and other distinctive markings of Lessee and completely strip and repaint the Airframe exterior all-white (fuselage and vertical fin) or in a livery designated by Lessor in a workmanlike manner.

5.   Maintenance Program.  Prior to the return of the Aircraft, Lessee shall provide Lessor with a true and complete copy of the current Maintenance Program including all software, general maintenance manual and other items necessary for a complete maintenance program.

6.   Modification Kits.  Lessor may request and Lessee shall provide any modification kits or other such items that are on order for the Aircraft and Lessor shall reimburse Lessee for the cost of such kits.  Lessee shall be responsible for ordering all no-charge kits, and if not incorporated, shall return them to Lessor with the Aircraft at no charge to Lessor.

7.   Maintenance Generally.  Upon return of the Aircraft to Lessor hereunder, at Lessee's expense:

(a)   Certification.  The Aircraft shall have a current, valid and effective transport category certificate of airworthiness issued by the Aviation Authority, or if required by Lessor, an export certificate of airworthiness for export to another country as designated by Lessor.  The Aircraft shall be immediately eligible for a valid and effective Standard Certificate of Airworthiness issued by the FAA, and shall be returned in compliance with the Maintenance Programs for Airframe, Engines, components, and assemblies, and shall be in full compliance with U.S. regulations applicable to the Aircraft's operations for noise, emissions and environment and be eligible for immediate registration and operation under EASA regulations without any restrictions or lessee-specific deviations or exemptions.

(b)   Overhaul and Repair.  The Engines, APU, Landing Gear and all Parts shall be documented with work orders, vendor serviceable tags, Form 8130's, FORM 337's, EASA Form 1's or equivalent FAA acceptable certificates and tags to have been repaired or overhauled by certified repair stations acceptable to the FAA and in such manner so that such Parts, Engines, APU, and Landing Gear are approved by the FAA for use on United States registered and certified aircraft.  All overhaul and repair procedures shall have met all requirements of the FAA, the Manufacturer, and the manufacturer of the applicable Item of Equipment for quality and documentation necessary to enable immediate transfer to a new operator under EASA Regulations.

(c)   Repairs.  All repairs that were performed since the Aircraft delivery and that then exist on the Aircraft shall be classified as category A or B repairs, conform to the Manuals and shall have FAA approval if required.  All repairs not covered by the Manuals shall be provided with complete data and documentation to verify and

substantiate their certification and methods of compliance.  Lessee shall keep and maintain a complete summary listing of all repairs performed (with dirty fingerprint accomplishment records).

(d)     Modifications.  All modifications to the Aircraft shall be in accordance with FAA-approved data or be removed, at Lessor's discretion, with appropriate post-removal repairs to the Aircraft to be made by Lessee.  All such modifications shall be provided with complete data and documentation to substantiate their certification, approval, and methods of compliance.  Lessee shall provide to Lessor a complete summary listing of all modifications performed with substantiating documentation.

(e)     Airworthiness Directives and Mandatory Regulations.  All Airworthiness Directives, U.S. Federal Aviation Regulations applicable to the Aircraft (including its systems and components) ("Regulatory Directives") requiring compliance at any time on or prior to the 18-month anniversary of  the Lease Termination Date shall  (i) be fully accomplished in accordance with the issuing authority's specific instructions; (ii) be accomplished to the highest level of compliance (which shall be terminating compliance, if any) without using any alternate means of compliance or any waivers or operator exemptions which delay compliance and (iii), if no terminating action exists, be accomplished at the highest level of inspection or modification possible.  Lessee shall provide (x) a current and accurate status report, certified by a quality control or equivalent manager, setting forth all Regulatory Directives that have been accomplished with dates, Flight Hours, Cycles and methods of accomplishment included and (y) all hard copy records evidencing compliance with the Regulatory Directives (the dirty fingerprint accomplishment records) with appropriate signatures or stamps .

(f)     Records.

        (i)     All records as required under this Section and all those necessary and required by the FAA and Aviation Authority to certify the Aircraft and place the Aircraft on an FAA approved maintenance program shall be delivered with the Aircraft.  Lessee shall return to Lessor all hard copy records in an organized fashion.  In no event will Lessee destroy or dispose of any hard copy records.  These records shall be all-inclusive for the Aircraft, Airframe, Engines, components, rotables, and assemblies, and at a minimum shall include all activities associated with each of the last completed maintenance checks, maintenance review board tasks, and corrosion control tasks, repairs, scheduled inspections and functional tests, and overhauls performed to the Maintenance Program, including tasks and compliance associated with noise and emissions requirements.

        (ii)    All Time Controlled Components shall be provided with part number, serial number, accumulated Cycles and Flight Hours, safe-life, life limits or hard time limits and remaining service lives on a separate listing, be

physically verified as installed (without disassembly of any subject Component) and have hard copy documentation (i.e., appropriate vendor tags and work orders) to verify their serviceability.

(iii)    All Life Limited Parts (LLP's) shall be provided with part number, serial number, their service histories, accumulated Cycles and Flight Hours, safe-life, life limits or hard time limits and remaining service lives on a separate listing, be physically verified (without disassembly of any subject Component) as installed and have hard copy documentation (i.e., appropriate vendor tags and work orders) to verify their service histories and serviceability with complete "back to birth" traceability.

(iv)    All components and assemblies which are identified on the maintenance records by part numbers and/or serial numbers other than the manufacturers' shall be provided with two way or two way cross-reference listing necessary to establish complete traceability.

(v)    All documentation, flight records, and maintenance records as specified by this Lease and in accordance with EASA requirements shall be delivered to Lessor with the Aircraft.  In the event of missing or incomplete records, Lessee shall accomplish the tasks necessary to produce such complete records in accordance with the Maintenance Program prior to return of the Aircraft.

(vi)    All documentation and records summaries or lists shall be in English and shall be made available to Lessor for review, in a mutually agreed upon location allowing direct access to the Aircraft, at least thirty (30) Business Days before the date that the Aircraft is required to be returned to Lessor.

(vii)    Lessee shall provide any and all documentation, data, drawings, records and manuals regardless whether Lessee considers such information proprietary.

All documentation and records shall be signed by the head of Lessee's quality control department certifying that the data and information contained therein is true and correct.  For any computerized records such head of quality control shall sign or initial each computer page.

(g)    <u>Return Status</u>.

(i)    The Aircraft shall be returned in the same operating order, repair and condition as originally delivered to Lessee, ordinary wear and tear excepted, and shall have been maintained in a non-discriminatory manner with other similar aircraft in Lessee's fleet.  The Aircraft shall be returned in compliance with the Maintenance Program, and shall be fresh from a

full block "C" check, including all lesser checks, multiples and calendar time-based structures checks and clearing all maintenance items due before the next scheduled "C" check, performed within ten (10) days prior to return.  The Aircraft will not be placed back into service by Lessee following the "C" check.

(ii)     The Airframe shall be returned with at least one-quarter the Flight Hours, Cycles or calendar time remaining with respect to performance of the Airframe Heavy Check in accordance with the Maintenance Program as existed on the Delivery Date (unless the Optimized Maintenance Program is in effect at return).

(iii)    Each Engine shall be returned with not more than 2,000 cycles since the last performance restoration.  Each of the Engine LLP's shall have at least 3,000 cycles of life remaining.  Each Engine shall not have any condition which according to trend monitoring shows a higher than normal deterioration of the Engine or a condition which will result in a removal of the Engine prior to reaching its next anticipated complete Refurbishment based on the Average Refurbishment Interval.  Each Engine shall meet the maintenance manual criteria for part power and full power runs with a minimum EGT margin consistent with the hours and cycles operated since last QME.  Each Engine shall have a complete video borescope inspection (cold section, hot section and combustors) performed by a provider selected by Lessor, with prior coordination with Lessee, at Lessor's expense and be satisfactorily completed immediately prior to return.  The Engines shall not be deemed to meet these return conditions if the borescope inspection reveals any watch items, unserviceable or reject conditions.  If the parameters of the Engine inspection are not within the Aircraft Manufacturer's Manual (AMM) limits, Lessee will be obligated to provide a replacement engine meeting the requirements of this subparagraph and of paragraph 2 of this Schedule 2 or have the Engine repaired to bring it within such limits.

(iv)    The APU shall have not more than 4,500 APU hours since its last overhaul.  Immediately prior to return, the APU shall undergo a video borescope inspection performed by a provider selected by Lessor, and a full operational check of the APU system.  All watch items, unserviceable or reject conditions, and all identified discrepancies that are outside of AMM limits shall be repaired at Lessee's expense.  In addition, the APU and all LLP's installed on the APU shall have at least one-quarter of its Cycles/Flight Hours/time remaining until scheduled replacement or Overhaul is required by the APU manufacturer's maintenance manual.

(v)     Each Landing Gear shall have not less than two (2) years remaining to next overhaul.

(vi)    All other components, equipment, LLP's (other than Engine LLP's), Time Controlled Components, appliances and other Items of Equipment which are time, Cycle or calendar controlled normally in service during the operation of the Aircraft will be redelivered with one-quarter the amount of Flight Hours, Cycles or calendar time, as applicable, remaining to next Refurbishment, Overhaul or replacement for each of the Items as specified in their respective manufacturer's maintenance manuals.  All Items of Equipment shall be no more than 115% than the Aircraft age at return.  Each installed tire and brake shall be returned in average of quarter-time condition, as determined using the Manufacturer's maintenance manual.

(vii)   Subject to the conditions set forth in Sections 17.04 and 17.05, should any items covered by (ii), (iii), (iv) or (v) above fall below the requirement set forth therein, but are otherwise acceptable to Lessor, Lessee shall pay Lessor the deficiency charges as determined in Sections 17.04 and 17.05.

(h)    <u>Deferred Maintenance</u>.  There shall be no deferred maintenance items, scheduled or unscheduled, temporary (category C) repairs, watch items, or items requiring repetitive inspections against the Aircraft, including those identified in redelivery inspections or demonstration flights.

(i)    [Reserved.]

(j)    <u>General Appearance</u>.  The Aircraft shall be clean, cosmetically acceptable and complete, shall function, perform and have been maintained in accordance with the Maintenance Program, and shall be in suitable condition to be immediately placed into scheduled revenue airline operations under EASA Regulations without waiver or restriction.  This shall include but not be limited to the following:

(i)    <u>Fuselage, Windows, and Doors</u>:  The fuselage shall be free of major dents and abrasions which are out of AMM limits, scab patches which are temporary or do not comply with AMM limits, and loose or pulled rivets (normal wear and tear excepted); windows shall be free of contamination, blemishes, distortion, delaminations and crazing and shall be properly sealed (normal wear and tear excepted); and doors shall be free-moving, correctly rigged, and fitted with serviceable seals; and all placards, decals or marking shall be installed and legible.

(ii)   <u>Wings and Empennage</u>:  All leading edges shall be free from damage out of Manual limits; all control surfaces shall be properly balanced (with substantiating records) and polished and cleaned, to the same standard as on Lessee's other aircraft; unpainted cowlings and fairings shall be polished and cleaned to the same standard as on Lessee's other aircraft; all wing internal fuel tanks, and fuel plumbing shall be free of fuel leaks, and all external placards and markings shall be installed and legible.

(iii)   <u>Interior</u>:  Carpets, galleys, lavatories, ceiling, side walls, overhead, passenger service units, bag racks and bulkhead panels shall be secure, clean and substantially free of cracks and stains; all signs, placards and decals shall be installed and clean and legible; and all calendar-lifed emergency equipment shall be in quarter-time condition but in no event have less than one year's life remaining; all seat covers and cushions shall be in good condition, clean, free of stains and tears and shall conform to FAA fire resistance regulations; and all seats shall be fully serviceable and in good condition meeting crashworthiness regulations.

(iv)   <u>Cockpit</u>:  All Aviation Authority / FAA required placards, decals and markings shall be installed, clean, secure, and legible.  All fairing panels shall be substantially free of stains and cracks, and shall be clean, secure, and repainted as necessary; all floor coverings shall be clean and effectively sealed and secured; all seat covers and cushions shall be in good condition and clean and shall conform to FAA fire resistance regulations; and all seats shall be fully serviceable and in good condition. All instruments and light panels shall be clean, secure and legible, function in accordance with their intended purpose and have all lighting operate properly.

(v)   <u>Cargo Compartments</u>.  All Aviation Authority / FAA required placards, decals and markings shall be installed, clean, secure, and legible.  All panels shall be in serviceable condition; all nets shall be in serviceable condition; all compartments shall meet current FAA fire regulations; all doors shall be rigged and function properly; and the compartments shall be clean to the standard acceptable for cargo operation.

(vi)   <u>Landing Gear and Wheel Wells</u>:  All Aviation Authority / FAA required placards, decals and markings shall be installed, clean, secure, and legible. The Landing Gear and all wheel wells shall be clean, free of leaks (which are beyond Manuals limits), and repaired as necessary; and all placards, decals and markings shall be clean, secure, and legible.

(vii)   Livery: Lessee will strip and re-paint the Aircraft (fuselage and vertical fin) in a workmanlike manner all white, or in a livery to be designated by Lessor provided that such livery is provided to Lessee at least 3 months prior to the redelivery.

(viii)   The Aircraft shall have installed the full complement of Engines and other equipment, parts, accessories, galley inserts and loose equipment as delivered to Lessee and be in a condition suitable for immediate operation in commercial cargo service under EASA regulations.  The Aircraft will be in the configuration originally delivered to Lessee or such other configuration acceptable to Lessor and agreed in writing by Lessor

(k)      <u>Fluid Quantities</u>.  The Aircraft will be returned with the same fluid quantities, including without limitation, fuel, oil and hydraulics, as was initially delivered with the Aircraft on the Delivery Date.  Each fluid reservoir, including oil, hydraulic, water and waste tanks will be serviced in accordance with the Maintenance Program.

SCHEDULE 3

DELIVERY CONDITION

The Aircraft shall be delivered new from the Manufacturer accompanied by a valid Export Certificate of Airworthiness issued by the FAA.  The Aircraft shall conform to Boeing Detail Specification D019U022TBC48F-4 Revision A dated February 6, 2015, subject to the following changes to Optional Features (which are subject to price and offerability confirmation from Boeing):

| Add Option | Delete Option | Option Title |
|---|---|---|
| 0220C700C44 | 0220E486A04 | TYPE CERTIFICATON & EXPORT CERTIFICATE OF AIRWORTHINESS FOR AIRPLANE DELIVERY - BERMUDA REQUIREMENT |
| 0220C700C45 | | TYPE CERTIFICATON FOR AIRPLANE DELIVERY - RUSSIA REQUIREMENT |
| 0228C700C46 | 0228C707B22 | AIRPLANE FLIGHT MANUAL - RUSSIAN (CIS) SUPPLEMENT |
| 0252B299A36 | 0252B299A35 | INSTRUMENTATION, AIRPLANE AND FUEL MEASURING STICK MANUALS IN METRIC UNITS - TEMPERATURE IN DEGREES CELSIUS |
| 1110C901G00 | 1110E399A16 RR47025-34 RR47025-39 | EXTERIOR COLOR SCHEME AND MARKINGS |
| 1110C901G03 | 1110E399A17 | EXTERIOR COLOR SCHEME - NACELLE AND STRUTS |
| 1120C901G04 | | EXTERIOR PLACARDS AND MARKINGS - DOOR OPENING INSTRUCTIONS – BILINGUAL (RUSSIAN/ENGLISH) |
| 1130C901G05 | 1130E399A15 | INTERIOR PLACARDS - SUPERNUMERARY COMPARTMENT - BILINGUAL (RUSSIAN / ENGLISH) |
| 1130D677A07 | | REGISTRY PLACARD AND/OR EXTERNAL DATA PLATE |
| 1130D677A08 | | MP - INTERIOR PLACARDS - INSTALLATION - REGISTRY PLACARD - DOOR 1L |
| | 1200C472A27 | SERVICE OPTION - DIGITAL FLIGHT DATA RECORDER (DFDR) RAW DATA DOWNLOAD |
| 2210-000037 | 2210-000036 | AUTOFLIGHT - BANK ANGLE HOLD AT AUTOPILOT COMMAND ENGAGE |
| 2210-000003 | 2210-000151 | AUTOFLIGHT - INHIBIT GLIDE SLOPE CAPTURE PRIOR TO LOCALIZER CAPTURE |
| 2324D994A24 | | FIXED EMERGENCY LOCATOR TRANSMITTER (ELT) - ELT CODING REVISION - ROCKWELL COLLINS |
| 2562D435D79 | 2562C909A12 | EMERGENCY LOCATOR TRANSMITTER - PORTABLE |
| 2564C204G44 | 2564C204G43 | FIRST AID KIT - EASA |
| | 3162-000026 | DISPLAY OF ROUND DIAL AND DIGITAL RADIO ALTITUDE - ADI |
| | 3162-000062 | GRID HEADING - NAVIGATION DISPLAY |
| | 3162-000084 | TCAS 3 NM RANGE RING - NAVIGATION DISPLAY |
| 3162-000212 | | VREF, SELECTED FLAP POSITION AND V2 SPEED - PRIMARY FLIGHT DISPLAY |
| | 3344C608E84 | ANTI-COLLISION LIGHTS - WHITE STROBE LIGHTS OFF -  EICAS MEMO MESSAGE |

| Add Option | Delete Option | Option Title |
|---|---|---|
| 3446C174A14 | 3446-000048 | ENHANCED GROUND PROXIMITY WARNING SYSTEM (EGPWS) - BANK ANGLE CALLOUT (VARIABLE CALLOUT BELOW 130 FT) - ENABLE |
| 3446-000082 | 3446-000078 | GROUND PROXIMITY WARNING SYSTEM ALTITUDE CALLOUTS - 50, 40, 30, 20, 10, PLUS HUNDRED, MINIMUM |
|  | 3461-000112 | VARIABLE TAKEOFF DERATE |
|  | 3461A213A06 | QUEENS FIELD ELEVATION (QFE)  PROMPT ON THE CONTROL DISPLAY UNIT (CDU) - FLIGHT MANAGEMENT COMPUTER |
| 3461A425A06 | 3461A425A05 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - RUNWAY DISTANCE AND OFFSET POSITION SHIFT IN UNITS OF METERS |
| 3461A425A09 | 3461A425A10 | FLIGHT MANAGEMENT COMPUTER SYSTEM (FMCS) - NAVIGATION DATABASE - BOEING SUPPLIED |
| 4510-000048 |  | CENTRAL MAINTENANCE COMPUTER (CMC)  -  DISABLE EICAS STATUS MESSAGE BULK ERASE FEATURE |
| 4610D153A80 | 4610C576A04 | MP - AIRPLANE GENERAL INFORMATION SYSTEMS - DELETION - ELECTRONIC FLIGHT BAG (EFB) |

**ANNEX C**

**FORM OF CONFIRMATION OF EFFECTIVE TIME**

_____, 2017

From:  Aircraft 60118, Inc. ("**Assignor**")
       BOC Aviation Limited ("**Assignee**")


To:    AirBridgeCargo Airlines LLC ("**Lessee**")
       Volga-Dnepr Logistics B.V. ("**Consenting Party**")

Re:    Confirmation of Effective Time

Ladies & Gentlemen:

        Reference is hereby made to the Assignment, Assumption and Amendment Agreement dated as of [_____], 2017 by and among Assignor, as assignor, Assignee, as assignee and Lessee, as lessee (the "**Assignment Agreement**") pertaining to one (1) Boeing Model 747-8F airframe with four (4) General Electric Model GEnx 2B67/P engines bearing manufacturer's serial numbers 959449, 959448, 959447, and 959452, bearing Bermuda Registration Mark VQ-BFE and Manufacturer's Serial Number 60118 ("**Aircraft**").  Any and all initially capitalized terms used herein shall have the meanings ascribed thereto in the Assignment Agreement, unless specifically defined herein.

        In accordance with Section 2 of the Assignment Agreement, the undersigned hereby confirm to Lessee that the sale of the Aircraft to Assignee and the Assignment occurred today, _____, 2017 (Time: _____ [Local time]) (the "**Effective Time**") when the Aircraft was located at [_____].

Sincerely,

AIRCRAFT 60118, INC.

By: _____

Name: _____

Title: _____


BOC AVIATION LIMITED

By: _____

Name: _____

Title: _____


Lessee hereby acknowledges receipt of the above Confirmation and (i) confirms the satisfaction or waiver of each of the conditions set forth in the Assignment Agreement and in Section 24.09 of the Lease, (ii) agrees to the effectiveness of the Assignment and the amendments to the Lease set forth in the Assignment Agreement, including Annex B thereto, and (iii) acknowledges that the Assignment takes effect at the Effective Time.

AIRBRIDGECARGO AIRLINES LLC

By: _____

Name: _____

Title: _____

Consenting Party hereby acknowledges receipt of the above Confirmation and (i) confirms the satisfaction or waiver of each of the conditions set forth in the Assignment Agreement and in confirms the Guaranty, (ii) agrees to the effectiveness of the Assignment and the amendments to the Lease set forth in the Assignment Agreement, including Annex B thereto, and (iii) acknowledges that the Assignment takes effect at the Effective Time.

VOLGA-DNEPR LOGISTICS B.V.

By: _____

Name: _____

Title: _____