UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/12/2022
```

-------------------------------------------------------------------X
:
BOC AVIATION LIMITED,                         :
:
Plaintiff,          :
:                    22-cv-2070 (LJL)
:
-v-                                 :                    OPINION AND ORDER
:
AIRBRIDGECARGO AIRLINES, LLC, and VOLGA-      :
DNEPR LOGISTICS B.V.,                         :
:
Defendants.         :
:
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff BOC Aviation Limited ("BOCA" or "Plaintiff") moves to hold Defendants

AirBridgeCargo Airlines LLC ("ABC") and Volga-Dnepr Logistics B.V. ("VDL," and with

ABC, "Defendants") in contempt of the March 14, 2022 *ex parte* order for immediate possession

of aircraft and injunction, Dkt. No. 26 ("March Order"), and the November 21, 2022 Order for

mandatory preliminary injunctive relief, Dkt. No. 70 ("November Order," and together with the

March Order, the "Orders").  For contempt of the March Order, BOCA seeks a daily fine of

$30,000, with this daily fine doubling each week until ABC submits sufficient proof of

compliance with the March Order by delivering to BOCA certified electronic copies of

statements of no accidents or incidents.  Dkt. No. 78.  For contempt of the November Order,

BOCA seeks a daily fine of $100,000 payable to BOCA with the daily fine increasing by

$50,000 each day until Defendants submit sufficient proof that they are in compliance with the

November Order.  *Id.*  BOCA also seeks damages, reasonable attorneys' fees, and costs incurred

in connection with its application.

      For the following reasons, the motion is granted in part and denied in part.

**BACKGROUND**

This case arises from the imposition of European sanctions against Russia and the imposition of Russian sanctions on foreign assets, including internationally leased aircraft. Plaintiff, a Singapore corporation engaged in the business of purchasing, selling, and leasing commercial aircraft, owns three Boeing Model 747-8F airframes each equipped with four General Electric engines.  Dkt. No. 41 ¶¶ 2, 6.  ABC, a Russian limited liability company, is a wholly owned subsidiary of VDL, a Netherlands company.  *Id.* ¶ 7–8.  ABC operates cargo-airline services and leased the three aircraft from Plaintiff.  *Id.* ¶ 7.  This dispute concerns only one of those planes (the "Airframe"), identified by its Manufacturer Serial Number 60119 ("MSN 60118"), and its accompanying engines (with the Airframe, "the Aircraft"), all of General Electric Model GEnx-2B67/P.  *Id.* ¶ 3.

I.       **The Agreements Between the Parties Governing the Aircraft**

Plaintiff leased the Aircraft to ABC pursuant to an Amended and Restated Aircraft Lease Agreement, dated as of November 13, 2015, and as amended and restated as of March 30, 2017 (the "60118 Lease Agreement").  Dkt. No. 47-1 at ECF p. 37.  Also on March 30, 2017, Plaintiff acquired ownership of the Aircraft and entered into an Assignment, Assumption and Amendment Agreement with respect to the Aircraft (the "60118 Assignment Agreement").  Dkt. No. 47-1 at ECF p. 16.  ABC and VDL are parties to the 60118 Assignment Agreement, which incorporates the 60118 Lease Agreement with Plaintiff as the new lessor.  *Id.* at ECF p. 17–19.

Several provisions of the 60118 Lease Agreement are relevant to this dispute.

Section 12.02 of the 60118 Lease Agreement outlines in part the obligations of ABC as the "Lessee" and the rights of Plaintiff as the "Lessor" in the case of an "Event of Loss" with respect to the leased engines on the MSN 60118.  In particular, the 60118 Lease Agreement

2

requires the conveyance "as soon as practicable" of a replacement engine by conveying title to

another engine of a "same or an improved" model.  Section 12.02 provides the following:

> [u]pon the occurrence of an Event of Loss with respect to an Engine not then
> installed on the Airframe . . . , Lessee shall give Lessor prompt written notice
> thereof and Lessee shall replace such Engine as soon as practicable after the
> occurrence of such Event of Loss by duly conveying to Lessor as a replacement for
> said Engine, title to another engine made by the Engine Manufacturer [General
> Electric] and of the same or an improved model and suitable for installation and use
> on the Airframe, which engine shall be free and clear of all Liens, and shall have a
> value and utility at least equal to, and be in as good an operating condition as, the
> Engine with respect to which such Event of Loss occurred, assuming such replaced
> Engine was of the value and utility and in the condition and repair as required by
> the terms hereof immediately prior to the occurrence of such Event of Loss.

*Id*. at ECF Page 84.  An "Event of Loss" is defined in part in Section 1.01 of the 60118 Lease

Agreement as follows:

> "Event of Loss" with respect to any Item of Equipment means any of the following
> events with respect to such Item: . . . (d) the condemnation, confiscation or seizure
> of, or requisition of title to, or requisition of use (for a period in excess of sixty (60)
> days, but in any event no longer than the last day of the Term) of, such Item by any
> Government Body; or (e) as a result of any rule, regulation, order or other action
> by any Aviation Authority, or other Government Body having jurisdiction, the use
> of such Item in the normal course of air transportation of persons or property shall
> have been prohibited for a period of more than six (6) months.

*Id*. at ECF Page 46.[1]

The 60118 Lease Agreement also separately defines an "Event of Default" and outlines

consequences for the occurrence of such an event.  The parties agree that under the 60118 Lease

Agreement, an "Event of Default" has occurred because reinsurance covering the Aircraft was

cancelled and invalidated as a result of sanctions issued by the European Union against Russia.

---

[1] "Government Body" is defined to include "any nation or government, any state or other
political subdivision thereof, any agency, authority, instrumentality, regulatory body, court,
central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or
administrative functions of or pertaining to government, . . . having jurisdiction over the Lessee
or the Aircraft."  *Id*. at ECF p. 47.  "Item of Equipment" is defined to include "Aircraft, the
Airframe, the Engines, the APU, the Landing Gear and each Part."  *Id*. at ECF p. 48.

*See* Dkt. No. 54 ¶ 5 (Defendants stating that "[t]hrough no fault of Defendant Airbridge, reinsurance covering the Aircraft was canceled and invalidated as a result of sanctions issued by the European Union.  The cancellation of reinsurance triggered a default of the Lease Agreement.").  Section 19.02 of the 60118 Lease Agreement provides that upon an Event of Default, and

> [u]pon the written demand of Lessor with or without terminating this Lease and at Lessee's expense, cause Lessee to return promptly, and Lessee shall return promptly, the Aircraft and any part thereof . . . as Lessor may so demand to Lessor . . . , or Lessor at its option and provided that Lessor has sent Lessee a notice of termination, may enter upon the premises where the Aircraft or any part thereof is located and take immediate possession of and remove the same (together with any engine which is not an Engine but which is installed on the Airframe, subject to all the rights of the owner, lessor, lienor or secured party of such engine, and such engine shall be held for the account of any such owner, lessor, lienor or secured party or, if owned by Lessee, may, at the option of Lessor, be exchanged with Lessee for an Engine as if the original Engine had suffered an Event of Loss) by summary proceedings or otherwise . . . .

*Id*. at ECF p. 101.

Plaintiff and VDL also entered into a Guaranty Agreement dated as of March 30, 2017 ("Guaranty Agreement").  That Guaranty Agreement imposes an obligation on VDL, as the "Guarantor" to ensure the performance of ABC under the 60118 Lease Agreement:

> Guarantor does hereby unconditionally and irrevocably guarantee to the Lessor (i) the due and punctual performance and observance by Lessee of each covenant, agreement, undertaking, representation, warranty and any other obligation or condition binding upon or to be performed or observed by it under and in accordance with the terms of the Lease and the other Operative Documents, . . . and (iii) in the event of any non-payment or non-performance, agrees to pay or perform or cause such payment or performance to be made upon notice from the Lessor of such non-payment or non-performance.

Dkt. No. 47-2 at ECF p. 3.

## II.     The March and November Orders

Pursuant to this Court's *ex parte* March Order, Dkt. No. 26, Plaintiff gained possession of the Airframe bearing MSN 60118.  The March Order concluded that "[o]ne or more Events of

Default have occurred and are continuing as [ABC] has failed to maintain the insurance on the Aircraft." Dkt. No. 26 at 2.  It further ordered, *inter alia*, that "BOCA is entitled to, and shall have, IMMEDIATE POSSESSION of the Aircraft (including all engines installed on the Airframe), the Aircraft Documentation, and all spare parts for the Aircraft."  *Id*. at 3.  It also ordered that "BOCA comply with Section 19.02 of the [60118] Lease [Agreement] if any of the engines installed on the Airframe is not an engine that BOCA leased to [ABC]," and that "Defendant shall immediate TURNOVER to BOCA all Aircraft Documentation."  *Id*.

The Airframe bearing MSN 60118 arrived in the United States from Hong Kong with two of Plaintiff's own engines installed.  The other two engines owned by Plaintiff are in Defendants' possession in Russia.  At the time of the repossession, one of the engines installed on the Airframe was owned by non-party Rainbow Leasing Limited ("Rainbow").  The parties have referred to that engine as "Rainbow Engine 1."  Rainbow also owns another two engines of the same make and model.  Dkt. No. 47-9.  One has a serial number of 959208 and is currently located in Scotland.  That engine is "Rainbow Engine 2."  The other has a serial number of 959221 and is currently located in the United Kingdom.  That engine is "Rainbow Engine 3."

Rainbow is an entity that is an affiliate of ABC and is a wholly owned subsidiary of V-D Ireland ("VDI").  VDI, in turn, is owned 69% by Defendant VDL and 31% by non-party Volga-Dnepr Airlines ("VDA").  Dkt. No. 80 at 9.

On October 21, 2022, Plaintiff filed a motion for injunctive relief by way of order to show cause.  Plaintiff asked for an injunction that included the following language:

(i) Directing [VDL] to cause its subsidiaries to transfer to BOCA all rights and interest in and to that certain General Electric Model GEnx2B67/P engine (ESN 959228);

(ii) Directing [VDL] to cause its subsidiaries to transfer to BOCA all rights and interest in and to that certain General Electric Model GEnx2B67/P engine (ESN 959208);

(iii) Directing BOC Aviation Limited ("BOCA"), after title is transferred to it, subject to BOCA's obtaining necessary approvals from regulatory authorities, to complete the title exchange with respect to General Electric Model GEnx2B67/P engines ESN 959452 and ESN 959449;

(iv) Permitting BOCA . . . to take all actions necessary to effectuate the leasing of the Boeing Model 747-8F airframe bearing Manufacturer's Serial Number 60118, and four General Electric Model GEnx2B67/P engine . . . .

Dkt. No. 45.

Plaintiff stated that, in an attempt to mitigate its damages, it had sought to lease MSN 60118 to a new lessee.  Plaintiff argued that it would be entitled to greater rent payments if it could lease MSN 60118 with all four engines installed.  It also argued that the engines are unique and otherwise irreplaceable, warranting specific performance.  Plaintiff argued that since April 2022, it had been engaging in discussions with Defendants to effectuate redelivery of Plaintiff's engines to Plaintiff, including a possible title swap involving Rainbow Engine 1 and a BOCA engine.  Dkt. No. 46 at 5.  The record showed that Defendants had submitted a request to the Russian government for approval of export of the BOCA engines on May 17, 2022.  *Id*. at 7. On October 19, 2022, Defendants also informed Plaintiff that it would take at least a month before they would be able to obtain internal approval to transfer title.  *Id*. at 6.  In its memorandum in support of injunctive relief, Plaintiff stated: "After receiving title to the Rainbow Engines [1 and 2], BOCA will convey to Rainbow title to the BOCA Engines, subject to obtaining all necessary regulatory approvals, in accordance with the 60118 Lease Agreement." *Id.* at 7.

Defendants submitted a memorandum of law "in limited opposition" to the motion for injunctive relief.  Defendants stated that they did not oppose the "ultimate relief" sought by Plaintiff—"a transfer of title between certain aircraft engines"—but objected to its timing.  Dkt. No. 54 at 1.  Defendants requested "until at least December 16, 2022, to effectuate the title

swap." *Id.* at 2.  Defendants objected to the "immediate injunctive relief" Plaintiff sought, *id.*, arguing, *inter alia*, that Plaintiff would be unlikely to succeed on the merits of its arguments concerning the violation of the Lease Agreement, that Plaintiff would not otherwise suffer irreparable harm absent an injunction, that the equities weigh against injunctive relief, and that the posting of a bond is required, *id.* at 10–14.  In particular, Defendants argued that the engines were owned by Rainbow, that "Rainbow only recently filled the vacancies on its Board of Directors and the new Board of Directors requires time to review the terms of the engine swap." *Id.* at 2.  Defendants requested "that they have until December 16, 2022, to effectuate the Title Swap [of Rainbow Engine 1 and Rainbow Engine 2] in order for the Board of Directors to have the requisite background information on the Title Swap to inform its decision on allowing Rainbow to sign the title transfer documents." *Id.* at 11.  Of note, in opposition to the motion for a preliminary injunction, Defendants submitted the sworn declaration of a director of VDL, Kirill Solovov, that stated that "Rainbow's Board of Directors was only recently appointed and needs time to review the leasing history among Rainbow, [VDL] and [ABC] and to review the terms of the Title Swap." Dkt. No. 56 ¶ 11.  Defendants did not make any mention of VDA or other shareholders of Rainbow or that the decision to effectuate the title swap could be made by the shareholders of Rainbow without the approval of the Rainbow Board of Directors ("Rainbow Board").  Nor did Defendants object to Plaintiff's request that title to the BOCA Engines would be conveyed only *after* title to the Rainbow Engines was transferred and contingent upon Plaintiff obtaining the necessary regulatory approvals for transferring title to the BOCA engines.

The Court held an in-person hearing on Plaintiff's motion for injunctive relief on November 3, 2022.  Dkt. No. 59.  Defendants reiterated their contention that the engines were owned by Rainbow, and not by Defendants.  Dkt. No. 71 at 24.  When asked why Defendants

needed until December 16, 2022 to deliver—and in response to the comment from the Court that "Boards usually can do things pretty darn quickly, particularly if there are orders"—Defendants' counsel answered that "[i]t was a new board . . . just put in place a few weeks ago. . . .  It's just to allow time for paperwork to go through and things to be done. . . . [T]he sanctions around the United States and E.U. has made all of this much more difficult.  Everyone's walking on eggshells."  *Id*. at 19–20.  No mention was made of VDA, VDI, or other shareholders.  The Court requested additional briefing from Plaintiff on the question of irreparable injury, and from Defendants on why they could not deliver title to the engines earlier.  *Id*. at 26–28.

In that additional briefing, Plaintiff produced a declaration that raised the prospect of a swap of Rainbow Engine 2 and Rainbow Engine 3, both located in the United Kingdom, suggesting that Rainbow Engine 1 was unserviceable.  Dkt. No. 60.  Defendants objected to the substitution of Rainbow Engine 3 for Rainbow Engine 1 (with the inclusion of Rainbow Engine 2 in the proposed swap remaining unchanged), asserting that they had not had the opportunity to run their own technical maintenance and engine condition assessment on Rainbow Engine 1.  Dkt. No. 61 at 2.  Defendants continued to argue that Plaintiff was unlikely to succeed on the merits because an Event of Loss has not occurred under the 60118 Lease Agreement and that it would not suffer irreparable harm because Plaintiff's loss would only be monetary in nature.  *Id*.  Again, Defendants contended that "Rainbow's Board of Directors must take a broader view of all of Rainbow's assets, including other aircraft engines not involved in the instant Order to Show Cause, and the effect . . . on Rainbow's overall Business operations."  Dkt. No. 62 ¶ 8.  Defendants made no mention of other shareholders, such as VDI or VDA.  For the first time, Defendants objected to Plaintiff's request that the title to the BOCA Engines be transferred only subject to U.S. regulatory approval and only after title to the Rainbow Engines

was transferred—terms that were in the original request for injunctive relief.  Defendants stated

that they "object to this Asymmetrical Swap and, should the Court order that such a title swap

proceed, respectfully request that, at a minimum, Plaintiff be directed to post a bond at least

equal to the full value of the Rainbow Engines until a complete exchange of titles has occurred."

Dkt. No. 61 at 2–3.

On November 16, 2022, the Court issued a decision from the bench making findings of

fact and stating conclusions of law.  The Court rejected Defendants' arguments on Plaintiff's

likelihood of success on the merits, irreparable harm, and its objections to the swap of Rainbow

Engine 2 and Rainbow Engine 3.  It granted Plaintiff's proposed injunctive relief with a deadline

of November 21, 2022 for title transfer.  The Court also ordered Plaintiff to post a bond of

$2,000,000 for the delay in transferring title to the BOCA Engines should it turn out that the

injunction was improvidently granted and ordered the parties to submit a proposed written form

of preliminary injunction that the Court could sign.

On November 21, 2022, the Court issued a formal order for injunctive relief

memorializing the terms of the November 16 order that required, *inter alia*, that Defendants

transfer to Plaintiff title to Rainbow Engine 2 and Rainbow Engine 3 "or an improved model" in

accordance with Section 12.02 of the 60118 Lease Agreement.  *See* Dkt. No. 70 at 1–2.  In

particular, the Court ordered the following:

> that, on or before November 21, 2022, Defendants transfer to BOCA, in accordance
> with Section 12.02 of the Amended and Restated Aircraft Lease Agreement with
> respect to MSN 60118 dated as of November 13, 2015, as amended and restated as
> of March 30, 2017 (the "60118 Lease Agreement") and the Guaranty from [VDL]
> with respect to MSN 60118 dated March 30, 2017, all rights, title and interest in
> and to two General Electric Model GEnx-2B67/P engines ("Replacement
> Engines"), or an improved model, free and clear of all liens, with a value and utility
> at least equal to, and in as good an operating condition as, the two BOCA-owned
> engines (ESN 959449 and ESN 959452) (together, the "BOCA Engines") currently
> in Defendants' possession in Russia, and which shall be suitable for installation and

use on the airframe of Boeing Model 747-8F MSN 60118 (the "Airframe"), and located in a country, state or jurisdiction in which the export of such engines would be reasonably obtainable by BOCA, which obligation may be satisfied by delivery of title to General Electric Model GEnx-2B67/P engine ESN 959208 ("Rainbow Engine 2") and General Electric Model GEnx-2B67/P engine ESN 959221 ("Rainbow Engine 3") . . . .

Dkt. No. 70 at 1–2.

The Court also ordered that Defendants provide certain requested documentation, including, *inter alia*, "executed warranty bills of sale," and "non-incident statements for all parts relating to the Replacement Engines as is required for return of an Engine under the 60118 Lease Agreement" with the originals to Plaintiff.  *Id*. at 2–3.  The Court also ordered Plaintiff to:

use all means possible to expeditiously obtain necessary approvals from regulatory authorities to transfer title to the BOCA Engines to Defendants and, within five business days of obtaining all such approvals, and after Defendants' full compliance with this Order, BOCA shall transfer to AirBridge all of its rights, title and interest in and to the BOCA Engines, in accordance with Section 12.02 of the 60118 Lease Agreement.

*Id*. at 3. In addition, the Court imposed a bond on Plaintiff, ordering Plaintiff to:

file an undertaking in the amount of $2,000,000 naming Defendants as co-obligees as an undertaking for damages Defendants may sustain as a result of any delay in obtaining title to the BOCA Engines if this preliminary injunction turns out to be improvidently granted.

*Id*.

Plaintiff filed the instant motion for contempt sanctions on November 23, 2022 after Defendants missed their November 21 deadline to comply with the November Order.  *See generally* Dkt. Nos. 73–78.

## PROCEDURAL HISTORY

Plaintiff filed its complaint on March 14, 2022.  That same day, Plaintiff filed a proposed *ex parte* order to show cause for immediate possession of the aircraft and injunction with an accompanying memorandum and declarations. Dkt. Nos. 4–6, 7, 13.  On March 25, 2022, the

10

Court issued the *ex parte* order for immediate possession of aircraft and injunction.  Dkt. No. 26.

On September 9, 2022, Defendants filed their answer and counterclaim against Plaintiff.  Dkt.

No. 39.  On September 30, 2022, Plaintiff filed an amended complaint.  Dkt. No. 41.  Defendants

filed their answer and counterclaim to the amended complaint on October 21, 2022.  Dkt. No. 51.

      On October 21, 2022, Plaintiff also filed a proposed order to show cause as to why this

Court should not impose injunctive relief on Defendants with an accompanying memorandum

and declarations.  Dkt. Nos. 45–48.  The Court entered the order to show cause on the same day.

Dkt. No.  52.  On October 28, 2022, Defendants filed their memorandum opposing plaintiff's

motion for injunctive relief with accompanying declarations.  Dkt. No. 54–56.  On November 1,

2022, Plaintiff filed its reply with an accompanying declaration.  Dkt. No. 57–58.  On

November 3, the court held a hearing on Plaintiff's motion for a preliminary injunction.  Dkt.

No. 59.  On November 7, 2022, Plaintiff filed an additional declaration in support of its motion.

Dkt. No. 60.  On November 10, 2022, Defendants filed a supplemental memorandum of law with

supporting declaration opposing the motion.  Dkt. No. 61–62.  On November 12, 2022, Plaintiff

filed additional declarations in support.  Dkt. No. 63–64.  On November 16, 2022, the Court

issued a decision from the bench granting Plaintiff's motion for a preliminary injunction.  On

November 18, 2022, the Court resolved disputes as to the language of the proposed order, Dkt.

No. 69, and on November 21, 2022, the Court filed an order for injunctive relief, Dkt. No. 70.

      On November 23, 2022, Plaintiff filed a proposed order to show cause as to why, *inter

alia*, Defendant should not be held in contempt of this Court's November Order and March

Order, with an accompanying memorandum and declarations.  Dkt. Nos. 73–77.  The Court

entered the order to show cause on the same day.  Dkt. No. 78.  On November 28, 2022,

Defendants filed their memorandum opposing Plaintiff's motion to hold them in contempt with

accompanying declarations.  Dkt. Nos. 80–82.  On November 29, 2022, Plaintiff filed its reply.

Dkt. No. 85.  The Court held a hearing on the motion for sanctions on December 1, 2022.  There,

the Court informed the parties that it would hold another evidentiary hearing on December 6,

2022 to allow Defendants to put in evidence that it tried to comply with the orders.  On

December 5, 2022, the Defendants rested on their papers in lieu of an evidentiary hearing.  Dkt.

No. 88.  In light of the Defendants having rested on their papers, the Court cancelled the hearing

scheduled for December 6, 2022.

## DISCUSSION

"A court has the inherent power to hold a party in civil contempt in order 'to enforce

compliance with an order of the court or to compensate for losses or damages.'"  *Powell v. Ward*,

643 F.2d 924, 931 (2d Cir. 1981) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187,

191 (1949)).  "[I]n order to hold the alleged contemnor in contempt, the court need only (1) have

entered a clear and unambiguous order, (2) find it established by clear and convincing evidence

that that order was not complied with, and (3) find that the alleged contemnor has not clearly

established his inability to comply with the terms of the order."  *Huber v. Marine Midland Bank*,

51 F.3d 5, 10 (2d Cir. 1995).  It need not be established that the violation was willful.

*Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645,

655 (2d Cir. 2004) ("*Paramedics*") (citing *Donovan v. Sovereign Sec. Ltd.*, 726 F.2d 55, 59 (2d

Cir. 1984)).  A defendant asserting that compliance with a court order constituted an inability or

impossibility must prove "clearly, plainly and unmistakably" that "compliance is impossible."

*Huber*, 51 F.3d at 10.

The parties appear to dispute who has the burden of production in response to a contempt

order.  Defendants propose that "[c]ivil contempt sanctions may be imposed only *when the*

*movant establishes* by clear and convincing evidence that the opponent violated the district

12

court's edict."  Dkt. No. 80 at 6 (emphasis added) (citing *Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc.*, 341 F.2d 101, 102 (2d Cir. 1965) (per curiam) and *Paramedics*, 369 F.3d at 655).  Later, however, Defendants recognize that "the alleged contemnor bears the burden of evidence of his inability to comply."  *Id.* at 7 (citing *Huber*, 51 F.3d at 10).  The Plaintiff also argues that the Defendants bear the burden, citing *Huber*.  See Dkt. No. 83 at 3.

Plaintiff's reply creates a dispute where there is none.  Defendants do not dispute that it is their burden to meet the third prong of "diligence" as to compliance with this Court's orders.  *See* Dkt. No. 80 at 7.  Defendants concede the first prong, stating that they "do not contend that the Swap Order was ambiguous."  *Id.*  They also concede the second prong, stating that they do not "contend that Plaintiff has failed to prove Defendant's non-compliance with the Swap Order."  *Id.*  Although Defendants describe a "movant's burden" by citing *Hart Schaffner* and *Paramedics*, they only do so in the context of establishing "clear and convincing evidence that the opponent violated the district court's edict," *id.*—or the second prong, which is not at issue here.[2]  The burden is on Defendants to show their inability to comply with the orders and that

---

[2] Although the parties do not appear to dispute the burden on the third prong of the analysis, the Court first notes that neither *Hart Schaffner* nor *Paramedics* appear to discuss the allocation of the burden on the second prong.  The Court also notes that there has been conflicting caselaw from the Circuit on the nature of the burden, and who bears the burden, as to the third prong.  For example, in *Latino Officers Ass'n City of New York, Inc. v. City of New York*, 558 F.3d 159 (2d Cir. 2009), the Second Circuit stated that "it is the moving party—in this case the plaintiffs—who bears the burden of establishing the three factors set forth in *King v. Allied Vision, Ltd.*," 65 F.3d 1051, 1058 (2d Cir. 1995).  *Id.* at 164.  The third factor is described as "defendants did not diligently attempt to comply with the order in a reasonable manner."  *Id.*  But the Second Circuit, in *King v. Allied Vision, Ltd.* cited *Hart Schaffner* to state that "[a] contempt order is warranted only where *the moving party establishes* by clear and convincing evidence that the alleged contemnor violated the district court's edict."  *Id.* at 1058 (emphasis added).  *Hart Schaffner* did not describe or assess the third prong of the analysis, let alone its burden.  The Circuit in *King* also cited *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989), but that case also does not describe the allocation of the burden.  Regardless, this Court need not assess this issue further given that both parties agree on the *Huber* standard that "the alleged contemnor bears the burden of producing evidence of his inability to comply."  Dkt. No. 80 at 7.

they exercised reasonable diligence in attempting to do so. *Huber*, 51 F.3d at 10. Such a burden "may be difficult to meet . . . particularly in cases such as this where the defendants have a long history of delay and the plaintiffs' needs are urgent." *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir. 1986); *see also Donovan*, 726 F.2d at 60 (describing it as a "heavy burden").

       Having properly described the allocation of the burden, the Court proceeds to assess whether the Defendants met their burden of "clearly establish[ing their] inability to comply with the terms of the order." *Id.* Under *Huber*, the ability to comply need not be clearly established; what is required is that the inability to comply be clearly established by the alleged contemnor. *Id.* Defendants argue that compliance with the March Order and the November Order is impossible for three reasons: (i) Rainbow, as a nonparty to this litigation, is governed by the strictures of Republic of Ireland's Companies Act of 2014" ("Companies Act"), and under that law, is purportedly required to hold a special resolution for the Swap that requires twenty-one days of notice and 75% of the owners' votes, Dkt. No. 80 at 9; (ii) that an order to Rainbow to deliver replacement engines would result in a breach of fiduciary duties by the directors of Rainbow, *id.*; and (iii) that Russian law prevents them from exporting hard copies of documentation. The Court, for the reasons that follow, finds that Defendants have failed to

---

Some district courts have attempted to square the discrepancy between the two conflicting statements by utilizing a burden-shifting analysis. *See, e.g.*, *S.E.C. v. Bronson*, 2021 WL 3167853, at *5 (S.D.N.Y. Jan. 19, 2021); *Sec. & Exch. Comm'n v. CKB168 Holdings, Ltd.*, 2016 WL 11796951, at *4 (E.D.N.Y. Feb. 12, 2016), *report and recommendation adopted*, 2016 WL 11796982 (E.D.N.Y. Sept. 28, 2016); *Schwarz v. ThinkStrategy Cap. Mgmt. LLC*, 2015 WL 4040558, at *10 (S.D.N.Y. July 1, 2015). Others have not undertaken such a burden-shifting analysis and have held that the alleged contemnor bears the burden. *See, e.g.*, *S.E.C. v. Mattera*, 2012 WL 4450999, at *11 (S.D.N.Y. Sept. 26, 2012). The Court need not resolve this question because it concludes that Defendants have not met their burden of showing impossibility and because neither party seeks nor has briefed this motion on the basis of a burden-shifting analysis.

"prov[e] plainly and unmistakably that compliance is impossible." *In re Marc Rich & Co.*, 736

F.2d 864, 866 (2d Cir.1984)

### A.    Failure to Comply with the November Order Due to the Ireland Companies Act of 2014 and Special Resolution Requirements

Defendants first argue that they were unable to comply with the November Order that

they transfer the two Replacement Engines because the "strictures of the[ ] corporate

documents" of Rainbow and VDI and "the requirements of the [Companies Act] prevent

Defendants from conveying the engines to Plaintiff." Dkt. No. 80 at 9. They first note that

Rainbow is not a party to this action and that Rainbow is wholly owned by VDI. *Id*. at 9.

Defendant VDL owns 69% of VDI, with the remainder owned by VDA. *Id*. at 9. Defendants

argue that "[a] swap of this nature is not one taken in Rainbow's normal course of business and,

as a result, would require a special resolution, as described in the Companies Act, to be passed

by Rainbow's owners." *Id*. at 4. They further claim that in order to shorten the timeframe to less

than twenty-one days, they would need at least 90% of the vote. *Id*. at 14. Further, a special

resolution would require 75% of the vote. *Id*. Thus, in order to deliver the engines on time,

Defendants contend that the vote of VDA is required for both the shortening of the timeframe

and the special resolution. *Id*.

Defendants' argument is without merit. The Court did not order Defendants to deliver to

Plaintiff Rainbow Engine 2 or Rainbow Engine 3 or to compel Rainbow to relinquish the

engines. It ordered Defendants to procure General Electric Model GEnx-2B67/P engines, that is,

"Replacement Engines," as they were required to do under Section 12.02 of the 60118 Lease

Agreement. Dkt. No. 70. Defendants have not demonstrated either that they tried to comply

with the Court's order or that, if they tried, compliance would have been impossible.

Defendants assert that they do not possess any Replacement Engines and that such engines "are not readily available on the open market," Dkt. No. 81 ¶ 6, purportedly in support of the claim that they are unable to purchase such engines to satisfy their contractual obligations and their obligations to the Court.   But it is not disputed that such Replacement Engines are in the possession of their affiliate Rainbow, that the Court's order could be satisfied by the delivery of Rainbow Engine 2 and Rainbow Engine 3, and that those engines are located in a jurisdiction from which those engines could be delivered to Plaintiff.   Defendants have not shown that it would be impossible to obtain the Replacement Engines from Rainbow.   In support of the argument that they tried to comply with the November Order, Defendants submit the declaration of Solovov that the morning after the Court entered the preliminary injunction from the bench, he advised VDL of the ruling and VDL, in turn, "advised" Rainbow management of the order.   Two days later, on November 18, 2022, after the Court issued the formal written order, Solovov drafted a letter to Rainbow "requesting" that it transfer title to the Rainbow Engines.   Dkt. No. 81 ¶¶ 8, 10.   The letter is anodyne.   It states that it is expected that the Court will issue an order that, on or before November 21, 2022, "Defendants must transfer to Plaintiff, all rights, title and interest in and to two . . . GEnx-2B67/P engines . . . which shall be suitable for installation and use on the airframe of . . . MSN 60118."   Dkt. No. 81-1 at ECF p. 2.   After reciting the understanding that Rainbow has Replacement Engines that could satisfy the order, the letter states:

> Defendants therefore recommend, due to the close affiliation between Rainbow and Defendants, generally, and V-D's indirect majority ownership of Rainbow, specifically, that Rainbow transfer title to the Replacement Engines to Plaintiff on or before November 21, 2022 and deliver the related documents (such as executed warranty bills of sale substantially in the form found in the attached sample document) as described in the Order, so that Defendants may comply with the Order.   Time is of the essence and it is imperative that Rainbow act with all due

haste in transferring title to the Replacement Engines to Plaintiff on [or] before
November 21, 2022.

*Id.* at ECF p. 3.  The letter concludes by providing contact information for BOCA's Chief

Operating Officer for assistance in effectuating the title of transfer.  The letter does not contain a

demand that Rainbow transfer title.  Nor does it contain any offer of consideration to Rainbow or

any other inducement that would cause it to effectuate the transfer.  Defendants did not offer to

buy the Replacement Engines.  They simply asked that Rainbow relinquish control voluntarily

and without receiving anything in exchange.

Three days later, Alexander Dammer, purportedly a Director of Rainbow, responded to

Solovov.  The letter states, in pertinent part:

> [W]e would like to draw your attention to our concerns related to the damage of
> Rainbow Engine 1 currently installed on Boeing Model 747-8F MSN 601 l 8, which
> is controlled and operated by Plaintiff since 14 March 2022.  In this respect, before
> the transfer of title to the Rainbow Engine 2 and the Rainbow Engine 3[,] Rainbow
> would like to evaluate more facts and information in relation to the Rainbow
> Engine 1 damage purportedly incurred during the period when Plaintiff controlled
> MSN 60118 aircraft with Rainbow's asset.
>
> Moreover, we inform you that due to our recent appointment Rainbow needs more
> time in order to review the provided information and documents as well as to
> discover the location of storage of the originals of the documents for the Rainbow
> Engine 2 and the Rainbow Engine 3.  In this respect, we hereby inform you that the
> title transfer to the Rainbow Engine 2 and the Rainbow Engine 3 Rainbow [sic]
> would unlikely be performed until after 21 November 2022. At the same time,
> Rainbow is not in position to transfer the title to the Rainbow Engine 2 and the
> Rainbow Engine 3 until Plaintiff obtains the required approvals from regulatory
> authorities to transfer title to the BOCA Engines.

Dkt. No. 81-2.  The letter makes no reference to a Rainbow shareholders meeting.

There is no evidence that Solovov ever responded to Dammer's letter, which is based on

a plain misunderstanding of the Court's order:  the Court did not order *Rainbow* to engage in an

engine swap.  It ordered Defendants to satisfy their contractual obligation by delivering

Replacement Engines and ordered BOCA to deliver the BOCA Engines "*after* Defendants' full

compliance with this Order" and *after* obtaining the necessary approvals.  It was up to

Defendants to determine how to satisfy the November Order.  There is no evidence that Solovov

informed Rainbow that the Court already addressed the issue of purported damage to Rainbow

Engine 1, stating that the issue of damage would be raised at trial on the merits, or that the

Court's order was not conditional upon evidence that Rainbow Engine 1 was not damaged.

There also is no evidence that Solovov informed Rainbow that the Court's order was that title to

the BOCA Engines would be transferred only after Defendants had satisfied their obligations

under the 60118 Lease Agreement and under the Court's order, or informed Rainbow that the

Court bonded the injunction precisely to cover any damages Defendants might suffer in the event

that the injunction was improvidently granted or that Plaintiff was unable to transfer title to the

BOCA Engines on a timely basis.  Tellingly, there is no evidence that Defendants did anything to

address Rainbow's concerns about the condition of Rainbow Engine 1 or with respect to the

delay in BOCA obtaining the necessary approvals (a matter the Court addressed through the

bond and that could be addressed by trial on the merits).

On November 28, 2022, in response to the order to show cause why Defendants should

not be held in contempt, Dammer wrote:

> While we appreciate all the anticipated complications with the Plaintiff, Rainbow's
> directors should act in best [sic] Rainbow's interests. And as of today, the best
> Rainbow's interest is not in transferring the titles to the Rainbow Engine 2 and the
> Rainbow Engine 3 before Rainbow's directors could evaluate all aspects of this
> transfer and potential risks (including, the sanctions risk) as well as until Plaintiff
> obtains the required approvals from regulatory authorities to transfer title to the
> BOCA Engines.  Moreover, given the unusual nature of this title transfer, our
> understanding is a special resolution would need to be passed by Rainbow's
> directors to allow for Rainbow to take such a step in accordance with Irish
> regulation—in this respect, Volga-Dnepr Airlines LLC, as a 31% interest holder in
> Rainbow, should be notified in due course.

Dkt. No. 87-7.  There is no more detail in Rainbow's letter regarding which "aspects" it would

need to consider, and why it had not already considered them.  There is no declaration from

Dammer himself or anyone from Rainbow.  There is no evidence of any action taken by Defendants to follow up on Dammer's concerns and to address them.

Defendants' submission is also conspicuous for what it does not contain as to VDI and VDA.  There is no evidence that either Defendant ever instructed VDL's direct subsidiary VDI—which is the sole owner of Rainbow—to direct Rainbow to make the transfer. Defendants' counsel admitted as much in oral argument, stating that "[y]ou don't have anything in regards to VDI."  Tr. 26–27.  While Defendants' counsel "assume[d]" that VDI had a board of directors, he did not even know and could not proffer evidence showing that the "board of directors met on this issue."  *Id*.  He stated that he was "not sure" if VDL had "asked the board of directors [of] VDI to meet."  *Id*.  Nor is there evidence that either Defendant ever asked VDA for its consent to the transfer.  There is no evidence that VDI ever considered the transfer or ever made any direction to Rainbow to effectuate the transfer.  As the sole owner of Rainbow, it plainly could have taken actions that would have resulted in the transfer.

Defendants' efforts to comply with the injunction were plainly deficient and lacked good faith.  At oral argument on the motion for contempt, Defendants' counsel admitted that if Defendants needed an asset from Rainbow for Defendants' own corporate purposes it could make that request.  The full colloquy follows:

> THE COURT: Are you saying that as an indirect owner of Rainbow, your client has no ability to make a request to Rainbow to do something?
>
> MR. TRAIN-GUTIERREZ: *No. I wasn't suggesting that.* Perhaps we're getting hung up on "recommendation" versus "request."  I don't know if they're necessarily different.  That's what they were. They were asking, hey, we would like you to transfer these engines -- that's what the letter to Rainbow was -- because otherwise we run the risk of being in contempt of this Court's order.
>
> THE COURT: Let's take it just as an ordinary business activity.  Let's say actually that the Russian entity wanted the engines for itself.  Would the Russian entity be able to ask Rainbow to deliver engines to it?

. . . .

MR. TRAIN-GUTIERREZ: . . . Do I think that they could unilaterally say, hey, we need a couple of engines over here for one of AirBridge's aircraft, give them to us, I don't.

THE COURT: And we'll pay you money for it.  And could they do that?

MR. TRAIN-GUTIERREZ: That is part of what they've done. That's the reason why Rainbow Engine 1 exists.

THE COURT: So have they done that in this case?

MR. TRAIN-GUTIERREZ: So have they said, give us the engine.

THE COURT: And we'll pay you for it.

MR. TRAIN-GUTIERREZ: Lease us these engines. *I don't know if that discussion has been had, your Honor. I don't know if it's been framed in that way. I don't know.*

Tr. 23–25 (emphasis added).  Defendants might have had to pay for that asset.  But that is also its

obligation under the 60118 Lease Agreement and under the November Order—it now holds

Plaintiff's engines and must procure replacement engines for Plaintiff, including, if necessary, by

paying to purchase engines on the open market or from Rainbow.[3]  There is no evidence that it

ever sought to do so.  In short, Defendants have not established that it was "literally impossible

and, as a result, any attempts at coercion are pointless," *Badgley*, 800 F.2d at 37; *see also Barcia*

*v. Sitkin*, 1997 WL 66785, at *2 (S.D.N.Y. Feb. 14, 1997) ("This contention fails because

defendants have not demonstrated that they have diligently explored every avenue for expediting

payment.  In this circuit, compliance must be beyond the realm of possibility, not just difficult to

achieve, before a party will be exonerated in a contempt proceeding.").[4]

---

[3] For this reason, Defendants' contention that there are no replacement engines on the market rings hollow in light of the fact that Rainbow has these engines and Defendants can procure them from Rainbow.

[4] Defendants' contention that Dammer or other directors had fiduciary obligations is thus irrelevant.  The Court imposed an obligation on *Defendants*, not on Rainbow, to transfer title in

Moreover, Defendants' argument that Rainbow cannot transfer the Rainbow Engines either through a board meeting or by a shareholder vote bears every hallmark of contrivance. The argument is not supported by any affidavit of anyone from Rainbow, or even from VDI— even though the Court gave Defendants the opportunity to proffer witnesses for testimony and even though it would have been apparent that if Defendants were to put the blame on Rainbow, some evidence from Rainbow should have been submitted.  There thus is no competent evidence from Rainbow that it would be unable to comply with a request or a demand from its indirect majority owner or from its direct majority owner.  There also is no evidence that VDI would have lacked the authority and ability to direct Rainbow to transfer the engines or that VDL lacked the authority to compel VDI to take that action.

In its initial response to the motion for a preliminary injunction, Defendants professed (without any evidence from Rainbow but presumably based upon some authority) that a transfer could be made (and would be made) but it required a vote of the Rainbow Board and the Rainbow Board needed until mid-December.  *See*, *e.g.*, Dkt. No. 54 at 11.  The excuses then changed in the supplemental briefing—but not by much.  Defendants contended that Rainbow could make the decision but would not unless either there was a simultaneous swap or a bond.

---

replacement engines to Plaintiff.  The Court also imposed an obligation on Plaintiff to transfer the BOCA engines to Defendants afterwards and upon necessary approvals and required Plaintiff to post bond for any delay.  If Defendants had an issue with that Order, the answer was to appeal or seek a stay, rather than take the matter into their own hands and defy the Court's order.  *See Maness v. Meyers*, 419 U.S. 449, 458 (1975) ("[T]he basic proposition [is] that all orders and judgments of courts must be complied with promptly.  If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal."); *Posr v. Roadarmel*, 466 F. Supp. 2d 527, 531 (S.D.N.Y. 2006) (same).  Further, on its own terms, the contention lacks merit.  As noted, Defendants have not produced anything showing any efforts by them to make it in the best interest of Rainbow's directors to consent to the title transfers.  They have also not produced anything showing that VDI's directors would violate any fiduciary duties to VDI by directing Rainbow to transfer title.

*See*, *e.g.*, Dkt. No. 61 at 1–3, 10–11.  Even after the Court ordered the transfer and ordered the posting of a bond, there was no mention of the need for a special resolution or a shareholder meeting:  Dammer's letter of November 21 states that the Rainbow Board would need more time.  It was only after Defendants had failed to comply and after Plaintiff had moved for contempt sanctions, that the excuse changed dramatically and was revealed for what it was—a transparent attempt to obtain more delay—that Defendants asserted that a special resolution was required.[5]  Tellingly, however, even then, Rainbow (the party with title to the Rainbow Engines) did not state that a shareholder meeting was required or that VDI would not be able to unilaterally accomplish (at the direction of Defendants) what Rainbow itself indicated it was unwilling to do.  Dammer's letter states that it is his "understanding" that a special resolution would need to be passed "*by Rainbow's directors*," and only that VDA "should be notified in due course," without either he or Defendants providing any basis for that understanding or why (or whether) VDA needed to be notified (much less whether VDA needed to approve the transaction).  Defendants have offered no evidence that Rainbow ever stated that a vote of shareholders was required.

---

[5] Defendants' contention at oral argument that the shareholder issue was belatedly raised only because the November Order implicated Rainbow Engines 2 and 3 rather than Rainbow Engines 1 and 2 is without merit.  In particular, Defendants contend that the "asymmetrical" nature of the swap is outside the "normal course of Rainbow's business" and thus would require a special resolution.  Dkt. No. 80 at 4.  These arguments were squarely rejected by the Court in its prior decision from the bench.  There is nothing in the 60118 Lease Agreement entitling Defendants to a simultaneous swap.  Section 12.02 require Defendants to transfer title "as soon as practicable" to another engine of a "same or an improved" model with Plaintiff's transfer of its own engines to follow afterwards.  There is also nothing in the 60118 Lease Agreement that entitled Defendants to evaluate the condition of Rainbow Engine 1 prior to transferring Rainbow Engines 2 and 3.  Further, the Court's order addressed these concerns by requiring Plaintiff to post bond. *See generally* Dkt. No. 70.

The only reference to a shareholder meeting is in the artfully worded declaration of Solovov, who is not a Rainbow director.  He asserts—without any authority—that "[a] swap of this nature is not one taken in Rainbow's normal course or business, and, as a result, would require a special resolution, as described in the Companies Act, to be passed by Rainbow's owners" and that "I have been informed that VDA's approval would be required before such a special resolution could pass and that, despite its majority ownership in [VDI], [VDL] cannot unilaterally pass such a resolution."  Dkt. No. 81 ¶¶ 19–20.  When counsel for Defendants was questioned at argument where in the Companies Act such a requirement could be found, he initially equivocated.  Ultimately, he responded that the Companies Act did not require such a special resolution.  More specifically, when asked about Solovov's declaration regarding the requirements of the Companies Act, Defendants' counsel admitted that "Rainbow is requiring [the special resolution], not . . . the Companies Act."  Tr. 22.  The Companies Act does not describe when a special resolution is necessary, let alone require that such a resolution is necessary when a corporate action is outside the "normal course of business," Dkt. No. 80 at 4.  Defendants' counsel conceded this point at oral argument, stating that "It's circular. . . .  we tried to look for this list of  . . . things that are special resolutions.  It doesn't exist in the Companies Act. . . .  Instead what it says is when a company deems it to be appropriate to take a special resolution."  Tr. 21.  Nor did counsel identify any part of Rainbow's Constitution that would require such a special resolution.  In other words, he took the position that it was that the Rainbow Board that wanted there to be such a special resolution because the matter was not one that would occur in the ordinary course.  The language in the declaration "as described in the Companies Act," modified the term "special resolution," but not the language that a special resolution would be required—in other words, a special resolution was *not* required (it was a

matter of discretion) but if one were to be taken it would have to be taken in accordance with the Companies Act.  But the problem with that argument—aside from its disingenuousness—is that it lacks support.  Dammer—who is not a witness and whom Defendants tellingly chose not to offer as a witness—did not say that Rainbow wanted to proceed by special resolution of the shareholders rather than by board vote.  As noted previously, he purportedly stated in a letter that is attached to Solovov's declaration that it was his "understanding" that "a special resolution would need to be passed *by Rainbow's directors* to allow for Rainbow to take such a step in accordance with Irish regulation."  Dkt. No. 81-7 (emphasis added).  But Defendants admitted that there is no Irish regulation that would require such a special resolution, much less one that would have to be the result of a shareholder meeting.  It is pure contrivance, an obstacle constructed by Defendants to manufacture an excuse for its failure to comply with the Court's orders.

For that reason alone, the defense, along with any other defenses that should have been properly raised before the Court when it was determining the November Order, is properly denied.  *See United States v. Rylander*, 460 U.S. 752, 756–57, (1983) ("[A] contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy.  The procedure to enforce a court's order commanding or forbidding an act should not be so inconclusive as to foster experimentation with disobedience." (quoting *Maggio v. Zeitz*, 333 U.S. 56, 69 (1948)); *see also id*. at 757 ("Thus while Rylander could not attack the enforcement order on the ground that he lacked possession or control of the records at the time the order was issued, he could defend the contempt charge on the ground that he was then unable to comply because he lacked possession or control.").

24

Further, even presuming that Defendants are correct that a special resolution would be required for Rainbow's approval to transfer the engines, Defendants do not explain why a special resolution would be necessary to direct VDI to simply vote—as the sole shareholder of Rainbow and thus sufficient alone to vote for a special resolution—to transfer title of the Rainbow Engines to BOCA.  All that Solovov's declaration provides is that this action is "not one taken in *Rainbow*'s normal course of business."  Dkt. No. 81 ¶ 19 (emphasis added).  Solovov's declaration does *not* state that it is not in *VDI's* normal course of business to order Rainbow to undertake transfers.  In fact, nothing is provided at all about any special resolution requirements at VDI, as opposed to Rainbow.[6]

Finally, even assuming that a special resolution is necessary at VDI and that VDA's approval is required, Defendants have not offered anything in the record showing that Defendants have undertaken reasonable efforts to ensure VDA's approval of the swap. Defendants assert, with no citation to the record, that "[w]hile VDA has been advised of both the Swap Order and the V-D Letter, it has not approved the shortening of the 21-day period required under Irish law for the calling of a meeting to discuss a special resolution on this matter and has not otherwise approved the Transfer."  Dkt. No. 81 ¶ 21.[7]  But it is well established that

---

[6] To the extent that Solovov, in his declaration, states that "I have been informed that VDA's approval would be required before such a special resolution [at Rainbow] could pass and that, despite its majority ownership in [VDI], [VDL] cannot unilaterally pass such a resolution," Dkt. No. 81 ¶ 20, such a statement is entirely hearsay, is otherwise unsubstantiated, and makes little sense, given that VDA is not a direct shareholder of Rainbow.  *See, e.g., Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 2021 WL 3418475, at *15 (S.D.N.Y. Aug. 5, 2021) ("Defendants again argue that they relied on the advice of counsel, without proffering the substance of any opinion."); *Chere Amie, Inc. v. Windstar Apparel, Corp.*, 175 F. Supp. 2d 562, 566 (S.D.N.Y. 2001) (rejecting evidence of attempted compliance with an order when it was based entirely on a "self-serving hearsay assertion").

[7] Both Rainbow and VDI appear to allow for the possibility of calling an "extraordinary general meeting" with only seven days' notice.  *See, e.g.*, Dkt. No. 81-4 § 11.2; Dkt. No. 81-6 § 9.2.

"[c]onclusory statements are inadequate to carry [Defendants'] burden." *Huber*, 51 F.3d at 10. Defendants here include no additional material to support this assertion and the description is otherwise entirely perfunctory.  The description does not identify any dates, names, places, documents, or anything of the like from VDA expressing such disapproval.  The declaration does not describe any efforts that VDL undertook to persuade VDA of the swap, the importance of complying with the Court's order, and why it should call for a special resolution on an expedited meeting schedule.  This one liner in a declaration is insufficient to establish impossibility. Further, there is reason to believe that the line is incredible—the letter from Rainbow, dated November 28, 2022, intimates that VDA had not even been notified yet.  *See* Dkt. No. 81-7 ("Volga-Dnepr Airlines LLC, as a 31% interest holder in Rainbow, *should be notified* in due course." (emphasis added)).  Defendants simply have not shown evidence of any efforts taken with respect to VDA and for them to raise VDA as a challenge at this point in the proceedings is simply incredible.  The Court need not "credit the . . . contemnor's denials" because "it finds them to be 'incredible in context.'"  *Huber*, 51 F.3d at 10 (quoting *Maggio v. Zeitz*, 333 U.S. 56, 75–76 (1948)).

After the oral argument on the order to show cause as to why contempt sanctions should not be imposed, the Court kept the evidentiary record open and allowed Defendants an opportunity to present a witness that would be able to offer live testimony as to these matters. Alternatively, Plaintiff was allowed to depose that witness, in order to afford "yet another opportunity to put in evidence that would try to satisfy [Defendants'] burden that [they've] tried to comply with the order."  Tr. 29–33.  Defendants subsequently indicated that they intended to rest on their briefs.  Dkt. No. 88.  In that light, Defendants' briefs and supporting materials offer only perfunctory and conclusory statements about their inability to comply with this Court's

orders.  They have been unable to provide supporting material in the record or produce witnesses that would be able to testify to the efforts undertaken.  For these reasons, the Court is unpersuaded that Defendants have met their burden on showing their inability.

**B.    Failure to Provide Hard Copies of Aircraft Documentation due to Russian Decree No. 311**

Defendants finally contend that they are unable to provide hard copy records for the Aircraft, including Non-Incident Statements, because "Decree Number 311 of the Government of the Russian federal dated November 9, 2022 imposes a prohibition on the export of aircraft and aviation goods . . . without a special authorization from the Russian government."  *See* Dkt. No. 80 at 5–6; Dkt. No. 81 ¶ 29.  They further argue that despite their "best efforts," they have been "unable to obtain such special authorization in connection with both the records and the engines."  *See* Dkt. No. 80 at 5–6; Dkt. No. 81 ¶ 29.  BOCA argues that they "have not described any efforts whatsoever to obtain special authorization for return" of the documents or compliance with the March Order.  Dkt. No. 85 at 8.

Defendants' argument sounds in comity, the respect which courts give the sovereign interests of a foreign state.  *See Gucci America, Inc. v. Weixing Liz*, 768 F.3d 122, 139–40 (2d Cir. 2014) (citing Restatement (Third) of Foreign Relations Law); *see also United States v. Davis*, 767 F.2d 1025, 1036–39 (2d Cir. 1985) (citing Restatement (Second) of the Foreign Relations Law of the United States).  "[W]hen a court order will infringe on sovereign interests of a foreign state, district courts may appropriately conduct an analysis using the framework provided by § 403 of the Restatement (Third) of Foreign Relations Law, entitled 'Limitations on Jurisdiction to Prescribe.'"  *Gucci Am., Inc.*, 768 F.3d at 139.  Section 403 provides a range of factors including, *inter alia*, the "link of the activity to the territory of the regulating state," "the connections . . . between the regulating state and the person principally responsible for the

activity," "the character of the activity to be regulated, the importance of regulation to the

regulating state," "the existence of justified expectations that might be protected or hurt by the

regulation," "the importance of the regulation to the international . . . system," "the extent to

which the regulation is consistent with the traditions of the international system," "the extent to

which another state may have an interest in regulating the activity," and the "likelihood of

conflict with regulation by another state."  Restatement (Third) of Foreign Relations Law § 403

(1987).  There are several problems with this argument.

     First, if Defendants had been concerned about comity and whether the Court's order

infringed on the rights and interests of Russia, the proper way to raise those concerns would have

been through a timely motion to vacate.  Instead, Defendants waited until after Plaintiff expected

them to comply with the Court's orders and were forced to move for contempt sanctions.[8]

Defendants were obliged to comply with the Court's order as entered and not to take the matter

into their own hands.  *See Rylander*, 460 U.S. at 756 ("[A] contempt proceeding does not open to

reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus

become a retrial of the original controversy."); *GTE Sylvania, Inc. v. Consumers Union of U. S.,*

*Inc.*, 445 U.S. 375, 386 (1980) ("Persons subject to an injunctive order issued by a court with

jurisdiction are expected to obey that decree until it is modified or reversed, even if they have

proper grounds to object to the order."); *United States v. United Mine Workers*, 330 U.S. 258,

---

[8] Defendants claim that Decree Number 311 was imposed on November 9, 2022.  Dkt. No. 80 at 5.  Defendants' own submissions indicate that Decree Number 311 had been imposed earlier than November 9, 2022, and Defendants do not identify what changes were made to Decree Number 311 on November 9, 2022.  And such a change, in any event, would have purportedly occurred before Defendants' deadline of November 10, 2022 (and the time in Moscow is ahead of New York time) for opposing the supplemental briefing with respect to the preliminary injunction.  *See* Dkt. No. 61.  It also would have occurred before the Court issued its November Order on November 16, 2022.  Defendants attempt to improperly raise claims of impossibility that should have been raised in the first instance before the Court issued the November Order.

293 (1947) ("[A]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings."); *In re Crim. Contempt Proc. Against Gerald Crawford, Michael Warren*, 329 F.3d 131, 138 (2d Cir. 2003) (same); *Milltex Indus. Corp. v. Jacquard Lace Co., Ltd.*, 55 F.3d 34, 41 n.14 (2d Cir. 1995) ("The fact that a court order might be unlawful does not, of course, give a lawyer or client license to violate it; to the contrary, the proper course is to adhere to the order until-and unless-it is vacated.").

Second, assuming that the Court is prepared to excuse Defendants' forfeiture, *see*, *e.g.*, *Gucci America*, 768 F.3d at 140 (holding that comity argument was not forfeited "given the important role that comity plays in ensuring the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience" (internal quotation marks omitted)), Defendants do not offer any evidence regarding the content of Russian law or showing the concerns of comity that would be offended by enforcement of this Court's order.  The only evidence that Defendants offer is the conclusory statement of Solovov that "Decree Number 311 of the Government of the Russian Federation dated November 9, 2022 imposes a prohibition on the export of aircraft and aviation goods (including the Original Records being an integral part of the Aircraft in accordance with the definition set out in the Lease Agreement) from Russia without a special authorization from the Russian government."  Dkt. No. 81 ¶ 29.  Defendants do not quote the law, do not include a citation to the law, and do not provide a copy of the law.  They provide no competent evidence that there is such a law and no evidence whatsoever with respect to its scope.  They also do not explain how Solovov, who is identified only to be a director of VDI, a Netherlands corporation, would be competent to state what the law addresses, much less to indicate whether the definition

of "aircraft and aviation goods"—assuming that that is the language of a decree—would cover the documentation at issue here.  Defendants offer only "[c]onclusory statements, [which] are inadequate to carry th[e] burden" of establishing impossibility of compliance with this Court's order.  *Huber*, 51 F.3d at 10.[9]  Defendants thus fail to show that the laws of two nations, in fact, require inconsistent conduct—a threshold requirement for invoking international comity.  *See In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 102 (2d Cir. 2019) ("A true conflict exists if compliance with the regulatory laws of both countries would be impossible." (internal quotation marks omitted)); *See In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1049 (2d Cir. 1996) ("International comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction.").

Third, assuming that there is a Russian decree that would forbid what the orders of this Court command, Defendants provide neither argument nor evidence by which the Court could conduct a comity analysis and thus fail to meet their burden.  *See Yukos Cap. S.A.R.L. v. OAO Samaraneftegaz,* 963 F. Supp. 2d 289, 295 (S.D.N.Y. 2013), *aff'd sub nom. Yukos Cap. S.A.R.L. v. Samaraneftegaz,* 592 F. App'x 8 (2d Cir. 2014)) ("The decision to grant comity is a matter within a court's discretion and the burden of proof to establish its appropriateness is on the moving party." (internal quotation marks and citation omitted))*; see also Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 999 (2d Cir. 1993) ("[S]ince comity is an affirmative defense, the [defendants] carried the burden of proving that comity was appropriate.").  Defendants offer no

---

[9] Although the comity analysis may apply at the first prong of determining, for the purposes of contempt sanctions, whether the violated order was "clear and unambiguous," *see*, *e.g.*, *Next Invs., LLC v. Bank of China*, 12 F.4th 119, 131 (2d Cir. 2021), Defendants here concede that the order is "clear and unambiguous," *see* Dkt. No. 80 at 7 ("Defendants do not contend that the Swap Order was ambiguous.").  Defendants' argument regarding Russian law is instead framed in terms of "factual impossibility," which Defendants concede is their burden to prove.  *See id*.

evidence how the refusal to deliver documentation—the delivery of which is required by contract and this Court's orders—would impact the vital national interest of Russia, or how that interest would outweigh the interests of the United States in the sanctity of commerce and worldwide interests in international commerce.  Indeed, Defendants present no evidence that the Russian decree has been enforced at all for aircraft documents or what the consequences for violation would be.  *Cf. Bodner v. Paribas*, 202 F.R.D. 370, 375 (E.D.N.Y. 2000) ("As held by numerous courts, the French Blocking Statute does not subject defendants to a realistic risk of prosecution, and cannot be construed as a law intended to universally govern the conduct of litigation within the jurisdiction of a United States court."); *see also Motorola Credit Corp. v. Uzan,* 73 F. Supp. 3d 397, 400 (S.D.N.Y. 2014), *on reconsideration*, 132 F. Supp. 3d 518 (S.D.N.Y. 2015) (citing cases involving numerous countries, including China, France, Mexico, Switzerland, Brazil, Spain, among others).  Although ABC is alleged to be a Russian limited liability company, Defendant VDL is a Netherlands corporation.  No evidence is offered regarding the extent of Russian enforcement that would be expected to ensure compliance with the regulation banning export of aircraft documents.  In the absence of the issue having been raised and briefed, the Court need not address these issues.  *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[O]ur system is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." (alterations accepted and internal quotation marks and citation omitted)).

Finally, even assuming that there exists an enforced Russian decree that would forbid compliance with the Order, Defendants have established neither that they engaged in a good faith effort to secure permission to make the documentation available, nor that compliance would be

31

impossible on the facts here.  Solovov's declaration states that "Decree Number 311 . . . imposes

a prohibition on the export of aircraft and aviation goods . . . from Russia without a special

authorization from the Russian government."  Dkt. No. 88 ¶ 9.  Thus, even accepting Solovov's

claim, the Russian decree is not absolute.  It admits of exceptions.  Export is permitted with

authorization from the Russian government.  On May 17, 2022, Defendants submitted a letter to

Russian regulatory authorities which provided that "[i]n accordance with clause 2(l) of the

3/17/2022 version of the Government Decree No. 311 of March 9, 2022 . . . we request you to

grant temporary Russian Government permission for the export of certain goods."  Dkt. No. 55-

2.  At oral argument, Defendants' counsel acknowledged that such an authorization was a

possibility.  *See also* Tr. 15 ("THE COURT: No. They're not handcuffed. From Solovov's

declaration itself, it indicates that the Russian government can give special authorization.  MR.

TRAIN-GUTIERREZ: And that's what they've requested, your Honor.").[10]  There thus is no

blanket ban on the export of the original documents.  Defendants quite literally admit that such

export is not "literally impossible" here.  They have not met their burden for both showing that

comity is warranted and that compliance with the order would be impossible.

    Defendants have not shown that they made efforts to obtain that authorization or that, if

they made efforts, such efforts would not have succeeded.  As to the efforts undertaken by

Defendants to obtain authorization to export the documents, Defendants have only produced one

record—their May 17, 2022 letter to Russian regulatory authorities.  Defendants do not provide

any evidence of their follow-up efforts to seek special authorization for those documents.  They

---

[10] The Court is not otherwise required to credit Solovov's statement that cite no text from Decree Number 311 or provide any legal support or analysis, let alone provide an affidavit of a lawyer knowledgeable of Russian sanctions law, for their assertion that Decree Number 311 would render the transfer of the documentation an impossibility.

do not provide cognizable evidence of any letters, emails, phone calls, or other outreach efforts to regulatory authorities in Russia to obtain special authorization.  Although they sent this letter on May 17, 2022, as of October 28, 2022, they claimed that they were "still awaiting a response to this communication."  Dkt. No. 55 ¶ 5.  Defendants counsel stated at oral argument that "they've written letters and they're in contact with the Russian Aviation Federation," Tr. 13., and that "[t]here have been follow-up calls to the Federation," *id.* at 14, but such calls and such letters do not appear in the record and no one attests to them in their declarations.  Defendants simply have not provided any documentation of those efforts.  As noted in *Huber*, this Court is "entitled to consider [the] refusal to produce documents in assessing the credibility of his oral representations."  *Huber*, 51 F.3d at 11; *see, e.g., Weston Cap. Advisors, Inc. v. PT Bank Mutiara*, 667 F. App'x 15, 18 (2d Cir. 2016) (summary order) (affirming sanctions when "while Liegey testified at the evidentiary hearing that both he and the Weston Entities were illiquid, no financial documents were submitted to support the claims of penury").  Here that refusal undermines Defendants' credibility.  Notably, Defendants do not produce any records supporting their assertions from *after* this Court issued the November Order.

## III.    The Award of Attorney's Fees

Plaintiff also moves for an award of attorney's fees and costs as part of its contempt motion.  Dkt. No. 74 at 12–13.  Defendants oppose this motion, arguing that their failure to comply with the November Order was not willful.  Dkt. No. 80 at 13–14.

It is within the district court's discretion to award attorneys' fees and costs to a victim of contempt.  *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir.1996).  "In order to award fees, the district court had to find that New Line's contempt was willful."  *King*, 65 F.3d at 1063; *see also M. Harvey Rephen & Assocs., P.C. v. Chase Bank USA, N.A.*, 853 F. App'x 690, 693 (2d Cir. 2021) (summary order) ("In determining whether to award attorneys' fees to compensate a

plaintiff, we consider whether the defendant's actions were willful.").[11]  "[Willfulness] merely

requires 'a specific intent to consciously disregard an order of the court.'"  *United States v.*

*Lynch*, 162 F.3d 732, 735 (2d Cir. 1998) (quoting *United States v. Cutler*, 58 F.3d 825, 837

(2d Cir. 1995)).  "A willful contempt is one where 'the contemnor had actual notice of the

court's order, was able to comply with it, did not seek to have it modified, and did not make a

good faith effort to comply.'"  *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*,

2007 WL 2982295, at *4 (S.D.N.Y. Oct. 10, 2007).  "[T]he party seeking compensation, bears

the burden of proving that the [contemnor's] actions were willful by clear and convincing

evidence."  *CSX Transportation, Inc. v. Emjay Env't Recycling, LTD.*, 2016 WL 755630, at *5

(E.D.N.Y. Feb. 25, 2016).  The Court, at this time, exercises its discretion to deny the motion for

attorneys' fees without prejudice to renewal.

## IV.     The Amount of the Sanction

Plaintiffs move for coercive sanctions, as they seek to "compel compliance."  Dkt. No. 74

at 10.  For contempt of the March Order, BOCA seeks a daily fine of $30,000, with the daily fine

to double each week until ABC submits sufficient proof of compliance with the March Order by

delivering to BOCA certified electronic copies of statements of no accidents or incidents.  Dkt.

No. 78.  For contempt of the November Order, BOCA seeks a daily fine of $100,000 payable to

BOCA, with the daily fine increasing by $50,000 each day until Defendants submit sufficient

proof that they are in compliance with the November Order.  *Id.*  Defendants argue that

---

[11] *Cf. Weitzman*, 98 F.3d at 719 ("[W]hile willfulness may not necessarily be a prerequisite to an award of fees and costs, a finding of willfulness strongly supports granting them.  Indeed, to survive review in this court, a district court, having found willful contempt, would need to articulate persuasive grounds for any denial of compensation for the reasonable legal costs of the victim of contempt."); *In re Keene Corp.*, 1999 WL 58683, at *1 (S.D.N.Y. Feb. 4, 1999) (describing such statement in *Weitzman* as dicta).

"sanctions [should] not be designed as a windfall to Plaintiff but rather be equitable and appropriate." Dkt. No. 80 at 13.

"The imposition of civil contempt sanctions may serve dual purposes: to secure future compliance with court orders and to compensate the party that has been wronged." *Paramedics*, 369 F.3d at 657. "Such sanctions may not be imposed as a purely punitive measure." *Id*. "Compensatory sanctions should reimburse the injured party for its actual damages." *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1353 (2d Cir. 1989). "When imposing coercive sanctions, a court should consider (1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden." *Id*. "The ultimate consideration is whether the coercive sanction—here, a fine—is reasonable in relation to the facts. That determination is left to the informed discretion of the district court." *Id*. "A coercive fine must be substantial enough to make it more economical for a contemnor to comply than not to comply." *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 2021 WL 3418475, at *16 (S.D.N.Y. Aug. 5, 2021). "[T]he discretion of the district court is more narrowly bounded when seeking to compensate the victim of contempt, and correspondingly broader when it seeks to force prospective compliance with its own order." *Weitzman*, 98 F.3d at 719. Where a fine is both coercive and compensatory, "some proof of loss must be present to justify its compensatory aspects." *Paramedics*, 369 F.3d at 658.

The Court finds Plaintiff's amounts to be excessive as they would grant Plaintiff a windfall and are more than should be necessary to compel compliance. However, the Court also concludes that coercive sanctions are appropriate here. The character and magnitude of the harm are significant—Plaintiff has described how the loss of such engines will result in lost rental

income of $7.2 million.  Dkt. No. 74 at 10.  Moreover, and importantly, the Court has found that Defendants have not even attempted to comply with the Court's orders and thus they cannot demonstrate that compliance would be impossible.

In the exercise of the Court's discretion, the Court will award $15,000 per day for the paperwork and $25,000 per day for the engines against each defendant.  Each amount will be doubled if Defendants fail to comply within two weeks, and then will be increased by another $15,000 and $25,000, respectively, if Defendants fail to comply within four weeks.  *See New York v. Shore Realty Corp.*, 763 F.2d 49, 54 (2d Cir. 1985) (Court may exercise its discretion to "increase the amount of [a] daily fine" if "a higher coercive sanction is . . . warranted"); *see also Perfect Fit Industries, Inc. v. Acme Quilting Co. Inc.*, 673 F.2d 53, 57 (2d Cir. 1982) (describing how courts may "design a remedy that will bring about compliance").  The Court may further increase the coercive sanctions, upon motion, should these sanctions be insufficient to compel compliance after the passage of six weeks.

## CONCLUSION

The motion for contempt sanctions is GRANTED IN PART and DENIED IN PART.


SO ORDERED.


Dated: December 12, 2022
        New York, New York

                                    LEWIS J. LIMAN
                                    United States District Judge

36