UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                              :

BOCA AVIATION LIMITED,                   :

                                     :

                    Plaintiff,          :

                                       :                 22-cv-2070 (LJL)

           -v-                          :

                                       :        OPINION AND ORDER

AIRBRIDGECARGO AIRLINES, LLC, and     :
VOLGA-DNEPR LOGISTICS B.V.,         :

                                       :

                  Defendants.       :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

       This case arises from the imposition of E.U. sanctions on the Russian Federation, following Russia's invasion of Ukraine, and the imposition of Russian sanctions on foreign assets, including internationally leased aircraft.  In February 2022, following the invasion, a number of governments, including the United States and the European Union, imposed sanctions on Russia that adversely affected the ability of air carriers based in Russia to perform their aircraft lease obligations.  Walton Direct Testimony ("Walton Test.") ¶ 21.  The Russian Federation then issued regulations with their own restrictions and consequences.  *Id.*

       Three aircraft, including their airframes, engines, and accompanying items of equipment, are at issue in this case.  The aircraft were leased by Plaintiff BOC Aviation Limited ("BOCA" or "Plaintiff" or "Lessor") to Defendant AirBridgeCargo Airlines, LLC ("AirBridge" or "Lessee"), pursuant to leases that were guaranteed by Defendant Volga-Dnepr Logistics, B.V. ("Volga-Dnepr," and with AirBridge, "Defendants").  After the invasion and due to events triggered by the imposition of sanctions, Plaintiff declared "Events of Default" under the leases and attempted, with only partial success, to exercise its rights to retake the aircrafts.  This case was initiated by Plaintiff on March 14, 2022, by filing of a complaint alleging breaches of the

leases and guaranties and a motion seeking emergency relief.  Dkt. Nos. 1, 4.  On March 25, 2022, the Court issued an *ex parte* order for an injunction and immediate possession of one of the aircraft, Dkt. No. 26, which allowed Plaintiff to recover one of the planes and two of its four engines, with the other two engines remaining in Russia.  The other two aircraft also are currently in Russia.  Following subsequent proceedings, by bench decision on November 16, 2022, the Court granted Plaintiff's motion for a preliminary injunction ordering, *inter alia*, Defendants to deliver title to two engines with respect to the one recovered aircraft that are of the same or an improved model to the engines remaining in Russia by November 21, 2021.  That decision was followed by several subsequent orders imposing contempt sanctions on Defendants payable to both Plaintiff and the Court due to their failure to comply with the Court's orders.  *See* Dkt. Nos. 91, 124, 135.

On April 3, 2023, the Court held a one-day bench trial.  The Court received testimony on direct examination by declaration of one witness: David Walton, the Deputy Managing Director and Chief Operating Officer of Plaintiff.  Defendants initially proposed offering three witnesses but offered no witnesses at trial.  This Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1).  To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

## FINDINGS OF FACT

### I.    The Relevant Parties and Persons

Plaintiff BOCA is a corporation organized and existing under the laws of Singapore that is engaged in the aviation business, principally with respect to the purchasing, selling, and leasing of commercial aircraft.  Dkt. No. 143-1 ¶ 1; Walton Test. ¶ 4.  It is a global aircraft operating and leasing company whose shares are publicly traded.  Walton Test. ¶ 4.  As of

December 31, 2022, BOCA owned, managed, and had on order a total of 633 aircraft. *Id.* ¶ 5.  It has airline customers in Asia, the Middle East, Europe, Latin America, and North America. *Id.* ¶ 6.  In the United States, BOCA aircraft are operated by American Airlines, United Airlines, Southwest, and Frontier Airlines. *Id.*

Defendant AirBridge is a limited liability company organized and existing under the laws of the Russian Federation that operates cargo airline services.  Dkt. No. 143-1 ¶ 2.  AirBridge is a wholly-owned subsidiary of parent corporation and defendant Volga-Dnepr. *Id.*  Volga-Dnepr is a company incorporated under the laws of the Netherlands. *Id.* ¶ 3.

Non-party Rainbow Leasing Limited ("Rainbow") is a company incorporated under the laws of Ireland and is an indirect partial subsidiary of Volga-Dnepr. *Id.* ¶¶ 4–6.  Rainbow is wholly owned by non-party Volga-Dnepr Airlines (Ireland) Limited ("V-D Ireland"). *Id.* ¶ 5.  In turn, Volga-Dnepr owns 68.7 percent of V-D Ireland. *Id.* ¶ 6.  Rainbow is the owner of three aircraft engines involved in this case: one bearing the engine serial number ("ESN") 959228 ("Rainbow Engine 1"), which was attached to the aircraft that was repossessed by BOCA following this Court's March 25, 2022 Order for immediate possession; [1] and two engines bearing ESN 959208 ("Rainbow Engine 2") and ESN 959221 ("Rainbow Engine 3"), unattached to any of BOCA's aircrafts and currently in GE Aviation overhaul shops. *Id.* ¶ 27; Walton Test. ¶¶ 45, 50; Dkt. No. 70.

SB Leasing Ireland Limited ("SBLI") is a leasing company unaffiliated with any of the parties to this lawsuit.  SBLI is the owner of an aircraft engine bearing ESN 959350 ("SBLI Engine"), which was attached to the aircraft that was repossessed by BOCA.  Dkt. No. 143-1

---

[1] Defendants voluntarily withdrew their counterclaims, Dkt. No. 51, seeking the return or other appropriate relief with respect to the Rainbow engine currently in the possession of Plaintiff. Dkt. No. 137.

¶ 27.

## II.     BOCA Acquires Title to the Airframes Leased to AirBridge and Guaranteed by Volga-Dnepr

As previously noted, this case involves the return of three Boeing Aircraft (collectively, the "Aircrafts").[2]  On March 30, 2017, BOCA acquired ownership of two Boeing Model 747-8F airframes respectively bearing manufacturer's serial number ("MSN") 60117 and MSN 60118, each equipped with four General Electric Model GEnx-2b67/P engines.  Dkt. No. 143-1 ¶¶ 7, 9. On October 31, 2017, BOCA acquired ownership of a third Boeing Model 747-8F aircraft with an airframe bearing serial number MSN 60119, also equipped with four General Electric Model GEnx-2b67/P engines.  *Id*. ¶ 12.  Each Aircraft was registered on the aircraft registry in Bermuda.  *Id*. ¶¶ 8, 11, 14.  Further, each Aircraft is outfitted as a cargo aircraft.  Tr. 55.  This Opinion and Order refers to each Aircraft as the " '117 Aircraft," " '118 Aircraft," and " '119 Aircraft."

Of relevance here, when AirBridge took delivery of the '118 Aircraft pursuant to its Lease Agreement, General Electric Model GEnx-2b67/P engine with ESN 959449 ("BOCA Engine 959449") and General Electric Model GEnx-2b67/P engine with ESN 959452 ("BOCA Engine 959452") (collectively, the "BOCA Engines") were installed on its airframe and were part of BOCA's purchase of the Aircraft.  Dkt. No. 143-1 ¶ 10; Pl. Ex. 3 at BOCA_00004423.

At the time BOCA acquired title to the '117 and '118 Aircrafts, each was under lease to AirBridge, pursuant to lease agreements guaranteed by Volga-Dnepr.  On March 30, 2017, the day BOCA acquired title to the aircraft, BOCA also entered into Assignment, Assumption and Amendment Agreements with respect to the '117 Aircraft and the '118 Aircraft.  Dkt. No. 143-1.

---

[2] The Court uses the term "Aircraft" to refer to the airframe, its engines, and its items of equipment.

4

¶¶ 7, 9; Pl. Exs. 1, 3.  The Court refers to the individual agreement as an "Assignment Agreement," with each particular agreement noted by the MSN of the airframe, *e.g.*, the " '117 Assignment Agreement."  Each Assignment Agreement incorporated the prior aircraft lease agreement for the '117 Aircraft and the '118 Aircraft, with BOCA as the new lessor.  Dkt. No. 143-1 ¶¶ 7, 9; Pl. Exs. 1, 3.

When BOCA acquired ownership of the '119 Aircraft on October 31, 2017, it was on lease to an affiliate of Defendants, an non-party airline called CargoLogicAir Ltd. ("CargoLogic").  Dkt. No. 143-1 ¶ 12.  That same day, BOCA, non-party BCC Equipment Leasing Corporation, CargoLogic, and Volga-Dnepr entered into an Assignment, Assumption and Amendment Agreement (the " '119 Assignment Agreement") with respect to the '119 Aircraft that incorporated the prior lease and with BOCA as the new lessor.  Walton Test. ¶ 17. On January 31, 2020, BOCA entered into an Assignment, Assumption and Amendment Agreement with respect to '119 Aircraft with CargoLogic and Volga-Dnepr, which incorporated the prior lease and replaced CargoLogic with AirBridge as the new lessee.  Dkt. No. 143-1 ¶ 13; Walton Test. ¶ 18.

Volga-Dnepr executed guaranty agreements as to each lease agreement, which guaranteed, *inter alia*, the due and punctual performance and observance by AirBridge of all obligations under the lease agreements and the due and punctual payment of each amount that AirBridge is or may become obligated to pay under the lease agreements.  Dkt. No. 143-1 ¶¶ 15, 16, 38; Pl. Exs. 2, 4, 6.

Because the parties agree that each of the lease agreements and guaranty agreements contain identical terms except with respect to the identity of the airframe and the stipulated loss values of those airframes, Pretrial Conf. Tr. 3, the Court, for the purposes of convenience and

brevity, cites Plaintiff's Exhibit 1, the Amended and Restated Aircraft Lease Agreement with respect to the '117 Aircraft, dated as of November 13, 2015, and as amended and restated as of March 30, 2017, as the "Lease Agreement," Pl. Ex. 1 at BOCA_00004234.  Individual lease agreements are referred to as, *e.g.*, the " '117 Lease Agreement."  The Court likewise cites Plaintiff's Exhibit 2, the Guaranty Agreement for the '117 Aircraft, as the "Guaranty," Pl. Ex. 2, and refers individual guaranty agreements as, *e.g.*, the " '117 Guaranty."

## III.    Relevant Provisions of the Lease Agreements

The Lease Agreements provide for BOCA to lease to AirBridge each of the three Aircrafts for a defined term, subject to the condition precedent (among others) that BOCA has received the Guaranties from Volga-Dnepr and that evidence reasonably acceptable to BOCA that the Aircrafts have been registered with Bermuda or that it will be so registered immediately after delivery of the aircraft to the Lessee has been delivered to BOCA.  *See* Pl. Ex. 1, § 2.02, at BOCA_00004251; *Id.* § 3.01(a)(v), at BOCA_00004253; *Id.* § 3.01(a)(xxii), at BOCA_00004254.  In exchange, BOCA was to receive rent payable on a monthly basis.  *Id.* Art. 5, at BOCA_00004258.  Under the Lease Agreements, AirBridge was not to relinquish or transfer possession of the Aircraft or any Item of Equipment,[3] *id.* Art. 7, at BOCA_00004266, was to maintain each Item of Equipment, *id.* § 7.05, at BOCA_00004268, was to replace any parts that became worn out, lost, stolen, destroyed, seized, or damaged beyond repair or permanently rendered unfit, *id.* § 10.01, at BOCA_00004272, and was to return the Aircraft to BOCA at the end of the lease term at its own expense and under conditions specified in the Lease Agreements, *id.* Art. 17, at BOCA_00004291.

---

[3] An "Item of Equipment" is defined as "all or any of the Aircraft, the Airframe, the Engines, the APU, the Landing Gear and each Part."  Pl. Ex. 1, § 1.01, at BOCA_00004454.

Two sets of provisions in the Lease Agreements are particularly relevant to the resolution of the instant dispute. They involve an "Event of Default" and an "Event of Loss." Upon an Event of Default, BOCA can consider AirBridge to have repudiated the lease and can terminate the lease. *Id*. § 19.01, at BOCA_00004298. Upon an Event of Loss of the Aircraft, or the Airframe and the Engines installed thereon, BOCA has the right to accept the Stipulated Loss Value for the Aircraft, plus then due and unpaid rent for the Aircraft, and interest at a contractually defined rate, in exchange for the transfer of title to the Aircraft to AirBridge and the termination of the obligation to pay rent. *Id*. § 12.01, at BOCA_00004280. Because of the importance of both sets of provisions, the Court sets them out at length.

The events that constitute Events of Default are set out in Article 18 of the Lease Agreements. *Id*. Art. 18, at BOCA_00004296. The laundry list of items constituting an Event of Default includes the (1) the failure to pay rent, *id*. § 18(a), the failure to maintain any insurance required by the Lease Agreements, *id*. § 18(b), the failure to perform any conditions of the Lease Agreements, *id*. § 18(h), if Lessee "suspends all or substantially all of its commercial airline operations," *id*. § 18(m), and if "any change . . . in any Law . . . of the jurisdiction of Lessee's incorporation or any jurisdiction in which Lessee conducts business . . . materially adversely affects Lessee's ability to meet its obligations hereunder," *id*. § 18(n).

Events of Default are not necessarily based upon the fault or action of the Lessee. The Lease Agreements specifically provide that such an Event of Default will have occurred "whether such events shall be voluntary or involuntary or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree, order, rule or regulation of any Government Body." *Id*. Art. 18, at BOCA_00004504.

The remedies for an Event of Default are set forth in Article 19 of the Lease Agreement. They include the right, "in Lessor's sole discretion, . . . [to] accept the Event of Default as a repudiation of th[e] Lease [Agreement] and [to] terminate the . . . Lease [Agreement]." *Id.* § 19.01, at BOCA_00004507. They also include the right to retake possession of the aircraft. *Id.* § 19.02. Section 19.02 provides the following remedy upon an Event of Default:

> Upon the written demand of Lessor with or without terminating this Lease and at Lessee's expense, cause Lessee to return promptly, and Lessee shall return promptly, the Aircraft and any part thereof . . . as Lessor may so demand to Lessor . . . , or Lessor at its option and provided that Lessor has sent Lessee a notice of termination, may enter upon the premises where the Aircraft or any part thereof is located and take immediate possession of and remove the same (together with any engine which is not an Engine but which is installed on the Airframe, subject to all the rights of the owner, lessor, lienor or secured party of such engine, and such engine shall be held for the account of any such owner, lessor, lienor or secured party or, if owned by Lessee, may, at the option of Lessor, be exchanged with Lessee for an Engine as if the original Engine had suffered an Event of Loss) by summary proceedings or otherwise . . . .

*Id.* The Event of Default provisions also provide authority to the Lessor to deregister the plane from Bermuda and provide that "Lessor shall be entitled and empowered to act in the name and in the place of Lessee . . . in Lessor's sole discretion, including with respect to the execution of documents and instruments, to effect such registration, recordation, exportation, termination and extinguishment." *Id.* § 19.03(d).

Finally, the Event of Default provisions provide for damages. Those damages assume that the Aircraft subject to the Event of Default is repossessed by the Lessor. The damages provision for the Event of Default in the Lease Agreements, Section 19.05, provides for "[a]ll accrued and unpaid Rent," as well as:

> All losses, expenses and costs incurred[, including] all reasonable costs and expenses incurred in connection with recovering possession, deregistration, exportation of the Airframe or any Engine, . . . all reasonable costs and expenses in placing such Airframe or Engine in the configuration, condition and repair required, . . . inability to place the Aircraft on lease with another lessee on terms as favorable to it as this Lease, . . . or the amount received by Lessor or any Indemnified Party

upon a sale or other disposal of the Aircraft, is not as profitable to Lessor or such Indemnified Party as leasing the Aircraft in accordance with the terms of this Lease would have been, including in each case, amounts corresponding to the payments of Rent which would have been due from the return of the Aircraft to Lessor until the Aircraft is placed on lease or otherwise disposed of by Lessor.

*Id*. § 19.05.  This provision also requires that "Lessor will use reasonable endeavors to mitigate any such amounts for which Lessee is responsible." *Id*.

Upon an Event of Default, the Lessor, in the case of repossession, retains its original set of property rights and interests in the Aircrafts as if the Lease Agreements had never occurred. Section 19.06 states:

If an Event of Default occurs, Lessor shall have the right to sell or re-lease or otherwise deal with the Aircraft Airframe, Engine or any Item of Equipment at such time and in such manner and on such terms as Lessor considers appropriate in its absolute discretion, free and clear of any interest of Lessee and without any duty to account to Lessee with respect to such action or inaction, as if this Lease had never been entered into.

*Id*. § 19.06.

An Event of Loss is defined in Section 1.01 of the Lease Agreement.  As a general matter, an Event of Loss involves some damage, loss, or circumstance affecting the Aircraft, Engine, or other Item of Equipment that would disable Lessee from returning the Aircraft, Engine, or Item of Equipment to the Lessor.  Section 1.01 defines an Event of Loss as follows:

"Event of Loss" with respect to any Item of Equipment means any of the following events with respect to such Item: (a) loss of such Item of Equipment or the use thereof due to disappearance for a period in excess of sixty (60) days (or such shorter period ending on the date on which an insurance settlement has been reached on the basis of a total loss); (b) theft, destruction, damage beyond repair or rendering of such Item permanently unfit for normal use for any reason whatsoever; (c) any damage to such Item which results in an insurance settlement with respect to such Item on the basis of an actual or constructive total loss; (d) the condemnation, confiscation or seizure of, or requisition of title to, or requisition of use (for a period in excess of sixty (60) days, but in any event no longer than the last day of the Term) of, such Item by any Government Body; or (e) as a result of any rule, regulation, order or other action by any Aviation Authority, or other Government Body having jurisdiction, the use of such Item in the normal course of

air transportation of persons or property shall have been prohibited for a period of more than six (6) months.

*Id.* § 1.01, at BOCA_00004243.

Article 12 of the Lease Agreements outlines the consequences for an "Event of Loss." Those consequences include payment by Lessee for the Airframe (and the Engines installed thereon). Section 12.01 provides that the Lessee must pay the Lessor "the Stipulated Loss Value in respect of the Aircraft," the "due and unpaid Rent in respect of the Aircraft," and "interest at the Incentive Rate," which is a contractually defined interest rate.[4] *Id.* § 12.01, at BOCA_00004280. At the time of payment of those amounts, the Lessor then shall transfer to Lessee "all its respective right, title, and interest in and to" the particular aircraft subject to an Event of Loss. *Id.*

Section 12.02 of the Lease Agreements outlines in part the obligations of AirBridge as the "Lessee" and the rights of BOCA as the "Lessor" in the case of an Event of Loss with respect to a leased engine. The remedy for an Event of Loss of an Engine includes Lessee providing "as

---

[4] The Incentive Rate is defined as "per annum interest rate equal to the Prime Rate plus three percent (3%), or the maximum rate permitted by applicable law, whichever is less, calculated on the basis of a year of 360 days and actual days elapsed." Pl. Ex. 1, § 1.01, at BOCA_00004245. The parties have stipulated that J.P. Morgan Chase Bank, National Association has designated the following as its prime or base lending rate on the effective dates shown:

| Effective Date | Rate |
|---|---|
| 3/16/2020 | 3.25% |
| 3/17/2022 | 3.50% |
| 5/5/2022 | 4.00% |
| 6/16/2022 | 4.75% |
| 7/28/2022 | 5.50% |
| 9/22/2022 | 6.25% |
| 11/3/2022 | 7.00% |
| 12/15/2022 | 7.50% |
| 2/2/2023 | 7.75% |
| 3/23/2023 | 8.00% |

soon as practicable," a replacement engine "of the same or improved model and suitable for installation and use on the Airframe" and in "as good an operating condition." *Id*. § 12.02.[5] There is no provision for the payment of actual damages for either the Engines or the Aircraft in an Event of Loss.

## IV.   Relevant Provisions of the Guaranties

As noted, it was a condition precedent to the Lease Agreements that BOCA received a guaranty from Volga-Dnepr as to each agreement. *Id*. § 3.01(a)(v), at BOCA_00004253.

BOCA and Volga-Dnepr entered into two Guaranty Agreements, both dated March 30, 2017, with respect to the '117 Aircraft and '118 Aircraft. Dkt. No. 143-1 ¶ 15; Pl. Exs. 2, 4. They then entered a Guaranty Agreement dated January 31, 2020, with respect to the '119 Aircraft. Dkt. No. 143-1 ¶ 16; Pl. Ex. 6. The Guaranty Agreements[6] imposes an obligation on Volga-Dnepr, as the "Guarantor" to ensure the performance of AirBridge under the Lease Agreements:

> Guarantor does hereby unconditionally and irrevocably guarantee to the Lessor (i) the due and punctual performance and observance by Lessee of each covenant, agreement, undertaking, representation, warranty and any other obligation or

---

[5] Section 12.02 provides the following as to an Event of Loss for an Engine:

> [u]pon the occurrence of an Event of Loss with respect to an Engine not then installed on the Airframe . . . , Lessee shall give Lessor prompt written notice thereof and Lessee shall replace such Engine as soon as practicable after the occurrence of such Event of Loss by duly conveying to Lessor as a replacement for said Engine, title to another engine made by the Engine Manufacturer [General Electric] and of the same or an improved model and suitable for installation and use on the Airframe, which engine shall be free and clear of all Liens, and shall have a value and utility at least equal to, and be in as good an operating condition as, the Engine with respect to which such Event of Loss occurred, assuming such replaced Engine was of the value and utility and in the condition and repair as required by the terms hereof immediately prior to the occurrence of such Event of Loss.

[6] As previously noted, the Court cite to the Guaranty Agreement for the '117 Agreement for the purposes of convenience and brevity. The parties agree that the guaranty agreements for each aircraft are similar.

condition binding upon or to be performed or observed by it under and in accordance with the terms of the Lease and the other Operative Documents, . . . and (iii) in the event of any non-payment or non-performance, agrees to pay or perform or cause such payment or performance to be made upon notice from the Lessor of such non-payment or non-performance.

Pl. Ex. 2, § 2(a), at BOCA_00039930.

## V.  The Outbreak of Hostilities in Ukraine, Subsequent Sanctions, and the Events of Default and Events of Loss

On February 24, 2022, Russia invaded and occupied portions of Ukraine.  In response, the United States and the European Union imposed sanctions and restrictive measures on Russia and Russia-affiliated entities.[7]  These included the closure of U.S. and E.U. airspace to Russian aircraft and a prohibition on E.U. entities leasing aircraft to Russian entities.

As a part of those efforts, beginning in late February 2022, a number of governments around the world took actions that adversely affected the ability of air carriers certificated by the Russian Federation to perform their aircraft lease and/or finance obligations.  Walton Test. ¶ 21. Of particular relevance, on February 25, 2022, the European Union issued Regulation 2022/328, which required lessors who are E.U. persons to terminate aircraft leases to Russian airlines and which prohibited E.U. insurers from providing insurance and reinsurance for Russian airlines in respect of aircraft in Russia.  *Id.* ¶ 22.  The Russian Federation subsequently issued regulations with their own restrictions and consequences.  *See*, *e.g.*, Def. Ex. N.

Following the imposition of these sanctions, BOCA received several notices of cancellation of the reinsurance policy with respect to all three Aircraft, with the Hull War coverage[8] cancellation notice becoming effective on March 7, 2022.  Walton Test. ¶ 23.  These

---

[7] The Court takes judicial notice of the events described in this paragraph. *See Casey v. Odwalla*, Inc., 338 F. Supp. 3d 284, 294 (S.D.N.Y. 2018) ("Courts may take judicial notice of public documents or matters of public record.").

[8] Hull war coverage in insurance is intended to cover war risks and related perils.

notices began on March 1, 2022, and continued throughout that week.  *See*, *e.g.*, Pl. Exs. 11–14, 16–17.  As a result of the notices of cancellation, (a) the reinsurance for each of the Aircrafts did not comply with the requirements of the Lease Agreements and (b) the presence of any of the Aircrafts in Russia after that date would breach the terms of their Lease Agreements.  Walton Test. ¶ 24.  One of AirBridge's requirements under the Lease Agreements was to maintain hull insurance, *see* Pl. Ex. 1, § 13.02, at BOCA_00004493, and one of the events permitting BOCA to declare an Event of Default was the failure to maintain hull insurance, *id*. § 18(b), at BOCA_00004505.  On March 2, 2022, BOCA had a phone call with Dmitry Nikitin, head of fleet for AirBridge, discussing the issues created by the reinsurance cancellations and the fact that the reinsurance would no longer comply with the terms of the Lease Agreements and that AirBridge would no longer be permitted to operate the aircraft in, to, or from Russia.  Walton Test. ¶ 25; Pl. Ex. 15.

On March 3, 2022, BOCA sent AirBridge a written notice concerning the cancellation of Hull War reinsurance and requiring AirBridge to (a) ensure that the commercial operation of the Aircrafts cease as soon as possible and (b) put the Aircrafts into storage at a location outside Russia by a date no later than March 7, 2022.  Walton Test. ¶ 26; Pl. Ex. 19.

On March 5, 2022, each of the Aircrafts was on the ground in airports located outside of Russia.  Dkt. No. 143-1 ¶ 17.  The '117 Aircraft was located near Shanghai, China.  *Id*. ¶ 18. The '118 Aircraft was located at Hong Kong International Airport.  *Id*. ¶ 19.  The '119 Aircraft was located near Zhengzhou, China.  *Id*. ¶ 20.

On that same date, BOCA sent a written notice to AirBridge requiring that AirBridge ground the Aircraft at the locations outside Russia where the Aircraft were then located.  *Id*.

¶ 21; *see also* Pl. Ex. 20.  Mr. Nikitin communicated to BOCA that AirBridge had seen the notice and that it would ground the aircraft and would not operate them.  Walton Test. ¶ 28.

Notwithstanding that assurance, the grounding notice issued on March 5, 2022, and BOCA's instructions to AirBridge, AirBridge flew the '117 Aircraft and the '119 Aircraft from China to Russia on March 6, 2022.  *Id*. ¶¶ 29, 35–36.  BOCA complained to AirBridge through both a phone call on March 6, 2022, and a follow-up email, during which BOCA demanded that the '117 and '119 Aircrafts be removed from Russia immediately and parked outside Russia before midnight on March 7, 2022 (and asking AirBridge for a plan to do so).  *Id.* ¶¶ 30–31.  BOCA never received a response to that demand.  *Id.* ¶ 31.

Later that same day, on March 6, 2022, BOCA sent written notices to AirBridge, declaring Events of Default for the '117 and '118 Aircrafts and terminating the leases for the '117 and '118 Aircrafts effective immediately.  *Id*. ¶¶ 32, 36; Pl. Ex. 26.  The notices indicated that the Events of Default included, but were not limited to, Events of Default as defined under Sections (b) and (n) of Article 18 of the Lease Agreements, involving respectively the failure to maintain hull insurance and a change in law that materially affected Lessor's material rights and Lessee's ability to meet its obligations under the Lease Agreements.  Pl. Ex. 26.  The notices also demanded the immediate return of the Aircrafts, all Aircraft documentation, and any parts that were not installed on the Aircrafts, including the BOCA Engines which had been removed from the '118 Aircraft.  Dkt. No. 143-1 ¶ 22; *see also* Pl. Ex. 26; Walton Test. ¶ 32.  Attached to the notices of lease termination was a letter dated March 5, 2022, from the Bermuda Civil Aviation Authority ("BCAA") indicating that the termination of the lease also had the effect of revoking the Certificates of Airworthiness for both the '117 and '118 Aircrafts, and thus that "the Aircraft must not fly and should therefore not leave the airport where it is located."  Pl. Ex. 26 at

BOCA_00004018; *see also* Pl. Ex. 25.  On March 11, 2022, BOCA sent a similar notice to

AirBridge for the '119 Aircraft, declaring Events of Default under Sections (b) and (n) of

Article 18 of the '119 Lease Agreement and terminating the lease for the '119 Aircraft, effective

immediately.  The notice also demanded the immediate return of the '119 Aircraft, all its

documentation, and any parts not installed on the '119 Aircraft.  Walton Test. ¶ 40; Pl. Ex. 35.

On March 14, 2022, this Court entered an *ex parte* order that, *inter alia*, granted BOCA

immediate possession of the '118 Aircraft, ordered AirBridge to turn over all of the '118

Aircraft's documentation, and enjoined AirBridge from interfering with BOCA's ability to ferry

the '118 Aircraft from Hong Kong to Arizona.  Dkt. No. 26.  On March 25, 2022, after

successfully obtaining possession of the '118 Aircraft, BOCA was able to have a crew from Elite

Aero Ireland Limited fly that aircraft to Arizona.  Walton Test. ¶ 43.  At the time that BOCA

repossessed the '118 Aircraft in March 2022, two of the Engines on its wings were owned by

BOCA, one engine (ESN 959228) was owned by Rainbow (Rainbow Engine 1) and the fourth

engine (ESN 959350) was owned by SBLI, a third party that is not affiliated with Volga-Dnepr

or AirBridge (the "SBLI Engine").  *Id.* ¶ 45.  BOCA claims to have incurred costs totaling

approximately $7 million with respect to the repossession of the '118 Aircraft and its preparation

for leasing to Airport Hongyuan Logistics Co., Limited ("Hongyuan").  *Id.* ¶ 65; *see also* Pl.

Ex. 66.  The other two BOCA Engines, as well as the hard copy documentation for the '118

Aircraft, remain in Russia in Defendants' possession.  Walton Test. ¶ 37; Dkt. No. 143-1 ¶¶ 39,

41.  The Rainbow Engine and the SBLI Engine are in a storage facility in Arizona.  Walton Test.

¶ 46.

AirBridge informed BOCA on March 17, 2022 that it had completely suspended its

commercial operations as of that date.  *Id.* ¶ 38; Pl. Ex. 37.  Both the '117 Aircraft and the '119

Aircraft have remained grounded in Russia since landing in Moscow following the flights which began on March 6, 2022.  Walton Test. ¶¶ 35–36.  In addition, the BOCA Engines have remained grounded in Russia since AirBridge stopped operating internationally in the second half of March 2022.  *Id.* ¶ 37.

## VI. Plaintiff's Efforts to Repossess the Airframes and Engines and to Obtain Rent

In March 2022, the Russian government issued a set of export restrictions that prevented export from Russia of aircraft and aircraft engines unless Russian government approval was obtained.  Def. Ex. N ("Regulation 311").  Those export restrictions cover both aircraft and the parts of aircraft.  *Id.* at ABC000546.  BOCA testified that only two aircraft have been re-leased from Russia thus far; they were Boeing 737 Max aircraft in the possession of an airline called S7 Airlines.  Those aircraft were passenger aircraft and were not cargo planes.  Tr. 54–55.

On March 15, 2022, BOCA sent a payment demand to Volga-Dnepr, with a copy to AirBridge, demanding that the Basic Rent[9] payment of $1,200,000 that was due on March 14, 2022, for '117 Aircraft be paid immediately by Volga-Dnepr or AirBridge.  Dkt. No. 143-1 ¶ 32; Pl. Ex. 38.

On September 17, 2022, BOCA sent three payment demands:  First, it sent a payment demand to Defendants demanding that they immediately pay the Stipulated Loss Value for the '117 Aircraft of $161,940,193 due for the Event of Loss under Section 12.01 of the '117 Lease Agreement, or alternatively, that, pursuant to the Event of Default provisions, the aircraft be delivered to BOCA and all past due amounts, including rent payments for the period since March 2022, be paid.  Dkt. No. 143-1 ¶ 33; Pl. Ex. 52.  That same day, BOCA also sent a payment demand to Defendants demanding payment of $52,000,000 for the BOCA Engines that BOCA

---

[9] Basic Rent is a contractually defined term in the Lease Agreements, equal to $1,200,000 per month for each Aircraft.  *See*, *e.g.*, Pl. Ex. 1, Sch. 1, at BOCA_00004324.

claims was due for an Event of Loss under Section 12.01, to be paid immediately by Defendants, or alternatively, that the BOCA Engines or replacement engines be delivered to BOCA as required in the Event of Loss in accordance with Section 12.02 of the '118 Lease Agreement. Dkt. No. 143-1 ¶ 34; Pl. Ex. 53.  Section 12.01 of the Lease Agreement, however, does not provide any liquidated damages or stipulated loss value for the BOCA Engines.  Finally, BOCA sent a payment demand to Defendants demanding payment of the Stipulated Loss Value of $166,287,077 due for the '119 Aircraft under Section 12.01 of the '119 Lease Agreement, to be paid immediately by Defendants, or alternatively, that under Section 19.02, the Aircraft be delivered to BOCA and all past due amounts, including the rent payments for the period since March 2022, be paid.  Dkt. No. 143-1 ¶ 35; Pl. Ex. 54.

Neither Volga-Dnepr nor AirBridge has complied with the demand notices sent by BOCA.  Defendants have not made any rent payments to BOCA with respect to any Aircraft since on or before March 1, 2022.  Dkt. No. 143-1 ¶¶ 36–37.  Defendants have not delivered Replacement Engines (as defined in the '118 Lease Agreement) to BOCA.  *Id.* ¶ 42.  None of the Stipulated Loss Values have been paid.  *Id.* ¶¶ 43–44.

BOCA engaged in various efforts with Defendants to retake possession of the BOCA Engines and the '117 and '119 Aircrafts.  Defendants represented on April 4, 2022, that they had started to prepare its applications to Russian authorities for exporting the '117 and '119 Aircrafts with an expected redelivery in May 2022.  Pl. Ex. 43.  On or around April 12, 2022, BOCA began a series of discussions with AirBridge to effectuate the redelivery of the BOCA Engines to BOCA.  Walton Test. ¶ 47.  The discussion first centered on a possible physical exchange to occur by August 2022 in a country outside of Russia.  *Id.*  Defendants indicated on a telephone call on June 24, 2022, that they were still awaiting resolution of the applications submitted to the

Russian government for approval to export the BOCA Engines.  *Id.* ¶ 48.  In another telephone call on July 4, 2022, AirBridge advised that there was no update as to export approvals from the Russian authorities for the '117 and '119 Aircraft.  *Id.* ¶ 49.  AirBridge also indicated that it would like to have a physical swap of the BOCA Engines for Rainbow Engine 1 and the SBLI Engine in the United Arab Emirates.  *Id.*

On August 1, 2022, BOCA met with Defendants in Abu Dhabi and there, Defendants proposed a new option to try to satisfy their obligation to provide replacement engines for the BOCA Engines.  *Id.* ¶ 50.  Defendants proposed a title swap of the BOCA Engines for Rainbow Engine 2 and Rainbow Engine 3, which were in GE Aviation overhaul shops.  *Id.*  The option would be subject to assessing the condition of the engines and potential payment if the conditions differed.  Pl. Ex. 47 at BOCA_000039876.  During that conversation, Defendants also referred to the Rainbow engines as "our engines."  Tr. 33, 50; *see also* Pl. Ex. 34 (email from AirBridge referring to Rainbow Engine 1 as "our own engine").

At that meeting, AirBridge also represented that the Russian government would only allow export of the '117 and '119 Aircrafts if they "(i) . . . will not be ceased [sic] if exported out of Russia, (ii) . . . will not be used to carry weapons etc. that could be used in Ukraine conflict and (iii) . . . will continue to service nonsanctioned cargo export to and from Russia (food, medicines etc.)."  *Id.* at BOCA_000039875.  In pursuit of both of these options, BOCA sought and received approval from the U.S. Department of Commerce to engage in these proposed transactions.  *See, e.g.*, Pl. Exs. 44, 59, 64.

BOCA also sought to re-lease the '118 Aircraft.  BOCA encountered difficulties in releasing the '118 Aircraft due to the inability to promise delivery with all four of its engines.  Walton Test. ¶ 52.  BOCA attempted to locate other engines on the market for the '118 Aircraft

but were unable to do so because the engines went out of production in 2022, and the cut-off date

for orders of new engines lapsed on June 15, 2021.  *Id.* ¶ 51.  While GE had an engine for sale, it

was for the asking price of $20 million and there was only one engine available.  Tr. 53.  BOCA

eventually leased the '118 Aircraft to a new lessor, Hongyuan.  Dkt. No. 143-1 ¶ 45.  That

lease's monthly rent was reduced by $100,000 for each engine that BOCA was unable to deliver;

the reduction was locked in for thirty-six months.  Walton Test. ¶ 56.  Hongyuan was able to

separately source two spare engines for the '118 Aircraft.  *Id.* ¶ 60.

## CONCLUSIONS OF LAW

This Court has original jurisdiction over the subject matter of this action pursuant to

28 U.S.C. §§ 1331 and 1367.  Plaintiff asserts a federal claim for an Order of Possession that

arises under the Consolidated Text of the Convention on International Interests in Mobile

Equipment and the Protocol to the Convention on International Interests in Mobile Equipment on

Matters Specific to Aircraft Equipment Signed at Cape Town on 16 November 2001 (the

"CTC"), a treaty to which the United States is a signatory.  The Court asserts supplemental

jurisdiction over the breach of contract claims under New York law, as they arise from the "same

common nucleus of operative fact."  *Huer Huang v. Shanghai City Corp.*, 459 F. Supp. 3d 580,

593 (S.D.N.Y. 2020).

Venue is also proper because under the Lease Agreements, both parties submitted to the

"nonexclusive jurisdiction" of any federal court sitting in the City and County of New York;

agreed that all claims arising out of or relating to the Lease Agreements may be heard and

determined in that court; and waived any objection, "to the fullest extent [they] may effectively

do so," to venue of such action in any such court.  Pl. Ex. 1 at BOCA_00004315.  *See Akers*

*Biosciences, Inc. v. Martin*, 2015 WL 1054971, at *4 (S.D.N.Y. Mar. 10, 2015) (Nathan, J.); s*ee*

*also NYC Vision Cap., Inc. v. C21FC, LLC*, 2022 WL 2527611, at *4 (S.D.N.Y. July 7, 2022).

The Court first discusses whether there has been an Event of Default and/or an Event of Loss and then whether Defendants are relieved from performance by virtue of the doctrine of impossibility. Having concluded that Plaintiff established a breach, the Court determines the amount of damages. The Court then addresses Defendants' argument that Plaintiff failed to mitigate its damages. Finally, the Court turns to Volga-Dnepr's liability under the Guaranties. For the following reasons, the Court concludes that there were Events of Loss and Events of Default under the Lease Agreements; that Defendants are not relieved from performance due to impossibility; that Defendants have failed to prove their defense that Plaintiff failed to reasonably mitigate its damages; that Volga-Dnepr is liable under the Guaranties; and that Defendants owe damages to Plaintiff in the sum of $175,882,727 for the '117 Aircraft, $179,547,949 for the '119 Aircraft, and $50,770,020 for the '118 Aircraft, for a sum total of $406,200,696.

## I.  The Occurrence of an Event of Loss or an Event of Default

The Lease Agreements are governed by New York law. *See* Pl. Ex. 1, § 24.16, at BOCA_00004314. "The elements of a claim of breach of contract under New York law are: (1) the existence of a contract; (2) performance by plaintiff; (3) a breach by the defendant; and (4) damages." *Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*, 2022 WL 17067984, at *14 (S.D.N.Y. Nov. 17, 2022) (citing *Terwilliger v. Terwilliger*, 206 F.3d 240, 246 (2d Cir. 2000)). It is undisputed that contracts exist between the parties, namely the Lease Agreements and the Guaranties, and that Plaintiff has performed.

### A.  There Have Been Events of Default

It is undisputed, and the Court concludes, that there have been Events of Default under each of the Lease Agreements with respect to each of the Aircrafts. Def. Pretrial Br. at 4 (Defendants stating that "the parties do not dispute that an Event of Default occurred under the

Lease Agreements"); *see also* Tr. 4.  The parties have stipulated that the Lease Agreements for each of the three Aircrafts, and their interpretation, are similar.[10]  Article 18 includes, among the events that constitute Events of Default: (1) the failure to "make any payment of Basic Rent within three (3) days of the due date," Pl. Ex. 1, § 18(a), at BOCA_00004296, the failure "to procure and maintain in full force and effect any insurance required by Article 13" of the Lease Agreements, *id*. § 18(b), if "Lessee voluntarily suspends all or substantially all of its commercial airline operations," *id*. § 18(m), and if "any change . . . in any Law . . . of the jurisdiction of Lessee's incorporation or any jurisdiction in which Lessee conducts business . . . materially adversely affects Lessee's ability to meet its obligations hereunder," *id*. § 18(n).  Section 13.02 of the Lease Agreements requires the Lessee to "maintain or cause to be maintained in full force and effect . . . all-risk ground and flight aircraft hull insurance covering the Aircraft including coverage of the Engines and Parts . . . ."  *Id*. § 13.02, at BOCA_00004284.  That Section also specifically requires that the "Lessee . . . maintain or cause to be maintained in full force and effect hull war and allied perils insurance in respect of the Aircraft."  *Id*.

Plaintiff has demonstrated the occurrence of several Events of Default, each arising as a result of, or in the aftermath of, the Russian invasion of Ukraine.  Upon the passage of E.U. Regulation 2022/328, insurers and reinsurers of AirBridge cancelled hull insurance on each of the Aircraft.  *See* Pl. Exs. 11–14, 16–17.  As a result, AirBridge has failed to maintain in full force and effect the insurance required by Article 13 of the Lease Agreements.  Pl. Ex. 1, § 18(b), at BOCA_00004296.  In addition, because there has been a change in the law of AirBridge's country of incorporation or in jurisdictions in which it conducts business and that

---

[10] For the purposes of convenience and brevity, as noted in the Findings of Fact, the Court will cite the '117 Lease Agreement, which is within Plaintiff's Exhibit 1.

change materially affected AirBridge's ability to meet its obligations under the Lease

Agreements, the Event of Default specified under Section 18(n) has occurred.  *See* Dkt.

No. 143-1 ¶ 29; *see also* Pls. Exs. 11–14, 16–17.

It also is undisputed, and the Court finds, that on or about March 17, 2022, AirBridge's

commercial flight operations were suspended.  Dkt. No. 143-1 ¶ 30; *see also* Pl. Ex. 37 (notes

from call with Defendants indicating that "as of the date of the call they have stopped operating

all aircraft commercially").  As a result, an Event of Default has occurred under Section 18(m) of

the Lease Agreements, which includes as an Event of Default that "Lessee voluntarily suspends

all or substantially all of its commercial airline operations."  Finally, from March 2022 onwards,

BOCA has sent numerous payment demands for both the missed Rent and the Stipulated Loss

Value of the Aircrafts, all of which remain unpaid.  As a result, an Event of Default has occurred

under Section 18(a), which defines as an Event of Default the failure to make any payment of

Basic Rent or Supplemental Rent.  *See* Dkt. No. 143-1 ¶¶ 32–37.

It is irrelevant under the Lease Agreements that the failure to maintain hull insurance or

pay rent may have been a result of events over which AirBridge had no control.  The Lease

Agreements state that an occurrence constitutes an Event of Default whether it "shall be

voluntary or involuntary or come about or be effected by operation of law or pursuant to or in

compliance with any judgment, decree, order, rule or regulation of any Government Body."  *Id.*

§ 18, at BOCA_00004296.

## B.       There Have Been Events of Loss

The parties dispute whether there has been an Event of Loss under the Lease Agreements.

Plaintiff argues that there have been Events of Loss for the '117 and '119 Aircrafts and the

BOCA Engines.  Defendants argue that there has been no "Event of Loss" as that term is defined

in the Lease Agreements.  *See* Def. Pretrial Br. at 1–3.

The relevant provision defining an Event of Loss is in Section 1.01 of the Lease

Agreements.  Section 1.01 defines an "Event of Loss" as follows:

> "Event of Loss" with respect to any Item of Equipment means any of the following
> events with respect to such Item: (a) loss of such Items of Equipment or the use
> thereof due to disappearance for a period in excess of sixty (60) days (or such
> shorter period ending on the date on which an insurance settlement has been
> reached on the basis of a total loss); (b) theft, destruction, damage beyond repair or
> rendering of such Items permanently unfit for normal use for any reason
> whatsoever; (c) any damage to such Item which results in an insurance settlement
> with respect to such Item  on the basis of an actual or constructive total loss; (d) the
> condemnation, confiscation or seizure of, or requisition of title to, or requisition of
> use (for a period in excess of sixty (60) days, but in any event no longer than the
> last day of the Term) of, such Item by any Government Body; or (e) as a result of
> any rule, regulation, order or other action by any Aviation Authority, or other
> Government Body having jurisdiction, the use of such Item in the normal course of
> air transportation of persons or property shall have been prohibited for a period of
> more than six (6) months.

Pl. Ex. 1, § 1.01, at BOCA_00004243.

Plaintiff argues that there have been Events of Loss under clauses (d) and (e).  With

respect to clause (d), Plaintiff specifically argues that there has been a "seizure" of the '117 and

'119 Aircrafts and the BOCA Engines.  *See*, *e.g.*, Dkt. No. 145; Tr. 10.  As for clause (e),

Plaintiff argues that the suspension of the Certificates of Airworthiness by the BCAA has

prohibited the '117 and '119 Aircrafts from being used in "the normal course of air

transportation."  *See*, *e.g.*, Tr. 12, 99–101.  Plaintiff also relies on Defendants' own statements to

assert that the "normal course of air transportation" was "prohibited" after the Russian

Federation prohibited the Aircrafts from flying outside Russia.  *See* Pl. Pretrial Br. at 21–24.

As for clause (d), Defendants contend that no evidence has been presented to support a

finding that there has been a "condemnation, confiscation or seizure of, or requisition of" the

'117 and '119 Aircrafts and BOCA Engines by the Russian government.  *See* Tr. 20; *see also* Pl.

Ex. 1, § 1.01, at BOCA_00004243.  Defendants specifically argue that Regulation 311 only

limits the transportation of the Aircrafts and BOCA Engines out of Russia and does not reflect

that the Russian government actually possessed them, which they contend is necessary to effectuate a "seizure." Tr. 20. As for clause (e), Defendants argue that there is no evidence that the '117 or '119 Aircrafts or BOCA Engines were disabled from their use in the normal course of air transportation as a result of an action by a Government Body. They argue that Regulation 311 only restricts the movement of the Aircrafts and BOCA Engines to travel outside of Russia absent Russian authorization; it does not prohibit AirBridge from operating the Aircrafts or BOCA Engines within the Russian Federation or from acquiring authorization to operate the Aircrafts or BOCA Engines outside of Russia. *Id*. at 21–22.

In giving meaning to the contractual provisions defining an "Event of Loss," the Court looks to the language of Section 1.01 both in isolation and in the context of the Lease Agreements as a whole. The Court "must give 'effect and meaning . . . to every term of [a] contract' and strive 'to harmonize all of its terms.'" *Spinelli v. Nat'l Football League*, 903 F.3d 185, 200 (2d Cir. 2018). "The Court must guard against adopting a[n] . . . interpretation that would 'render any individual provision superfluous.'" *Id.*; *see also N.Y. State Thruway Auth. v. KTA-Tator Eng'g Servs., P.C.*, 913 N.Y.S.2d 438, 440 (4th Dep't 2010) ("It is well settled that a contract must be read as a whole to give effect and meaning to every term . . . . Indeed, a contract should be interpreted in a way that reconciles all of its provisions, if possible."); Restatement (Second) of Contracts § 203(a) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms [of an agreement] is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."). Under New York law, "[w]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations." *Willsey v. Gjuraj*, 885 N.Y.S.2d 528, 530 (2d Dep't

2009); *see also Beach v. HSBC Bank USA, N.A.*, 2018 WL 3996931, at *6 (S.D.N.Y. Aug. 21,

2018) (internal quotation marks and citation omitted) (same).  "In interpreting a contract, courts

'should examine the entire contract and consider the relation of the parties and the circumstances

under which it was executed.  Particular words should be considered, not as if isolated from the

context, but in the light of the obligation as a whole and the intention of the parties as manifested

thereby.'"  *Holland Loader Co., LLC v. FLSmidth A/S*, 313 F. Supp. 3d 447, 469 (S.D.N.Y.

2018) (quoting *MBIA Ins. Corp. v. Patriarch Partners VII, LLC*, 842 F. Supp. 2d 682, 704

(S.D.N.Y. 2012), *aff'd*, 769 F. App'x 40 (2d Cir. 2019) (summary order)).

     The provisions regarding an "Event of Loss" under the Lease Agreements must be read

together with the provisions regarding an "Event of Default."  Both describe circumstances under

which the Lessor can effectively declare the lease at an end, recover either the Aircraft or the

Stipulated Loss Value of the Aircraft, and relieve the Lessee of the obligation to pay continuing

rent.  Comparison of the two sets of provisions is instructive.  Each of the items that constitute an

Event of Default and the remedies attendant to an Event of Default presuppose that the Lessee is

able to return the Aircraft to the Lessor with its complete set of accompanying property rights

intact.  The occurrences which constitute an Event of Default do not include events which result

in the destruction, loss, or appropriation of the Aircraft or its parts or a limitation on the ability of

the Aircraft to be returned to the Lessor.  They relate, for example, to the inability of the Lessee

to protect the Aircraft (hence hull insurance), the failure to comply with the economic or non-

economic terms of the Lease Agreement, or changes in the business of the Lessee as a whole

(such as bankruptcy, the failure to pay debts, or the suspension of operations).  Thus, for

example, although the list of Events of Default include, that a "Government Body shall have

condemned, seized or appropriated all or any substantial portion of the property of Lessee," Pl.

Ex. 1, § 18(o), at BOCA_00004298, and that the "Lessee voluntarily suspends all or substantially all of its commercial airline operations," *id.* § 18(m), it does not include as an Event of Default the seizure or appropriation of the Aircraft itself (which is not part of the "property of the Lessee") or a regulation that prohibits the normal course of air transportation.

Correspondingly, the remedies upon an Event of Default all presuppose that the Lessor has the practical and legal ability to retake possession of the Aircraft and its parts.  The first remedy available upon an Event of Default, after the right to terminate the lease, is the right "to cause Lessee to return promptly . . . the Aircraft and any part thereof."  Pl. Ex. 1, § 19.02, at BOCA_00040931.  The Lessor has the right to require the Lessee to move the Aircraft to a location designated by the Lessor, *id.* § 19.03.  The damages provision for an Event of Default likewise presumes that the Lessor will have been able to repossess the Aircraft.  For example, it requires the Lessee to pay, *inter alia*, "[a]ll accrued and unpaid Rent . . . in respect of any period *prior to return of the Aircraft to Lessor*," "all reasonable costs incurred in *recovering possession, deregistration, exportation* of the Airframe or any Engine," and "all damages incurred by Lessor . . . including all losses suffered by Lessor . . . because of its inability to place the Aircraft on lease with another lessee on terms as favorable to it as this Lease."  *Id.* § 19.05 (emphasis added).  Once an Event of Default occurs, all rights with respect to the Aircraft revert to the Lessor, unfettered by any obligations to or interests of the Lessee.  Section 19.06 specifically states the following:

> 19.06  <u>Sale or Re-lease of Aircraft</u>.  If an Event of Default occurs, Lessor shall have the right to sell or re-lease or otherwise deal with the Aircraft Airframe, Engine or any Item of Equipment at such time and in such manner and on such terms as Lessor considers appropriate in its *absolute discretion*, *free and clear of any interest of Lessee and without any duty to account to Lessee with respect to such action or inaction, as if this Lease had never been entered into.*

*Id.* § 19.06 (emphasis added).

The Lessor is protected against any loss caused by the failure of the Lessee to return the Aircraft in the condition required by the Lease Agreements both by the explicit contractual requirement that the Lessee return the Aircraft "in the manner and condition required by, and otherwise in accordance with all the provisions of, this Lease as if such were being returned at the expiration of the term," *id*. § 19.02, and by the provision that, in the event that the Aircraft is not returned in such condition, the Lessee must pay "all reasonable costs and expenses" necessary to put it back in such condition, *id*. § 19.05(2)(b).

An Event of Loss, by contrast, involves an entirely different set of circumstances pursuant to which the Lessor would lack the practical or legal ability to repossess the Aircraft. The Events of Loss thus include, apart from the circumstances set forth in clauses (d) and (e), the "loss of such Item of Equipment or the use thereof due to disappearance for a period in excess of sixty (60) days," "theft, destruction, damage beyond repair or rendering of such Item permanently unfit for normal use," and "any damage to such Item which results in an insurance settlement with respect to such Item on the basis of an actual or constructive total loss." *Id*. § 1.01 (a), (b), & (c).  An Event of Loss does not give rise to a right to retake possession of the Aircraft or any of its parts.  Each of the circumstances under which there is an Event of Loss is one as to which there is either no Aircraft to retake or no practical ability to retake it.  Thus, upon an Event of Loss, but not upon an Event of Default, the Lessee is required to pay the Stipulated Loss Value of the Aircraft, representing the parties' estimate of the valuation of the Aircraft at the time of the Event of Loss.  *Id*. § 12.01; Walton Test. ¶ 69; Pl. Ex. 1 at BOCA_00004327; Pl. Ex. 5 at BOCA_00040960.  Thereafter, and following the payment of due and unpaid rent and applicable interest, the Lessor relinquishes to the Lessee all its rights, title and interest to the Aircraft:

> Lessor shall Transfer to *Lessee all its respective right, title, and interest, in and to (1) the Airframe and Engines*, (2) all claims for damage to such Items, if any, against third persons arising from the Event of Loss (unless any insurance carrier requires that such claims be assigned to it), and (3) all rights to any insurance claims under all insurance maintained by Lessee hereunder except liability insurance.  The obligation to pay Maintenance Rent and Basic Rent shall terminate after receipt by Lessor of the sum of paragraph (i), (ii) and (iii) above.

Pl. Ex. 1, § 12.01, at BOCA 00004489–4490 (emphasis added).  Lessor is thus made whole for its lost value of the Aircraft and transfers its property rights in full to the Lessee.

Plaintiff has proven by a preponderance of the evidence that an Event of Loss occurred under clause (e) when the BCAA issued its General Notice "provisionally suspend[ing] all Certificates of Airworthiness" for the Aircraft.  Pl. Ex. 36.  Clause (e) provides that an Event of Loss occurs when "as a result of any rule, regulation, order or other action by *any Aviation Authority*, or other Government Body having jurisdiction, the use of such Item in the normal course of air transportation of persons or property shall have been prohibited for a period of more than six (6) months."  Pl. Ex. 1, § 1.01, at BOCA_00004243 (emphasis added).  The term "Aviation Authority" is defined as including the "BDCA" or the "Bermuda Department of Civil Aviation and any successor Government Body thereto."  *Id*.  The Bermuda Department of Civil Aviation was renamed and succeeded by the Bermuda Civil Aviation Authority in 2016.  *See* BCAA, "Overview," https://www.bcaa.bm/overview (last accessed April 10, 2023).[11]  It further is undisputed that the BCAA had jurisdiction over the '117 and '119 Aircrafts.  By contract, Lessee was required to maintain the "State of Registry" for both Aircraft as "Bermuda or such other country or state of registration for the Aircraft as Lessor may, subject to Lessee's prior communication and agreement, approve in writing."  Pl. Ex. 1, § 1.01, at BOCA_00004250; *see also id*. § 16.01, at BOCA_00004290 (describing as "Further Assurances" that "Lessee shall, at

---

[11] The Court takes judicial notice of the transition from the Bermuda Department of Civil Aviation to the Bermuda Civil Aviation Authority.  *See supra* note 7.

its sole cost and expense and at all times during the Term, cause . . . the Aircraft registration to remain in effect with the BDCA"). The '117 and the '119 Aircrafts are both registered on the aircraft registry in Bermuda, with the '117 Aircraft bearing Bermuda Registration Mark VQ-BFU and the '119 Aircraft bearing Bermuda Registration Mark VP-BIN. Walton Test. ¶¶ 10, 19. The words of clause (e), furthermore, are expansive—they address not only rules, regulations, and orders of an Aviation Authority, but also "other action" by "any" Aviation Authority.

It cannot be disputed, and the Court finds that, on March 14, 2022, the BCAA took an "action" that prohibited the "normal course of air transportation" for each of the '117 and '119 Aircrafts for a period of more than six months. That action was the general notice from the BCAA that, "in the interest of aviation safety," it was suspending the Certificates of Airworthiness for "aircraft operating under the Article 83bis arrangement between Bermuda and the Russian Federation." Pl. Ex. 36. That suspension included the Certificates of Airworthiness of the '117 and '119 Aircraft. Dkt. Nos. 146, 146-1. Without a Certificate of Airworthiness, the "Aircraft must not fly and should . . . not leave the airport where it is located, until the [BCAA] has been able to evaluate the matter further." Pl. Ex. 26 at BOCA_00004018; Dkt. No. 27. Moreover, according to the records of the BCAA, the Certificates of Airworthiness for the '117 and '119 Aircrafts remained suspended as of March 1, 2023. Dkt. Nos. 146, 146-1.

The evidence further establishes that, even before the March 14, 2022 general notice, the BCAA took action that prohibited the "normal course of air transportation" for the '117 and '119 Aircrafts. Specifically, on March 5, 2022, the BCAA issued a notice, which became effective on March 6, 2022, when Plaintiff declared an Event of Default for the '117 Aircraft—as is undisputed that Plaintiff had the legal right to do under its Lease Agreement—that provided that upon the effective date of a notice of lease termination, the BCAA "would no longer be satisfied

that the continued airworthiness management of the aircraft could be maintained."  Pl. Ex. 26 at

BOCA00004017.  The letter concludes by stating that "in such circumstances . . . the Certificate

of Airworthiness of the Aircraft [is] no longer in force," and also stated that "the Aircraft must

not fly and should therefore not leave the airport where it is located, until the Bermuda Civil

Aviation Authority has been able to evaluate the matter further."  *Id*.  Plaintiff also terminated

the leasing of the '119 Aircraft on March 11, 2022.  Pl. Ex. 54.  Defendants did not have the

legal ability to fly the Aircrafts out of Russia and return them to Plaintiff.  To do so would have

been unsafe and prohibited pursuant to the actions of the BCAA.

Defendants asserted at trial that the action of the BCAA should not be deemed an Event

of Loss because the BCAA provided the possibility that the Aircrafts could be deregistered in

Bermuda and re-registered in Russia.  Specifically, the March 14, 2022 general notice took note

of the fact that the Russian Federation had "issued a directive to have Bermuda registered aircraft

re-registered in the Russian Federation without first being de-registered by BCAA."  Pl. Ex. 36.

Although the Notice stated that such action would be illegal because "dual registration is strictly

forbidden," it offered the possibility that BCAA would "deregister aircraft on request from the

registered owner, in accordance with relevant BCAA legislation and procedures, that ensures an

aircraft is not deregistered until a registered mortgage . . . deregistration and export request

authorization . . . is discharged."  *Id.*  In that event, registration could be transferred.  *Id.*

Defendants appear to argue that to the extent the Aircrafts were rendered unfit to fly, that event

was of Plaintiff's own manufacture—Plaintiff could have caused the Aircrafts to be de-registered

in Bermuda and their registration transferred to Russia.

Defendants' argument fails.  Defendants do not have the right to cause Plaintiff under the

Lease Agreements to transfer registration of the Aircrafts from Plaintiff's preferred registry to

Defendants' home registry.  As noted, the Lease Agreements define the "State of Registry" as "Bermuda or such other country or state of registration for the Aircraft as Lessor may, subject to Lessee's prior communication and agreement, approve in writing."  Pl. Ex. 1, § 1.01, at BOCA_00004250.  It gives Plaintiff, as the owner of the Aircraft, the prerogative to determine the regulatory authority that will govern whether and under what circumstances the Aircraft should be permitted to fly.  Indeed, under the Lease Agreement, Plaintiff had the right, upon the Event of Default, "without the need for any consent, authorization, or action of Lessee," both to "cause the Aircraft to be deregistered" by Bermuda "*and* to cause all rights of Lessee in respect of the Aircraft and this Lease . . . resulting from the registration of the Aircraft . . . with the Aviation Authority – Bermuda, the Aviation Authority – Russia or otherwise, to be terminated and extinguished." *Id*. § 19.03(d), at BOCA_00004299–4300 (emphasis added).  Finally, if more were required, Defendants also have not offered evidence that the conditions that the BCAA imposed upon deregistration and transfer were or could have been satisfied.  Thus, even if Plaintiff somehow was under an obligation to transfer the registration of the Aircrafts, Defendants have not shown that Plaintiff would have been able to effect a transfer of registration.

That the use of the Aircrafts "in the normal course of air transportation" has been prohibited by action of a Government Body or an Aviation Authority is further corroborated by Defendants' own statements and admissions.  The record is replete with evidence, including statements from Defendants themselves, that they could no longer operate the Aircrafts.  Immediately in response to the leasing termination notices, AirBridge stated that the "Aircraft ha[ve] been removed from the commercial operations and has been grounded in . . . Moscow." Pl. Ex. 32.  In a March 17, 2022 call, AirBridge reiterated that they had "stopped operating all aircraft commercially," that "[m]ost of ABC's fleet is grounded in Russia," and that "ABC was

not able to find any solutions to date how to continue to operate."  Pl. Ex. 37 at BOCA_00039884.  On March 19, 2022, Insider published a news article titled "Russia's biggest cargo airline suspends all Boeing flights amid sanctions that cut off the supply of most aircraft and parts," which stated that "Volga-Dnepr Group has halted all Boeing flights as Western sanctions hit supply chains," and that it "had suspended operations of AirBridgeCargo."  Pl. Ex. 39.  In a June 22, 2022 letter from AirBridge to the Minister of Transport of the Russian Federation, AirBridge stated that the "operation of [AirBridge's fleet of Boeing aircraft] . . . has become impossible for the Airline due to sanctions imposed by unfriendly jurisdictions."  Pl. Ex. 46 at ABC000524.  The letter explained that "safe operation and maintenance of the aircraft . . . due to its uniqueness . . . is impossible due to Council Regulation EU 2022/328."  *Id.*  An August 10, 2022 news article indicated that Volga-Dnepr had fired 200+ pilots and was only retaining a "skeleton crew" of Boeing pilots.  Pl. Ex. 48.  All of this evinces that the "normal course of air transportation" has been prohibited by the actions of Government Bodies following the Russian invasion of Ukraine.

Although it is somewhat of a closer question, the Court also concludes that a "seizure" occurred within the meaning of clause (d).  The Court rejects Defendants' argument that, for there to be a "condemnation, confiscation, or seizure of, or requisition of title to, or requisition of use" of the Aircrafts, the Russian Federation must have taken possession of the Aircrafts.  *See* Tr. 20.  Defendants offer no legal support for that argument.  The language used by clause (d) is broad and seemingly all-encompassing.  It includes government actions that might involve the government taking possession of the Aircrafts (*i.e.*, confiscation), as well as actions such as condemnation and requisition of title or of use that would not necessarily involve the taking of possession.  *See*, *e.g.*, Tr. 49 (describing a program "where the U.S. Government is allowed to

requisition the use of aircraft operated by U.S. airlines.  The airlines remain in possession of the aircraft under this program, but they can be used to, for example, move troops or equipment around, to support a war effort."); *United States v. W. Tex. Cottonoil Co.*, 155 F.2d 463, 467 (5th Cir. 1946) ("[D]efendant's cotton, was requisitioned by the Government under the law of July 11, 1938.  Defendant's cotton was not, however, physically taken into possession by GIRC, but under agreement with GIRC was handled for it by [defendant's parent entity]."); *William Wrigley, Jr., Co. v. United States*, 75 Ct. Cl. 569, 582 (1932) ("Under the statutes physical possession was not necessary to validate such an expropriation.  In fact, in many cases, there was never any physical possession.  The nature of the case did not always require it, nor was it contemplated.  The requisition itself with its attendant notice, transferred the contract and the contract rights, and it was obligatory."); *Standard Oil Co. v. United States*, 61 Ct. Cl. 951, 955 (1926) (distinguishing a tank steamer that was subject to a requisition notice or order of October 12, 1917, but was nonetheless allowed to remain within physical possession of the plaintiff for some time).

In analogous contexts, the Supreme Court has held that the government need not take possession of property in order to seize it.  A "'seizure' of property" occurs "when there is some meaningful interference with an individual's possessory interests in that property."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *see also Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.*, 363 F.3d 177, 185 (2d Cir. 2004) (same).  That definition arises from the "oft-repeated definition of the 'seizure' of a person within the meaning of the Fourth Amendment—meaningful interference, however brief, with an individual's freedom of movement."  *Jacobsen*, 466 U.S. at 114 n.5.  It is sufficiently meaningful of an interference, in those contexts, that the Government take one of the rights commonly associated with ownership, such as the right to

exclude or use.  *See*, *e.g.*, *United States v. Greene*, 2022 WL 1488570, at *7 (D. Conn. May 11,

2022) (noting brief detention of motor vehicle constitutes a seizure) (citing *Whren v. United

States*, 517 U.S. 806, 809 (1996))); *United States v. O'Neill*, 239 F. Supp. 3d 651, 659

(W.D.N.Y. 2017) (finding that a seizure occurred when the state permitted only emergency

responders to enter a garage and prevented the garage door from being closed); *Carpenter v.

Koskinen*, 2015 WL 3510300, at *4 (D. Conn. June 4, 2015) (noting that a possessory interest,

for the purposes of a seizure, includes the "right to exclude others from access to such

property").  For the Government to seize property, it need not take it permanently.  *See*, *e.g.*,

*Greene v. David*, 41 F. Supp. 2d 167, 171 (N.D.N.Y.), *aff'd*, 199 F.3d 1322 (2d Cir. 1999) ("The

Court has no trouble concluding that a forced ejection from property, even for a brief period,

constitutes such an interference and thus a seizure of property."); *Picard v. Torneo*, 2019 WL

4931353, at *6 (D. Conn. Sept. 16, 2019), *on reconsideration*, 2019 WL 4933146 (D. Conn.

Oct. 4, 2019) ("Once property has been taken away from a person, it has been 'seized' regardless

of the duration of the seizure.").

     Plaintiff has shown that the '117 and '119 Aircrafts were seized within the meaning of

the lease.  Defendants rely on the language of Regulation 311 in isolation and without context to

support the notion that a seizure was not effected.  The language introduces what purports to be

an export ban for a number of products, including aircraft and parts of aircraft, with a number of

exceptions, including "on goods exported from the territory of the Russian Federation for the

purpose of ensuring the activities of military formations of the Russian Federations located on

the territories of foreign states."  Def. Ex. N at ABC000537.  If the Court were limited to the

plain language of Regulation 311 and required to ignore the actual limitations on use of the

Aircrafts and the conduct of the Russian Federation, it might agree with Defendants that there

was no seizure.  An export limitation itself does not necessarily effect a seizure, so long as the limitations do not infringe on those property rights negotiated and preserved by the parties under the Lease Agreements.  The Lease Agreements elsewhere refer to compliance with export controls and trade and economic sanctions laws.  Section 7.03 on "Lawful Operations" under the Lease Agreements forbids the Lessee to "employ, suffer or cause the Aircraft to be used in any business which is forbidden by applicable Law, including without limitation any United States export and re-export controls and trade and economic sanctions laws and regulations, or in any manner which may render the Aircraft liable or susceptible to condemnation, destruction, seizure, or confiscation by any Government Body."  Pl. Ex. 1 at BOCA_00004267.[12]  If the parties had intended every export limitation or sanctions law alone to constitute an Event of Loss, they certainly had the means and ability to say so expressly.

Plaintiff has proven that the Russian government has effected a seizure because of the effect that Regulation 311 has on the respective rights and duties of the parties under the Lease Agreements and because of the conduct of the Russian Federation (whether or not pursuant to Regulation 311).  In the first instance, on the facts here, Regulation 311 does not just prohibit the export of the '117 and '119 Aircrafts to particular countries or under particular circumstances. Regulation 311 appears to flatly prohibit the use of the '117 and '119 Aircrafts outside the Russian Federation, save perhaps to areas in Ukraine or for the purposes of war, and does so even if the purpose of the use is to return the '117 and '119 Aircrafts to its owner and to comply with AirBridge's legal duties under the Lease.  Def. Ex. N at ABC000537.  Plaintiff had already

---

[12] It is evident that the obligations arising under an Event of Loss may occur in tandem with Defendants' compliance with Section 7.03.  The two scenarios are not mutually exclusive. Payment of the Stipulated Loss Value, and transfer of title of or payment for engines located outside of Russia, would not violate Section 7.03, which applies only to lawful operations of the Aircraft in question.

declared an Event of Default prior to Regulation 311 and triggered its right to retake the '117 and '119 Aircrafts, and AirBridge's corresponding duty to return the Aircrafts.  While it is a different and more difficult question whether the Russian government would have meaningfully interfered with Plaintiff's ownership interest in the Aircrafts or AirBridge's contractual rights to operate the Aircrafts if—for a period within the lease term—AirBridge were limited to commercial flights within the territory of the Russian Federation, those are not the facts here.  Instead, the facts here are that, upon the notice of an Event of Default and the request by Plaintiff to AirBridge that it return the Aircrafts, AirBridge no longer had a right to operate the Aircrafts in any territory, Plaintiff had a right both to possess the Aircrafts and to exercise all of its ownership interests in the Aircrafts, and AirBridge had a duty to return the Aircrafts.  On Defendants' own account, Regulation 311 frustrated both Plaintiff's rights and AirBridge's duties.  Under these circumstances, where Regulation 311 has prohibited Plaintiff from possessing and exercising its rights with respect to the Aircrafts, it cannot be said that there was no seizure of the Aircrafts, even if the Aircrafts are not in the physical possession of the Russian government.

Moreover, Regulation 311 cannot be read in isolation.  On April 4, 2022, Defendants wrote Plaintiff regarding additional resolutions adopted by the Russian Federation, including those that conditioned any movement of the Aircrafts outside the Russian Federation on approval not just of the Ministry of Transport or the Federal Air Transport Agency but also of the Federal Security Service and the Ministry of Defence.  Pl. Ex. 43 at BOCA_00002957.  As of August 1, 2022, the Russian government imposed still further limitations on the exercise by Plaintiff of its rights with respect to the Aircrafts.  According to Defendants, the Russian government required that, as a condition to the return of the Aircrafts to Plaintiff, that the Russian government be provided with "confirmations/undertakings from lessors that (i) aircraft will not be [seized] if

36

exported out of Russia; (ii) aircraft will not be used to carry weapons etc. that could be used in the Ukraine conflict and (iii) the aircraft will continue to service non-sanctioned cargo export to and from Russia (food, medicines etc.)." Pl. Ex. 47 at BOCA_00039875.[13]  It is a fair inference from these documents, and one that the Court draws, that the Russian Federation (1) has taken the Aircrafts for its use, including for the delivery of food and to prevent them from being used against it in the Ukraine war and (2) that it has seized the Aircrafts by preventing the Aircrafts from being returned save upon the issuance of undertakings from the Lessor on how the Aircrafts can be used in the future.  That seizure constitutes "meaningful" interference with Plaintiff's property rights due to the contractual duties and expectations that the parties negotiated in the case of an Event of Default.  The undertakings that the Russian Federation has insisted upon would frustrate the ability of Lessee to return the Aircraft to Plaintiff such that Plaintiff could possess the Aircraft in their "absolute discretion" and "as if the Lease Agreement had never been entered into." Pl. Ex. 1, § 19.06, at BOCA_00004511.  There thus is sufficient evidence to meet Plaintiff's burden to show an Event of Loss in the form of a seizure.

---

[13] Plaintiff also produced a letter from AirBridge to the Ministry of Transport evincing why the Russian government is unlikely to allow export of the Boeing aircraft.  The letter states that the Boeing aircraft only continue to accrue monthly losses and that there are other and better options for "maintain[ing] the cargo traffic for the Russian Federation" and "ensuring the cargo traffic of consumer goods to the regions of the Far North and the Far East," in part because of the "length of the runway, taxiways, ramp, the availability of equipment for unloading aircraft"—the inference being that the Russian Federation is planning to requisition, or at the very least has seized (by not allowing to leave), large cargo planes such as Plaintiff's to serve their national efforts during the Ukraine conflict.  Pl. Ex. 46 at ABC000524–525.  In fact, one of Defendants' defenses expressly asserts that such export is impossible, stating that "[i]t has been—and remains—impossible for Defendants to remove the Aircraft, the MSN 60118 Engines, and the Original Records from Russia due to the ongoing War and the sanctions and regulations imposed thereby," and describes such a permit as a "special authorization."  Def. Pretrial Br. at 5.  That defense fails namely because the parties anticipated such an outcome in their contract as an Event of Loss, as articulated later in this Opinion and Order.

Similarly, Regulation 311 by its own terms effected a seizure, or an Event of Loss, for the BOCA Engines remaining in Russia.  The parties stipulated that "[i]n March 2022, the Russian Government issued a set of export restrictions that prevented export from Russia of aircraft *and aircraft engines* unless Russian government approval was obtained."  Dkt. No. 143-1 ¶ 31 (emphasis added).  Regulation 311 applies to "Parts of aircraft of heading 8801, 8802, or 8806" Def. Ex. N at ABC000546, with heading 8802 encompassing "Other aircraft (for example, helicopters, aircraft),"  *id.*  The export ban applied to that list, and by extension, the BOCA Engines, as "[p]arts of aircraft."  *Id.* at ABC000537.

Furthermore, to the extent that there is any ambiguity in the record regarding the meaning of the messages from and conduct of the Russian Federation, Defendants had it within their peculiar ability to call a witness, including the representatives of Defendants who spoke to the actions of the Russian Federation, to try to explain away those actions of the Russian Federation. Recognizing the limited ability of those within the Russian Federation to travel, the Court granted the request of Defendants to have their witnesses testify remotely.[14]  Dkt. No. 127 at 14. Plaintiff also consented to remote testimony.  *Id.*  Up until the filing of the final pretrial order, Defendants indicated their intention to call witnesses remotely from the Russian Federation.  The Court reiterated its permission at the time of final pretrial conference.  Pretrial Conf. Tr. 4. Defendants declined to produce a witness, but not because of any technical or legal restrictions on calling a witness remotely from the Russian Federation.  *Id.* at 4.  Defendants stated at the time of final pretrial conference that they did not think that they needed a witness.  *Id.*  The Court agrees with Defendants that, as a general matter, where a party fails to offer sufficient evidence

---

[14] Certain defense witnesses may not have been within the Russian Federation.  Volga-Dnepr is a Netherlands corporation and Rainbow is an Ireland Corporation.

to support a finding as to an essential element of a claim, it may not meet that burden on the basis of a missing witness inference.  Tr. 121.  At the same time, however, where (as here) there is sufficient evidence to support each element of the claim, and where a witness could have been called by the defendant, the defendant was in the best position to call the witness, and the witness would have given important new testimony, then the Court as factfinder is permitted but not required to infer that the testimony of the witness would have been unfavorable to that defendant.  *See*, *e.g.*, Sand et al., Modern Federal Jury Instructions: Civil, Instruction 75-3 (2023); *see also 4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202, 211 n.7 (2d Cir. 2019) (noting that the adverse inference is permissible in bench trials); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 700 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d Cir. 2016).  All of those conditions are satisfied here where, if the Court is misinterpreting the conduct and the actions of the Russian Federation as relayed by Defendants, Defendants could have called a witness to rebut Plaintiff's arguments and to disabuse the Court of those notions.  For example, Denis Fisenko is identified in the record as the General Director of AirBridge and is often the signatory to agreements and official communications from AirBridge.  *See*, *e.g.*, Pl. Ex. 3 at BOCA_00004412, Pl. Ex. 32 at BOCA_00003659; Pl. Ex. 57.  As the General Director of AirBridge physically located in Russia, he is more available to Defendants than to Plaintiff.  Defendants failed to call him and thus the Court draws an inference against Defendants with respect to the acts of the Russian Federation.[15]

---

[15] Defendants cite *United States v. Dawkins*, 999 F.3d 767, 796 (2d Cir. 2021) in their response, *see* Tr. 121, but that case did not involve an employee of a party, and thus the witness was not "peculiarly within the power" of the defendants to call.  *See United States v. Caccia*, 122 F.3d 136, 138 (2d Cir. 1997); *United States v. Beekman*, 155 F.2d 580, 584 (2d Cir. 1946); *Donziger*, 974 F. Supp. 2d at 700.  Further, unlike the government in *Dawkins*, the Defendants had represented that they intended to call Fisenko until the filing of their joint pretrial order, when they finally indicated that they did not intend to call any witnesses, including Fisenko.

### C.   AirBridge Is Not Relieved of the Obligation to Satisfy the Remedial Obligations of the Lease by the Doctrine of Impossibility

Defendants next argue that they should be relieved from the consequences of an Event of Default or an Event of Loss, or that neither event should be deemed to have occurred, by virtue of the doctrine of impossibility.  Plaintiff argues that the conditions constituting the Event of Default and the Event of Loss were, in fact, foreseeable by the parties, and thus the impossibility defense must fail.  The Court agrees with Plaintiff.

Impossibility "excuses a party's performance only when the subject matter of the contract or the means of performance makes performance objectively impossible."  *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 22 (2d Cir. 2018) (quoting *Kel Kim Corp. v. Cent. Mkts., Inc.*, 519 N.E.2d 295, 296 (N.Y. 1987)).  "Moreover, the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract."  *Kel Kim Corp.*, 519 N.E.2d at 296; *Axginc Corp. v. Plaza Automall, Ltd.*, 759 F. App'x 26, 29 (2d Cir. 2018) (same).  "The [New York] Court of Appeals explained that a defense to contract performance such as impossibility should be applied narrowly and only in extreme circumstances due in part to judicial recognition that the purpose of contract law is to allocate risks."  *Gap Inc. v. Ponte Gadea New York LLC*, 524 F. Supp. 3d 224, 237 (S.D.N.Y. 2021) (quoting *Sher v. Allstate Ins. Co.*, 947 F. Supp. 2d 370, 383 (S.D.N.Y. 2013)); *see also RW Holdings, LLC v. Mayer*, 17 N.Y.S.3d 171 (2d Dep't 2015) ("[A] party seeking to rescind a contract [on impossibility grounds] must show that the intervening act was unforeseeable, even if the intervening act consisted of the actions of a governmental entity or the passage of new legislation.").

Defendants argue that it cannot be liable for an Event of Default because the Events of Default arose as a result of circumstances outside the control of Defendants.  Thus, for example,

Defendants argue that it was impossible for AirBridge to obtain hull insurance as a result of the sanctions imposed by the European Union.  But the section in the Lease Agreements defining Events of Default does not speak to fault.  It states that "[t]he following events shall constitute Events of Default . . . whether such events shall be voluntary or involuntary or come about or be effected by operations of law or pursuant to or in compliance with any judgment, decree, order, rule or regulation of any Government Body."  Pl. Ex. 1 Art. 18, at BOCA_00004504.  It thus allocates risk as between Lessor and Lessee.  Under the Lease, Lessee has responsibility, for example, for maintaining hull insurance.  If it fails to maintain such insurance, the Lessor is entitled to the return of the Aircraft.  The Lease Agreements are indifferent as to whether the failure to maintain hull insurance is the result of some voluntary or willful act of the Lessee or simply because the Lessee cannot obtain the insurance, whether it ceases to be available on the open market, or as a result of the act of some Government Body.  In either event, where the Aircraft is no longer protected by and covered by hull insurance, the Lessor is entitled to its return.  Similarly, the failure of Defendants to maintain commercial operations, or to pay its rent, also constitute Events of Default even if those events were a result of an act of a Government Body.

The same is true as to an Event of Loss.  Defendants argue that it was impossible for the Defendants to ground the planes outside of Russia because there was a Russian order that required them to fly the planes back to Russia.  Def. Pretrial Br. at 5.  They also argue that it is now impossible for them to return the planes absent a permit from the Russian Federation under Regulation 311.  *Id.*; *see also* Tr. 14–15.  But, while those factors might be relevant to the question of whether the Court issues specific performance, they are not relevant to the question of an Event of Loss.  All kinds of Events of Loss may occur outside the control of the Lessee and

might frustrate the ability of the Lessee to return the aircraft or the engines or parts.  Section 1.01 speaks of the loss of an Item of Equipment or the "theft, destruction, [or] damage" of the Aircraft as being Events of Loss.  Those events ordinarily are not within the control of the Lessee; they may arise as a result of accident or of sabotage.  But that does not make them any less Events of Loss.  It is precisely the point of the Event of Loss provision to allocate the risk of the occurrence of those events between the Lessee and Lessor during the term of the lease.  The provision requires the Lessee—while it has the right to possession of the Aircraft under the Lease Agreement—to compensate the Lessor if such circumstances occur in exchange for all of Lessor's rights and title to the Aircraft.

So too the events set forth in clauses (d) and (e).  The "condemnation, confiscation, seizure of, or requisition of title . . . [or] of use" of property is by definition involuntary.  If it were volitional, it would not be a seizure but a relinquishment.  It can be presumed that when a "government body" or "aviation authority" issues a rule or takes an action that prohibits the "normal course of air transportation," such action is taken without the consent of the Lessee; it is the government body or aviation authority that imposes such condition.  But that does not make them any less of an Event of Loss.  They are Events of Loss because they frustrate the ability of the Lessee to return the aircraft or the engines or parts.  If those events occur before the lease is terminated, AirBridge is required to compensate BOCA for them.  Defendants' argument could not be accepted without frustrating the entire purpose of the Event of Loss provisions.  The impossibility of avoiding an Event of Loss is thus irrelevant to whether the parties must bear the consequences of an Event of Loss under the Lease Agreements.

## II.    Relief

Plaintiff submits calculations for its request for relief through April 14, 2023.  It divides up the request for relief into (A) equipment values, (B) rent, (C) technical and repossession costs,

and (D) default interest at the Incentive Rate before April 14, 2023.  Pl. Ex. 66.  It further

provides figures for (E) additional damages in terms of daily default interest after April 14, 2023,

and (F) additional daily rent for the '117 and '119 Aircraft after April 14, 2023.  *Id*.  The Court

will treat each category in turn and adjusts the granted relief to reflect the date of this Opinion

and Order.

### A.    Equipment Values

For the equipment values, Plaintiff asserts that it is entitled to the Stipulated Loss Values

of the '117 and'119 Aircrafts.  Those amounts are $148,723,980 and $152,882,381, respectively.

These provisions operate as liquidated damages clauses.  Under New York law, "[l]iquidated

damages are not penalties if they bear a reasonable proportion to the probable loss and the

amount of actual loss is incapable or difficult of precise estimation."  *United Air Lines, Inc. v.

Austin Travel Corp.*, 867 F.2d 737, 740 (2d Cir. 1989).  "The salutary effect of the clause is to

relieve the parties—on both sides—of the often arduous and sometimes unpredictable exercise of

litigating the precise sum of actual damages after-the-fact in a court proceeding where certain

and definite damages are not susceptible of calculation with a fair amount of precision."  *EMA

Fin., LLC v. AppTech Corp*., 2022 WL 4237144, at *14 (S.D.N.Y. Sept. 13, 2022).  "[T]he party

opposing enforcement of a liquidated damages provision bears the burden of proving that the

provision operates as a penalty."  *FCS Advisors, Inc. v. Fair Fin. Co., Inc.*, 378 F. App'x 65, 68

(2d Cir. 2010).  The evidence here is undisputed that the Stipulated Loss Values are "consistent

with the most recent appraisal values for the aircraft obtained by BOCA," obtained "from

internationally recognized, qualified appraisal firms."  Walton Test. ¶ 69.  There is no reason to

disturb these amounts.  Defendant did not argue that these provisions were unenforceable

penalties at trial.  Accordingly, Plaintiff is entitled to these amounts.  Once Plaintiff has received

the Stipulated Loss Value in respect to an aircraft, the due and unpaid rent, and interest according

to the relevant Lease Agreement, the obligation to pay Maintenance Rent and Basic Rent will terminate and AirBridge will be entitled to all right, title and interest of Plaintiff in the aircraft. Pl. Ex. 1, § 12.01, at BOCA 00004280–4281.

Plaintiff also requests damages from AirBridge for its failure to satisfy its obligation under Section 19.02 of the Lease to "return promptly" the engines, Pl. Ex. 1 § 19.02, at BOCA_00004298, as well as for its breach of its obligation to secure replacement engines of "a value and utility at least equal to . . . the Engine with respect to which such Event of Loss occurred," *id*. § 12.02, at BOCA_00004281.  It is undisputed that Plaintiff is entitled to those remedies once an Event of Default or an Event of Loss has occurred.  Plaintiff calculates those damages as $28,301,288.  This figure is based on the number of cycles remaining on each engine until they require a performance restoration shop visit, or a complete refurbishment.  *Id*. § 17.05, at BOCA_00004293; Pl. Ex. 66 at 3–6; Walton Test. ¶ 70.  Based on those calculations, BOCA Engine ESN 959452 is worth $14,117,402 and BOCA Engine ESN 959449 is worth $14,183,886.  Walton Test. ¶ 70.  Defendants do not dispute these figures.  Accordingly, Plaintiff is entitled to $28,301,288 for the two Engines.

### B.    Rent

Plaintiff also claims damages for the unpaid rent now due and owing for all three Aircrafts.  For the '117 and '119 Aircrafts, Plaintiff is entitled to recover monthly rent payments that would be due pursuant to both Section 12.01(b) for an Event of Loss and Section 19.05(a) for an Event of Default.  Section 12.01(b) provides that "the obligation of Lessee to pay [rent] shall terminate after receipt by Lessor of the sum of [the due and unpaid rent, the stipulated loss value, and interest]."  Pl. Ex. 1, § 12.01, at BOCA_00004281.  As for the Events of Default, Plaintiff is entitled to monthly rent payments until the date of judgment pursuant to Section 19.05(a), which allows for payment of "Rent which would have been due from the return of the

Aircraft to Lessor until the Aircraft is placed on lease or otherwise disposed of by Lessor." *Id.* §

19.05(b), at BOCA_00004301.  Schedule 1 to the Lease Supplement defines the Basic Rent at

$1,200,000 per month per installment, with the exception of payment for Month 14.  Pl. Ex. 1 at

BOCA_00004324.  All three Aircraft are paid at the same Basic Rent rate.[16]  *See also* Pl. Ex. 3 at

BOCA_00004533 ('118 Aircraft), Pl. Ex. 5 at BOCA_00040957 ('119 Aircraft).  The

application of that rate to the months between March 13, 2022, or the first missed rent payment

for the '117 Aircraft, to the date of this Opinion and Order (April 11, 2023), yields the figure of

$15,560,000.  Likewise, the application of that rate to the months between April 1, 2022, the first

missed rent payment for the '119 Aircraft, to April 11, 2023, yields the figure of $14,840,000.

These figures can also be reached by subtracting the daily rent figure of $40,000 per day from

the April 14, 2023 figures, both provided by Plaintiff.  The missing rent due for the months

between March 16, 2022, the first missed rent payment for the '118 Aircraft, to December 30,

2022, or the date on which Plaintiff signed the new lease with Hongyuan, yields the figure of

$11,380,645.  Pl. Ex. 66.

### C.    Technical and Repossession Costs

Plaintiff also claims damages for technical and repossession costs for the '118 Aircraft.

Plaintiff first claims $7,200,000 based on AirBridge's failure to deliver replacement engines.[17]

---

[16] The '118 Airplane does not have an exception for Month 14.  That distinction is irrelevant
because the time period of missing payments does not encompass Month 14.

[17] Plaintiff only seeks the difference between these damages and the compensatory sanctions
previously awarded by this Court.  It does not seek double recovery for those damages.  Tr. 114.
The parties agree on this point.  The Court thus directs the parties to jointly submit a proposed
order that would address how the Court should treat the compensatory sanctions to ensure there
is no double recovery.  *See* Dkt. No. 91, Dkt. No. 127.  The Court will receive supplemental
briefing addressed to the question of how the Court should handle the remaining coercive
sanctions payable to the Court.  Letter briefs addressed to that subject shall be submitted within
one week of the date of this Opinion and Order.

Second, Plaintiff claims damages for technical costs of recovery under Section 19.02(b) for an Event of Default, which provides that Plaintiff is entitled to:

> all reasonable costs and expenses incurred in connection with recovering possession, deregistration, exportation of the Airframe or any Engine and/or all reasonable costs and expenses in placing such Airframe or Engine in the configuration, condition and repair required by and all lost Rent payments during such recovery and reconditioning.

Pl. Ex. 1, § 19.05(b), at BOCA_00004301.  With the Court's permission, Plaintiff has submitted a separate spreadsheet outlining those damages for the '118 Aircraft, including a column entitled "Other evidence" indicating the exhibit or evidence that supports those damages.  Dkt. No. 147-1.  The Court has excluded all costs that do not have supporting evidence.  It also has offered testimony that the costs reflected in the spreadsheet are all "with respect to the repossession of MSN 60118 and preparation of it to be leased to Honguan [sic]."  Walton Test. ¶ 65.  Defendants did not cross-examine Walton on these costs, but argued that the evidence is insufficient to support certain of these charges.  Dkt. No. 148.

The evidence supports some but not all of Plaintiff's requested damages.  As Defendants argued at trial, Plaintiff is entitled to the reasonable costs it incurred with respect to the repossession of the '118 Aircraft, but it is not entitled to costs it would have incurred in preparing the aircraft for lease to Hongyuan if it would have incurred those costs anyway, had the lease not been terminated earlier.  Thus, Walton's testimony cannot support each charge reflected in Plaintiff's spreadsheet.  In particular, certain of the items have no supporting evidence.  Those items are equally likely to have been incurred in connection with the repurposing of the aircraft for Hongyuan as with respect to the repossession and reconditioning of the aircraft.  The Court has eliminated those costs from its calculation of Plaintiff's recoverable damages.  Other costs are not disputed by Defendants and appear on their face to be consistent with the repossession of the aircraft.  Plaintiff is entitled to those costs.  As to the

Adhetec invoices, the Court agrees with Defendants that there is no evidence in the record that the "HY Livery decal" was related to removal of the old decal, as opposed to putting on a new decal for Hongyuan, which Defendants were not obliged to do under the Lease Agreements.  As to the Ascent charges, the Court finds supported the storage and parking costs; the Court excludes the "RTS from storage" charge, as it is unclear what RTS stands for or means based on the record; and includes the storage charges for the Rainbow and SBLI Engines as necessary to place the Aircraft in the return conditions required by Schedule 2 of the Lease Agreement.  *See* Pl. Ex. 5 at BOCA_00041010.  The Eastway Global Forwarding charges are excluded.  There is no explanation for the fan case dolly transportation charge or why charges related to ESN 959448, a BOCA engine attached to the '118 Aircraft, should be included.  Therefore, the GE Evergreen Engine Services charges are also excluded.  The costs of installing the Hongyuan Engines, ESN 959262, and ESN 959263, are included as necessary to restore the condition of the plane to the condition it was required to be in upon return.  Finally, Plaintiff seeks recovery for the estimated cost of the repair of exchange parts, but the Lease Agreements provides for the recovery only of costs incurred.  There is no evidence that these costs have been incurred. Accordingly, they are excluded.  Finally, the Hongyuan logistics company charge is excluded because there is no indication in the record of what those costs are.  Dkt. Nos. 147, 147-1.

Those figures supported by evidence yields the figure of $1,053,991 for the '118 Aircraft. The Court also awards the amount of $7,200,000, the calculation of which was undisputed between the parties.

### D. Default Interest at the Incentive Rate

The Lease Agreements also allow for the accrual of interest at the "Incentive Rate," which the Lease Agreements define as "a per annum interest rate equal to the Prime Rate plus three percent (3%), or the maximum rate permitted by applicable law, whichever is less,

calculated on the basis of a year of 360 days and actual days elapsed."  Pl. Ex. 1, § 1.01, at

BOCA_00004245.  The Event of Loss and Event of Default provisions allows for the application

of the Incentive Rate to the outstanding balances due under those provisions.  For the Event of

Loss, the Lease Agreements provide that there shall be additional damages of "interest at the

Incentive Rate on the unpaid balance of [the due and unpaid Rent] and [the Stipulated Loss

Value] until paid in full."  *Id.* § 12.01, at BOCA_00004281; *see also id.* § 5.02 (providing the

payment of the Incentive Rate on any part of any installment of Basic Rent not paid on the due

date therefor for any period for which the same shall be overdue).

Based on the foregoing, Plaintiff seeks interest to April 14, 2023 of $11,749,414 for the

'117 Aircraft, $11,979,423 for the '119 Aircraft, and $2,870,471 for the '118 Aircraft and its

engines.  Defendants do not challenge that calculation.  The Court adjusts those values for the

date of this Opinion and Order to $11,598,747 for the '117 Aircraft, $11,825,568 for the '119

Aircraft, and $2,834,096 for the '118 Aircraft.[18]  The Court awards those interest damages to

Plaintiff.

### E.    Daily Default Interest after April 14, 2023

Plaintiff also seeks default interest at the same rate after April 14, 2023, to the extent it is

applicable.  That would accrue at a daily amount of $50,235 for the '117 Aircraft, $51,285 for

the '119 Aircraft, and $12,125 for the '118 Aircraft.  The Court declines to award the post-

---

[18] The interest figure is calculated by using the daily default interest figures in section (E) on page 1 of Plaintiff's Exhibit 66.  All of those figures, with the exception of the interest on the outstanding rent figure for '117 Aircraft, can be multiplied by three days (for the number of days between April 14, 2023 and April 11, 2023), with the resulting amount subtracted from the prior interest figure.  The only exception is for the outstanding rent figure for the '117 Aircraft, which overlaps slightly into the prior interest-bearing period ending on April 12, 2023, during which the daily default interest is $4,766, and not $4,791.  The Court thus subtracts $150,667 from the total default interest owed for the '117 Aircraft, $153,855 from the total default interest owed for the '119 Aircraft, and $36,375 from the total default interest owed for the '118 Aircraft.

judgment interest rate.  As previously noted, the interest provision in the Event of Loss section provides that interest accrues "at the Incentive Rate on the unpaid balance of (i) and (ii) above from the due date until paid in full."  Pl. Ex. 1, § 12.01, at BOCA_00004281.  Likewise, for unpaid rental payments under the Event of Default, Section 5.02 allows for the application of the Incentive Rate to Basic Rent and Supplemental Rent, which includes other liabilities incurred under the Lease Agreement, "until the same shall be paid."  *Id.* § 5.02, at BOCA_00004259.

"Under New York C.P.L.R. § 5001, a creditor is entitled to prejudgment interest on all sums due, as of the date they became due." *Cap. Ventures Int'l v. Republic of Argentina*, 552 F.3d 289, 296 (2d Cir. 2009).  "New York courts have long held that when an agreement involving an indebtedness 'provides that the interest shall be at a specified rate until the principal shall be paid, then the contract rate governs until payment of the principal, or until the contract is merged in a judgment.'"  *NML Capital v. Republic of Argentina*, 952 N.E.2d 482, 488–89 (N.Y. 2011); *see also KLS Diversified Master Fund, L.P. v. McDevitt*, 532 F. Supp. 3d 126, 138 (S.D.N.Y. 2021), *aff'd*, 2022 WL 2759055 (2d Cir. July 13, 2022).  "Under New York law, contract language stating that a particular interest rate will accrue on a debt until the date of payment is interpreted as applying to the debt itself, and not to any judgment into which the debt is merged." *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 102 (2d Cir. 2004).  "If parties want to override the general rule on merger and specify a post-judgment interest rate, they must express such intent through 'clear, unambiguous and unequivocal' language." *Id.* (quoting *Banque Nationale de Paris v. 1567 Broadway Ownership Assocs.*, 669 N.Y.S.2d 568, 569 (1st Dep't 1998)).  There is no such clear, unambiguous, and unequivocal language overriding New York's statutory post-judgment interest rate.  *See* N.Y. C.P.L.R. §§ 5003 and 5004.  The Court thus applies New York's statutory interest rate of 9% for post-judgment interest.

### F.      Mitigation

In its pretrial briefing, Defendants argued that Plaintiff has failed to mitigate its damages with respect to Plaintiff's obligations to (1) procure replacement engines; (2) obtain an alternative lessee for the '118 Aircraft located in the United States; and (3) to attempt to have the planes and engines in Russia flown out of Russia.  Def. Pretrial Br. at 6–7.

"New York's courts adhere to the universally accepted principle that a harmed plaintiff must mitigate damages."  *Air Et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 494 (2d Cir. 1985).  It is the breaching party's burden to prove that a plaintiff could have lessened its damages.  *Id.* at 494.  "More specifically, the breaching party must show that the plaintiff unreasonably failed to minimize damages."  *Aristocrat Leisure Ltd. v. Deutsche Bank Tr. Co. Americas*, 618 F. Supp. 2d 280, 306 (S.D.N.Y. 2009) (quoting *Fed. Ins. Co. v. Sabine Towing & Transp. Co., Inc*., 783 F.2d 347, 350 (2d Cir. 1986)).  "However, if the course of action chosen by the plaintiff was reasonable, the plaintiff can recover despite the existence of another reasonable course of action that would have avoided further damage."  *Fed. Ins. Co*., 783 F.2d at 350; *see also Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp. 3d 323, 346 (S.D.N.Y. 2021) ("Failure to mitigate damages is an affirmative defense to a breach of contract claim, which requires the defendant to establish not only that the plaintiff unreasonably failed to mitigate, but that reasonable efforts would have reduced the damages." (internal quotation marks and citation omitted)); *Matsushita Elec. Corp. of Am. v. Gottlieb*, 1991 WL 152615, at *9, (S.D.N.Y. Aug. 1, 1991) ("Proof of mitigation of damages requires only a showing that plaintiff took reasonable steps to cut its losses, not that plaintiff did what the defaulting defendants would have had it do, or what in hindsight seems most effective to reduce the defaulting defendants' damages.").

The Court first addresses mitigation for obtaining possession, title, or export of the '117 and '119 Aircrafts.  Tellingly, while the Lease Agreements require Plaintiff to mitigate damages

with respect to the costs incurred in connection with recovering possession of the Aircrafts under

Section 19.05(b), they do not contain a mitigation of damages provision with respect to the

remedies for an Event of Loss.  That is because the occurrence of an Event of Loss is not a

breach by either party; it is a circumstance triggering duties for performance under the Lease

Agreement, and "[t]he duty to mitigate damages comes into play once there has been a *breach* of

a contract."  *U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 441 (S.D.N.Y.

2010) (Chin, J.) (emphasis in original).  Defendants here breached by failing to pay the

Stipulated Loss Value, accrued rent, and interest under the liquidated damages clause in Section

12.01 of the Lease Agreements.  Further, under New York law, "once liquidated damages are

awarded pursuant to a valid contract provision, the plaintiff need not make efforts to mitigate

those damages and subtract the mitigation from the liquidated damages award."  *Wells Fargo*

*Bank Nw., N.A. v. Taca Int'l Airlines, S.A.*, 315 F. Supp. 2d 347, 351 (S.D.N.Y. 2003) (Lynch,

J.); *see also JMD Holding Corp. v. Congress Fin. Corp*., 828 N.E.2d 604, 609 (N.Y. 2005)

("[W]here the court has sustained a liquidated damages clause the measure of damages for a

breach will be the sum in the clause, no more, no less."); *Delvecchio v. Bayside Chrysler*

*Plymouth Jeep Eagle, Inc*., 706 N.Y.S.2d 724, 727 (2d Dep't 2000) ("Mitigation of damages is

not relevant when there is a valid liquidated damages clause.").  Simply put, that Plaintiff "didn't

write a letter to Russia, and they didn't seek permission," Tr. 65–66, is irrelevant to the damages

for the Events of Loss of the '117 and '119 Aircrafts.

　　　　Second, Defendants argued at trial that BOCA "did not reasonably attempt to procure

replacement engines on its own," namely that engines were available and that it never reached

out to Rainbow despite knowing that Rainbow had two replacement engines available.  Instead,

according to Defendants, "[Plaintiff] chose to rely exclusively on pushing [D]efendants to do

so." Tr. 15. There is no liquidated damages clause for the engines. Plaintiff seeks actual

damages. Plaintiff thus was under a common law duty to mitigate. Defendants have failed to

show, however, that Plaintiff failed in that duty. The evidence at trial, including that from Mr.

Walton, did not show that any of the proposed steps from Defendants would have been

reasonable or that Plaintiff's proposed steps were unreasonable. Walton testified to the

following:

> BOCA also tried to locate other engines for MSN 60118 but, due to market
> conditions, was unable to do so on terms that were economical for BOCA to rent
> or buy similar engines. In addition, GEnx-2B67/P engines went out of production
> last year and the cut-off date for orders of new engines, as advised by GE Aviation,
> lapsed on June 15, 2021. The supply of GEnx-2B67/P engines on the aftermarket
> remains very limited, and it is not economically feasible for BOCA to purchase
> replacement engines for re-leasing.

Walton Test. ¶ 51. Plaintiff also pursued a title swap of the two engines, which Defendants

*themselves* proposed when Plaintiff and Defendants met in Abu Dhabi. *Id*. ¶ 50. Plaintiff also

entertained a physical swap of the engines in the United Arab Emirates before the proposed title

swap. *Id*. ¶ 49. Plaintiff, again, also sought and received Department of Commerce approval for

those swaps. None of these options—proposed by Defendants—were unreasonable; and the fact

that there may have been a more reasonable option does not as a matter of law show that Plaintiff

failed to sufficiently mitigate its damages. To be sure, Plaintiff did not attempt to procure the

engines from Rainbow itself; but that was hardly an unreasonable decision, given that

Defendants had continually conveyed to Plaintiff that those engines were, in fact, under the

common ownership or could easily fall under the ownership of Defendants by referring to them

as "our engines." *See*, *e.g.*, Tr. 33. Thus, it was not unreasonable for Plaintiff to have taken the

steps that it did.[19] There is likewise no evidence that the steps that Defendants propose were

---

[19] Defendants also elicited testimony that Plaintiff had an offer to procure an engine from
General Electric. However, during redirect, Plaintiff revealed why that option was not a

reasonable.  The engine for sale from General Electric was priced too high and General Electric was only selling one engine; General Electric had also discontinued production of the engines. Defendants have not shown the existence of replacement engines that would be reasonable replacements for mitigation of the rental damages from the re-lease of the '118 Aircraft.

Finally, Defendants argue that Plaintiff failed to mitigate by obtaining an alternative lessee for the '118 Aircraft located in the United States.  On that theory, they presumably argue that the missing rent that Plaintiff is seeking is greater than that to which it is entitled.  But Defendants point to no alternative deal that Plaintiff passed up, or demonstrate how the lease to Hongyuan was unreasonable.  Walton testified that "BOCA's inability to promise delivery of that aircraft with a full complement of four engines hampered those [re-leasing] efforts."  Walton Test. ¶ 52.  He also testified that "BOCA was only able to find one lessee that was willing to (a) lease MSN 60118 with only two engines owned by BOCA and (b) take on the risk associated with sourcing two of its own spare engines."  *Id*. ¶ 53.  All that Defendants elicited on cross examination was that BOCA "had a lot of interest for the releasing," Tr. 46, but they did not elicit that any of the "25 to 30 airlines contacted," other than Hongyuan, were willing to sign a lease.

## III.   Specific Performance

Finally, Plaintiff seeks specific performance for the remaining engines in Russia as an alternative remedy.  *See* Dkt. No. 143 at 7.  Because damages are an adequate remedy for Plaintiff, Plaintiff's alternative relief of specific performance of possession and control of the

---

reasonable substitute: "The asking price was approximately $20 million, and there was only one engine available at the time."  Tr. 53.  To the extent that Defendants sought to elicit testimony that the '118 Aircraft could have been re-leased or sold earlier, Plaintiff again revealed on redirect why that option was challenging, as the absence of hard copy records with the plane made it difficult to do so.  Tr. 56.

BOCA Engines, whether pursuant to the obligations of the Lease Agreements or pursuant to the CTC, is denied.

Specific performance for a contractual obligation is available only under limited circumstances. The ordinary rule is that the party in breach pays damages. "Under New York law, which applies here, a party can be compelled to perform its contractual obligations if (1) there is a valid contract; (2) plaintiff has substantially performed under the contract and is willing and able to perform its remaining obligations; (3) defendant is able to perform its obligations;[20] and (4) plaintiff has no adequate remedy at law." *La Mirada Prod. Co. v. Wassall PLC*, 823 F. Supp. 138, 140 (S.D.N.Y. 1993). As for the last element, "[b]efore the 'extraordinary' equitable remedy of specific performance may be ordered, the party seeking relief must demonstrate that remedies at law are incomplete and inadequate to accomplish substantial justice." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002); *see also Leasco Corp. v. Taussig*, 473 F.2d 777, 786 (2d Cir. 1972). "[T]he remedy of specific performance rests entirely in the district court's discretion, and such discretion is to be exercised

---

[20] Plaintiff met its burden of showing, by the preponderance of the evidence, that procurement of such engines was possible. Defendants argue, as a defense to the breach of contract, that it was impossible for them to procure replacement engines. *See Dresser-Rand Co. v. Petroleos de Venezuela, S.A.*, 574 F. Supp. 3d 217, 223 (S.D.N.Y. 2021) ("[T]he defendant has the burden to prove that its performance was 'objectively impossible.'"). The evidence does not support that claim. Defendants' representatives referred to the engines in the possession of Rainbow as "our engines," giving rise to the inference that Defendants had control over the engines. *See, e.g.*, Tr. 33. Defendants also proposed a transaction—the swap—that it would have had no reason to propose had it not believed that it had control over the engines. Furthermore, there is also undisputed evidence that Volga-Dnepr is the parent corporation of V-D Ireland, and a majority owner in Rainbow, presumably with the power to replace the boards of those companies if they did not transfer or sell the engines to Defendants. Dkt. No. 143-1 at 5–6. Defendants introduced no evidence to the contrary. Defendants introduced no evidence of any effort to purchase the engines from Rainbow or on the open market. Finally, there was evidence of the existence of a replacement engine from a source other than Rainbow, Tr. 53, and no evidence that Defendants had sought to purchase that engine.

according to settled principles of equity with reference to the facts of the particular case." *La Mirada Prod. Co.*, 823 F. Supp. at 141.

Plaintiff has conceded that there exists a "replacement value of the engines that would be equivalent to the value of the engines through specific performance." Tr. 112. In short, "[t]here is simply no reason why . . . money damages would not adequately compensate [Plaintiff] for [Defendants'] breach." *Lucente*, 310 F.3d at 262.

The Court thus declines to award specific performance in lieu of damages.

## IV.    Guaranty

Finally, Plaintiff argues that Defendant Volga-Dnepr is jointly and severally liable for the damages sustained as a result of Defendant AirBridge's breach. Plaintiff Pretrial Br. at 29. Defendant does not dispute the argument. The Court agrees with Plaintiff.

"A guaranty is a promise to fulfill the obligations of another party, and is subject to the ordinary principles of contract construction." *Of a Feather, LLC v. Allegro Credit Services, LLC*, 2021 WL 1040482, at \*9 (S.D.N.Y. Mar. 18, 2021), *aff'd*, 2023 WL 2415607 (2d Cir. Mar. 9, 2023) (summary order). "In an action against a guarantor, a plaintiff must show: (1) the existence of the guaranty; (2) the underlying debt; and (3) the guarantor's failure to perform under the guaranty." *UMB Bank, N.A. v. Bluestone Coke, LLC*, 2020 WL 6712307, at \*4 (S.D.N.Y. Nov. 16, 2020). "Where . . . a guaranty provides that it is 'absolute and unconditional irrespective of any lack of validity or enforceability of the agreement or any other circumstance which might otherwise constitute a defense,' the guarantor is precluded from asserting a defense as to the 'existence of a valid underlying debt.'" *Id*. at \*4 (quoting *136 Field Point Circle Holding Co., LLC v. Invar Int'l Holding, Inc.*, 644 F. App'x 10, 12 (2d Cir. 2016)).

Volga-Dnepr executed the Guaranties as to each Lease Agreement, which guaranteed the due and punctual performance and observance by AirBridge of all obligations under the Lease

Agreements and the due and punctual payment of each amount that AirBridge is or may become obligated to pay under the Lease Agreements.  Dkt. No. 143-1 ¶¶ 15, 16, 38; *see also* Pl. Ex. 2, § 2(a), at BOCA_00039930.  Most significantly, the Guaranties obligate Volga-Dnepr "in the event of any nonpayment or non-performance . . . to pay or perform or cause such payment or performance to be made upon notice from the Lessor or such non-payment or non-performance." *Id.*  That was an "unconditional and irrevocable" guaranty.  *Id.*  The contracts further provide for "absolute; unconditional and continuing guaranty of payment and performance and not of collection, as primary obligor, and not merely a surety."  *Id.* § 2(d).  Volga-Dnepr also waived any defenses as to the Lease Agreements and any other circumstances that might be construed to constitute a legal discharge of the Guarantor.  *Id.* § 2(f).  Those show the "ironclad" nature of the Guaranties sufficient to hold Guarantor liable.  *UMB Bank, N.A.*, 2020 WL 6712307, at *4.

The Court thus finds Defendant Volga-Dnepr is jointly and severally liable for all of the damages sustained as a result of AirBridge's breach.

## CONCLUSION

For these reasons, the Court awards Plaintiff a judgment of damages in the amounts of $175,882,727 for the '117 Aircraft, $179,547,949 for the '119 Aircraft, and $50,770,020 for the '118 Aircraft, for a sum total of $406,200,696.  The Court does not award specific performance. The Clerk of Court is respectfully directed to enter judgment in the amount of $406,200,696 for Plaintiff and to close this case.

The parties are directed to file their proposed findings of fact and conclusions of law on the docket.

The parties are directed to jointly submit a proposed order dismissing the compensatory sanctions payable to Plaintiff due to Defendants' violations of the Court's previous orders.

The parties are directed to submit additional letter briefs by April 18, 2023, not to exceed

three single spaced pages in length, on the question of the effect of this Opinion and Order on the

award of coercive sanctions payable to the Court.

SO ORDERED.

Dated: April 11, 2023
      New York, New York

                                    LEWIS J. LIMAN
                              United States District Judge