UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| BOC AVIATION LIMITED, | : |
| Plaintiff, | Case No. 22 Civ. 2070 (LJL) |
| | : |
| - against - | : |
| AIRBRIDGECARGO AIRLINES, LLC, and VOLGA-DNEPR LOGISTICS B.V., | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFF'S PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

SMITH, GAMBRELL & RUSSELL, LLP
1301 Avenue of the Americas, 21st Floor
New York, New York 10019
Tel: (212) 907-9700
Fax: (212) 907-9800
*Attorneys for Plaintiff*

*Of Counsel*
    John G. McCarthy
    Edward J. Heppt

## <u>TABLE OF CONTENTS</u>

PROPOSED FINDINGS OF FACT ............................................................................................. 1

    Cast of Characters .............................................................................................................. 1

    Equipment at Issue ............................................................................................................. 2

    BOCA Acquires Three Freighter Aircraft .......................................................................... 5

    The Imposition of Sanctions and Cancellation of Insurance .............................................. 6

    AirBridge Flies BOCA's Equipment To Russia ................................................................. 8

    Events In Russia In March 2022 ....................................................................................... 10

    BOCA Repossesses MSN 60118 ..................................................................................... 11

    Defendants Stop Paying Rent .......................................................................................... 11

    BOCA's Efforts To Obtain MSN 60117 And MSN 60119 from Defendants ...................... 11

    BOCA's Efforts To Obtain the BOCA Engines Or Replacement Engines from Defendants 13

    BOCA Leases MSN 60118 To A New Lessee .................................................................. 14

    Unpaid Rent…………………………………………………………………………………15

    Incentive Interest Rate ..................................................................................................... 15

PROPOSED CONCLUSIONS OF LAW .................................................................................. 16

    I.      This Court Has Subject Matter Jurisdiction.................................................................. 16

    II.     BOCA is entitled to judgment on its first cause of action  for breach of
           contract against AirBridge. ...................................................................................... 17

           (a)   BOCA validly terminated the Lease Agreements in March 2022..................... 19

           (b)   AirBridge breached the 60117 and 60119 Lease Agreements  by failing
                to pay (i) the Stipulated Loss Value for each aircraft,  (ii) amounts
                corresponding to rental payments and (iii) accrued interest.............................. 21

                1.   An Event of Loss occurred with respect to MSN 60117 and MSN
                    60119. .................................................................................................. 21

                2.   Section 12.01 of the Lease Agreements is enforceable. .......................... 24

3. BOCA is entitled to damages in the amount of (i) the Stipulated Loss Value for MSN 60117 and MSN 60119, (ii) amounts corresponding to rental payments and (iii) accrued interest. ................... 25

(c) AirBridge is required to pay rent, costs, and the rent reduction with new lessee for MSN 60118. ........................................................................ 26

(d) BOCA is entitled to the value of the BOCA Engines. ...................................... 27

(e) Defendants are required to pay BOCA's reasonable attorneys' fees. ............... 28

III. BOCA is entitled to judgment on its second cause of action for breach of contract against Volga-Dnepr. ................................................................... 28

IV. BOCA is entitled to judgment on its third cause of action for an order of possession under the CTC (in the alternative). ........................................... 30

V. BOCA is entitled to judgment on its fifth cause of action for specific performance (in the alternative). ............................................................... 32

VI. Defendants will be unable to establish their defenses at trial. ................... 34

(a) Defendants' defense of impossibility of performance fails. .............................. 34

(b) BOCA mitigated its damages with respect to MSN 60118. .............................. 37

(c) Volga-Dnepr waived its defenses. ................................................................ 38

CONCLUSION ................................................................................................ 39

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Ackermann v. Levine*,
    788 F.2d 830 (2d Cir. 1986) ................................................................................. 31

*Arnone v. Aetna Life Ins. Co.*,
    860 F.3d 97 (2d Cir. 2017) .................................................................................... 18

*Aspinall's Club Ltd. v. Aryeh*,
    86 A.D.2d 428 (2d. Dept. 1982) ............................................................................ 31

*Axginc Corp. v. Plaza Automall, Ltd.*,
    759 F. App'x 26 (2d Cir. 2018) ............................................................................. 34

*Bank of Am. Nat. Tr. and Sav. Ass'n v Envases Venezolanos, S.A.*,
    740 F. Supp. 260 (S.D.N.Y. 1990) ........................................................................ 17

*Bank of New York v Tri Polyta Fin. B.V.*,
    No. 01 Civ. 9104 (LTS) (DFE), 2003 WL 1960587 (S.D.N.Y. Apr. 25, 2003) ................ 38, 39

*Biscone v JetBlue Airways Corp.*,
    681 F. Supp.2d 383 (E.D.N.Y. 2010) .................................................................... 17

*BOC Aviation Limited v. AirBridgeCargo Airlines, LLC*,
    No. 22 Civ. 2070 (LJL), 2022 WL 17581775 (S.D.N.Y. Dec. 12, 2022) .......................... 30

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*,
    98 F.3d 13 (2d Cir. 1996) ..................................................................................... 28

*Coastal Power Int'l v. Transcontinental Capital Corp.*,
    10 F. Supp. 2d 345 (S.D.N.Y.1998) ...................................................................... 37

*Crossland Federal Savings Bank v. A. Suna & Co., Inc.*,
    935 F. Supp. 184 (E.D.N.Y.1996) ........................................................................ 39

*Custom Imports, Inc. v. Hanmee Trading Co., Inc.*,
    596 F. Supp. 1126 (S.D.N.Y.1984) ....................................................................... 18

*Dresser-Rand Co. v. Petroleos de Venezuela, S.A.*,
    574 F. Supp. 3d 217 (S.D.N.Y. 2021) ................................................................... 34

*Dreyfus v Von Finck*,
    534 F.2d 24 (2d Cir. 1976) ............................................................................ 16, 17

*Ez–Tixz, Inc. v. Hit–Tix*,
    969 F. Supp. 220 (S.D.N.Y.1997) ........................................................................ 18

*Gap Inc. v. Ponte Gadea New York LLC*,
    524 F. Supp. 3d 224 (S.D.N.Y. 2021) ................................................................. 35, 36

*Gen. Elec. Capital Corp., LLC v G. Howard Assoc., Inc.*,
    No. 09 Civ. 3923 (RRM ) (JMA), 2010 WL 2346296 (E.D.N.Y. May 18, 2010) ............ 25, 28

*Kel Kim Corp. v. Cent. Markets, Inc.*,
    70 N.Y.2d 900, 524 N.Y.S.2d 384, 519 N.E.2d 295 (1987) .................................... 35

*Lucente v. International Business Machines Corp.*,
    310 F.3d 243 (2d Cir. 2002) ................................................................................ 33

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007) ................................................................................ 18

*Millgard Corp. v. E.E. Cruz/Nab/Fronier-Kemper*,
    No. 99 Civ. 2952 (LBS), 2004 WL 1900359 (S.D.N.Y. Aug. 24, 2004) ...................... 35

*Of a Feather, LLC v. Allegro Credit Services, LLC*,
    No. 19 Civ. 9351 (DLC), 2021 WL 1040482 (S.D.N.Y. Mar. 18, 2021) ....................... 29

*PacifiCorp Cap., Inc. v. Tano, Inc.*,
    877 F. Supp. 180 (S.D.N.Y. 1995) ....................................................................... 25

*Peyton Holdings, LLC v. Clover Aviation Co.*,
    No. 18 Civ. 3165 (PAC), 2020 WL 4273981 (S.D.N.Y. July 24, 2020) ....................... 37

*R/S Assocs. v. New York Job Dev. Auth.*,
    98 N.Y.2d 29 (2002) ........................................................................................... 19

*Red Line Air LLC v. G. Howard Assocs., Inc.*,
    No. 09 Civ. 3928, 2010 WL 2346299 (E.D.N.Y. May 11, 2010) ............................... 24, 25

*Rosen v. Mega Blocks Inc.*,
    No. 08 Civ. 3474 (LTS) (GWG), 2008 WL 2810208 (S.D.N.Y. Jul. 21, 2008) .............. 33

*RW Holdings, LLC v. Mayer*,
    131 A.D.3d 1228, 17 N.Y.S.3d 171 (2015) ........................................................... 35

*Sher v. Allstate Ins. Co.*,
    947 F. Supp. 2d 370 (S.D.N.Y. 2013) ................................................................... 35

*Shih v Petal Card, Inc.*,
    No. 18 Civ. 5495 (JFK), 2020 WL 5659429 (S.D.N.Y. Sept. 23, 2020) ..................... 32

*Sokoloff v. Harriman Estates Dev Corp.*,
    96 N.Y.2d 409, 754 N.E.2d 184, 729 N.Y.S.2d 425 (2001) .................................... 32, 33

iv

*Terwilliger v. Terwilliger*,
    206 F.3d 240 (2d Cir. 2000) .......................................................................................... 18

*The Edward Andrews Grp., Inc. v. Addressing Servs. Co.*,
    No. 04 Civ. 731, 2005 WL 3215190 (S.D.N.Y. Nov. 30, 2005) .............................................. 24

*TransPerfect Glob., Inc. v. Lionbridge Techs., Inc.*,
    No. 19 Civ. 3283, 2020 WL 1322872 (S.D.N.Y. Mar. 20, 2020) ........................................... 17

*Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*,
    924 F.3d 32 (2d Cir. 2019) ........................................................................................... 19

*URSA Minor Ltd. v. AON Financial Products*,
    No. 00 Civ. 2474 (AGS), 2000 WL 1010278 (S.D.N.Y. July 21, 2000)................................. 39

*Wechsler v. Hunt Health Sys., Ltd.*,
    330 F. Supp. 2d 383 (S.D.N.Y. 2004) .......................................................................... 37, 38

*Wells Fargo Bank Minnesota v. BrooksAmerica Mortgage Corp.*,
    419 F.3d 107 (S.D.N.Y. 2004)....................................................................................... 37

*Wells Fargo Tr. Co., N.A. v Synergy Group Corp.*,
    465 F. Supp. 3d 355 (S.D.N.Y. 2020) ...................................................................... passim

*Williams v. Time Warner Inc.*,
    No. 09 Civ. 2962 (RJS), 2010 WL 846970 ........................................................................ 18

*Wilmot v. State*,
    344 N.Y.S.2d 350, 297 N.E.2d 90, 32 N.Y.2d 164 (1973)...................................................... 37

Statutes

28 U.S.C. § 1331....................................................................................................... 16, 17

28 U.S.C. § 1367............................................................................................................. 17

N.Y. Gen. Oblig. Law § 5-1401........................................................................................ 17

N.Y. U.C.C. § 2A-102..................................................................................................... 24

N.Y. U.C.C. § 2A-504(1)................................................................................................. 24

United States Constitution, Art. VI, cl. 2 ............................................................................. 31

Rules

Federal Rule of Civil Procedure 54(d)(2) ....................................................................... 19, 28

Other Authorities

*Convention on International Interests in Mobile Equipment (Nov. 16, 2001)* .................. 16, 31 32

*Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment* ................................................................................................. 16, 31, 32

Restatement (Second) of Contracts § 359 (1981) ........................................................................ 32

Plaintiff BOCA Aviation Limited ("BOCA"), pursuant to this Court's March 2, 2023 order, respectfully submits the following proposed findings of fact and conclusions of law to be established at trial.

## PROPOSED FINDINGS OF FACT

### Cast of Characters

Plaintiff BOC Aviation Limited ("BOCA").  BOCA is a corporation organized and existing under the laws of Singapore with an office at 79 Robinson Road, #15-01, Singapore 068897, which is engaged in the aviation business principally with respect to the purchasing, selling and leasing of commercial aircraft.  (Dkt. 143-1, ¶ 1.)  BOCA is a top tier global aircraft operating leasing company whose shares are publicly traded.  BOCA-owned aircraft are leased to a globally diversified airline customer base.  BOCA's core competencies include aircraft procurement, leasing, financing, sales and technical and asset management.  (Direct Testimony of David Walton by declaration executed on March 24, 2023 ("Walton Test."), ¶ 4.)  As of December 31, 2022, BOCA owned, managed and had on order a total of 633 aircraft.  (Walton Test., ¶ 5.)  BOCA has airline customers in Asia, the Middle East, Europe, Latin America and North America.  In the United States, BOCA aircraft are operated by American Airlines, United Airlines, Southwest and Frontier Airlines.  (Walton Test., ¶ 6.)

Defendant AirBridgeCargo Airlines LLC ("AirBridge").  Airbridge is a limited liability company organized and existing under the laws of the Russian Federation, with an office at 28B, Building 3, Mezhdunarodnoe Rd., Moscow 141411.  (Dkt. No. 143-1, ¶ 2.)  Prior to March 2022, AirBridge operated cargo airline services with a fleet consisting of approximately 17 Boeing aircraft.  (Dkt. No. 143-1, ¶ 2; Pl. Ex. 39 at 2; Pl. Ex. 46 at ABC000524; Pl. Ex. 48 at 1.)  Nearly all of AirBridge's flights were international.  (Pl. Exs. 46 & 48 at 1.)  On or about March 18, 2022, AirBridge suspended its commercial operations.  (Dkt. No. 143-1, ¶ 30; Walton Test., ¶

38; Pl. Ex. 39.)  In July 2022, AirBridge began firing its pilots and retained only a skeleton crew
of Boeing pilots.  (Pl. Ex. 48 at 1.)

      <u>Defendant Volga-Dnepr Logistics B.V. ("Volga-Dnepr")</u>.  Volga-Dnepr is a company
incorporated under the laws of the Netherlands.  (Dkt. No. 143-1, ¶ 3.)  Volga-Dnepr has its
official seat in Schiphol, municipality Haarlemmermeer, the Netherlands and is registered with
the Dutch Trade Register under number 34239107.  (Pl. Ex. 2 at 1; Pl. Ex. 4 at 1; Pl. Ex. 6 at 1.)
Volga-Dnepr has an office at Schiphol Boulevard 127, 1118 BG, Schiphol, The Netherlands.
(Pl. Ex. 61 at 1.)  AirBridge is a subsidiary of defendant Volga-Dnepr.  (Dkt. No. 143-1, ¶ 2.)

      <u>Volga-Dnepr Airlines (Ireland) Limited ("V-D Ireland")</u>.  Volga-Dnepr owns
approximately 68.7 percent of V-D Ireland.  (Dkt. No. 143-1, ¶ 6.)

      <u>Rainbow Leasing Limited ("Rainbow")</u>.  V-D Ireland is the sole shareholder of Rainbow.
(Dkt. No. 143-1, ¶ 5.)  Rainbow is the owner of three aircraft engines involved in this case.  (Dkt.
No. 143-1, ¶ 27; Walton Test., ¶¶ 45 & 50.)

      <u>SB Leasing Ireland Limited ("SBLI")</u>.  SBLI is a leasing company that is not affiliated
with any of the parties to this lawsuit.  SBLI is the owner of an aircraft engine involved in this
case.  (Dkt. No. 143-1, ¶ 27; Walton Test., ¶ 45.)

**<u>Equipment at Issue</u>**

      The following aircraft and aircraft engines are involved in this case:

      <u>"MSN 60117"</u> is a Boeing Model 747-8F airframe bearing MSN 60117, equipped with
four General Electric Model GEnx-2B67/P engines.  (Dkt. No. 143-1, ¶ 7; Walton Test., ¶ 8; Pl.
Ex. 1 at BOCA_00004214.)  MSN 60117 is registered on the aircraft registry in Bermuda and
bears Bermuda Registration Mark VQ-BFU.  (Dkt. No. 143-1, ¶ 8; Pl. Ex. 1 at
BOCA_00004213.)  MSN 60117 is a freighter aircraft.  (Pl. Ex. 39 at 2.)  The Stipulated Loss

Value of MSN 60117 for the rental period from 73 to 84 months (November 13, 2021 to November 12, 2022) was $148,723,980.  (Pl. Ex. 66 at 2; Pl. Ex. 1 at BOCA_0004327.)

"MSN 60118" is a Boeing Model 747-8F airframe bearing MSN 60118, equipped with four General Electric Model GEnx-2B67/P engines.  (Dkt. No. 143-1, ¶ 9; Walton Test., ¶ 8; Pl. Ex. 1.)  Until recently, MSN 60118 was registered on the aircraft registry in Bermuda and bore Bermuda Registration Mark VQ-BFE.  (Dkt. No. 143-1, ¶ 9; Pl. Ex. 3 at BOCA_00004423.)  MSN 60118 is a freighter aircraft.  (Pl. Ex. 39 at 2.)  BOCA repossessed MSN 60118 in March 2022 and had it ferried from Hong Kong International Airport on March 25, 2022 pursuant to this Court's *Ex Parte* Order For Immediate Possession.  (Walton Test., ¶¶ 42-43.)  MSN 60118 was ultimately ferried to Pinal Airpark in Marana, Arizona ("Marana") with a stopover in San Bernadino, California.  (Walton Test., ¶ 43.)

"MSN 60119" is a Boeing Model 747-8F airframe bearing MSN 60119, equipped with four General Electric Model GEnx-2B67/P engines.  (Dkt. No. 143-1, ¶ 7; Walton Test., ¶ 8; Pl. Ex. 1.)  MSN 60119 is registered on the aircraft registry in Bermuda and bears Bermuda Registration Mark VP-BIN.  (Dkt. No. 143-1, ¶ 14; Pl. Ex. 5 at BOCA_00004602.)  MSN 60119 is a freighter aircraft.  (Pl. Ex. 39 at 2.)  The Stipulated Loss Value of MSN 60119 for the rental period from 61 to 72 months (August 1, 2021 to July 31, 2022) was $152,882,381.  (Pl. Ex. 66 at 2; Pl. Ex. 5 at BOCA_00040960.)

The "BOCA Aircraft" refers collectively to MSN 60117, MSN 60118 and MSN 60119.

The "BOCA Engines" are both General Electric Model GEnx-2B67/P engines with engine serial number ("ESN") 959449 and ESN 959452.  (Walton Test., ¶ 32.)  The BOCA Engines were delivered to AirBridge with MSN 60118.  (Pl. Ex. 2 at BOCA_00004423; Pl. Ex. 2 at BOCA_00004529.)  At some point prior to March 1, 2022, AirBridge removed the BOCA

Engines from MSN 60118.  (Walton Test., ¶ 44.)  Today, the BOCA Engines are located in Moscow, Russia installed on other Boeing 747-8F airframes in the possession of AirBridge. (Walton Test., ¶ 44.)  The BOCA Engines are worth an estimated total of $28,301,288.  (Pl. Ex. 66 at 3; Walton Test., ¶ 70.)

"Rainbow Engine 1" is a General Electric Model GEnx-2B67/P engine ESN 959228 that is owned by Rainbow.  (Walton Test., ¶ 45.)  Rainbow Engine 1 was installed on MSN 60118 when BOCA repossessed it in March 2022.  (Dkt. No. 143-1, ¶ 27.)  BOCA had a qualified service provider remove Rainbow Engine 1 from MSN 60118.  (Walton Test., ¶ 61.)  Today, Rainbow Engine 1 remains at a storage facility in Marana. (Walton Test., ¶ 46.)

"Rainbow Engine 2" is General Electric Model GEnx-2B67/P engine with ESN 959208 that is owned by Rainbow.  (Walton Test., ¶ 50.)  Rainbow Engine 2 is located at a GE Aviation overhaul shop outside of Russia.  (Walton Test., ¶ 50; Pl. Ex. 47 at BOCA_00039876.)

"Rainbow Engine 3" is General Electric Model GEnx-2B67/P engine with ESN 959221 that is owned by Rainbow.  (Walton Test., ¶ 50.)  Rainbow Engine 3 is located at a GE Aviation overhaul shop outside of Russia.  (Walton Test., ¶ 50; Pl. Ex. 47 at BOCA_00039876.)

"SBLI Engine" is General Electric Model GEnx-2B67/P engine ESN 959350 that is owned by SBLI.  (Walton Test., ¶ 45.)  SBLI Engine was installed on MSN 60118 when BOCA repossessed it in March 2022.  (Dkt. No. 143-1, ¶ 27.)  BOCA had a qualified service provider remove SBLI Engine from MSN 60118.  (Walton Test., ¶ 61.)  Today, SBLI Engine remains at a storage facility in Marana.  (Walton Test., ¶ 46.)

**BOCA Acquires Three Freighter Aircraft**

On March 30, 2017, BOCA acquired ownership of MSN 60117 and MSN 60118. (Dkt. No. 143-1, ¶¶ 7 & 9.) BOCA, AirBridge and Volga-Dnepr entered into an Assignment, Assumption and Amendment Agreement with respect to MSN 60117 and with respect to MSN 60118 (respectively, the "60117 Assignment Agreement" and the "60118 Assignment Agreement"). (Dkt. No. 143-1, ¶¶ 7 & 9; Pl. Ex. 1 & Pl. Ex. 3.) The 60117 Assignment Agreement incorporated the Aircraft Lease Agreement (60117) as amended and restated (the "60117 Lease Agreement") with BOCA as the new lessor (Pl. Ex. 1 at BOCA_0004213) and the 60118 Assignment Agreement incorporated the Aircraft Lease Agreement (60118) as amended and restated (the "60118 Lease Agreement") with BOCA as the new lessor. (Pl. Ex. 3 at BOCA_0004422.) On March 30, 2017, Volga-Dnepr executed and delivered to BOCA guaranties with respect to the 60117 Lease Agreement (the "60117 Guaranty") and the 60118 Lease Agreement (the "60118 Guaranty"). (Dkt. No. 143-1, ¶ 15; Pl. Ex. 2; Pl. Ex. 4.)

On October 31, 2017, BOCA acquired ownership of MSN 60119, which was on lease to CargoLogicAir Ltd. ("CargoLogic"). (Dkt. No. 143-1, ¶ 12.) BOCA entered into an assignment, assumption and amendment agreement with respect to MSN 60119, pursuant to which BOCA was assigned all rights as lessor of MSN 60119 and Aircraft Lease Agreement (60119) was amended, restated and incorporated into the assignment, assumption and amendment agreement. (Dkt. No. 143-1, ¶ 12; Pl. Ex. 5 at BOCA_00040845.) On January 31, 2020, BOCA entered into an Assignment, Assumption and Amendment Agreement (the "60119 Assignment Agreement") with respect to MSN 60119. CargoLogic, AirBridge and Volga-Dnepr are parties to the 60119 Assignment Agreement. (Dkt. No. 143-1, ¶ 13.) The 60119 Assignment Agreement amended Aircraft Lease Agreement (60119) (the "60119 Lease Agreement") and replaced CargoLogic with AirBridge as the new lessee of MSN 60119. (Dkt. No. 143-1, ¶ 13; Pl. Ex. 5 at

BOCA_0004601.)  On January 31, 2020, Volga-Dnepr executed and delivered to BOCA a guaranty with respect to the 60119 Lease Agreement (the "60119 Guaranty").  (Dkt. No. 143-1, ¶ 16; Pl. Ex. 6.)[1]

Pursuant to the Guaranties, Volga-Dnepr guaranteed, among other things, the due and punctual performance and observance by AirBridge of all obligations under the Lease Agreements and the due and punctual payment of each amount that AirBridge is or may become obligated to pay under the Lease Agreements.  (Dkt. No. 143-1, ¶ 38; Pl. Exs. 2, 4, & 6.)

**The Imposition of Sanctions and Cancellation of Insurance**

Commencing in late February, 2022, a number of governments around the world took a series of actions, including the imposition of sanctions that adversely affected the ability of airlines certificated by the Russian Federation to perform their aircraft lease and/or finance obligations.  (Walton Test., ¶ 21.)  The Russian Federation subsequently issued legislation with their own restrictions and consequences.  (Walton Test., ¶ 21.)  On February 25, 2022, the Council of the European Union ("EU") issued Regulation 2022/328 (the "EU Regulation"), which prohibited provision by EU insurers of insurance and reinsurance for Russian airlines in respect of aircraft in Russia and required lessors who are EU persons to terminate aircraft leases to Russian airlines.  (Walton Test., ¶ 22.)  The EU sanctions and sanctions issued by the United States prohibited Russian carriers like AirBridge from operating within the territory of the European Union countries and the United States.  (Pl. Ex. 46 at ABC000524; Pl. Ex. 39 at 2.)

Within the first days of March, 2022, BOCA received a number of notices of cancellation of reinsurance policies with respect to the BOCA Aircraft, with the Hull War coverage

---

[1] The 60117 Lease Agreement, 60118 Lease Agreement and 60119 Lease Agreement are referred to collectively herein as the "Lease Agreements."  Each of the three guaranties at issue are referred to collectively herein as the "Guaranties."

cancellation notice becoming effective on March 7, 2022.  (Walton Test., ¶ 23; Pl. Exs. 11-14; Pl. Ex. 16.)  As a result of a number of the notices of cancellation, (a) the reinsurance for each of the three BOCA Aircraft did not comply with the requirements of its respective Lease Agreement and (b) the presence of any BOCA Aircraft in Russia after March 7 would breach the terms of its respective Lease Agreement.  (Walton Test., ¶ 24.)

On March 2, 2022, BOCA had a phone call with Dmitry Nikitin, head of fleet for AirBridge, discussing the issues created by the reinsurance cancellations and the fact that the reinsurance would no longer comply with the terms of the Lease Agreements, and discussing that AirBridge would no longer be permitted to operate the aircraft in, to or from Russia.  (Walton Test., ¶ 25; Pl. Ex. 15.)  On March 3, 2022, BOCA sent AirBridge a notice informing AirBridge in writing about the cancellation of Hull War reinsurance and requiring AirBridge to (a) ensure that the commercial operation of the BOCA Aircraft cease as soon as possible and (b) put the BOCA Aircraft into storage at a location outside Russia by a date not later than March 7, 2022. (Walton Test., ¶ 26; Pl. Ex. 19.)  On March 3, 2022, BOCA had another phone call with AirBridge stressing the need to stop using the BOCA Aircraft in commercial operation and to put them into storage. (Walton Test., ¶ 27.)  Mr. Nikitin informed BOCA that AirBridge was considering possible storage locations outside of Russia and that AirBridge would revert shortly. (Walton Test., ¶ 27.)

On March 5, 2022, each of MSN 60117, MSN 60118 and MSN 60119 (collectively the "Aircraft") were on the ground in airports located outside of Russia.  (Dkt. No. 143-1, ¶ 17.) MSN 60117 was located near Shanghai, China.  (Dkt. No. 143-1, ¶ 18.)  MSN 60118 was located at Hong Kong International Airport.  (Dkt. No. 143-1, ¶ 19.)  MSN 60119 was located near Zhengzhou, China.  (Dkt. No. 143-1, ¶ 20.)  That day, BOCA sent a written notice to AirBridge

demanding that AirBridge ground the BOCA Aircraft at their present locations in Hong Kong, China for MSN 60118, Shanghai, China for MSN 60117 and Zhengzhou, China for MSN 60119. (Walton Test., ¶ 28; Dkt. No. 143-1, ¶ 21; Pl. Ex. 20.)  Mr. Nikitin communicated to Anna Nikulina, legal counsel at BOCA, that AirBridge had seen the notice and that it would ground the BOCA Aircraft and would not operate them.  (Walton Test., ¶ 28.)

**AirBridge Flies BOCA's Equipment To Russia**

In early March 2022, the Russian government issued communications that required Russian airlines to bring aircraft back to Russia.  (Dkt. No. 143-1, ¶ 23.)  On March 6, 2022, upon checking FlightRadar, BOCA discovered that MSN 60117 and MSN 60119 left China and were on a route to Moscow.  (Walton Test., ¶ 29.)  BOCA also learned that MSN 60118 was scheduled to depart Hong Kong at 23:05 on March 6, 2022.  (Walton Test., ¶ 29.)

BOCA spoke with Mr. Nikitin to discuss the fact that MSN 60117 and MSN 60119 were *en route* to Russia.  (Walton Test., ¶ 30.)  Mr. Nikitin informed BOCA that MSN 60117 and 60119 were being flown to Russia for the purposes of closing the Russian customs regime. (Walton Test., ¶ 30.)  BOCA demanded that those BOCA Aircraft be removed from Russia immediately and that MSN 60118 not be moved to Russia.  (Walton Test., ¶ 30.)  BOCA also requested a plan from AirBridge to park the BOCA Aircraft outside Russia before midnight on March 7, 2022.  (Walton Test., ¶ 31.)

On March 6, 2022, AirBridge flew MSN 60119 from China to Russia and MSN 60119 remains in Moscow.  (Dkt. No. 143-1, ¶ 24.)  AirBridge also flew MSN 60117 from China to Russia with a stop in Dubai.  (Dkt. No. 143-1, ¶ 25; Walton Test., ¶ 36.)  BOCA unsuccessfully attempted to prevent that aircraft from leaving Dubai, and it remains in Moscow.  (Dkt. No. 143-1, ¶ 25.)  BOCA terminated the leasing in respect of MSN 60117 on March 6, 2022, which automatically suspended the certificate of airworthiness for MSN 60117.  (Walton Test., ¶ 36; Pl.

Ex. 26.) An official with the Bermuda Civil Aviation Authority attempted to have MSN 60117 grounded due to the lack of a certificate of airworthiness.  (Walton Test., ¶ 36; Pl. Ex. 25.) Nevertheless, AirBridge flew MSN 60117 from Dubai to Moscow, Russia after the leasing had been terminated and after the certificate of airworthiness was no longer in effect.   (Walton Test., ¶ 36; Pl. Ex. 25 at BOCA_00003782.)

Later that same day, March 6, 2022, BOCA sent a written notice to AirBridge (i) terminating its leasing of MSN 60118, effective immediately, as a result of the occurrence of one or more Events of Default, including but not limited to, Events of Default under Article 18, Paragraphs (b) and (n) of the 60118 Lease Agreement, and (ii) demanding the immediate redelivery of MSN 60118, all "Aircraft Documentation" (*i.e.*, all logs, manuals and data, inspection and maintenance records, and other records with respect to MSN 60118 as detailed in the 60118 Lease Agreement) and any parts that are not installed on MSN 60118 to BOCA, which included the BOCA Engines.  (Walton Test., ¶ 32; *see* Pl. Ex. 24 at BOCA_00004097.)  BOCA also sent requests to the authorities at Hong Kong International Airport and the Hong Kong Civil Aviation Department to prevent AirBridge from flying MSN 60118 to Moscow.  (Pl. Ex. 23; Pl. Ex. 24.)  AirBridge contacted the Hong Kong Civil Aviation Department and claimed that it had not received the notice terminating the leasing and that the Certificate of Airworthiness remained in effect.  (Pl. Ex. 29.)  AirBridge, however, was unable to fly MSN 60118 from Hong Kong. (*See* Walton Test., ¶ 42.)

On March 11, 2022, BOCA terminated the lease for MSN 60119 by sending a written notice to AirBridge (i) terminating its leasing of MSN 60119, effective immediately, as a result of the occurrence one or more Events of Default, including but not limited to, Events of Default under Article 18, Paragraphs (b) and (n) of the 60119 Lease Agreement, and (ii) demanding the

9

immediate delivery of the aircraft, all Aircraft Documentation and any parts that were not installed on the aircraft.  (Dkt. No. 143-1, ¶ 26; Walton Test., ¶ 41; Pl. Ex. 35 at BOCA _00003469.)  BOCA also sent notices to AirBridge in respect of the BOCA Aircraft (i) reaffirming leasing termination as to MSN 60117 and MSN 60118 and (ii) again requesting AirBridge to return MSN 60117 and the Aircraft Documentation related to MSN 60117 and 60118 to BOCA.  (Pl. Ex. 35 at BOCA_00003472-3477.)

AirBridge, in March 2022, also flew to Russia the aircraft on which the BOCA Engines were installed.  (Dkt. No. 143-1, ¶ 41.)  AirBridge continues to possess those Engines in Moscow, Russia.  (Dkt. No. 143-1, ¶ 41.)

**Events In Russia In March 2022**

In March 2022, the Russian government issued a set of export restrictions that prevented export from Russia of certain goods, including aircraft and aircraft engines, unless Russian government approval was obtained.  (Dkt. No. 143-1, ¶ 23; Walton Test. ¶ 39; Pl. Ex. 32.)  On March 8, in letters dated March 6, 2022, AirBridge informed BOCA "that Russian Aviation Authorities issued the document requiring prior authorization for any movement of any aircraft operated by any Russian carrier outside Russia."  (Pl. Ex. 32 at BOCA_00003660.)  Volga Dnepr instructed its brokers to cancel all international reinsurance effective March 9, 2022.  (Pl. Ex. 43 at BOCA_0002960-2961.)  During a telephone call with David Walton on or before March 13, 2022, AirBridge informed BOCA that the Russian government was not allowing AirBridge to move BOCA's Aircraft.  (Pl. Ex. 43 at BOCA_0002961.)  On or about March 18, 2022, AirBridge suspended its commercial flight operations.  (Dkt. No. 143-1, ¶ 30; Walton Test., ¶¶ 37-38; Pl. Ex. 39.)

**BOCA Repossesses MSN 60118**

On March 14, 2022, this Court entered an *Ex Parte* Order that, among other things, granted BOCA immediate possession of MSN 60118, ordered AirBridge to turn over all of the Aircraft Documentation, and enjoined AirBridge from interfering with BOCA's ability to ferry the aircraft from Hong Kong to Arizona.  (Walton Test., ¶ 42.)  On March 25, 2022, after successfully obtaining possession of MSN 60118, BOCA was able to have a crew from Elite Aero Ireland Limited fly MSN 60118 to Arizona with a stopover in San Bernadino, California. (Walton Test., ¶ 43.)  At the time that BOCA repossessed MSN 60118 in March 2022, two of the Engines on wing were owned by BOCA.  (Dkt. No. 143-1, ¶ 27.)  The Rainbow Engine and the SBLI Engine were also installed on MSN 60118 at the time.  (Dkt. No. 143-1, ¶ 27.)  Those two engines are being held by BOCA in Marana on account for their owners.  (Walton Test., ¶ 46.)

Defendants possess the hard copy Aircraft Documentation for MSN 60118, including the non-incident statement relating to that aircraft.  (Dkt. No. 143-1, ¶ 39.)  Defendants have not delivered the hard copy Aircraft Documentation to BOCA.  (Dkt. No. 143-1, ¶ 40.)

**Defendants Stop Paying Rent**

Defendants last made any rent payments to BOCA with respect to any BOCA Aircraft prior to March 1, 2022.  (Dkt. No. 143-1, ¶ 37.)

**BOCA's Efforts To Obtain MSN 60117 And MSN 60119 from Defendants**

BOCA made constant efforts to have AirBridge move MSN 60117 and MSN 60119 out of Russia.  (*See, e.g.,* Pl. Ex. 43 at BOCA_00002961.)  On April 4, 2022, AirBridge told BOCA that the "second half of May 2022 is the realistic term when we anticipate obtaining the permission for the aircraft redelivery."  (Pl. Ex. 43 at BOCA_00002957.)  On April 6, 2022, BOCA obtained authorization from the Office of Exporter Services, Bureau of Industry and Security of the U.S. Department of Commerce ("BIS") to fly MSN 60117 and MSN 60119 from

Russia "for the purpose of transfer to a non-Russian operator outside of Russia."  (Pl. Ex. 44; Pl.

Ex. 45 at BOCA_00002463-2464 (sending BIS authorization to Defendants).)  In a June 22,

2022 letter to the Deputy Minister of Transport of the Russian Federation, AirBridge stated that

the operation of its fleet had become impossible due to sanctions imposed by unfriendly

jurisdictions.  (Pl. Ex. 46 at ABC000524.)  The letter noted:

> In particular, the safe operation and maintenance of the aircraft, and especially,
> due to its uniqueness, the Boeing 747-8F aircraft, is impossible due to Council
> Regulation EU 2022/328 adopted on February 25, 2022, imposing sanctions,
> restrictions and a ban on the supply of spare parts for aircraft from EU countries
> to the Russian Federation. In addition, on March 18, 2022, the US Department of
> Commerce published a list of aircraft exported to Russia in violation of US export
> control rules, including 12 aircraft of the Airline. From this date, any individual
> and legal entity in the world is prohibited, under the risk of falling under
> secondary US sanctions, from interacting in any way with these Aircraft
> (including their maintenance).

(Pl. Ex. 46 at ABC000524.)  On a telephone call on July 4, 2022, AirBridge advised that there

was no update in respect of export approvals from the Russian authorities related to MSN 60117

and MSN 60119.  (Walton Test., ¶ 49.)  During a meeting in Abu Dhabi on August 1, 2022,

representatives of Defendants advised BOCA that, in order to authorize MSN 60117 and MSN

60119 to leave Russia, the Russian government required BOCA to confirm, *inter alia*, that they

"will continue to service non-sanctioned cargo export to and from Russia (food, medicines etc.)."

(Pl. Ex. 47 at BOCA_00039875.)  At that same meeting, Defendants discussed a plan to sell

MSN 60117 and MSN 60119 to a Middle Eastern investor who would lease them to Etihad

Airlines.  (Pl. Ex. 47 at BOCA_00039875.)

On September 16, 2022, BOCA sent Defendants letters demanding that they pay the

Stipulated Loss Value and other sums due to BOCA for MSN 60117 and MSN 60119.  (Pl. Ex.

52; Pl. Ex. 54; Dkt. No. 143-1, ¶¶ 33 & 35.)  Neither Volga-Dnepr nor AirBridge has complied

with the demand notice sent by BOCA.  (Dkt. No. 143-1, ¶ 36.)  Defendants have not paid to

BOCA the Stipulated Loss Value of MSN 60117 set forth in the 60117 Lease Agreement.  (Dkt. No. 143-1, ¶ 43.)  Defendants have not paid to BOCA the Stipulated Loss Value of MSN 60119 set forth in the 60119 Lease Agreement.  (Dkt. No. 143-1, ¶ 44.)

**BOCA's Efforts To Obtain the BOCA Engines Or Replacement Engines from Defendants**

On or around April 12, 2022, BOCA began a series of discussions with AirBridge to effectuate the redelivery of the BOCA Engines to BOCA.  (Walton Test., ¶ 47.)  These discussions first centered on a physical exchange to occur by August 2022 in a country outside of Russia, provided all necessary regulatory approvals for such exchange were granted.  (Walton Test., ¶ 47.)  The exchange was intended to result in BOCA regaining possession of the BOCA Engines.  (Walton Test., ¶ 47.)

On a telephone call on June 24, 2022, Defendants indicated that they were awaiting the resolution of applications submitted to the Russian government for approval to export the BOCA Engines, but they could not provide any time-table.  (Walton Test., ¶ 47.)  On a telephone call on July 4, 2022, AirBridge stated that they would like to have a physical swap of the BOCA Engines and Rainbow Engine 1 and SBLI Engine to take place in Sharjah, UAE.  (Walton Test., ¶ 49.)  BOCA repeated that any engine swap would be subject to receipt by BOCA of the necessary approvals.  (Walton Test., ¶ 49.)

Ms. Nikulina and David Walton of BOCA travelled to Abu Dhabi to meet with representatives of the Defendants on August 1, 2022 about, *inter alia*, the title swap.  (Walton Test., ¶ 50; Pl. Ex. 47.)  During the meeting, Defendants proposed a new option to try to satisfy their obligation to provide replacement engines for the BOCA Engines.  (Walton Test., ¶ 50; Pl. Ex. 47 at BOCA_00039876.)  This new option was a title swap of the BOCA Engines for two engines owned by Rainbow that were located in GE Aviation overhaul shops.  (Pl. Ex. 47 at BOCA_00039876.)  Those engines are Rainbow Engine 2 and Rainbow Engine 3.  (Walton

13

Test., ¶ 50.)  On September 17, 2022, BOCA sent a payment demand to Volga-Dnepr with a copy to AirBridge demanding payment for the BOCA Engines be made immediately by Volga-Dnepr or AirBridge, or alternatively, that the BOCA Engines or Replacement Engines be delivered to BOCA in accordance with Section 12.02 of the 60118 Lease Agreement.  (Pl. Ex. 53; Dkt. No. 143-1, ¶ 34.)  Neither Volga-Dnepr nor AirBridge has complied with the demand notice sent by BOCA.  (Dkt. No. 143-1, ¶ 36.)  Defendants have not delivered Replacement Engines (as defined in the 60118 Lease Agreement) to BOCA.  (Dkt. No. 143-1, ¶ 42.)

**BOCA Leases MSN 60118 To A New Lessee**

During the summer of 2022, BOCA undertook efforts to find a new lessee for MSN 60118.  (Walton Test., ¶ 52.)  BOCA's inability to promise delivery of that aircraft with a full complement of four engines hampered those efforts.  (Walton Test., ¶ 52.)  BOCA was only able to find one lessee willing to (a) lease MSN 60118 with only two engines owned by BOCA and (b) take on the risk associated with sourcing two of its own spare engines.  (Walton Test., ¶ 53.)  On or about August 11, 2022, BOCA and Airport Hongyuan Logistics Co., Limited ("Hongyuan") executed a letter of intent with respect to leasing MSN 60118.  (Walton Test., ¶ 54; Dkt. No. 143-1, ¶ 45.)  The lease agreement between BOCA and Hongyuan requires Hongyuan to pay monthly rent for MSN 60118 in an amount exceeding the rent that would have been payable by AirBridge, if all four engines would have been installed on the airframe at delivery to Hongyuan.  (Walton Test., ¶ 55.)  Hongyuan, however, is entitled to a reduction in the monthly rent by $100,000 for each engine that BOCA was unable to deliver with the MSN 60118 Airframe for a total of $7,200,000 of rent reduction for the first 36 months of the lease. (Walton Test., ¶ 56.)  That reduction in monthly rent was locked in for 36 months due to the fact that Hongyuan was able to source to spare engines for MSN 60118 but became obligated to lease those engines for a minimum of 36 months.  (Walton Test., ¶¶ 56 & 60.)  BOCA caused its

qualified service providers to remove Rainbow Engine 1 and the SBLI Engine from MSN 60118 and install the spare engines supplied by Hongyuan on MSN 60118 in their place.  (Walton Test., ¶ 61.)  On December 30, 2022, Hongyuan accepted delivery of MSN 60118.  (Walton Test., 62; Pl. Ex. 63.)  BOCA incurred a total of $6,967,910 with respect to recovering possession of MSN 60118 and preparing it for delivery to Hongyuan.  (Pl. Ex. 66 at 1 & 8-9.)

**Unpaid Rent**

AirBridge remains liable for damages corresponding to monthly rent payments for MSN 60117 and MSN 60119 pursuant to Section 12.01(b) of the Lease Agreements.  (Pl. Ex. 1 at BOCA_00004280; Pl. Ex. 2; Pl. Ex. 5 at BOCA_00040913; Pl Ex. 6.)  As of April 14, 2023, Defendants will owe BOCA $15,680,000 for MSN 60117 and $14,960,000 for MSN 60119.  (Walton Test., ¶ 72; Pl. Ex. 66 at 1 & 7.)  Thereafter, damages in the amount of unpaid rent continues to accrue at a rate of $40,000 per day per Aircraft.  (Walton Test., ¶ 72; Pl. Ex. 66 at 1 & 7.)  As of December 30, 2022, Defendants owed BOCA $11,380,645 in respect of lost rent on MSN 60118, all of which remains unpaid.  (Walton Test., ¶ 73; Pl. Ex. 66 at 1 & 7.)

**Incentive Interest Rate**

The Lease Agreements set an "Incentive Rate" of interest on all unpaid amounts thereunder which is defined as "the Prime Rate plus three percent (3%) … calculated on the basis of a year of 360 days and actual days elapsed."  (Pl., Ex. 1 at BOCA_00004245; Pl., Ex. 3 at BOCA_00004454; Pl., Ex. 5 at BOCA_00040878; Pl. Ex. 66 at 21.)  They provide that "Prime Rate" means the interest rate designated by J.P. Morgan Chase Bank, National Association … designated as its prime or base lending rate, with each change in such rate to take effect immediately under this Lease."  (Pl., Ex. 1 at BOCA_00004248; Pl., Ex. 3 at BOCA_00004457; Pl., Ex. 5 at BOCA_00040822; Pl. Ex. 66 at 21.)  J.P. Morgan Chase Bank, National Association has designated the following as its prime or base lending rate on the effective dates shown:

| Effective Date | Rate |
|----------------|-------|
| 3/16/2020 | 3.25% |
| 3/17/2022 | 3.50% |
| 5/5/2022 | 4.00% |
| 6/16/2022 | 4.75% |
| 7/28/2022 | 5.50% |
| 9/22/2022 | 6.25% |
| 11/3/2022 | 7.00% |
| 12/15/2022 | 7.50% |
| 2/2/2023 | 7.75% |
| 3/23/2023 | 8.00% |

(Dkt. No. 143-1, ¶ 46.)

## PROPOSED CONCLUSIONS OF LAW

**I.      This Court Has Subject Matter Jurisdiction.**

28 U.S.C. § 1331 provides that "the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  Federal courts have subject matter jurisdiction to consider a plaintiff's treaty-based claims where the right to recover "will be sustained if the treaties of the United States are given one construction and will be defeated if they are given another." *Dreyfus v Von Finck*, 534 F.2d 24, 28 (2d Cir. 1976).

BOCA pursues a claim pursuant to the *Convention on International Interests in Mobile Equipment* and the *Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment*, both signed on November 16, 2001, at Cape Town, South Africa (which are generally referred to as the Cape Town Convention or "CTC").  The CTC is an international treaty intended to standardize the law governing, among other things, transactions involving movable property.  The U.S. Senate ratified the CTC, and there is nothing in the enacting resolution excluding federal question jurisdiction. BOCA's claim for an order of possession and control of the BOCA Engines arises under the CTC.  The Lease Agreements

confirm that the parties shall be entitled to the maximum benefit of the rights and remedies contained within the CTC. (Pl. Ex. 1, 3, 5, § 20.07.)  Enforcement of the CTC presents a federal question, and accordingly, this Court has subject matter jurisdiction over this action. See, ECF 26; 28 U.S.C. § 1331; *Dreyfus,* 534 F.2d at 28.

This Court has supplemental jurisdiction over BOCA's claims for breach of contract and specific performance pursuant to 28 U.S.C. § 1367.  "[I]f federal question jurisdiction is satisfied by one cause of action, then the court may exercise supplemental jurisdiction over other causes of action that are part of the same case or controversy..." *Biscone v JetBlue Airways Corp.*, 681 F. Supp.2d 383, 386 (E.D.N.Y. 2010); 28 U.S.C. § 1367.  BOCA's other claims arise out of the same case or controversy as its claims under the CTC.

## II.       BOCA is entitled to judgment on its first cause of action for breach of contract against AirBridge.

BOCA's first cause of action against AirBridge is for breach of contract as to the three Lease Agreements between BOCA and AirBridge.  The Lease Agreements each contain a provision selecting New York law to govern.  (Pl. Ex. 1, 3, 5, § 24.16.)  A choice of law provision in an agreement designating New York law to govern the parties' rights and duties is valid even if the agreement has no reasonable relation to the State, provided that the transaction is valued at a minimum of $250,000.00. N.Y. Gen. Oblig. Law § 5-1401.  The passage of § 5-1401 "explicitly eliminated the 'contacts' analysis of choice of law provisions in New York.'" *Bank of Am. Nat. Tr. and Sav. Ass'n v Envases Venezolanos, S.A.*, 740 F. Supp. 260, 264 (S.D.N.Y. 1990), *affd sub nom. First Nat. Bank Maryland v Envases Venezolanos*, 923 F.2d 843 (2d Cir. 1990); *see TransPerfect Glob., Inc. v. Lionbridge Techs., Inc.,* No. 19 Civ. 3283, 2020 WL 1322872, at *7 (S.D.N.Y. Mar. 20, 2020) (explaining that a New York federal court must

apply New York choice-of-law rules, which generally enforce contractual choice of law provisions) (citing *Arnone v. Aetna Life Ins. Co.*, 860 F.3d 97, 108 (2d Cir. 2017)).

Under New York law, "to prevail on a breach of contract claim ... a plaintiff must prove [i] a contract; [ii] performance of the contract by one party; [iii] breach by the other party; and [iv] damages." *Williams v. Time Warner Inc.*, No. 09 Civ. 2962 (RJS), 2010 WL 846970, at *6 (S.D.N.Y. Mar. 6, 2010) (quoting *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000)). "[I]t is beyond cavil that the failure of a party to perform its obligations under a valid and binding contract constitutes a breach and entitles the other contractually bound party to damages which arose out of the breach." *Ez–Tixz, Inc. v. Hit–Tix*, 969 F. Supp. 220, 225 (S.D.N.Y.1997) (*quoting Custom Imports, Inc. v. Hanmee Trading Co., Inc.*, 596 F. Supp. 1126, 1130 (S.D.N.Y.1984)). As to the fourth element of a breach of contract of contract claim, "[a] party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007).

The parties agree that they are parties to three Lease Agreements – the 60117 Lease Agreement, the 60118 Lease Agreement and the 60119 Lease Agreement. (Pl. Ex. 1, 3 & 5.) Defendants do not dispute that BOCA (and its predecessor lessor) fully performed lessor's obligations under the Lease Agreements. It is also undisputed that AirBridge breached those lease agreements in March 2022. (Dkt. 143-1, ¶ 28.) As to the third element, AirBridge has failed to perform several of its obligations under each Lease Agreement. BOCA is entitled to damages for (a) AirBridge's failure to pay the contractually Stipulated Loss Value of two aircraft MSN 60117 and MSN 60119; (b) amounts corresponding to unpaid rent as to MSN 60117, 60118 and 60119; (c) the value of the BOCA Engines; (d) costs to repossess MSN 60118, costs

to prepare it to be leased to a new lessee and other costs incurred in connection with the delivery of MSN 60118 to the new lessee; (e) the rent reduction necessitated by the Defendants' failure to provide Replacement Engines; and (f) interest on those amounts at the Incentive Rate.  BOCA is also entitled to its reasonable attorney's fees expended on this action pursuant to a post-judgment motion under Federal Rule of Civil Procedure 54(d)(2).

**(a)  BOCA validly terminated the Lease Agreements in March 2022.**

A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms. *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 41 (2d Cir. 2019); *see also R/S Assocs. v. New York Job Dev. Auth.*, 98 N.Y.2d 29, 32 (2002).  The Lease Agreements set forth various events of default "whether such events shall be voluntary or involuntary or come about or be effected by operation of law or pursuant to or in compliance with any judgment, decree, order, rule or regulation of any Government Body." (Pl. Ex. 1, 3, 5, § 18.)  Events of Default under the Lease Agreement include, but are not limited to:

(i)  AirBridge's failure to maintain in full force and effect any insurance required by Article 13 of the Lease Agreements (Pl. Exs. 1, 3, 5, § 18(b));

(ii)  suspension of AirBridge's commercial airline operations (Pl. Exs. 1, 3, 5, § 18(m));

(iii)  any change (or such change shall be enacted or made by notice or otherwise and shall be scheduled to become thereafter effective) in any Law (or in the interpretation thereof) of the jurisdiction of AirBridge's incorporation or any jurisdiction in which AirBridge conducts business which materially adversely affects (i) any of BOCA's material rights hereunder or under the Lease Agreements or (ii) AirBridge's ability to meet its obligations (Pl. Exs. 1, 3, 5, § 18(n));

(iv)     revocation of any license, consent, approval or authorization of any Government Body necessary for the performance by AirBridge of its obligations under the Lease Agreements (Pl. Exs. 1, 3, 5, § 18(h)); and

(v)     failure to pay the Supplemental Rent required under the Lease Agreements (Pl. Exs. 1, 3, 5, § 18(a)).

Under Section 19.02 of Lease Agreements, upon the occurrence of an event of default, and upon written demand by BOCA, AirBridge is required to "return promptly, the Aircraft and any part thereof (including the Aircraft Documentation) as BOCA may so demand to AirBridge or its order in the manner and condition required by, and otherwise in accordance with all provisions of, this Lease." (Pl. Ex. 1, 3, 5, § 19.02.)  Multiple events of default occurred under the Lease Agreements.

On February 25, 2022, the Council of the European Union ("EU") issued Regulation 2022/328 (the "Regulation"), which prohibits provision by EU insurers of insurance or reinsurance in respect of aircraft in Russia and required lessors who are EU persons to terminate aircraft leases to Russian airlines. (Dkt. No. 143-1, ¶ 29.)  As a result of the Regulation and the notices of termination of the Hull War reinsurance policy with respect to the BOCA Aircraft, the reinsurance covering the BOCA Aircraft did not comply with the requirements of the Lease Agreements, constituting an Event of Default.  AirBridge breached Section 19.02 of the Lease Agreements by failing to ground the BOCA Aircraft upon notice and flying MSN 60117, MSN 60119 and the BOCA Engines to Russia. (*Id*., ¶¶ 21, 24-26.)    Accordingly, on March 6, 2022, BOCA validly terminated the lease for MSN 60117 and MSN 60118 (*Id*., ¶ 22.).  On March 11, 2022, BOCA validly terminated the lease for MSN 60119. (*Id*., ¶ 26.)

**(b) AirBridge breached the 60117 and 60119 Lease Agreements
by failing to pay (i) the Stipulated Loss Value for each aircraft,
(ii) amounts corresponding to rental payments and (iii) accrued interest.**

AirBridge breached Section 12.01 of the 60117 and 60119 Lease Agreements.  Section 12.01 provides that upon the occurrence of an Event of Loss, AirBridge is required to pay to BOCA, 75 days after the occurrence of an Event of Loss (i) then due and unpaid Rent in respect of the Aircraft to and including such date, (ii) an amount equal to the Stipulated Loss Value in respect of the Aircraft and (iii) interest at the Incentive Rate on the balance of (i) and (ii) from the due date until paid in full.  AirBridge is also required to pay Basic Rent and Maintenance Rent until BOCA receives the sum of (i), (ii) and (iii) above. (Pl. Exs. 1, 3, 5, § 12.01.)  BOCA waived its right to receive the Maintenance Rent that is based on a monthly amount.

**1.   An Event of Loss occurred with respect to MSN 60117 and MSN 60119.**

"Event of Loss" is defined in relevant part as follows: (d) "the condemnation, confiscation or seizure of, or requisition of title to, or requisition of use (for a period in excess of sixty (60) days, but in any event no longer than the last day of the Term) of, such Item by any Government Body;" or (e) "as a result of any rule, regulation, order or other action by any Aviation Authority, or other Government Body having jurisdiction, the use of such Item in the normal course of air transportation of persons or property shall have been prohibited for a period of more than six (6) months."  (Pl. Exs. 1, 3, 5, at 5-6.)  "Government Body" is defined to include "any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, . . . having jurisdiction over the Lessee or the Aircraft." (Pl. Exs. 1, 3, 5, at 6.) "Item of Equipment" is defined to include "Aircraft, the Airframe, the Engines, the APU, the Landing Gear and each Part." (Pl. Exs. 1, 3, 5, at 7.)

21

This Court has already held that an Event of Loss occurred with respect to the BOCA Engines in Russia.  In October 2022, BOCA moved for an order requiring Defendants to provide Replacement Engines for the two BOCA Engines in Russia, as required under the 60118 Lease Agreement. (Dkt. No. 45.)  In opposition, Defendants contended that a Russian Regulation prevented them from returning MSN 60117, MSN 60119 and the BOCA Engines from Russia. They argued, however, that an Event of Loss had not occurred under subsection (d) of the definition of Event of Loss because "AirBridge maintains possession of the Aircraft and the BOCA Engines inside of Russia." (Dkt. No. 62, ¶ 14.)  Defendants also argued that subsection (e) does not apply because "the use of the Aircraft in the normal course of air transportation has not been prohibited by government authorities" because, according to Defendants, "the Russian government is not preventing the domestic use of the Aircraft. It is only the international use of the Aircraft which has been temporarily curtailed by the Russian government." *Id*., ¶ 15.

 On November 16, 2022, this Court rejected Defendants' arguments and granted BOCA's motion for a preliminary injunction. (Dkt. No. 86.)  The Court held that "the evidence establishes an Event of Loss has occurred under subsections (d) and (e) of the definition of 'Event of Loss' in the 60118 Lease Agreement'" with respect to the BOCA Engines. (*Id*. at 12.)  In reaching its conclusion, the Court explained:

> As a result of a regulation issued by the Russian government, effective March 8, 2022, Defendants have been prevented from redelivering the BOCA Engines to Plaintiff for over eight months. Dkt. No. 47-8. That constitutes 'confiscation,' "seizure of," and most certainly "requisition of use" of the engines for a period in excess of 60 days by a Government Body under subsection (d). It also constitutes the prohibition "of the use of an Item in the normal course of air transportation of persons or property. . . for a period of more than six . . . months" under subsection (e). An Event of Loss has also occurred under subsection (e) because the restrictions from the Russian government have prevented the use of the engines in the "normal course of air transportation," which is international cargo flights.

(Dkt. No. 86 at 12.)

The same reasoning applies with respect to MSN 60117 and MSN 60119.  For over a year now, Defendants have maintained that the Russian Regulation prohibits them from returning MSN 60117 and MSN 60119 to BOCA.  Under the Court's prior analysis, this restriction constitutes the "confiscation, seizure of, and most certainly requisition of use of [MSN 60117 and MSN 60119] for a period in excess of 60 days by a Government Body under subsection (d).'" (Dkt. No. 86 at 12.)  Defendants have not offered any justification for this Court to depart from its prior determination.  The Russian Regulation went into effect March 8, 2022. (Dkt. No. 86 at 12.) Accordingly, an Event of Loss occurred sixty-one days thereafter, on May 8, 2022, with respect to MSN 60117 and MSN 60119 under subsection (d) of the definition of Event of Loss.

An Event of Loss also occurred with respect to MSN 60117 and MSN 60119 under subsection (e) of the definition of Event of Loss.  The Russian regulation has prohibited the use these aircraft in the normal course of air transportation for over a year.  Additionally, the Bermuda Civil Aviation Authority invalidated the Certificates of Airworthiness for MSN 60117 and MSN 60119.  (Walton Test., ¶ 36; Pl. Ex. 25 at BOCA_00003781 (stating that a Certificate of Airworthiness issued by the Bermuda Civil Aviation Authority is invalidated upon termination of the leasing of a subject aircraft); Pl. Ex. 36).)  Defendants have acknowledged that, as a result of international sanctions, the operation of these aircraft – domestically or internationally – has become "impossible."  (Pl. Ex. 46 at ABC000524.)  AirBridge has been forced to suspend its commercial operations for over a year.  (Dkt. 143-1, ¶ 30; Walton Test., ¶ 38; Pl. Ex. 39.)  It is clear that these restrictions and regulations "have prevented the use of [MSN 60117 and MSN 60119] in the "normal course of air transportation…" (Dkt. No. 86 at 12.)  Alternately,

thereafter, an Event of Loss occurred on September 9, 2022 (six months and one day after the Russian Regulation became effective) under subsection (e) of the definition of Event of Loss.

## 2. **Section 12.01 of the Lease Agreements is enforceable.**

Section 12.01 of the Lease Agreements, which requires AirBridge to pay the Stipulated Loss Values for MSN 60117 and MSN 60119, is an enforceable contractual provision.[2]  Article 2A of the Uniform Commercial Code "applies to any transaction ... that creates a lease." N.Y. U.C.C. § 2A-102.  Pursuant to Section 504 of Article 2A, damages "may be liquidated in the lease agreement but only at an amount or by formula that is reasonable in light of the then anticipated harm caused by the default." N.Y. U.C.C. § 2A-504(1).  "New York courts will generally sustain a liquidated damages clause so long as the provision is neither a penalty nor a forfeiture, and equity should intervene to invalidate a liquidated damages clause only in 'rare cases.'" *The Edward Andrews Grp., Inc. v. Addressing Servs. Co*., No. 04 Civ. 731, 2005 WL 3215190, at *6 (S.D.N.Y. Nov. 30, 2005); *Red Line Air LLC v. G. Howard Assocs., Inc*., No. CV 09-3928, 2010 WL 2346299, at *3 (E.D.N.Y. May 11, 2010), *report and recommendation adopted*, 2010 WL 2348643 (E.D.N.Y. June 8, 2010).  "Generally, as long as the provision reasonably estimates actual damages, courts will enforce the contract so not to interfere with the agreement of the parties."  *Red Line Air LLC v. G. Howard Assocs., Inc*., 2010 WL 2346299, at *3.  A provision will be considered an unenforceable penalty only if "the amount liquidated is plainly disproportionate to the probable loss." *PacifiCorp Cap., Inc. v. Tano, Inc.*, 877 F. Supp. 180, 184 (S.D.N.Y. 1995).

---

[2] "The party seeking to strike a damages provision bears the burden of showing the provision is in fact, a penalty." *See, Wells Fargo Tr. Co., N.A. v Synergy Group Corp.,* 465 F. Supp. 3d 355, 363-64 (S.D.N.Y. 2020), *affd sub nom. Wells Fargo Tr. Co., N.A. v Synergy Group Corp.,* 848 Fed. Appx. 467 (2d. Cir. 2021).  Defendants do not challenge the enforceability of Section 12.01. (Dkt. 143 at Section IV(B).)

The Stipulated Loss Values for MSN 60117 ($148,723,980) and MSN 60119 ($152,882,381) constitute reasonable estimates of BOCA's actual damages. The lessor is also entitled to the fair market value of the aircraft upon expiration of the lease. The average of three full-life, current market value appraisals from internationally recognized appraisal firms values MSN 60117 and MSN 60119 at $146,300,000 and $150,800,000, respectively, as December 31, 2022. (Walton Test., ¶ 69.) These appraisals are dated nearly seven months after MSN 60117 and MSN 60119 suffered Events of Loss. The Stipulated Loss Values set forth in the 60117 and 60118 Lease Agreements are proportionate to BOCA's probable loss, and therefore, are enforceable. *See Red Line Air LLC,* 2010 WL 2346299, at *3 (awarding lessor the stipulated loss value of the aircraft, costs incurred by reason of the default, and attorney' fees); *Gen. Elec. Capital Corp., LLC v G. Howard Assoc., Inc.,* No. 09-3923 (RRM ) (JMA), 2010 WL 2346296, at *4-5 (E.D.N.Y. May 18, 2010), *report and recommendation adopted*, 2010 WL 2348640 (E.D.N.Y. June 9, 2010) (same).

### 3. BOCA is entitled to damages in the amount of (i) the Stipulated Loss Value for MSN 60117 and MSN 60119, (ii) amounts corresponding to rental payments and (iii) accrued interest.

On the 75th day following the occurrence of an Event of Loss, AirBridge was required to pay to BOCA (i) the Stipulated Loss Values of MSN 60117 and MSN 60119 as of May 8, 2022 set forth in the Lease Agreements, (ii) then due and unpaid Rent, and (iii) amounts corresponding to interest at the Incentive Rate on (i) and (ii) from the due date until paid in full. AirBridge was also required to pay Basic Rent and Maintenance Rent for MSN 60117 and MSN 60119 until BOCA receives the sum of the (i)-(iii). (Pl. Ex. 1, 3, 5, § 12.01.)

AirBridge has not paid the Stipulated Loss Values for MSN 60117 and MSN 60119. It has not paid rent on MSN 60117 or MSN 60119 since February, 2022, and has not paid interest

on any of these amounts. (Walton Test., ¶¶ 72-73; Pl. Ex. 66.)  Accordingly, BOCA is entitled to

a judgment against AirBridge for (i) the Stipulated Loss Values of MSN 60117 and MSN 60119,

(ii) rental payments on MSN 60117 from March 13, 2022 until judgment is entered, (iii) rental

payments on MSN 60119 from April 1, 2022 until judgment is entered, and (iv) interest at the

incentive Rate on (i)-(iii).

### (c) AirBridge is required to pay rent, costs, and the rent reduction with new lessee for MSN 60118.

Under the 60118 Lease Agreement, AirBridge was required to return MSN 60118 in the

condition set forth in the Lease Agreements. (Pl. Ex. 3 at §§ 7.05 & 17.)  AirBridge is also

required to reimburse BOCA for all costs, expenses and reasonable attorneys' fees incurred by

BOCA in connection with any Event of Default or the exercise of BOCA's remedies with respect

thereto, including all costs and expenses incurred in connection with the repossession or return of

the aircraft. (Pl. Ex. 3, § 24.08.)  Under Section 19.05 of the 60118 Lease Agreement, AirBridge

is required to pay Basic Rent and Maintenance Rent for MSN 60118 through the date that BOCA

was able to lease the aircraft to a new lessee.  AirBridge is also required to pay all reasonable

costs and expenses incurred in recovering possession, deregistration, exportation of the Airframe

or any Engine and/or all reasonable costs and expenses in placing such Airframe or Engine in the

configuration, condition and repair required by and all lost Rent payments during such recovery

and reconditioning, and all losses suffered by BOCA because of its inability to place the Aircraft

on lease with another lessee on terms as favorable to it as this Lease.  (Pl. Ex. 3, § 19.05.)  The

60118 Lease Agreement confirms, "for the avoidance of doubt," that AirBridge is required to

pay "all losses, expenses or costs incurred, directly or indirectly, by [BOCA] in connection with

such Default [by AirBridge]." (Pl. Ex. 3, § 19.05(d).)

26

AirBridge breached its obligations under the 60118 Lease Agreements by failing to pay rent, failing to reimburse BOCA for costs incurred in connection with MSN 60118, and failing to compensate BOCA for a reduction in rent charged to the new lessee.  Accordingly, pursuant to Section 19.05 of the 60118 Lease Agreement, BOCA is entitled to all unpaid rent after March 16, 2022. (Walton Test., ¶ 73; Pl. Ex. 63.)  BOCA is also entitled to the costs to repossess MSN 60118 and costs to prepare it to be leased to a new lessee and other costs incurred in connection with the delivery of MSN 60118 to the new lessee. (*Id*., ¶¶ 65-68.)  BOCA is further entitled to be made whole for the rent reduction necessitated by the Defendants' failure to provide Replacement Engines.  (*Id*., 56.)  *See Wells Fargo Tr. Co., N.A.,* 465 F. Supp. 3d. at 363-64 (lessor of aircraft engine was entitled to all repair and maintenance and repossession costs and fees).

### (d) **BOCA is entitled to the value of the BOCA Engines.**[3]

Section 12.02 of the 60118 Lease Agreement governs the parties' rights and obligations upon the occurrence of an event of loss with respect to an Engine. (Pl. Ex. 63.)  Under Section 12.02, upon the occurrence of an event of loss, AirBridge "shall replace such Engine as soon as practicable after the occurrence of such Event of Loss by duly conveying to Lessor as a replacement for said Engine, title to another engine made by the Engine Manufacturer and of the same or an improved model and suitable for installation and use on the Airframe, which engine shall be free and clear of all Liens, and shall have a value and utility at least equal to, and be in as good an operating condition as, the Engine with respect to which such Event of Loss occurred…" (Dkt. No. 86 at 7.)  As mentioned, this Court has already held that an Event of Loss occurred with respect to the BOCA Engines, and ordered Defendants to provide replacements, as

---

[3] BOCA is including this portion of the proposed conclusions of law in case the Court awards monetary relief instead of an order of possession under the CTC or specific performance.

required under the 60118 Lease Agreement. (*Id*. at 12.)  AirBridge has failed to provide

replacement engines, in breach of its contractual obligations. (Walton Test., ¶¶ 58-59.)

Accordingly, BOCA is entitled to a judgment for the value of the BOCA Engines in Defendants'

possession.

### (e)  Defendants are required to pay BOCA's reasonable attorneys' fees.

"Under New York law, a provision in a contract for the reimbursement of attorneys' fees

is enforceable." *Gen. Elec. Capital Corp., LLC v G. Howard Assoc., Inc.,* 2010 WL 2346296 at

*5; *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20–21 (2d Cir. 1996).

The Lease Agreements entitle BOCA to costs, expenses and reasonable attorneys' fees incurred

in connection with any Event of Default or the exercise of BOCA's remedies with respect

thereto. (Pl. Ex. 3, § 24.08.)  Accordingly, BOCA is entitled to recover its reasonable attorneys'

fees expended on this action, the amount of which will be established pursuant to a post-

judgment motion under Federal Rule of Civil Procedure 54(d)(2). *See*, *Wells Fargo Tr. Co., N.A.*

*v Synergy Group Corp.,* 465 F. Supp. 3d at 370 (lessor of aircraft engine was entitled to

attorneys' fees and expenses and 10% prejudgment interest for all unpaid amounts payable under

guaranty).

### III.      BOCA is entitled to judgment on its second cause of action
###           for breach of contract against Volga-Dnepr.

The second cause of action is against Volga-Dnepr for breach of the three guaranties that

it executed and delivered to BOCA with respect to the aircraft lease agreements that are subject

to the first cause of action.  Pursuant to the Guaranties, Volga-Dnepr is responsible for

AirBridge's payment and performance under each Lease Agreement.  The damages sought on

this cause of action are the same as the damages on the first cause of action.

The Guaranties each contain a provision selecting New York law to govern (Pl. Exs. 2, 4, 6, § 7(a)), and therefore, New York law applies for the reasons discussed above. *See* Section I(a), *infra*; *Wells Fargo Tr. Co., N.A.,* 465 F. Supp. 3d. at 361 ("New York law expressly governs the agreements and, accordingly, this breach of guaranties dispute.").

"A guaranty is a promise to fulfill the obligations of another party, and is subject to the ordinary principles of contract construction." *Of a Feather, LLC v. Allegro Credit Services*, LLC, No. 19 Civ. 9351 (DLC), 2021 WL 1040482, at *9 (S.D.N.Y. Mar. 18, 2021), *aff'd,* 2023 WL 2415607 (2d Cir. Mar. 9, 2023). "Guaranties that contain language obligating the guarantor to payment without recourse to any defenses or counterclaims, i.e., guaranties that are 'absolute and unconditional,' have been consistently upheld by New York courts.'" *Id.* at *9. "Absolute and unconditional guaranties have in fact been found to preclude guarantors from asserting a broad range of defenses." *Id*. at *9 (holding guarantors liable for obligations incurred in connection with underlying agreement).

Pursuant to the Guaranties, Volga-Dnepr unconditionally and irrevocably guaranteed to BOCA, *inter alia*, "(i) the due and punctual performance and observance by [AirBridge] of each covenant, agreement, undertaking, representation, warranty and any other obligation or condition binding upon or to be performed or observed by it under and in accordance with the terms of the Lease and the other Operative Documents, (ii) the due and punctual payment of each amount that Lessee is or may become obligated to pay under and in accordance with the terms of the Operative Documents, and (iii) in the event of any non-payment or nonperformance, agrees to pay or perform or cause such payment or performance to be made upon notice from the [BOCA] of such non-payment or non-performance." (Pl. Exs. 2, 4, 6, § 2(a).) Volga-Dnepr also waived any defense with respect to the validity or enforceability of the Lease Agreements, any defense,

set-off or counterclaim that may be available to Volga-Dnepr under the Lease Agreements, and any other circumstances whatsoever that might be construed to discharge Volga-Dnepr of its obligations under the 60118 Guaranty. (Pl. Exs. 2, 4, 6, § 2(d).)

Volga-Dnepr is on notice of AirBridge's default in payment and performance, and BOCA has demanded that Volga-Dnepr pay or cause such performance to be made.  (Pl. Exs. 52-54.) Volga-Dnepr has failed to pay any amounts owed by AirBridge under the Lease Agreements, and failed to cause AirBridge to fulfill its performance obligations to deliver the Aircraft Documentation and Replacement Engines for MSN 60118.  (Pl. Ex. 66; Walton Test. ¶¶ 71-76.)

Accordingly, BOCA is entitled to a judgment against Volga-Dnepr for the same damages sought against AirBidge. *See*, *Wells Fargo Tr. Co. N.A.*, 465 F. Supp. 3d at 366 (granting summary judgment against guarantor of aircraft engine lease for past due unpaid rent and use fees, future rent, repair costs, maintenance costs, costs incurred in repossessing the engine, attorneys' fees and prejudgment interest.); Dkt. No. 70 (November 21, 2022 Order requiring AirBridge and Volga-Dnepr to provide two Replacement Engines for MSN 60118);  *BOC Aviation Limited v. AirBridgeCargo Airlines, LLC*, No. 22 Civ. 2070 (LJL), 2022 WL 17581775 (S.D.N.Y. Dec. 12, 2022) (holding Defendants in contempt of court for failing to provide Replacement Engines and Aircraft Documentation as required under the Lease Agreements).

## IV.     BOCA is entitled to judgment on its third cause of action for an order of possession under the CTC (in the alternative).

In its third cause of action against AirBridge, BOCA seeks, pursuant to Article 14 of the CTC's Consolidated Text, an order of authorizing or directing that BOCA take possession or control of the BOCA Engines.  The provisions of a treaty ratified by the United States are considered the supreme law of the land, and takes precedence over any contrary laws, rules, or regulations of any State. The United States Constitution, Art. VI, cl. 2, (the "Supremacy Clause")

provides "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." "A 'convention' is a treaty for purposes of the Supremacy Clause of the Constitution.'" *Aspinall's Club Ltd. v. Aryeh*, 86 A.D.2d 428, 433 (2d. Dept. 1982); *see also Ackermann v. Levine*, 788 F.2d 830, 838 (2d Cir. 1986) ("As a ratified treaty, the [Hague] Convention is of course the 'supreme law of the land.'").

The CTC applies to any security agreement, conditional sale agreement or lease agreement with respect to an aircraft for which a Russian carrier is the debtor if that agreement was concluded on or after September 1, 2011. (See, CTC Art. 2 (*The International Interest*), 3 (*Sphere of Application*).) The CTC is in effect in each of the Russian Federation, Bermuda and the United States as they are each a Contracting State as that term is defined in the Lease Agreement. (Dkt. No. 6-4; CTC Art. 16 (*Additional Remedies under Applicable Law*).)

The CTC remedies applicable to this transaction are dependent on the remedies afforded by the applicable Contracting States to the CTC, in this case, the Contracting States of the Russian Federation, where AirBridge is situated, (CTC Article 3(1) (Sphere of Application)) and Bermuda, where the Airframe is registered. (CTC Article 3(3).) Thus, the CTC as adopted by Bermuda and the Russian Federation apply when considering the rights and remedies afforded BOCA as a "creditor" under the CTC.

This Court has the authority to issue an order pursuant to the CTC.  (See, Dkt. No. 26; CTC Article 42 ("the courts of a Contracting State chosen by the parties to a transaction have jurisdiction in respect of any claim brought under this Convention, whether or not the chosen forum has a connection with the parties or the transaction").)  Under the CTC, in the event of a

default under an aircraft lease agreement, BOCA may apply to the court for an order of possession or control of any aircraft object to which the lease relates.  (See, CTC Article 14.)  In addition, under the CTC, BOCA is entitled to procure the export and physical transfer of the aircraft object from the territory in which it is situated.  (CTC Article 15(1).)

Several events of default have occurred under the Lease Agreements with respect to the Aircraft, including MSN 60118.  (See, Section II, *infra*.)  Accordingly, BOCA is entitled to an order of possession under the CTC for the BOCA Engines.

V.     **BOCA is entitled to judgment on its fifth cause of action
       for specific performance (in the alternative).**

BOCA's fifth cause of action is against Defendants and seeks, in the alternative, specific performance of their obligation to deliver and convey title to BOCA to Replacement Engines of the same or improved model, suitable for installation and use on MSN 60118 and delivered outside Russia, which shall be free and clear of all liens with a value and utility at least equal to and be in as good an operating condition as the BOCA Engines are required to be under the 60118 Lease.

In granting specific performance, a court has a duty to place the parties, insofar as possible, in the same position they would have been in had the contract been performed according to its terms.  Specific performance is a proper remedy for a breach of contract if money damages would be inadequate to uphold the expectations of the injured party. *See*, *Shih v Petal Card, Inc*., No. 18 Civ. 5495 (JFK), 2020 WL 5659429, at *20 (S.D.N.Y. Sept. 23, 2020) *quoting Sokoloff v. Harriman Estates Dev Corp.,* 96 N.Y.2d 409, 416, 754 N.E.2d 184, 188, 729 N.Y.S.2d 425, 429 (2001) *citing* Restatement (Second) of Contracts § 359 (1981).  Specific performance is an equitable remedy granted at the discretion of the Court. *See, Lucente v. International Business Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002). A court may grant

specific performance to remedy a party's failure to comply with its performance obligations, where money damages would not suffice, such as when "the subject matter of the particular contract is unique and has no established market value," or where a determination of money damages is "entirely speculative and largely incalculable." *Rosen v. Mega Blocks Inc*. No. 08 Civ. 3474 (LTS) (GWG), 2008 WL 2810208 (S.D.N.Y. Jul. 21, 2008) (granting order of specific performance directing defendant to comply with its contractual obligation to deliver earnout statement); *Sokoloff v. Harriman Estates Dev. Corp.*, 96 N.Y.2d at 415. "Specific performance is an appropriate remedy for a breach of contract concerning goods that are unique in kind, quality or personal association where suitable substitutes are unobtainable or unreasonably difficult or inconvenient to procure.'" *Sokoloff*, 96 N.Y.2d at 416.

Defendants have claimed that Rainbow Engine 1 and the SBL Engine, which are the same make and model as the BOCA Engines, are "unique and cannot be easily replaced, or adequately valued, due to a severe lack of comparable engines in the marketplace." (Dkt. No. 51, ¶ 31; see also, Dkt. No. 81, ¶ 6, claiming Replacement Engines "are not readily available on the open market").) This Court has already directed Defendants to provide Replacement Engines. It has held Defendants in contempt of court twice now for failing to comply with their obligation to do so. In granting BOCA's preliminary injunction, the Court held that Defendants' obligation to provide Replacement Engines may be satisfied by delivery of title to Rainbow Engine 2 and Rainbow Engine 3 free and clear of all liens except for outstanding balances due the GE MRO facility in Caledonia, Scotland on Rainbow Engine 2 and any outstanding balance due the GE MRO facility currently in possession of Rainbow Engine 3. (Dkt. No. 70 at 2.) BOCA is unable to obtain replacement engines under current market conditions on economically viable terms. (Walton Test., ¶ 51.)

Accordingly, BOCA is entitled to specific performance of Defendants' obligation to deliver and convey to BOCA title to Replacement Engines of the same or improved model, suitable for installation and use on MSN 60118 and delivered outside Russia, which shall be free and clear of all liens with a value and utility at least equal to and be in as good an operating condition as the BOCA Engines are required to be under the 60118 Lease, which obligation may be satisfied by delivery of title to Rainbow Engine 2 and Rainbow Engine 3 free and clear of all liens except for outstanding balances due the GE MRO facility in Caledonia, Scotland on Rainbow Engine 2 and any outstanding balance due the GE MRO facility currently in possession of Rainbow Engine 3.

## VI.     **Defendants will be unable to establish their defenses at trial.**

Defendants assert two defenses: impossibility of performance and failure to mitigate damages.[4]  Defendants did not establish these defenses at trial.

### (a) **Defendants' defense of impossibility of performance fails.**

Defendants allege "the Complaint fails because Defendants' breach, if any, is excused on the basis of impossibility of performance."  (Dkt. No. 51, ¶ 113; Dkt. No. 143 at § IV(B).)  Defendants bear the burden of establishing this defense as a matter of law.  *See Dresser-Rand Co. v. Petroleos de Venezuela, S.A.*, 574 F. Supp. 3d 217, 223 (S.D.N.Y. 2021).

Under New York law, impossibility is "a defense to a breach of contract action only when ... performance [is rendered] objectively impossible ... by an unanticipated event that could not have been foreseen or guarded against in the contract.'" *Axginc Corp. v. Plaza Automall, Ltd.*, 759 F. App'x 26, 29 (2d Cir. 2018) (*quoting Kel Kim Corp. v. Cent. Markets, Inc.*, 70 N.Y.2d 900, 902, 524 N.Y.S.2d 384, 519 N.E.2d 295 (1987)).  "The New York Court of Appeals

---

[4] Defendants have abandoned their defenses of force majeure and frustration of purpose. (Dkt. No. 143 at § IV(b).)

explained that a defense to contract performance such as impossibility should be applied narrowly and only in extreme circumstances 'due in part to judicial recognition that the purpose of contract law is to allocate risks.'" *Gap Inc. v. Ponte Gadea New York LLC*, 524 F. Supp. 3d 224, 237 (S.D.N.Y. 2021), *citing Sher v. Allstate Ins. Co.*, 947 F. Supp. 2d 370, 383 (S.D.N.Y. 2013) (*quoting* Kel Kim, 70 N.Y.2d at 902)).  Thus, "a party seeking to rescind a contract [on impossibility grounds] must show that the intervening act was unforeseeable, even if the intervening act consisted of the actions of a governmental entity or the passage of new legislation." *RW Holdings, LLC v. Mayer*, 131 A.D.3d 1228, 1230, 17 N.Y.S.3d 171 (2015); *Millgard Corp. v. E.E. Cruz/Nab/Fronier-Kemper*, No. 99 Civ. 2952 (LBS), 2004 WL 1900359, at *4 (S.D.N.Y. Aug. 24, 2004) ("foreseeability negates a defendant's use of impossibility as an affirmative defense").

Defendants have not identified the conditions that they claim rendered performance impossible.  To the extent they assert that the EU Sanctions made it "impossible" to comply with the insurance provisions under the Lease Agreements, their defense would fail because the text of the Lease Agreements demonstrates that such conditions were foreseeable.  Section 18(n) of the Lease Agreements provides for the occurrence of an event of default upon the passage of a law that would materially adversely affect Defendant's ability to comply with the lease terms. (Pl. Exs. 1, 3, 5.) [5]  The Lease Agreements have also allocated the risks resulting from government regulation prohibiting, for various reasons, the return of the BOCA Aircraft or use of the BOCA Aircraft in the normal course of air transportation.  (Pl. Ex. 1 at BOCA_00004243-4234; Pl. Ex. 3 at BOCA_00004452-4453; Pl. Ex. 5 at BOCA_00040877) (providing for the

---

[5] Defendants have not taken the positon that international sanctions prohibit payment to a company based in Singapore.

occurrence of an Event of Loss upon (i) the seizure, condemnation or requisition of use of the

Aircraft by a Government Body for over sixty days, or (ii) a rule, regulation, order or other

action by any Government body of Aviation Authority prohibiting the use of the Aircraft in the

normal course of air transportation for more than six months).) Further, to the extent Defendants

assert that the Russian Regulation has prohibited the return MSN 60117, MSN 60119 and the

BOCA Engines, they essentially acknowledge the occurrence of an Event of Loss under the

Lease Agreements. (*Id.*)

Any argument that AirBridge is not required to pay rent and other amounts under the

Lease Agreements because its entire fleet has been grounded due to forces outside its control is

not well founded.  But "the fact that its continued performance may be burdensome, even to the

extent of insolvency or bankruptcy, does not render [AirBridge's] performance objectively

impossible under New York law." *Gap Inc. v. Ponte Gadea New York LLC*, 524 F. Supp. 3d at

237.

Additionally, the Lease Agreements provide that AirBridge's obligation to pay all Rent[6]

"shall be absolute and unconditional and shall not be affected by any circumstances…happening

or event whatsoever," (Pl. Exs. 1, 3, 5 at § 5.03)  and make clear that "risk of loss for the Aircraft

shall be for the account of Lessee."  (*Id.* at §17.07.)  Such provisions are considered a "hell or

high water clause" that subject AirBridge to incontrovertible payment obligations. *See, e.g.*,

*Wells Fargo Bank Minnesota v. BrooksAmerica Mortgage Corp.*, 419 F.3d 107, 110 (S.D.N.Y.

2004) (granting lessor summary judgment where leases contained absolute and unconditional

---

[6] Rent is defined as Basic Rent and Supplement Rent.  Supplemental Rent includes "all amounts, liabilities and obligations (other than Basic Rent) which Lessee assumes or agrees to pay under this Lease [Agreement] …." (cites) Thus, Rent includes the Stipulated Loss Value, default interest in any other amounts due under the Lease Agreements. (Pl. Ex. 1 at BOCA 00004249-4250; Pl. Ex. 3 at BOCA 00004458-4459; Pl. Ex. 5 at BOCA 00040833-40834.)

obligations to pay, stating that "courts and commentators have observed that the viability of the market for commercial leases depends on the ironclad enforceability of hell or high water clauses"), *aff'd,* 419 F.3d 107, 110 (2d Cir. 2005).  Where, as here, an aircraft lease agreement contains a hell or high water clause, repossession of the subject aircraft does not excuse the lessee's obligation to continue to pay rent.  *See Peyton Holdings, LLC v. Clover Aviation Co.*, No. 18 Civ. 3165 (PAC), 2020 WL 4273981 at *3-4 (S.D.N.Y. July 24, 2020) (enforcing hell or high water clause in lease agreement that required lessee to pay rent that accrued after repossession of the aircraft and after termination of the lease).

### (b) **BOCA mitigated its damages with respect to MSN 60118.**

Under New York law, an injured party cannot recover damages for a loss that it could have avoided by reasonable efforts. *Wilmot v. State,* 344 N.Y.S.2d 350, 352–53, 297 N.E.2d 90, 32 N.Y.2d 164 (1973).  The non-injured party bears "the burden of introducing evidence to prove that plaintiff [ ] could have lessened [its] damages. *Wechsler v. Hunt Health Sys., Ltd.,* 330 F. Supp. 2d 383, 427 (S.D.N.Y. 2004).  "Specifically, defendant must show not that plaintiff failed to accept a reasonable offer that would mitigate its losses, but that plaintiff *unreasonably* failed to mitigate" its damages.  *Id.* (emphasis in original), *quoting Coastal Power Int'l v. Transcontinental Capital Corp.,* 10 F. Supp. 2d 345, 370 (S.D.N.Y.1998).  In other words, "if the plaintiff takes such action within the range of reason, the defendant is liable for further damages resulting therefrom." *Id*.

Defendants' refusal to provide Replacement Engines for MSN 60118 hampered BOCA's ability to find a new lessee.  Ultimately, BOCA was able to find one lessee that was willing to lease MSN 60118 and take on the risk associated with not having a full complement of engines.  On or about August 11, 2022, BOCA and Hongyuan executed a letter of intent with respect to leasing MSN 60118.  (Pl. Ex. 49.)  The letter of intent was executed less than five months after

BOCA ferried MSN 60118 from Hong Kong to Arizona and only four months after BOCA

obtained BIS approval.  (Walton Test., ¶ 54; Dkt. 143-1 ¶ 45; Pl. Ex. 44.)  Defendants offered no

evidence that this was an unreasonably long period of time to market a Boeing 747-8F aircraft.

MSN 60118 was accepted by Hongyuan on December 30, 2022.  (Pl. Ex. 63.)  Defendants

offered no evidence that this was an unreasonably long period of time from execution of a letter

of intent to delivery of the aircraft.  BOCA does not seek rent for the period after December 30,

2022, with one exception.  The deal with Hongyuan also includes a reduction in the monthly rent

by $100,000 for each engine that BOCA was unable to deliver with the MSN 60118 Airframe.

That reduction in monthly rent was locked in for 36 months once Hongyuan became obligated on

leases of other suitable engines.  (Walton Test., ¶ 56.)  Under the circumstances, Defendants

have not demonstrated that BOCA failed to mitigate damages.  *See Weschler v. Hunt Health

Systems, Ltd*., 330 F. Supp. 2d at 427 (rejecting defense of failure to mitigate where the evidence

showed "earnest attempts" by plaintiff, and defendants offered no evidence to show that plaintiff

should have reasonably taken additional mitigation measures).

    **(c)  Volga-Dnepr waived its defenses.**

Under the Guaranties, Volga-Dnepr waived any defense with respect to the validity or

enforceability of the Lease Agreements, any defense, set-off or counterclaim that may be

available to Volga-Dnepr under the Lease Agreements, and any other circumstances whatsoever

that might be construed to discharge Volga-Dnepr of its obligations under the 60118 Guaranty.

(Pl. Exs. 2, 4, 6, § 2(a).)  Under New York law, which the relevant agreements invoke,

unconditional guarantees with clear and unambiguous terms "are enforceable and bar the

assertion of affirmative defenses." *Bank of New York v Tri Polyta Fin. B.V.*, No. 01 Civ. 9104

(LTS) (DFE), 2003 WL 1960587, at *4-5 (S.D.N.Y. Apr. 25, 2003) *quoting URSA Minor Ltd. v.*

*AON Financial Products,* No. 00 Civ. 2474 (AGS), 2000 WL 1010278 at *8 (S.D.N.Y. July 21, 2000).

The Guaranties are "unambiguous and convey that the contract is unconditional" and accordingly, Volga-Dnepr "has waived any and all affirmative defenses." *Bank of New York v Tri Polyta Fin. B.V.*, 2003 WL 1960587, at *4-5, *citing Crossland Federal Savings Bank v. A. Suna & Co., Inc.,* 935 F. Supp. 184, 192-193 (E.D.N.Y.1996).

## CONCLUSION

For all the foregoing reasons and those set forth in the direct testimony of David Walton, BOCA is entitled to judgment on each its first and second causes of action or, alternatively, on its third and firth causes of action.

Dated: New York, New York
      March 27, 2023

                                SMITH, GAMBRELL & RUSSELL, LLP

                                By:   /s/ *John G. McCarthy*       
                                      John G. McCarthy
                                      Edward J. Heppt

                                *Attorneys for Plaintiff*
                                1301 Avenue of the Americas, 21st Floor
                                New York, New York 10019
                                Tel: (212) 907-9700
                                jmcarthy@sgrlaw.com
                                eheppt@sgrlaw.com